## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

v.

FREDERICK L. SHARP, ZHIYING
YVONNE GASARCH, COURTNEY
KELLN, MIKE K. VELDHUIS,
PAUL SEXTON, JACKSON T.
FRIESEN, WILLIAM T. KAITZ,
AVTAR S. DHILLON, and
GRAHAM R. TAYLOR,

        Defendants.

Case No. 21-cv-11276-WGY

ORAL ARGUMENT REQUESTED

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT COURTNEY KELLN'S MOTION TO DISMISS THE SEC'S COMPLAINT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND .............................................................................................. 2

    I.      The Alleged "Sharp Group" ...................................................................... 2

    II.     The Allegations Specific to Kelln ............................................................ 3

         A.      Stevia First/Vitality ...................................................................... 4

         B.      Arch ............................................................................................... 6

         C.      Garmatex ....................................................................................... 7

ARGUMENT ....................................................................................................................... 7

    I.      The Complaint Fails to State A Claim Against Kelln ............................... 7

         A.      The SEC Fails To State Securities Fraud Claims Against Kelln For Violations Of Section 17(a) Or 10(b) (Counts 1 & 2). ..................................................... 8

         B.      The SEC Fails To State Claims Against Kelln For Unregistered Offerings Of Securities (Count 3). ....................................................................... 13

         C.      The SEC Fails to Allege that Kelln Aided and Abetted Others in Violating Securities Laws (Counts 8 & 9). ..................................................... 14

    II.     The Court Lacks Personal Jurisdiction Over Kelln. ............................... 16

    III.    The SEC's Prayers For Relief Should Be Dismissed Or Stricken. ........... 18

         A.      The SEC Has Not Alleged a Basis for Disgorgement from Kelln ....................... 18

          B.      The SEC Has Not Alleged a Basis for a Permanent Injunction Against Kelln. ... 19

         C.      Civil Monetary Penalties and Disgorgement Are Time-Barred In Part. ............... 20

CONCLUSION .................................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aaron v. SEC*,
    446 U.S. 680 (1980)................................................................................................11

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
    512 F.3d 46 (1st Cir.2008)......................................................................................10

*In re Amaranth Nat. Gas Commodities Litig.*,
    730 F.3d 170 (2d Cir. 2013)....................................................................................15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................................7

*ATX Innovation, Inc. v. Velocity Mobile Ltd.*,
    2016 WL 918052 (W.D. Tex. Mar. 8, 2016) .........................................................16

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................................................7

*Centro Medico del Turabo, Inc. v. Feliciano de Melecio*,
    406 F.3d 1 (1st Cir. 2005)........................................................................................8

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976)................................................................................................10

*Gabelli v. SEC*,
    568 U.S. 442 (2013)................................................................................................20

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945)................................................................................................17

*Kokesh v. SEC*,
    137 S. CT. 1635 (2017)...........................................................................................20

*LG Corp. v. Huang Xiaowen*,
    2017 WL 2504949 (S.D. Cal. June 8, 2017) .........................................................16

*Liu v. SEC*,
    140 S. Ct. 1936 (2020)............................................................................................18

*Lorenzo v. SEC*,
    139 S. Ct. 1094 (2019)......................................................................................10, 15

*Maldonado v. Dominguez*,
　137 F.3d 1 (1st Cir. 1998) ........................................................................................10

*Manchester Knitted Fashions, Inc. v. Amalgamated Cotton Garment & Allied*
　*Indus. Fund*,
　967 F.2d 688 (1st Cir. 1992) ....................................................................................16

*In re Montreal, Me. & Atl. Ry., Ltd.*,
　888 F.3d 1 (1st Cir. 2018) ......................................................................................7, 8

*Ora Catering, Inc. v. Northland Ins. Co.*,
　57 F.Supp.3d 102 (D. Mass 2014) ...........................................................................18

*Rick v. Profit Mgmt. Assocs., Inc.*,
　241 F.Supp.3d 215 (D. Mass. 2017) ..........................................................................9

*Rush v. Savchuk*,
　444 U.S. 320 (1980) .................................................................................................18

*SEC v. Berry*,
　2008 WL 4065865 (N.D. Cal. Aug. 27, 2008) .........................................................19

*SEC v. City of Victorville*,
　2013 WL 12133651 (C.D. Cal. Nov. 14, 2013) ........................................................19

*SEC v. Collins & Aikman Corp.*,
　524 F.Supp.2d 477 (S.D.N.Y. 2007) .........................................................................10

*SEC v. Complete Bus. Sols. Grp.*,
　2021 WL 1907020 (S.D. Fla. May 11, 2021) ...........................................................20

*SEC v. Druffner*,
　353 F.Supp.2d 141 (D. Mass. 2005) ...............................................................9, 10, 12

*SEC v. Duncan*,
　2021 WL 4197386 (D. Mass. Sept. 15, 2021) ..........................................................12

*SEC v. Durgarian*,
　477 F.Supp.2d 342 (D. Mass. 2007) .......................................................................8, 9

*SEC v. Elliott*,
　2020 WL 7185854 (D. Mass. Dec. 7, 2020) .........................................................16, 17

*SEC v. Esposito*,
　260 F.Supp.3d 79 (D. Mass. 2017) ...........................................................................19

*SEC v. Fife*,
　311 F.3d 1 (1st Cir. 2002) .......................................................................................10

*SEC v. Jones,*
    300 F.Supp.3d 312 (D. Mass. 2018) ................................................13, 14, 18, 19

*SEC v. Kabra,*
    2020 WL 1550555 (D. Mass. Apr. 1, 2020) ...........................................................8

*SEC v. Papa,*
    555 F.3d 31 (1st Cir. 2009)................................................................................8, 15

*SEC v. Rio Tinto PLC*, 2019 WL 1244933
    (S.D.N.Y. Mar. 18, 2019) .....................................................................................15

*SEC v. Sargent,*
    329 F.3d 34 (1st Cir. 2003).....................................................................................19

*Texasgulf, Inc. v. Canada Dev. Corp.,*
    366 F.Supp.374 (S.D. Tex. 1973) ..........................................................................11

*U.S. v. Swiss Am. Bank, Ltd.,*
    274 F.3d 610 (1st Cir. 2001)...................................................................................17

*Vermont Pure Holding, Ltd. v. Nestle Waters N. Am., Inc.,*
    2005 WL 8175834 (D. Mass. Sept. 20, 2005) .......................................................18

**Statutes**

15 U.S.C. § 77e(a)..........................................................................................................13

15 U.S.C. § 77e(c)..........................................................................................................13

15 U.S.C. § 77o(b) .........................................................................................................15

15 U.S.C. § 77q(a) .........................................................................................................11

15 U.S.C. § 77v(a) .........................................................................................................16

15 U.S.C. § 78aa ............................................................................................................16

15 U.S.C. § 78t(e) ..........................................................................................................15

15 U.S.C. §78u(d) ..........................................................................................................18

28 U.S.C. § 2462............................................................................................................20

Nat'l Def. Auth. Act,
    Pub. L. No. 116-283 (2021) ...................................................................................20

**Other Authorities**

Fed. R. Civ. P. 9(b) ....................................................................................................9

Fed. R. Civ. P. 12(b)(2)........................................................................................16, 18

Fed. R. Civ. P. 12(b)(6)..............................................................................................18

Fed. R. Civ. P. 12(f) ...................................................................................................18

Fed. R. Civ. P. 65(d) ..................................................................................................19

Russell Brandom, "Want to Protect Your Data at the Border?  Delete It," The
     Verge, Feb. 15, 2017, https://www.theverge.com/2017/2/15/14629022/border-
     search-customs-data-privacy-encryption ................................................................12

Arnold S. Jacobs, *The Williams Act – Tender Offers & Stock Accumulations* § 2:8
     (Dec. 2020) ..............................................................................................................11

## INTRODUCTION

In this sprawling Complaint, the Securities and Exchange Commission ("SEC") brings fifteen claims under various securities laws, arising out of an illegal "pump and dump" scheme. The SEC sues nine individuals who allegedly worked together to consolidate control over four securities and then to sell the securities at an inflated price for a handsome profit. But the 81-page Complaint barely has anything at all to do with Defendant Courtney Kelln ("Kelln"), a low-level administrative employee with no connection to fraudulent activity within the United States.[1]

The Complaint improperly sweeps Kelln into the "Sharp Group" with (1) the "mastermind," Kelln's boss, Fred Sharp, and (2) Sharp's accountant and nominee-holder, Yvonne Gasarch. The only specific allegations against Kelln in the 294-paragraph Complaint demonstrate that, in contrast to the intense involvement of her co-defendants, she merely performed simple administrative tasks—at the behest of Sharp—to transfer securities on very few occasions. Critically, Kelln never promoted or sold the securities herself. These allegations fail to plead that Kelln substantially participated in any fraud or sale of unregistered securities or acted with scienter.

Nor can the few specific allegations against Kelln establish personal jurisdiction. All of Kelln's alleged conduct occurred entirely outside the United States, with nothing to indicate it was purposefully directed toward the United States. She is not alleged to have ever visited the United States, held bank accounts in the United States, or made transfers between United States entities.

Even if the SEC could state a claim or establish personal jurisdiction as to Kelln, the SEC's requested remedies are legally deficient. A permanent injunction and disgorgement do not apply to Kelln because there is no future conduct to enjoin or profits to disgorge. And disgorgement and

---

[1] If this case proceeds to discovery, the evidence will show that Kelln began working for Mr. Sharp at approximately age twenty-four. She has no training or education in securities or law. She quit working for Mr. Sharp over three years ago in October 2018.

civil monetary penalties are largely time-barred by the applicable 5-year statute of limitations.

The Complaint against Kelln should be dismissed in its entirety with prejudice.

## <u>FACTUAL BACKGROUND</u>[2]

The Complaint alleges a sophisticated, 10-year long "pump and dump" scheme that generated over $1 billion in illicit gross proceeds involving countless offshore corporate nominee shareholders and more than nine individuals. The bulk of the Complaint details how three Defendants, Mike Veldhuis, Paul Sexton, and Jackson Friesen (referred to as the "Veldhuis Control Group") used the so-called "Sharp Group" and others to "pump and dump" three securities: Vitality Biopharma, Inc. ("Stevia First/Vitality"),[3] Arch Therapeutics, Inc. ("Arch"), and OncoSec Medical, Inc. ("OncoSec"). *See* Compl. ¶¶ 63-219. The Complaint also alleges that a nonparty, Luis Carrillo, executed a similar scheme for a fourth security, Garmatex Holdings, Ltd. ("Garmatex") (together with Stevia First/Vitality, Arch, and OncoSec, the "Example Securities"). *See id.* ¶¶ 223-30.

## I.    <u>The Alleged "Sharp Group"</u>

According to the SEC, the "Sharp Group" is made up of three individuals: the "mastermind and leader," Fred Sharp, and two of his employees, Yvonne Gasarch, the money-mover and owner of a nominee entity, and Kelln, Sharp's administrative assistant. *Id.* ¶¶ 5-6, 44. The SEC generally alleges that the "Sharp Group" "provided a variety of services to help corporate control persons conceal their identities when selling the stock of penny stock companies they controlled." *Id.* ¶ 5.

The "Sharp Group's" critical functions were performed by Sharp and Gasarch—not Kelln. As the "mastermind and leader," Sharp "cultivated relationships" with clients, created and

---

[2] Kelln accepts the SEC's factual allegations as true only for purposes of this Motion and only to the extent they are well-pleaded and not contradicted by materials subject to judicial notice.

[3] Vitality Biopharma, Inc. was formerly known as Stevia First Corp. Compl. ¶ 31.

deployed front companies for use as nominee shareholders, and installed "nominal owners to pose as the beneficial owners" of the nominee shareholders. *Id.* ¶¶ 44-47. He also "oversaw the creation of a network of encrypted communications," "hired and directed" accounting and administrative employees, and "arranged for the Encrypted Communication services and the Q accounting system to be hosted on a server that was physically located . . . [in] Curaçao." *Id.* ¶¶ 49-51. Gasarch handled the money. She "routinely arranged to transfer stock sale proceeds to accounts . . . to conceal the fact that undisclosed control persons were, in fact, the actual beneficial owners of the stock being sold, and the ultimate recipients of the sales proceeds." *Id.* ¶ 57. She also had skin in the game by "personally serving as the purported owner of a nominee shareholder" that was "routinely used to facilitate the illegal stock sales on behalf of control group clients." *Id.* ¶ 58.

## II.    THE ALLEGATIONS SPECIFIC TO KELLN

Very few allegations are specific to Kelln, a Canadian resident with no purported connection to the United States. Those that exist show that, between 2010 and 2017, Kelln worked in Canada as an administrative assistant to Sharp, an attorney almost thirty years her senior. *See id.* ¶¶ 22, 24, 52-53. She worked entirely "at the direction" of Mr. Sharp in performing basic "administrative tasks," which included arranging transfers on behalf of Sharp's clients, with whom Sharp was responsible for liaising. *See id.* ¶¶ 44, 52-53. Kelln is not alleged to have ever illegally promoted any of the Example Securities, to have sold any of the Example Securities, or to have been informed of the content of any promotional campaigns.

Glaringly, the Complaint does not allege that Kelln profited from the sale of the Example Securities. Unlike most of her co-defendants, who allegedly received significant profits from the illegal sales, the Complaint does not allege that Kelln received any such profits. In one illustrative example, five of Kelln's co-defendants were allocated $16.6 million from the Stevia First/Vitality

stock proceeds; Kelln was allocated none.  *Id.* ¶ 140.  And though the Complaint misleadingly alleges that from 2010 to 2019 Kelln was the "beneficiar[y] of more than $1 million . . . of the funds derived from the Sharp Group's conduct," that amount is simply the sum total of her annual salary as an administrative assistant of roughly $100,000 during that ten-year period, and in any event, the Complaint makes no attempt to connect those funds to the sale of any particular security. *Id.* ¶ 62.

Moreover, the Complaint references "Encrypted Communications" and records from Sharp's internal accounting system, known as "Q," that do not mention Kelln.[4]  The referenced communications that are attached to the Complaint are sent by an individual(s) using code names "CELT" or "The Cuntessa."  *Compare id.* ¶¶ 53, 124, 136, *with* Donelan Decl. Exs. D, H.  The SEC alleges that "'Celtic' was Kelln's pseudonym," but does not allege *any* connection between Kelln and "The Cuntessa."  Compl. ¶ 116; Donelan Decl. ¶ 13.  For the referenced communications not attached to the Complaint, the SEC does not specify the sender's username or how the SEC determined the messages were attributable to Kelln.  *See, e.g.*, Compl. ¶¶ 59, 116, 226.

## A.    <u>Stevia First/Vitality</u>

The Complaint describes four rounds of sales of Stevia First/Vitality in its first example of the alleged "pump and dump" scheme.  Of the 87 paragraphs devoted to Stevia First/Vitality, only eight contain allegations specific to Kelln—none of which demonstrate that Kelln's involvement was more than ministerial.  *See* Compl. ¶¶ 86, 116, 117, 124, 132, 134, 135, 136.

<u>Round 2.</u>  The Complaint does not allege that Kelln had any involvement with Stevia First/Vitality until the second round of stock sales that occurred between 2012 and 2014.  As part

---

[4] These documents were "hosted on a server. . . physically located on the island of Curaçao," *id.* ¶ 51, and "produced to the Commission during the course of its investigation by various third parties," Donelan Decl. ¶ 7(e).  Kelln expressly reserves her right to challenge the legality of the production of these documents to the Commission, as well as the admissibility and authenticity of these documents.

of the second round, the SEC alleges that over 1 million shares of Stevia First/Vitality were divided and transferred to two Sharp-created nominee shareholders, Nautilus Growth Fund and Gotama Capital, and then sold through offshore brokerage firms. *Id.* ¶¶ 84-85. A lone paragraph of the Complaint alleges that on October 9, 2013, Kelln—as part of her job *and at the direction of Sharp*—submitted paperwork and a check to a transfer agent in order to transfer roughly half of the shares of Stevia First to Nautilus Growth Fund. *Id.* ¶ 86. The paperwork "included an attorney opinion letter that falsely represented that Nautilus Growth Fund was not an affiliate of Stevia First." *Id.* The SEC does not allege that Kelln received any proceeds from the second round of sales. Nor does it allege anything to suggest that she directed the attorney's work.

**Round 3.** Next, the Plaintiff alleges that in 2015 and 2016, in a third round of stock sales, Defendant Avtar Dhillon transferred nearly 20 million shares of Stevia First/Vitality to fourteen nominee shareholders owned by Sharp and Defendant Graham Taylor in amounts all less than 5% of the total outstanding shares. *Id.* ¶¶ 107-08. Thereafter, the Veldhuis Control Group directed the unregistered sales of those shares in coordination with another stock promotional campaign run by Defendant William Kaitz. *Id.* ¶ 118.

Kelln's alleged involvement is scant. The SEC points to two Encrypted Communications that Kelln supposedly sent. In one message, on December 2, 2014, Kelln allegedly acknowledged to Veldhuis that the relevant nominee shareholders were "ours," (i.e., that they were Sharp-owned). *Id.* ¶ 116. This communication is not attached to the Complaint, and the SEC has not specified the username that sent the communication or how it can be attributed to Kelln. In the other, on March 31, 2015, Kelln allegedly delegated a request from Veldhuis to Gasarch. *Id.* ¶ 124. The SEC also alleges that Kelln "arranged" for shares of Stevia First to be deposited into accounts with Swiss-based trading platforms Wintercap SA and Blacklight SA. *Id.* ¶¶ 116-17. But, again, there are no

allegations that Kelln shared in any illicit proceeds from this round of sales, had any knowledge of the illegal nature of the sales, or acted outside her role as an administrative assistant.

**Round 4.**  The Complaint alleges a fourth round of sales that occurred between 2016 and 2018, after Stevia First changed its name to Vitality, in which the Veldhuis Control Group wired approximately $4.4 million to Vitality in exchange for millions of restricted shares issued to Sharp-owned nominee shareholders.  *Id.* ¶¶ 130-31.  Once the shares were unrestricted, the cycle repeated: Kaitz touted the stock and Wintercap SA sold the shares.  *See id.* ¶¶ 130-41.

Kelln was allegedly involved in only two minor ways.  First, Kelln allegedly retained an attorney for nominee shareholders to "prepare opinion letters that falsely represented that the nominee shareholders were not affiliates of Vitality."  *Id.* ¶ 132.  There are no allegations that she directed or oversaw this attorney's work.  Second, the SEC summarily claims that "Kelln wrote" a communication sent in February 2017 that reads: "allocate all Vbio shares to the sihi account today.  We need to make room for the pending 750k.  Again 5% rule is biting me in the ass."  Donelan Decl. Ex. H; Compl. ¶ 136.  This communication was actually sent by the username "The Cuntessa," which the SEC fails to connect to Kelln.  Donelan Decl. Ex. H; Donelan Decl. ¶ 13 (SEC's table of "code names" with no mention of Cuntessa).  There are no allegations that Kelln profited from the fourth round of sales or knew about Kaitz's promotional campaign.

## B.  **Arch**

Of the 46 paragraphs in the Complaint that the SEC devotes to the alleged promotion and sale of Arch stock, only one single paragraph contains allegations specific to Kelln.  In 2013, the Veldhuis Control Group allegedly directed the transfer of 19,230,000 Arch shares to fifteen Sharp-owned nominee shareholders for the benefit of the Veldhuis Control Group.  *Id.* ¶¶ 152, 154, 156, 158.  Kelln allegedly "arranged, on behalf of the Veldhuis Control Group, to transfer" shares of

Arch to one of the fifteen entities, "Victory Capital." Compl. ¶ 155.  There are no allegations that Kelln knew the sales were fraudulent or profited from the sales.  While the Veldhuis Control Group was allocated $4.7 million of Arch stock proceeds, Kelln was allocated none.  *Id.* ¶ 173.

### C.    Garmatex

Between February and April 2017, Sharp and Kelln—acting "at Sharp's direction"—allegedly deposited 1,750,000 shares of Garmatex with Wintercap SA in the name of three nominee shareholders on behalf of an individual, Luis Carrillo.  *Id.* ¶¶ 225-26.  The SEC claims that "on or about March 9, 2017, Kelln replied to . . . Wintercap SA's principal about . . . Garmatex stock: 'Changing the [transfer agent] first . . . [Carrillo is] up my butt to get grmx [the ticker of Garmatex] all in.'" *Id.* ¶ 226 (alterations in original).  The quoted communication is not attached to the Complaint, and the SEC does not otherwise indicate the username from which it was sent, provide the unaltered language, or detail how the message is attributed to Kelln.  Further, the Complaint conclusorily asserts that Kelln "coordinated" with Carrillo to transfer 12,233,337 shares of Garmatex to Wintercap SA, Blacklight SA, and a third party.  *Id.* ¶ 228.  The SEC does not allege that Kelln profited from the sale of Garmatex.

### ARGUMENT

### I.    THE COMPLAINT FAILS TO STATE A CLAIM AGAINST KELLN.

For a plaintiff's claim to survive a motion to dismiss, it must "possess enough heft" to set forth "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 559 (2007). The Court must look only to "well-pleaded factual allegations . . . [to] determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  It must "'strip away and discard the complaint's conclusory legal allegations.'" *In re Montreal, Me. & Atl. Ry., Ltd.*, 888 F.3d 1, 6 (1st Cir. 2018) (quoting *Shay v. Walters*, 702 F.3d 76, 82 (1st Cir.

7

2012)). "Dismissal is warranted when a complaint's factual averments are 'too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture.'" *Id.* (quoting *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (en banc)). Accordingly, "dismissal for failure to state a claim will be appropriate if the pleadings fail to set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005) (internal quotations omitted).

Although the SEC pleads a number of serious allegations against Defendants, few of the facts alleged address Kelln's supposed role in the supposed scheme. Indeed, the Complaint relies in large part on broad allegations against the "Sharp Group" without addressing how Kelln's conduct, specifically, violated federal securities laws. Those facts that do discuss Kelln portray a low-level administrative employee with only the most tenuous connection to the "Sharp Group's" alleged scheme. That is insufficient to support the SEC's claims.

A.    **The SEC Fails To State Securities Fraud Claims Against Kelln For Violations Of Section 17(a) Or 10(b) (Counts 1 & 2).**

Counts 1 and 2 of the Complaint assert scheme liability against Kelln. "To prevail on its claim for scheme liability under Sections 17(a)(1) and (a)(3) of the Securities Act and Rule 10b-5(a) and (c), the SEC must demonstrate that [Kelln] employed a device, scheme or artifice to defraud or engaged in any transaction practice or course of business which operates as a fraud or deceit upon the purchaser in the offer or sale of securities" and acted with "scienter." *SEC v. Kabra*, 2020 WL 1550555, at *3 (D. Mass. Apr. 1, 2020). In other words, "the complaint must allege . . . facts to demonstrate that the defendant under consideration 'substantially participated' in the alleged scheme and acted with scienter." *SEC v. Durgarian*, 477 F.Supp.2d 342, 352-53 (D. Mass. 2007), *aff'd sub nom. SEC v. Papa*, 555 F.3d 31 (1st Cir. 2009). The SEC fails to adequately

allege Kelln's substantial participation or scienter in this case.

**No Substantial Participation.**  In order to plead substantial participation, "the SEC must allege how each of the defendants' actions had a principal purpose and effect upon creating a false appearance in fact in furtherance of the scheme to defraud." *Id.* at 353.  Such allegations must establish each defendant's role with particularity. *See Rick v. Profit Mgmt. Assocs., Inc.*, 241 F.Supp.3d 215, 224 (D. Mass. 2017) ("[W]here there are multiple defendants, the specific role of each must be alleged."); *SEC v. Druffner*, 353 F.Supp.2d 141, 148 (D. Mass. 2005) ("Because the SEC's allegations rest on fraud, the complaint must satisfy the requirements of Rule 9(b)."). Dismissal is thus warranted where "the SEC has inappropriately lumped [defendants] together with" other defendants "named for their roles in devising, approving, or implementing the scheme." *Durgarian*, 477 F.Supp.2d at 354.

The SEC has failed to plead Kelln's substantial participation in the scheme with any particularity.  The Complaint paints with a broad brush, often mentioning Kelln only in passing, or lumping her in with other, much more senior and involved defendants.  She is not alleged to have promoted or sold any of the Example Securities.  There are no specific allegations that she cultivated or maintained client relations, created or owned fake nominee shareholder entities, devised or developed the encrypted communications network used to conceal the fraud, or oversaw or executed the day-to-day financial aspects of the fraud.  The Complaint's generalized allegations against her are not enough to overcome Rule 9(b), or a lesser pleading standard for that matter.

The few instances where the Complaint more specifically describes Kelln's conduct allege administrative tasks undertaken at Sharp's direction that cannot amount to substantial participation.  *See, e.g.*, Compl. ¶¶ 52–56 (splitting stock at Sharp's direction); *see infra* at Argument I.B.  "A person who participates in such a scheme by performing purely administrative

duties without knowledge of the purpose of the scheme has not employed a manipulative or deceptive device and so has not incurred liability under section 10(b)." *SEC v. Collins & Aikman Corp.*, 524 F.Supp.2d 477, 486 (S.D.N.Y. 2007). The U.S. Supreme Court recently reiterated this important limitation, explaining that low-level employees who are "tangentially involved" should not face scheme liability. *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019). The allegations about Kelln's administrative role thus are more akin to a "tangentially involved . . . mailroom clerk—for whom liability would typically be inappropriate" than the defendant in *Lorenzo* who "sent false statements directly to investors, invited them to follow up with questions, and did so in his capacity as vice president of an investment banking company." *Id.* The Complaint's failure to plead Kelln's substantial participation is fatal to the scheme liability claims against her.

**No Scienter.** The Complaint also fails to plead that Kelln had the requisite scienter for scheme liability. Scienter is an intention "to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, n.12 (1976). Proving scienter requires "a showing of either conscious intent to defraud or 'a high degree of recklessness.'" *ACA Fin. Guar. Corp. v. Advest, Inc.,* 512 F.3d 46, 58 (1st Cir.2008) (quoting *Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 82 (1st Cir. 2002)). "Recklessness is 'a highly unreasonable omission, involving not merely simple, or even inexcusable[ ] negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.'" *SEC v. Fife*, 311 F.3d 1, 9-10 (1st Cir. 2002) (quoting *Greebel v. FTP Software,* 194 F.3d 185, 198 (1st Cir. 1999)). Importantly, scienter cannot be based on mere "general inferences" from the facts alleged that an individual should have been aware that he participated in impermissible conduct. *Maldonado v. Dominguez*, 137 F.3d 1, 10 (1st Cir. 1998); *see Druffner*, 353 F.Supp.2d at 151 (complaint must "allege facts that give rise

to a 'reasonable and strong' inference of scienter"). Instead, plaintiffs must allege "specific allegations of fact which strongly imply a fraudulent intent." *Id*; *see also* SEC Opp'n to Friesen Mot. to Dismiss 15-16, ECF No. 124 (embracing "strong inference" standard). For violations of Section 17(a)(3), a plaintiff must show at least negligence—that a defendant acted unreasonably. *See Aaron v. SEC*, 446 U.S. 680, 702 (1980).

The SEC's allegations in this case fail to demonstrate that Kelln acted with fraudulent intent, or, for purposes of Section 17(a)(3), that she acted negligently. The Complaint seeks to infer scienter from allegations that Kelln retained "an attorney on behalf of each of the nominee shareholder entities to prepare opinion letters that falsely represented that the nominee shareholders were not affiliates of Vitality," Compl. ¶ 132, and shared "an attorney opinion letter that falsely represented that Nautilus Growth Fund was not an affiliate of Stevia First," *id.* ¶ 86. But the SEC never alleges any plausible factual basis to conclude that Kelln—an administrative assistant—was reckless for not having understood the significance of the term "affiliate." It certainly is not evidence that Kelln knowingly or recklessly committed fraud, or that Kelln negligently engaged in a "transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(3).

Elsewhere, the Complaint relies on mere insinuation. Most notably, the Complaint points to Kelln's supposed awareness of the "5% rule," Compl. ¶¶ 135-36. but the Complaint does nothing more than imply that Kelln must have known that the purpose of keeping ownership below 5% was to defraud investors. "[C]onscious avoidance of the 5% triggering requirement," which is a common practice among investors, is "not a violation of the law." *Texasgulf, Inc. v. Canada Dev. Corp.*, 366 F.Supp.374, 404 (S.D. Tex. 1973); *see* Arnold S. Jacobs, *The Williams Act – Tender Offers & Stock Accumulations* § 2:8 (Dec. 2020) ("[P]urposely staying at or just below 5%

11

is not a Section 13(d) or Section 13(g) infraction."). Similarly, the SEC infers nefarious intent from Kelln's deletion of unspecified data from her phone while going through U.K. customs. *See* Compl. ¶ 59. But such data deletion practices are endorsed by the mainstream media and are not indicative of fraudulent intent. *See, e.g.*, Russell Brandom, "Want to Protect Your Data at the Border? Delete It," The Verge, Feb. 15, 2017, https://www.theverge.com/2017/2/15/14629022/b order-search-customs-data-privacy-encryption. Mere insinuations such as these do not create "a 'reasonable and strong' inference of scienter." *Druffner*, 353 F.Supp.2d at 151.[5]

The SEC's inability to allege Kelln's scienter is not surprising. As the SEC itself acknowledges, Kelln made only roughly $100,000 per year while working for the "Sharp Group," *see* Compl. ¶ 62, and nowhere does the Complaint allege anything about Kelln receiving a portion of the alleged scheme's profits. That sets this case apart from those where a "[d]efendant expected to profit personally." *SEC v. Duncan*, 2021 WL 4197386, at *14 (D. Mass. Sept. 15, 2021). It is simply implausible that Kelln would intentionally—or even negligently—subject herself to such severe liability in exchange for so small a stake in the endeavor.

Tellingly, none of the evidence of scienter that the SEC relies on as to other defendants is pled as to Kelln. She did not sell stock. She did not fail to file necessary securities disclosures. And she was not allocated cash as payments for stock sales. *Compare* SEC Opp'n to Friesen Mot. to Dismiss 15-16 (highlighting basis for scienter as to defendant Friesen).

In sum, the facts alleged in the Complaint as to Kelln are more consistent with a low-level employee doing her job without any awareness of or participation in Sharp's putative scheme.

---

[5] The SEC suggests that Kelln deleted data in compliance with a security memorandum circulated by Gasarch, *see* Compl. ¶¶ 58-59, but the SEC never alleges that Kelln saw such a memorandum or was even aware of its existence. The SEC also misleadingly describes the quote as Kelln "reminding" Wintercap principals of these alleged "security protocols" to falsely amplify her responsibility. A plain reading of the quote shows nothing of the sort.

**B.     The SEC Fails To State Claims Against Kelln For Unregistered Offerings Of Securities (Count 3).**

Count 3, which asserts that Kelln impermissibly offered to sell unregistered securities in violation of Section 5(a) and (c) of the Securities Act, 15 U.S.C. §§ 77e(a), (c), is also fatally deficient.  "Because Section 5 imposes strict liability for violations of its registration requirement, . . . it is particularly important that the necessary participant and substantial factor test be carefully applied to each case so as not to subject defendants with a *de minimis* or insubstantial role in a securities scheme to strict liability."  *SEC v. Jones*, 300 F.Supp.3d 312, 317 (D. Mass. 2018) (quoting *SEC v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1257 (9th Cir. 2013)).  But *de minimis* participation by Kelln is precisely what the SEC pleads here.

The SEC's case, in many respects, resembles the SEC's failed attempt to bring Section 5 claims in *SEC v. Jones*, 300 F.Supp.3d 312 (D. Mass. 2018).  In that case, the SEC argued that the defendant performed various tasks in support of the unregistered sale of securities, including recruiting investors, "allaying and deflecting investor concerns," serving "as an early warning system" when investors became suspicious, and that, "but for her involvement," the scheme would not have succeeded.  *Id.* at 316.  The district court disagreed that such allegations could support a violation, noting that "these items do not take the Complaint over the *de minimis* threshold."  *Id.* at 317.  Moreover, according to the court, even the performance of "'mechanical acts *without which there could be no sale*,'" such as "'prepar[ing] key documents,'" does not necessarily result in liability under Section 5.  *Id.* (quoting *SEC v. Murphy*, 626 F.2d 633, 650 (9th Cir. 1980)) (emphasis added).  Instead, the conduct alleged must be *substantial*.

Here, the Complaint alleges nothing beyond *de minimis* involvement on the part of Kelln. Indeed, all of Kelln's actions, as described in the Complaint, are ministerial and under the direction of others.  For example, the Complaint notes that Kelln distributed blocks of shares "at the direction

13

of Sharp and others," Compl. ¶¶ 52-54, and that Kelln, again, "*at Sharp's direction*, deposited three blocks of Garmatex stock," *id.* ¶ 225 (emphasis added).  For reasons that are unclear, the Complaint makes much of the alleged fact that Kelln engaged in tasks typical of an administrative assistant, noting that "Kelln provided Stevia First's transfer agent with the required paperwork" and that "Kelln also provided a check to pay for the transfer." *Id.* ¶¶ 52, 86.  These actions are of the variety rejected as insufficient by the court in *Jones*.  They should likewise be rejected here.

Moreover, certain allegations directed against Kelln lack any plausible factual support.  For example, the SEC conclusorily alleges that Kelln instructed Wintercap SA in writing to "allocate all VBIO [ticker symbol of Vitality] to the [Hilton Capital] account today.  We need to make room for pending 750k.  Again 5% rule is biting me in the ass." *Id.* ¶ 136.  But Exhibit H, attached to the Complaint, indicates that this instruction came from an individual going by the name "The Cuntessa."  Donelan Decl. Ex. H (email dated Feb. 2, 2017, 6:56AM).  Nowhere does the Complaint, nor any of the accompanying declarations, allege that Kelln is the individual answering to that name.

Simply put, the SEC's allegations demonstrate that Kelln was, at most, a minor administrator.  Establishing strict liability for a Section 5 violation requires something more.

### C.    The SEC Fails to Allege that Kelln Aided and Abetted Others in Violating Securities Laws (Counts 8 & 9).

Counts 8 and 9 against Kelln are for aiding and abetting securities fraud and unregistered securities violations by Defendants Veldhuis, Sexton, Friesen, Carrillo, as well as other unnamed "Sharp Group clients."  As with the SEC's other claims, Counts 8 and 9 find no support in the Complaint's threadbare allegations against Kelln.

To allege that Kelln aided and abetted a violation of securities laws, the SEC must show that she provided "substantial assistance" to the principals who engaged in the alleged violations.

14

15 U.S.C. §§ 77o(b), 78t(e); *see SEC v. Rio Tinto PLC*, 2019 WL 1244933, at *16 (S.D.N.Y. Mar. 18, 2019) (Section 10(b)); *SEC v. Papa*, 555 F.3d 31, 35 (1st Cir. 2009) (Section 20(e)).  For the same reasons Kelln cannot be liable for Counts 1, 2, and 3, she cannot be held liable for aiding and abetting others under Counts 8 and 9:  Kelln's role—as pled by the SEC—was minimal, and certainly not "substantial."  As discussed, Kelln effectively served as Sharp's secretary, performing menial and administrative tasks like divvying up shares at the direction of others, *see* Compl. ¶¶ 52-54, 225, or processing paperwork, *see id.* ¶¶ 52, 86.  The Complaint acknowledges that the "Sharp Group" compensated her accordingly.  *See id.* ¶¶ 60-62.

Moreover, Kelln lacked the requisite state of mind to aid and abet.  To establish that Kelln is secondarily liable for securities violations, the SEC must show that she acted with the requisite scienter—specifically, that she "knowingly" assisted in violations of Sections 5(a), 5(c), and 17(a)(1) and (3) of the Securities Act, or that she at least recklessly assisted in the violation of Section 10(b) of the Exchange Act.  *See In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 182 n.15 (2d Cir. 2013).  The Complaint does not even attempt to aver facts that might support the allegation that Kelln had the requisite scienter to aid and abet others in their supposed violations.  *See infra* Argument I.A.

Finally, it is well established that there can be no secondary liability where there is no individual primarily liable for impermissible conduct.  *See Lorenzo*, 139 S. Ct. at 1104 ("[T]he statute insists that there be a primary violator to whom the secondary violator provided 'substantial assistance.'" (quoting 15 U.S.C. § 78t(e))).  Here, the SEC has failed to allege primary violations of the securities laws by Defendants Veldhuis, Sexton, Friesen, or Carrillo.  *See, e.g.*, Friesen Mem. Supp. Mot. to Dismiss 12–18, ECF No. 110; Sexton Mem. Supp. Mot. to Dismiss 6-15, ECF No. 133.  Indeed, that the SEC elsewhere identifies the principal violators simply as unnamed "Sharp

clients" only confirms its inability to establish the primary violations necessary to allege that Kelln is secondarily liable.

For these reasons, Counts 8 and 9—along with Counts 1, 2, and 3—fail to state a claim against Kelln, and the Complaint against her should be dismissed in its entirety with prejudice.

## II.    THE COURT LACKS PERSONAL JURISDICTION OVER KELLN.

This Court also lacks personal jurisdiction over Kelln.[6]  Under Rule 12(b)(2), the plaintiff bears the burden of establishing a factual basis for personal jurisdiction and "must 'go beyond the pleadings' and make a 'showing of personal jurisdiction . . . based on evidence of specific facts set forth in the record.'"  *SEC v. Elliott*, 2020 WL 7185854, at *2 (D. Mass. Dec. 7, 2020) (quoting *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 675 (1st Cir. 1992)).

The SEC alleges that this Court has personal jurisdiction over Kelln under Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Compl. ¶ 20.  Because these statutes provide for nationwide service, "the jurisdictional inquiry focuses on whether [the defendants] had sufficient contacts with the United States as a whole, rather than with just Massachusetts."  *Elliott*, 2020 WL 7185854, at *3.  The SEC, however, must still demonstrate that the exercise of jurisdiction is consistent with Constitutional due process.  *Id.* To that end, the SEC must plead facts sufficient to establish "general or specific jurisdiction."  *Id.* SEC has failed to establish general jurisdiction because it does not allege Kelln "engaged in

---

[6] Kelln's stipulated agreement to a preliminary injunction expressly preserved her "right to challenge the Commission's entitlement to any relief in this case," thereby preserving her right to challenge personal jurisdiction in her motion to dismiss.  Joint Mot. Prelim. Inj. ¶ 5, ECF No. 77; *see, e.g.*, *ATX Innovation, Inc. v. Velocity Mobile Ltd.*, 2016 WL 918052, at *2 (W.D. Tex. Mar. 8, 2016) (holding that language in defendant's stipulation to preliminary injunction that it was "without waiver of any claims, defenses, or arguments that may be available to any party" "forestalls [plaintiff's] assertion of waiver by conduct" as to defendant's personal jurisdiction motion); *LG Corp. v. Huang Xiaowen*, 2017 WL 2504949, at *2 (S.D. Cal. June 8, 2017) (holding that defendant preserved personal jurisdiction challenge where stipulation to preliminary injunction "expressly stated that [defendant] reserved all of its defenses").  *Cf. Manchester Knitted Fashions, Inc. v. Amalgamated Cotton Garment & Allied Indus. Fund*, 967 F.2d 688, 692 (1st Cir. 1992) ("These parties could have just as easily inserted a sentence or paragraph in the motion first filed in the district court, preserving the venue issue.  They did not.  Thus the defense was waived.").

continuous and systematic activity, unrelated to the suit" in the United States. *U.S. v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001).

To establish specific jurisdiction, the SEC must allege that Kelln maintained Constitutionally required "minimum contacts" with the United States, "such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation omitted). This Court uses a "tripartite test" to assess whether minimum contacts exist: (1) "the litigation [must] result[ ] from alleged injuries that arise out of or relate to the defendant's in-forum activities," (2) "there must be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum . . . thus invoking the benefits and protections of its laws," and (3) "the defendant's conduct and activities much be such that it is reasonable . . . to require the [defendant] to defend a suit in the chosen forum." *Elliott*, 2020 WL 7185854, at *3 (internal quotation omitted).

The Complaint fails entirely to connect Kelln to the United States. Kelln is not a United States citizen or resident; she is a Canadian citizen who resides in Surrey, British Columbia, Canada. Compl. ¶ 24. There is no allegation that Kelln ever directly interacted with anyone in the United States or traveled to the United States during the relevant time. Veldhuis, Gasarch, and Sharp, the only named individuals alleged to have received messages from Kelln, are all Canadian citizens. *Id.* ¶¶ 22, 23, 25, 116, 124. Further, the transfers Kelln allegedly facilitated were between "offshore" corporate nominee shareholders and "Swiss-based" trading platforms. *Id.* ¶¶ 6, 47. Kelln is not alleged to have ever sold stock in the United States markets as part of the scheme or to have ever held bank accounts in the United States. She is also not alleged to have had any involvement with promotional campaigns directed at the United States. Accordingly, the SEC has failed to meet its burden to show Kelln had minimum contacts with the United States.

17

The SEC's generalized allegations regarding the so-called "Sharp Group" do not change this outcome. The SEC cannot aggregate factual allegations concerning multiple defendants in order to demonstrate personal jurisdiction over an individual defendant. *Rush v. Savchuk*, 444 U.S. 320, 331-32 (1980) (rejecting aggregation of co-defendants' forum contacts in determining personal jurisdiction). Personal jurisdiction must be based on the specific relationship between Kelln and the United States. *See id.* Lacking any such relationship, the Complaint must be dismissed with prejudice pursuant to Rule 12(b)(2).

### III.   THE SEC'S PRAYERS FOR RELIEF SHOULD BE DISMISSED OR STRICKEN.

To the extent that the SEC does state a claim against Kelln and has established personal jurisdiction, it is not entitled to the relief requested. The SEC has not alleged a sufficient factual basis to request a permanent injunction or disgorgement, and its requests for financial penalties are partially time-barred. This Court may consider challenges to a prayer for relief on a motion to dismiss under Rule 12(b)(6) or a motion to strike Rule 12(f). *See, e.g.*, *Jones*, 300 F.Supp.3d at 318 (allowing motion to dismiss as to injunctive relief); *Vermont Pure Holding, Ltd. v. Nestle Waters N. Am., Inc.*, 2005 WL 8175834, at *1 (D. Mass. Sept. 20, 2005) (noting that under Rule 12(f) the court may strike "prayers for relief that are unavailable as a matter of law"). A defendant "can raise the statute of limitations as an affirmative defense in a Rule 12(b)(6) motion to dismiss, so long as the underlying factual basis for the defense is clear on the face of the plaintiff's pleadings." *Ora Catering, Inc. v. Northland Ins. Co.*, 57 F.Supp.3d 102, 107 (D. Mass 2014). This Court should dismiss or strike the SEC's requested remedies as follows.

### A.   The SEC Has Not Alleged a Basis for Disgorgement from Kelln.

The SEC's prayer for disgorgement should be dismissed, or stricken, because the SEC does not allege that Kelln was unjustly enriched as a direct result of the scheme. *See* 15 U.S.C. §78u(d)(7); *Liu v. SEC*, 140 S. Ct. 1936, 1940 (2020). To be entitled to disgorgement, the SEC

must provide a reasonable approximation of profits "causally connected to the illegal conduct alleged in the Complaint." *See SEC v. Esposito*, 260 F.Supp.3d 79, 92 (D. Mass. 2017); *SEC v. City of Victorville*, 2013 WL 12133651, at *13 (C.D. Cal. Nov. 14, 2013) (striking SEC's claim for disgorgement for failure to allege that defendant was unjustly enriched from the illegal conduct); *SEC v. Berry*, 2008 WL 4065865, *10 (N.D. Cal. Aug. 27, 2008) (same).  Otherwise, "there is nothing . . . to disgorge." *Berry*, 2008 WL 4065865, at *9-10.  The SEC does not—and cannot—allege that Kelln shared in the illicit proceeds generated by sales of the Example Securities.  Further, the SEC does not allege a causal connection between Kelln's annual salary and the scheme.  Kelln's compensation was not allegedly dependent on the success of the scheme or her participation therein.  And, Kelln's alleged involvement is so scarce and so sporadic that her annual salary cannot plausibly be attributed to the scheme.  Further, in light of the detailed allegations about how other Defendants profited, the failure to plead a connection between Kelln's salary and the scheme is "significant and telling."  *City of Victorville*, 2013 WL 12133651, at *13.

      **B.**    <u>**The SEC Has Not Alleged a Basis for a Permanent Injunction Against Kelln.**</u>

Similarly, this Court will not permit the SEC to pursue a permanent injunction where "in a practical sense, there is nothing remaining to be enjoined" and the injunction "would simply admonish [the defendant] to obey the federal securities laws." *Jones*, 300 F.Supp.3d at 318; Fed. R. Civ. P. 65(d); *see also SEC v. Sargent*, 329 F.3d 34, 39 (1st Cir. 2003) (noting that injunctions are appropriate only where "future violations" are "likely").  Such is the case here.  The Complaint does not and cannot allege that Kelln still works for Mr. Sharp, services his clients, or works in the securities industry in any way.  The Complaint does not allege that she owns any of the Example Securities or still benefits from the scheme.  In contrast, the Complaint makes clear that Kelln's very limited involvement ended long ago, in April 2017.  Compl. ¶¶ 225-28.

## C.    Civil Monetary Penalties and Disgorgement Are Time-Barred In Part.

The SEC's claims for civil monetary penalties and disgorgement are also partially time-barred.  Both claims are subject to a five-year statute of limitations[7] that "begins to tick [] when a defendant's allegedly fraudulent conduct occurs."  *Gabelli v. SEC*, 568 U.S. 442, 448 (2013); 28 U.S.C. § 2462; *Kokesh v. SEC*, 137 S. Ct. 1635, 1640-41 (2017).  So, to the extent that the SEC seeks financial penalties related to conduct occurring prior to August 5, 2016, five years before the SEC filed the Complaint, its prayers should be dismissed.  *See SEC v. Complete Bus. Sols. Grp.*, 2021 WL 1907020, at *23 (S.D. Fla. May 11, 2021) ("If the SEC's claims included violations occurring outside the five-year limitations period, it would be appropriate for the Court to partially dismiss the claims to the extent they seek time-barred relief.").  With the exception of Kelln's involvement in the fourth round of Stevia First sales and Garmatex, all of her alleged conduct falls outside of the five-year limit.  Thus, any claims for civil monetary penalties and disgorgement of funds are partially time-barred.[8]

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in its entirety with prejudice as to Kelln for failure to state a claim and for lack of personal jurisdiction.  To the extent that any claims can survive, this Court should dismiss or strike the SEC's prayer for relief in accordance with this Motion.

---

[7] The National Defense Authorization Act, passed on January 1, 2021, does not extend the five-year statute of limitations for disgorgement stemming from scienter-based claims in this case.  This point has been extensively briefed by other parties, and Kelln expressly adopts and incorporates those arguments herein.  *See* Friesen Mem. Supp. Mot. to Dismiss 7-10; Sexton Mem. Supp. Mot. to Dismiss 7-18; Taylor Mem. Supp. Mot. to Dismiss 10-20, ECF 127; Gasarch Mem. Supp. Mot. to Dismiss 5-8, ECF No. 144; Friesen Reply 2-5, ECF 146.

[8] Though it has no practical effect in this case, the SEC's claims for a permanent injunction, a penny stock bar, and a U.S. securities bar are also subject to a five-year statute of limitations and are similarly time-barred in part.

Respectfully submitted,

Dated: December 2, 2021        /s/ Kevin B. Muhlendorf
Kevin B. Muhlendorf (*pro hac vice*)
Pamela L. Signorello (BBO# 651483)
Holly J. Wilson (*pro hac vice*)
WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
Tel.: 202.719.7000
Fax: 202.719.7049
KMuhlendorf@wiley.law
PSignorello@wiley.law
HWilson@wiley.law

*Counsel for Defendant Courtney Kelln*

## CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2021, I filed the foregoing via the Court's ECF system, which electronically serves a copy on all counsel of record.

/s/ Kevin B. Muhlendorf
Kevin B. Muhlendorf