UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>　　　　　　Plaintiff,<br><br>　　v.<br><br>**FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,**<br><br>　　　　　　Defendants. | 21-cv-11276-WGY |

## DECLARATION OF TREVOR T. DONELAN

I, Trevor T. Donelan, pursuant to 28 U.S.C. §1746, hereby declare as follows:

1.　Since September 2014, I have been employed as an Enforcement Accountant with the U.S. Securities and Exchange Commission ("the Commission") in its Boston Regional Office. My duties include conducting investigations relating to potential violations of the federal securities laws.

2.　I received a Bachelor of Science degree in business administration, with a concentration in accounting, from the University of Richmond in Virginia in 2000. Before joining the Commission, I was most recently a managing director in the forensic accounting and complex business litigation unit at StoneTurn Group, LLP ("StoneTurn"), in Boston, where I worked for over seven years. Before joining StoneTurn, I held forensic accounting and auditor positions for a total of approximately seven years with Deloitte Financial Advisory Services LLP, and Arthur Andersen LLP, both in Boston.

1

3. I am a Certified Public Accountant in the Commonwealth of Massachusetts, and a Certified Fraud Examiner by the Association of Certified Fraud Examiners. I am also Certified in Financial Forensics by the American Institute of Certified Public Accountants.

4. I make this Declaration based upon my personal knowledge and upon information and belief as set forth below, and in support of the Commission's Motion for Default Judgment Against Defendant Frederick Sharp ("Sharp").

5. I previously submitted a declaration in this case in support of the Commission's Motion for a Temporary Restraining Order, Order Freezing Assets, and Order for Other Equitable Relief (Dkt. No. 1-13).

6. In or about 2017, I became actively involved in the Commission's investigation into possible violations of the federal securities laws by the defendants in the Complaint, including Sharp.

7. Based on the information gained through my investigation, I understand that Sharp is a Canadian citizen, and a resident of British Columbia, who is 69 years old and is thus not an infant, nor is he incompetent, nor is he serving in the military of the United States.

8. In the course of my investigation, I reviewed documents and data produced to the Commission and attended witness interviews and testimony. The purpose of this declaration is to relay certain information that the Commission has gathered about Sharp and his clients through interviews and testimony of certain witnesses and the review and analysis of certain documents.

9. The principal sources of documentation produced to the Commission that I have relied upon for this declaration include, but are not limited to:

a. Records that were maintained on Sharp's servers located in Curacao, which included an accounting system that Sharp and others referred to as "Q" or the "Q system," and also contained Encrypted Communications that were exchanged between users of the xPhone devices that Sharp supplied to his clients.

b. Transfer agent records for certain penny stock issuers held by and/or traded by nominee companies administered by Sharp and his employees.

c. Trading data collected by the Commission for certain penny stock issuers held by and/or traded by nominee companies administered by Sharp and his employees (referred to as "Blue Sheet Data").

d. Brokerage records for domestic and foreign brokerage accounts through which nominee companies administered by Sharp and his employees traded in the penny stocks owned by Sharp's clients.

e. Banking records for certain accounts held in the names of nominee companies administered by Sharp and his employees at a variety of foreign banks.

f. Publicly available market and trading data.

**Sharp Used Foreign Brokerage Accounts to Sell Shares In the United States**

10. The network of nominee companies administered by Sharp and his employees used numerous foreign brokerage accounts to trade securities that were owned by Sharp's control group clients. For example, as described in paragraphs 114 to 127 of the Complaint, Sharp and his employees arranged for Sharp-administered nominees with accounts at Swiss trading platforms Wintercap SA and Blacklight SA to take possession of

3

over 19.9 million shares of Stevia First/Vitality and to sell millions of those shares in 2015 and 2016. I have reviewed Wintercap SA and Blacklight SA trading records for those sales. Many of those sales into the U.S. market were routed through foreign omnibus brokerage accounts held in Wintercap SA's own name and through foreign brokerage accounts managed by Blacklight on which the account owner was a Sharp-administered nominee.

11.   I have reviewed historical trading data available from public sources, including from the website of the Over-the-Counter ("OTC") Markets Group, Inc. ("OTC Markets"). *See* Complaint, ¶31. OTC Markets is headquartered in New York. Based on my review of these records, the stock of Stevia First/Vitality, Arch and OncoSec traded via OTC Markets' platform during the time periods that defendants were selling those shares as described in the Complaint.

**Sharp's Net Proceeds from the Scheme Described in the Complaint**

12.   I have been asked by counsel for the Commission to calculate, based on the information presently available to the Commission, the net proceeds that Sharp received as a result of the trading described in the Complaint.

13.   To do this analysis, I reviewed the Q system, which was the accounting system developed and maintained by Sharp and his employees to record clients' trades, the fees and commissions that Sharp earned on those trades, the distributions of the proceeds of those trades, and other adjustments reflecting allocations and transfers of proceeds originating from the conduct described in the Complaint. I focused specifically on transactions in the "BOND" account within Q which I understand to represent Sharp's personal account on the platform.

14. Counsel asked me to isolate transactions with entry dates starting on August 5, 2011, and ending on May 24, 2019 (the last date for which the Commission has Q data affecting the BOND account) to exclude activity beyond what I understand to be the 10-year statute of limitations period. I further isolated those entries which transferred value within the Q system to or from the BOND account and other accounts on the Q system. These inter-account transfers are processed through a specific account code called WORK and they show where the BOND account received income (credits) from fees or commissions, or a share of specific deal proceeds. These inter-account transfers also reflect withdrawals (debits) of value where, for example, Sharp made payments to some of his employees.

15. The inter-account transfers affecting the BOND account were denominated in four currencies, United States dollars, Canadian dollars, British pounds and Swiss francs. I downloaded the historical daily foreign exchange rates from the Federal Reserve website (https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H10) to calculate the daily U.S. dollar value for each transaction on the day it actually happened.

16. The table below summarizes my calculation of the net profit received into or withdrawn from the BOND account from inter-account transfers for each year 2011 through 2019 (2011 data was limited to August 5, 2011 – December 31, 2011). Numbers in parentheses in the table below show a net loss for that calendar year.

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| BOND | $ 1,361,026 | $ 4,871,396 | $ 7,066,289 | $ 3,251,419 | $ 2,488,876 | $ 1,341,597 | $ 1,228,157 | $ (8,222,765) | $ (896,537) | $ 12,489,459 |

17. I then reviewed the Q system entries causing the significant debit balance in 2018. There were a series of entries posted to Q between October 2018 and January 2019 following the news of the arrest of Roger Knox in October 2018. Knox controlled Wintercap SA which was, at the time, the principal trading outlet for Sharp and his business.

5

The journal entries posted to the Q system during this period purported to transfer value out of the BOND account for two reasons: 1) partially to cover the debits to other client accounts in Q that were caused by a write-off of the Wintercap SA balances, and 2) to cover various other Q accounts that had debit positions at the time described as "bad debt" entries. In total, these write-off / "bad debt" accounting entries reduced the total BOND account by $9,271,477 in 2018. However, these accounting entries debiting the BOND account in the amount of $9,271,477 did not reflect the transfer of any real value or currency away from BOND to Sharp's clients or others. My review indicates that they were journal entry debits so that the Q accounting for client accounts would balance when Sharp closed out client accounts with losses attributable to the shuttering of Wintercap SA or other bad or uncollectable debts.

18. As a result of my analysis described in paragraph 17, counsel for the Commission asked me to add the 2018 write-off / "bad debt" entries totaling $9,271,477 back to the calculated BOND account net profit calculation. After doing so, the revised calculation of Sharp's net profit is $21,760,936 and is summarized in the table below:

|  | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| Disgorgement | $1,361,026 | $4,871,396 | $7,066,289 | $3,251,419 | $2,488,876 | $1,341,597 | $1,228,157 | $1,048,712 | $(896,537) | $21,760,936 |

**Prejudgment Interest**

19. Counsel for the Commission asked me to calculate prejudgment interest for Sharp using his net proceeds listed in paragraph 18 above as a disgorgement amount. I calculated prejudgment interest on Sharp's net proceeds for each calendar year separately, assuming (favorably to Sharp) that each year's net profit was received on the last day of the year in which it was received in the BOND account. The ending date for the prejudgment interest calculation was July 31, 2021 (the last day of the month before the Commission

sought and obtained the asset freeze in this case). I calculated prejudgment interest using the standard calculation tool established by the Commission, which applies the interest rate used by the Internal Revenue Service for underpayments, which changes quarterly, and which compounds interest quarterly. Following this method, I calculated total prejudgment interest of $7,173,497 based on the timing of Sharp's net profit.

20. The chart below shows the details of my prejudgment interest calculation, and combines it with the disgorgement amount for each calendar year.

| | 2011* | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| **Disgorgement** | $1,361,026 | $4,871,396 | $7,066,289 | $3,251,419 | $2,488,876 | $1,341,597 | $1,228,157 | $1,048,712 | $(896,537) | $21,760,936 |
| **Prejudgment Interest** | $ 581,257 | $1,875,738 | $2,432,694 | $ 990,657 | $ 662,706 | $ 294,965 | $ 211,565 | $ 123,915 | $ - | $ 7,173,497 |
| **Disgorgement + Prejudgment Interest** | $ 1,942,283 | $ 6,747,134 | $ 9,498,983 | $ 4,242,076 | $ 3,151,582 | $ 1,636,562 | $ 1,439,722 | $ 1,172,627 | $(896,537) | $ 28,934,433 |

*- Limited to August 5, 2011 through December 31, 2011 to capture 10-years prior filing date.

**Sharp's Network of Accounts**

21. During the course of the investigation that led to the filing of the Complaint, I have reviewed dozens of account statements from bank and brokerage accounts in foreign jurisdictions that were controlled and administered by Sharp, often through nominee beneficial owners. Based on the documents I have seen, and my understanding about the range of entities Sharp used, I think it is possible that Sharp controls numerous other nominee entities and corresponding accounts, of which the Commission is not aware.

**Civil Penalty Calculation**

22. Counsel for the Commission asked me to calculate the number of penny stock issuers whose shares were sold through Sharp's enterprise between August 5, 2016 and August 5, 2021 (the time period lasting five years before the Commission filed its complaint).

23. I performed this calculation by reviewing the Q system to examine all of the securities trades it reflected during the time from August 5, 2016 to August 5, 2021, and for

those trades, I then examined the number of unique values that were listed in the data field that contained the ticker of the securities being traded. I counted trades of 123 different issuers' securities as being recorded into the Q system, which means they were traded using the facilities provided by Sharp.

24. Multiplying 123 issuers times $195,047 per issuer yields a total of $23,990,781.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 15, 2021, in Boston, Massachusetts.

_____
Trevor T. Donelan