# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,<br><br>    Defendants. | Civil Action No. 21-CV-11276 (WGY) |

## PLAINTIFF'S OPPOSITION TO DEFENDANT COURTNEY KELLN'S MOTION TO DISMISS COMPLAINT

Plaintiff Securities and Exchange Commission (the "SEC" or "Commission") submits this opposition to defendant Courtney Kelln's ("Kelln") motion to dismiss the complaint. *See* Dkt. Nos. 147, 148. Kelln seeks to dismiss the complaint pursuant to Fed. R. Civ. P. 9(b). To do so, Kelln asks the Court to view the SEC's allegations in the light most favorable to her. Indeed, she disregards the SEC's well-pled allegations, which must be deemed as true, and misconstrues the elements of the offenses that Kelln is alleged to have violated. Further, Kelln seeks to dismiss or strike various aspects of the relief the Commission seeks. Kelln's arguments, however, are based on a constricted reading of the complaint, a failure to apply the 10-year statute of limitations to certain conduct, and ignoring the fact that the statute of limitations applicable to her conduct only accrues when she sets foot in the United States. Finally, Kelln argues that the Court lacks personal jurisdiction over her. But, Kelln routinely availed herself of the privilege of conducting business in the United States when she engaged with United States

securities intermediaries to facilitate the sale of stock, which was then illegally sold to victim-investors in the United States.  As set forth further below, Kelln's motion to dismiss should be denied.

## FACTUAL BACKGROUND

On August 5, 2021, the SEC sued Kelln and others for engaging in a sophisticated, multiyear, multi-national attack on United States financial markets and retail investors.  *See* Dkt. No. 1 ("Complaint").  Kelln teamed with defendants Frederick Sharp and Yvonne Gasarch (collectively defined as the "Sharp Group") to facilitate the illegal sale of stock in the public securities markets.  Complaint ¶5.  The Sharp Group provided a variety of services to help corporate control persons conceal their identities when selling the stock of penny stock companies they controlled.  *Id.*  For example, the Sharp Group deliberately concealed the identities of its clients through an array of services it offered, including forming and providing offshore nominee companies that could hold shares for undisclosed control persons; providing and administering an encrypted communications network; purchasing, configuring and delivering devices ("xPhones") to be used on the encrypted communications network; and arranging for clients to deposit and trade stock on offshore trading platforms.  *Id.*, ¶6.

Kelln's duties included obtaining, allocating, and distributing blocks of shares across multiple nominee shareholders in a manner designed to conceal the Sharp Group's clients' common control of all the stock so distributed.  *Id.*, ¶52.  In particular, Kelln routinely split Sharp Group clients' shareholdings into blocks of stock, each comprising less than five percent of each public company's outstanding shares, to be held in the names of nominee entities.  *Id.*, ¶53.  Her acts enabled the Sharp Group's clients to further conceal their control by making it seem as if multiple different, unrelated offshore corporate entities each held less than five

percent of the stock of a public company when, in actuality, those offshore corporate entities were all under common control by the Sharp Group and their clients. *Id.*, ¶54.

In light of the foregoing, the Complaint alleges that Kelln violated Sections 5(a), 5(c), 17(a)(1), and 17(a)(3) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5(a) and (c) thereunder, and that she aided and abetted the Sharp Group's clients' violations of those provisions.

## PROCEDURAL POSTURE

On December 2, 2021, Kelln filed a motion to dismiss and memorandum of law in support. *See* Dkt. No. 147 (Motion to Dismiss) and 148 ("Kelln Br."). Kelln raises three issues, none of which have merit. Kelln claims that: (1) the SEC has failed to satisfy the pleading standard of Fed. R. Civ. P. 9(b) (*see* Kelln Br. at 7-16); (2) the Court lacks personal jurisdiction over Kelln (*see* Kelln Br. at 16-18); and (3) the SEC alleged no basis for disgorgement or a permanent injunction, and civil monetary penalties and disgorgement are partially barred by the statute of limitations (*see* Kelln Br. at 18-20).

## ARGUMENT

### I.    MOTION TO DISMISS STANDARD: RULE 12(b)(6).

A Rule 12(b)(6) motion to dismiss a complaint for "failure to state a claim upon which relief can be granted" tests the sufficiency of the claims in a pleading. In reviewing the sufficiency of stated claims, the Court must accept as true all well-pled facts and must draw all reasonable inferences in favor of the non-moving party. *See SEC v. Tambone*, 597 F.3d 436, 441 (1st Cir. 2010); *see also North Bridge Assocs., Inc. v. Boldt*, 274 F.3d 38, 40 (1st Cir. 2001) (the Court must "indulge every reasonable inference in favor of allowing the lawsuit to proceed"). Dismissal is appropriate only if the pleadings fail to support "a plausible entitlement to relief."

*Rodriguez-Ortiz v. Margo Caribe, Inc.*, 490 F.3d 92, 95 (1st Cir. 2007). Assessing plausibility within the pleadings is "context-specific . . . [requiring] the reviewing court to draw on its judicial experience and common sense." *Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009).

## II.    THE COMPLAINT STATES CLAIMS AGAINST KELLN FOR WHICH RELIEF CAN BE GRANTED.

### A. The SEC's Allegations that Kelln Violated Securities Act Sections 17(a)(1) and (3), Exchange Act Section 10(b), and Rules 10b5-(a) and (c) Are Sufficient.

Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder prohibit any person, in connection with the purchase or sale of any security, from, directly or indirectly: (a) employing any device, scheme or artifice to defraud; or (c) engaging in any act, practice, or course of business that operates as a fraud or deceit upon any person, in connection with the purchase or sale of a security. *See* 15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5(a), (c). Section 17(a) of the Securities Act contains similar prohibitions in the offer or sale of any security. *See* 15 U.S.C. §77q(a). The language of these provisions is "expansive" and they "capture a wide range of conduct." *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019). *Lorenzo* defined the term "device," simply as something "devised, or formed by design," defined a scheme as a "project, plan or program of something to be done," and defined an artifice as "an artful stratagem or trick." *Id.* (internal quotations and citations omitted). The Court similarly defined "act" and "practice" broadly to include things done, actions and deeds. *See id.*

To establish violations of Section 10(b) and Section 17(a)(1), the SEC must show that Kelln acted with scienter, but negligence is sufficient to establish liability under Section 17(a)(3). *See Aaron v. SEC*, 446 U.S. 680, 687 n.5, 695-97 (1980); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002) (scienter may be established by a showing of recklessness). Direct

evidence of scienter is unnecessary; rather, "proof of scienter required in fraud cases is often a matter of inference from circumstantial evidence." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n.30 (1983).

### 1. The SEC Alleges that Kelln Substantially Participated in the Scheme.

Kelln's argument for dismissal rests on her assertion that she was merely a low-level administrative employee and that there are more allegations against others in the Complaint. But, the securities laws apply to all persons. Kelln cannot point to any authority that says otherwise because there is none. Instead, Kelln relies on the notion that "[a] person who participates in such a scheme by performing purely administrative duties *without knowledge of the purpose of the scheme* has not employed a manipulative or deceptive device and so has not incurred liability under [S]ection 10(b)." Kelln Br. at 10 (quoting *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 486 (S.D.N.Y. 2007)) (emphasis added). For this argument to have any force here, the Court would have to read the Complaint in the light most favorable to Kelln and conclude, as Kelln argues, that she was too inexperienced or otherwise has some credible innocuous explanation for all of the illegal conduct in which she is alleged to have participated. But, that is not the standard. To the contrary, the SEC alleges that Kelln had "knowledge of the purpose of the scheme," *see id.*, has pled facts showing her knowledge of the rules and limits on shareholding that constrained the division of Sharp Group clients' shares among nominee entities, and the Court must take the SEC's allegations as true. *See Tambone*, 597 F.3d at 441. For examples, the SEC alleges the following about Kelln's conduct:

1. Kelln, as a member of the Sharp Group, provided a variety of services to help control persons conceal their identities when selling the stock of penny stock companies they controlled. Complaint ¶5.

2. Kelln performed tasks associated with obtaining, allocating, and distributing blocks of shares across multiple nominee shareholders in a manner designed to

conceal the Sharp Group's clients' common control of all the stock so distributed. *Id.*, ¶52.

3. Kelln routinely split the Sharp Group clients' shareholdings into blocks of stock, each comprising less than five percent of each public company's outstanding shares, which enabled the Sharp Group's clients to further conceal their control by making it seem as if multiple different, unrelated offshore companies each held less than five percent of the stock of a company when, in actuality, those offshore corporate entities were all under common control. *Id.*, ¶¶53, 54, 116, 117, 124, 132-136, 155, 225.

4. And, further demonstrating her knowledge of the purpose of the scheme, Kelln discussed her efforts to ensure that various nominee entities held less than five percent of an issuer's stock. *Id.*, ¶¶53, 136.

When viewed in the light most favorable to the SEC, it is clear that the Complaint adequately alleges that Kelln understood the purpose of the scheme and substantially participated in it by facilitating the sale of stock for Sharp Group clients like co-defendants Mike Veldhuis, Paul Sexton, and Jackson Friesen (the "Veldhuis Control Group"). *See SEC v. Durgarian*, 477 F. Supp. 2d 342, 352-53 (D. Mass. 2007). Kelln's argument in her brief in reliance on *Lorenzo* is misplaced. Kelln Br. at 10. The Court in *Lorenzo*, when explaining that Rules 10b-5(a) and (c) "capture a wide range of conduct," imagined a scenario where a mailroom clerk disseminates information without any idea what is in the mail and noting that, for that person, "liability would typically be inappropriate." *Lorenzo*, 139 S. Ct. at 1101. On the other hand, as the foregoing allegations demonstrate—which must be accepted as true—Kelln's role was much more involved than the "mailroom clerk" because she understood and furthered the purpose of the scheme; that is, to allocate stock in less than five percent tranches to avoid scrutiny by regulators and securities intermediaries and to conceal the identity of the true owners – the Sharp Group's clients. *See* Complaint ¶¶53, 54, 116, 117, 124, 132-136.

Kelln makes some additional, irrelevant, arguments about why her participation in the scheme was not "substantial." For example, Kelln complains that "[s]he is not alleged to have

promoted or sold any of the Example Securities [and] [t]here are no specific allegations that she cultivated or maintained client relations, created or owned fake nominee shareholder entities, devised or developed the encrypted communications network used to conceal the fraud, or oversaw or executed the day-to-day financial aspects of the fraud." Kelln. Br. at 9. Kelln's focus on what is not alleged misses the point. As in many conspiracies (and businesses), the defendants in this case served different, compatible and mutually-supportive roles. Arguing that an operations employee (like Kelln) is not a finance employee (like Gasarch) or a marketing employee is irrelevant to the question of whether all of those employees work together to make an illegal business function. And, to be sure, Kelln served a critical role. The Complaint's allegations demonstrate that Kelln was the primary Sharp Group point of contact for Veldhuis, among others, *see, e.g.*, Complaint ¶¶116, 124, and that she was responsible for ensuring that he, Sexton, and Friesen illegally sold stock through various nominee entities—and those allegations sufficiently plead claims for which relief may be granted.

## 2.    The SEC Alleges that Kelln Acted with Scienter and/or Negligently.

The SEC sufficiently pled facts supporting a plausible inference that Kelln acted with scienter. "Scienter may be demonstrated by indirect evidence," and "this circuit has rejected any rigid formula for pleading scienter, preferring to rely on a 'fact-specific approach' that proceeds case by case." *In re Cabletron Systems, Inc.*, 311 F.3d 11, 38 (1st Cir. 2002); *see Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n.30 ("proof of scienter is often a matter of inference from circumstantial evidence"); *SEC v. Papa*, 555 F.3d 31, 35 n. 1 (1st Cir. 2009) (same); Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge and other conditions of a person's mind may be alleged generally").

Kelln communicated with Sharp Group clients and trading partners about her efforts to

ensure that various nominee entities held less than five percent of an issuer's stock. Complaint ¶¶53, 135-36. Kelln's response to these allegations is to suggest that "the Complaint does nothing more than imply that Kelln must have known that the purpose of keeping ownership below 5% was to defraud investors." Kelln Br. at 11. This argument is flawed on several fronts.

First, the Complaint does not merely "imply" that Kelln must have known something; instead, the SEC explicitly alleges that "[a]s Kelln knew or recklessly disregarded, any shareholder who was the beneficial owner of more than 5% of Vitality's outstanding stock was legally required to publicly disclose its holdings." Complaint ¶135; *see* Exchange Act, §13(d), Rule 13d-1 (requiring beneficial owners of greater than five percent of an issuer's stock to file disclosures with the SEC). This allegation, which is grounded by statements Kelln made such as the "5% rule is biting me in the ass," must be accepted as true. *Id.* ¶136. And, to be sure, seeking to evade disclosure requirements is a basis for liability under Section 10(b) of the Exchange Act. *See United States v. Wey*, 2017 WL 237651, at *8 (S.D.N.Y. Jan. 18, 2017) (denying motion to dismiss indictment alleging violations of Section 10(b) of the Exchange Act and Rule 10b-5 predicated on failure to disclose stock holdings); *cf. United States v. Bilzerian*, 926 F.2d 1285, 1299 (2d. Cir. 1991) (upholding Section 10(b) conviction based on defendant's erroneous description of the source of funds used to purchase blocks of shares); *SEC v. Brown*, 740 F. Supp. 2d 148, 172 (D.D.C. 2010) (allegations that a corporate officer failed to file required stock ownership disclosures under Section 16(a) of the Exchange Act stated claim for scheme liability under Rules 10b-5(a) and (c)).

Second, and as the foregoing cases demonstrate, Kelln's reliance on *Texasgulf* is misplaced. Kelln Br. at 11. Kelln cites *Texasgulf* for the notion that "conscious avoidance of the 5% triggering requirement . . . is not a violation of the law." *Texasgulf, Inc. v. Canada Dev.*

*Corp.*, 366 F. Supp. 374, 404 (S.D. Tex. 1973). But, the point of *Texasgulf* is merely that if an investor purposely holds 4.99% *in total* of an issuer's stock—to avoid filing a Schedule 13D—it is not illegal. On the other hand, if a person (or group of persons) holds, for example, 37% of an issuer's stock, *see* Complaint ¶77, but divides that stock into various nominee entities in less than 5% tranches to conceal the fact that the group is the beneficial owner of more than 5%, it is not just illegal, it is criminal. *See Wey*, 2017 WL 237651, at *8; *United States v. Kelln*, No. 2021-mj-07182-JCB-4, Dkt. No. 3 (D. Mass.) (charging Kelln in a conspiracy to commit securities fraud based on the same facts as this case). The SEC has, therefore, "allege[d] how [Kelln's] actions had a principal purpose and effect of creating a false appearance in fact in furtherance of the scheme to defraud." *Durgarian*, 477 F. Supp. 2d at 353; *see, e.g.*, Complaint ¶135 ("[s]uch disclosures would have frustrated [Kelln's co-defendants'] efforts to conceal their stock holdings and sales"). All of the foregoing allegations also sufficiently plead that Kelln acted at least negligently, which is sufficient to prove a violation of Section 17(a)(3) of the Securities Act.

Further, Kelln's contention that the SEC cannot plead that she acted with scienter because she "only" made $100,000 per year is irrelevant. Kelln Br. at 12. Putting aside the implication that $100,000 per year is mere pocket change, there is no threshold amount of money that a defendant must make to violate the federal securities laws. Nor is there any requirement that a defendant expected to profit personally (and, Kelln's citation to *SEC v. Duncan*, 2021 WL 4197386, at *14 (D. Mass. Sept. 15, 2021), is off base because *Duncan* concerns whether an investment adviser had a conflict of interest when he "expected to profit personally" from a venture in which he solicited his clients). In any event, the Complaint actually alleges that: (a) from approximately 2010 through at least 2019, the Sharp Group facilitated the illegal sales of stocks of hundreds of penny stock companies, Complaint ¶¶5, 42; and (b) on various dates

between 2010 and 2019, Kelln was the beneficiary of more than $1 million in funds derived from the Sharp Group's conduct, *id.*, ¶62.

**B. The SEC's Allegations that Kelln Illegally Sold Unregistered Securities Are Sufficient.**

Section 5(a) of the Securities Act prohibits the direct or indirect sale of securities through interstate commerce unless a registration statement has been filed and is in effect. Section 5(c) of the Securities Act prohibits the offer to sell securities through the mail or interstate commerce unless a registration statement has been filed. A *prima facie* showing of a Section 5(a) or 5(c) violation requires that: (1) no registration statement was filed or is in effect; (2) the defendant directly or indirectly offered to sell the securities; and (3) the offer or sale was made in connection with the use of interstate communications. *See SEC v. Esposito*, 260 F. Supp. 3d 79, 88 (D. Mass. 2017); *SEC v. Tropikgadget FZE*, 146 F. Supp. 3d 270, 280 (D. Mass. 2015) (citing *SEC v. Spence & Green Chemical Co.*, 612 F. 2d 896, 901-02 (5th Cir. 1980)). Section 5 violations are strict liability offenses and do not require proof of scienter. *See Esposito*, 260 F. Supp. 3d at 88-89; *SEC v. Current Fin. Servs., Inc.*, 100 F. Supp. 2d 1, 5-6 (D.D.C. 2000).

Regarding the first element, the requirement for a registration statement applies to each separate offer and sale of a security, not to the security itself; thus, "proper registration of a security at one stage does not necessarily suffice to register subsequent offers or sales of that security." *SEC v. Universal Exp., Inc.,* 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007). No registration statement existed to govern, for example, the Veldhuis Control Group's sales of Stevia, Arch or OncoSec stock. *See* Complaint ¶¶63, 75, 77, 86, 110, 118, 167, 169, 172, 179, 187, 196, 212, 218. For the third element, the Veldhuis Control Group's stock sales were in connection with the use of interstate communications because the sales were effectuated using interstate methods to communicate with the foreign and domestic bank and brokerage accounts

through which the nominee shareholders sold via OTC Markets. *Id.* ¶¶31-33, 91.

Courts interpreting the second, "sale," element have concluded that it may be satisfied by a showing that an indirect seller defendant was a "necessary participant" or a "substantial factor" in the unregistered sale or offer of sale. *See Zacharias v. SEC,* 569 F.3d 458, 464-66 (D.D.C. 2009) (applying "substantial factor" test); *see also SEC v. Friendly Power Co. LLC,* 49 F. Supp. 2d 1363, 1371 (S.D. Fla. 1999); *SEC v. Murphy,* 626 F.2d 633, 649-52 (9th Cir. 1980); *SEC v. Holschuh,* 694 F.2d 130, 139-40 (7th Cir. 1982) ("[T]he relevant inquiry in an enforcement action is whether the evidence shows that the defendant was a substantial and necessary participant in the sales transactions."); *cf. SEC v. Saxena,* 26 Fed. Appx. 22, 23 (1st Cir. 2001) (per curiam) (noting that defendant violated Sections 5(a) and 5(c) by "participating in the offer or sale of unregistered securities in interstate commerce or through the mails").

The SEC alleges that Kelln was a "necessary participant" and "substantial factor" in the sale of the relevant securities. Kelln coordinated the deposit of the Sharp Group's control group clients' stock with the Wintercap SA and Blacklight SA trading platforms, and arranged for stock to be held by Sharp Group-administered nominee entities in blocks of less than 5% each, so that the Sharp Group's clients' stock could be sold without revealing their clients' control over that stock. *See* Complaint ¶¶6, 52, 53, 116, 117, 124, 132-136, 155, 225.

Kelln's response to the foregoing is to ask this Court to draw all inferences in her favor and conclude that she was merely a "de minimis" participant in the stock sales. Kelln Br. at 13. Kelln's disregard of the fact that the Court must draw all inferences in favor of the SEC, and her attempt to skip discovery by asking this Court to conclude as a matter of law that she was not a necessary or substantial participant, must be rejected. Further, Kelln's reliance on *SEC v. Jones*, 300 F. Supp. 3d 312 (D. Mass. 2018) is misplaced. The defendant in *Jones* simply helped her

brother, who was engaging in a Ponzi scheme, find some investors. *See id.* at 316. Kelln's conduct is more analogous to that of an attorney, who prepares the documents that enable the distribution of stock to investors, because Kelln arranged for stock to be held in less-than five percent tranches across various nominees. She then retained an attorney to write opinion letters (necessary to clear that stock for trading) premised on the fact that each nominee held less than five percent. *See e.g.*, Complaint ¶¶132-136. Kelln thus created the deceptive fact, and then solicited legal confirmation of her deception, as a necessary precondition to the transfer agent allowing the Sharp Group's clients' shares to trade as unrestricted shares. *See id.*, ¶39. In such circumstances, courts routinely view defendants as necessary and substantial participants, and the fact that Kelln did not actually sign the opinion letters (but hired someone else to do so) is a distinction without a difference. *See SEC v. Sidoti*, No. 20-cv-2178-JGB, 2021 WL 1593253, at *11-12 (C.D. Cal. March 19, 2021) (denying motion to dismiss because "whether Defendant's conduct [authoring a letter that enabled the sale of shares] was a substantial factor in the distribution of unregistered securities is a question of fact unsuitable for determination at this stage"); *SEC v. Blackburn*, No. 15-2451, 2015 WL 10911439, at *3-4 (E.D. La. Sept. 11, 2015); *see also SEC v. Greenstone Holdings Inc.*, 954 F. Supp. 2d. 211, 214 (S.D.N.Y. 2013) ("opinion letter providing the authority to issue . . . unregistered shares without a restrictive legend . . . is sufficient to hold an attorney liable under Section 5"); *SEC v. Spongetech Delivery Sys.*, No. 10-cv-2031, 2011 WL 887940, *17-18 (E.D.N.Y. Mar. 14, 2011).

**C.  The SEC's Allegations that Kelln Aided and Abetted Others' Violations Are Sufficient.**

In order to show that Kelln aided and abetted Sharp Group clients' violations, the Commission must allege: (1) a primary violation, and (2) that Kelln was "generally aware that h[er] role or conduct was part of an overall activity that was improper and . . . [that she]

knowingly and substantially assisted in the primary violation." *SEC v. Tambone,* 550 F.3d 106, 144 (1st Cir. 2008), *aff'd in rel. part*, 597 F.3d 436 (1st Cir. 2010) (en banc).  Aiding and abetting liability requires knowing or reckless conduct by Kelln.  *See* 15 U.S.C. §77o(b); §78t(e); *SEC v. Wey*, 246 F. Supp. 3d 894, 930 (S.D.N.Y. 2017) (discussing aiding and abetting elements post Dodd-Frank).  A defendant need not have actual knowledge of the primary violation for conduct that occurs after the Dodd-Frank Act was passed in 2010.  *See id.* at 926 (clarifying that the "actual knowledge" requirement is a relic of pre-Dodd Frank conduct).  Indeed, the SEC is not required to allege that Kelln specifically knew that the others she substantially assisted were violating the law.  *See SEC v. Global Investment Strategy UK Ltd.*, No. 20-cv-10838 (AKH), 2021 WL 4896127, at *8 (S.D.N.Y. Oct. 19, 2021).  "To establish knowledge, the SEC must show a defendant's general awareness of [her] overall role in the primary violator's illegal scheme."  *Id.* (internal quotations omitted).  "The scienter requirement for aiding and abetting a regulatory violation 'means awareness of the underlying facts, not the labels that the law places on those facts.'"  *Id.* (quoting *SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 77 (D.C. Cir. 1980)).

### 1. Kelln Had General Awareness of Her Overall Role in the Primary Violators' Schemes.[1]

As the well-pled facts summarized in Section II.A., above, demonstrate, the SEC alleges that Kelln had overall awareness of her role in the scheme.  *See Global Investment*, 2021 WL 4896127, at *8.  The SEC alleges that Kelln had general awareness about her role in helping others conceal their ownership of the stock they planned to sell by arranging for that stock to be held by various nominee entities and for restricted legends to be removed by transfer agents.  *See*

---

[1] Kelln's argument that the SEC has failed to plead claims against primary violators is wrong and merely based on unpersuasive pleadings filed by other defendants in this case.  Kelln Br. at 15.  The SEC incorporates by reference its oppositions to those defendants' motion to dismiss in response to Kelln's arguments about their conduct.  *See* Dkt. Nos. 124, 157, 158, 162.

Complaint ¶¶52, 53, 86, 116, 117, 124, 132-136, 155, 225. To the extent Kelln now argues that she was unaware of her actions, or that she was just an administrator with a "minimal" role, *see* Kelln Br. at 15, those arguments are of no moment at the motion to dismiss stage. *See Tambone*, 597 F.3d at 441; *see also Boldt*, 274 F.3d at 40 (the Court must "indulge every reasonable inference in favor of allowing the lawsuit to proceed"). As with other arguments she raises, Kelln is asking this court to dismiss this case on the basis of inferences drawn in her favor.

### 2. Kelln Substantially Assisted Others.

In order to prove that Kelln provided "substantial assistance" to the fraudulent scheme, the Commission must demonstrate that she "in some sort associate[d] [her]self with the venture, that [she] participate[d] in it as something that [she] wish[ed] to bring about, [and] that [she sought] by [her] action[s] to make it succeed." *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012) (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)). Kelln substantially assisted primary violators by, among other things, arranging for their stock to be held by various nominee entities and for restricted legends to be removed by transfer agents. *See* Complaint ¶¶52, 53, 86, 116, 117, 124, 132-136, 155, 225. Kelln's actions also provided substantial assistance to the other defendants because their motive was to make money while concealing their ownership of the stock, and she helped them do so by serving as their point person and intermediary with Wintercap SA, transfer agents, and at least one attorney. *See e.g. SEC v. Durgarian*, 477 F. Supp. 2d 342, 353-54, 357 (D. Mass. 2007) (defendants who acted to conceal errors and were aware actions would further the scheme were liable as aiders and abettors).

For all the reasons set forth in Section II, above, the SEC has pled facts sufficient to infer that Kelln acted with scienter when she substantially assisted the primary violators.

**D.  The SEC Has Alleged a Basis for Disgorgement.**

Kelln contends that the SEC's prayer for relief should be dismissed, or stricken, because the SEC does not allege that Kelln was unjustly enriched as a "direct result of the scheme." Kelln Br. at 18.  Kelln argues that only those people who sell stock *directly* to investors—not those who receive a cut of the proceeds thereafter—are unjustly enriched.  Kelln is wrong. Disgorgement is merely a reasonable approximation of profits "*causally* connected to the illegal conduct alleged in the Complaint."  *Esposito*, 260 F. Supp. 3d at 92 (emphasis added).

The SEC alleges that: (a) from approximately 2010 through at least 2019, the Sharp Group facilitated the illegal sales of stocks of hundreds of penny stock companies, Complaint ¶¶5, 42; and (b) on various dates between 2010 and 2019, Kelln was the beneficiary of more than $1 million in funds "*derived* from the Sharp Group's conduct," *id.*, ¶62 (emphasis added).  The allegation that Kelln received "more than $1 million in funds *derived* from the Sharp Group's conduct" is not just a basis to conclude that Kelln's conduct was "causally connected" to the scheme, but actually an explicit allegation that she received funds directly "derived" from the Sharp Group's illicit conduct.  *See Esposito*, 260 F. Supp. at 79; *SEC v. Happ*, 392 F.3d 12, 32 (1st Cir. 2004) (disgorgement is appropriate where there is no "clear break in or considerable attenuation of the causal connection between the illegality and the ultimate profits" (*quoting SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989)).  In that regard, Kelln's casual assertion that her "alleged involvement is so scarce and so sporadic that her annual salary cannot plausibly be attributed to the scheme" ignores the allegations in the complaint, and is premature and only relevant, if ever, at a remedies hearing.  Kelln Br. at 19.

**E.  The SEC Has Alleged a Basis for a Permanent Injunction.**

Kelln's argument that the SEC has not alleged a basis for a permanent injunction is

similarly unavailing.  To advance this flawed argument, Kelln relies on misinformation.  She asserts that the "Complaint makes clear that Kelln's very limited involvement ended years ago, in April 2017."  Kelln Br. at 19, *citing* Complaint ¶¶225-28.  The Complaint says no such thing.  Instead, the paragraphs of the Complaint cited by Kelln are just additional examples of well-pled allegations of Kelln's knowing and substantial participation in the scheme in March and April 2017 as it concerned the illegal sale of Garmatex stock.  However, nowhere in these paragraphs does the Commission suggest that Kelln ceased all business thereafter.  To the contrary, Paragraph 5 of the Complaint explicitly says: "[b]eginning in or before 2010 and continuing through the *present* [i.e., August 5, 2021], Sharp, Gasarch, and *Kelln* (the 'Sharp Group') were in the business of facilitating illegal stock sales in public securities markets."  *Id.*, ¶5 (emphasis added); *see also* Dkt. No. 1-13 at ¶104 (Declaration of Trevor Donelan) ("Based on a Financial Industry Regulatory Action [FINRA] referral I have reviewed dated January 29, 2021, Kelln . . . may still be involved in promotional schemes").  Regardless, the time for the Court to evaluate the propriety of injunctive relief as to Kelln is not on a motion to dismiss, but rather after Kelln is found liable on the SEC's claims, and the Court can evaluate the evidence supporting that finding of liability.  *See SEC v. Gentile*, 939 F.3d 549, 564 (3d Cir. 2019) (noting that courts should rule on the appropriate scope of injunctive relief on a developed factual record).

Even if Kelln's interpretation of the Complaint is correct, there is no requirement, as Kelln suggests, that a defendant's conduct must be ongoing to warrant an injunction.  Indeed, the vast majority of SEC lawsuits are adjudicated years after the conduct, but courts routinely enjoin the defendants in those cases.  *See e.g., SEC v. Eagleeye Asset Management, LLC*, No. 11-cv-11576-WGY, Dkt. No. 124 (D. Mass. Dec. 12, 2012) (injunction entered following a trial by this Court); *SEC v. DFRF Enterprises LLC*, 384 F. Supp. 3d 129, 131 (D. Mass. 2019) (entering

injunction against defendant years after the case was stayed). Instead, a court may issue a permanent injunction if the defendant's conduct demonstrates a reasonable likelihood of further violations. *See SEC v. Sargent*, 329 F.3d 34, 39 (1st Cir. 2003). When assessing the likelihood of recurrence, courts consider the egregious or isolated nature of the violation, the degree of scienter, and the extent to which the defendant recognizes the wrongfulness of his conduct. *See id*. Given the multi-year attack on United States markets perpetrated by Kelln, her scienter (as described above), and the fact that she has not recognized any wrongfulness of her conduct, an injunction is warranted.

### F. Civil Monetary Penalties and Disgorgement are Not Time-Barred.

Further, Kelln's arguments that civil penalties and disgorgement are partially time-barred should be rejected. As an initial matter, Kelln recognizes that disgorgement for all of her alleged misconduct after August 5, 2016, is within the five year limitations period in 28 U.S.C. §2462, even before Congress amended the Exchange Act through the National Defense Authorization Act ("NDAA") of 2021. Kelln Br. at 20. But, because the NDAA explicitly applies retroactively, the SEC is also entitled to seek disgorgement for 10 years. *See* 15 U.S.C. §78u(d)(7), (8)(B).

With regards to a civil monetary penalty pursuant to 28 U.S.C. §2462, the clock only begins to run after Kelln is found in the United States. The SEC alleges that Kelln resides in Canada. Complaint ¶24. Kelln concedes that "[t]here is no allegation that Kelln ever . . . traveled to the United States during the relevant time." Kelln Br. at 17; *see SEC v. Wey*, 246 F. Supp. 3d 894, 934-35 (S.D.N.Y. 2017) (complaint's allegation, and defendant's concession, that defendant resided in Switzerland were sufficient to defeat motion to dismiss on statute of limitations grounds under §2462).

For these reasons, there is no basis to conclude that the disgorgement or civil penalty relief the SEC seeks is partially time-barred.

## III.    THE COURT HAS PERSONAL JURISDICTION OVER KELLN.

In addition, Kelln seeks to dismiss the Commission's complaint pursuant to Fed. R. Civ. P. 12(b)(2), claiming that the SEC has not established that the Court has personal jurisdiction over her.  As set forth below, the purpose of the fraudulent schemes in which Kelln substantially participated was to sell stock in United States markets.  *See e.g.*, Complaint ¶1.  As the allegations in the Complaint make clear, and as supplemented herein by the Declaration of Trevor Donelan, dated December 16, 2021 ("Kelln Donelan Dec."), the Court has personal jurisdiction over Kelln.

### A.  Standard of Review.

The Court should apply a "prima facie" standard when it considers a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing.  *See United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001).  Under that standard, the Commission must "proffer evidence which, taken at face value, suffices to show all facts essential to personal jurisdiction."  *Baskin-Robbins Franch'g LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 34 (1st Cir. 2016).  The Court must take the Commission's "properly documented evidentiary proffers as true and construe them in the light most favorable to [the Commission's] jurisdictional claim."  *A Corp. v. All Am. Plumbing, Inc.*, 812 F.3d 54, 58 (1st Cir. 2016).  A plaintiff may not "rely on unsupported allegations in [its] pleadings. Rather, [the plaintiff] must put forward 'evidence of specific facts' to demonstrate that jurisdiction exists."  *Id.* (citations omitted).

Kelln agrees that "the jurisdictional inquiry focuses on whether [Kelln] had sufficient contacts with the United States as a whole, rather than with just Massachusetts."  *SEC v. Elliott*,

2020 WL 7185854, at *3 (D. Mass. Dec. 7, 2020); Kelln Br. at 16. The SEC must plead facts

sufficient to establish "*either* general *or* specific jurisdiction." *Swiss Am. Bank,* 274 F.3d at 618;

*Elliott*, 2020 WL 7185854, at *3 (same). To establish specific jurisdiction, the SEC must allege

that, in connection with the violations alleged in the complaint, Kelln maintained "minimum

contacts" with the United States, "such that maintenance of the suit does not offend traditional

notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316

(1945) (internal quotations omitted).

### B. The Evidence Demonstrates Kelln's "Minimum Contacts."

This case concerns a sophisticated, multiyear, multi-national attack on the United States

financial markets and retail United States investors by Kelln and others. Complaint ¶1. Kelln

routinely performed a variety of tasks associated with obtaining, allocating and distributing

blocks of shares across multiple nominee shareholders in a manner designed to conceal the Sharp

Group's clients' common control of all the stock so distributed. *Id.*, ¶52. These tasks routinely

required Kelln to have contacts with parties in the United States. For examples:

> i.    Kelln routinely communicated with United States-based transfer agents
>       regarding stock that Sharp Group clients, like the Veldhuis Control Group,
>       sold. *See id.,* ¶¶53, 86; Kelln Donelan Dec., ¶¶9, 11, Exhibits A-C.

> ii.   Kelln routinely engaged a lawyer in the United States to write opinion
>       letters that facilitated the sale of stock by Sharp Group clients, like the
>       Veldhuis Control Group. *See* Complaint ¶¶132-136; Kelln Donelan Dec.
>       ¶10, Exhibit D.

Further, the purpose of the scheme was to sell stock in the United States markets. *See*

*e.g.*, Complaint ¶1. Kelln's efforts to allocate stock across nominees and their accounts enabled

its sale in United States markets, and consequently, numerous United States investors purchased

that stock and were significantly harmed. *See* Kelln Donelan Dec., ¶12. Not only does this

evidence meet the standard set forth in *International Shoe*, but it would "offend traditional

notions of fair play and justice," if Kelln could escape liability in the United States merely

because she chose to victimize investors here while operating out of Canada. *See SEC v. Straub*,

921 F. Supp. 2d 244, 256 (S.D.N.Y. 2013) (trading by foreign party on the New York Stock

Exchanges satisfies minimum contacts); *In re Parmalat Securities Litigation*, 376 F. Supp. 2d

449, 456 (S.D.N.Y. 2005) (finding personal jurisdiction over an Italian auditor in connection

with company's misleading financial statements where the company "traded actively in the

United States"); *In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 304-06 (E.D.N.Y. 2002)

(personal jurisdiction over Canadian general counsel where she "must have known that [her

fraudulent registration] [s]tatement was made to comply with the laws governing securities

offerings in American markets and, as such, it would be used and relied upon by American

investors").

Accordingly, the Court has personal jurisdiction over Kelln.

## **CONCLUSION**

For the reasons set forth above, the SEC respectfully requests that the Court DENY

Kelln's Motion to Dismiss.

Dated:  December 16, 2021                  Respectfully submitted,

                                           SECURITIES AND EXCHANGE COMMISSION
                                           By its attorneys,

                                           /s/ Eric A. Forni
                                           Eric A. Forni (Mass Bar No. 669685)
                                           Kathleen Burdette Shields (Mass Bar No. 637438)
                                           SECURITIES AND EXCHANGE SEC
                                           33 Arch St., 24th Floor
                                           Boston, MA 02110
                                           Phone: (617) 573-8827 (Forni direct), (617) 573-
                                           8904 (Shields direct)
                                           Fax: (617) 573-4590 (fax)
                                           Fornie@sec.gov; Shieldska@sec.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 16, 2021, a true and correct copy of the foregoing document was filed through the Court's CM/ECF system, and accordingly, the document will be sent electronically to all participants registered to receive electronic notice in this case. A copy will also be sent via first class mail, overnight mail, and/or email to those parties who have not yet registered for notice via the Court's CM/ECF system.

<u>/s/ Eric A. Forni</u>
Eric A. Forni
