**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <br>                               **Plaintiff,** <br>    v. <br> **FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,** <br>                              **Defendants.** | Civil Action No. 21-CV-11276-WGY <br><br> **JURY TRIAL DEMANDED** |

## PROPOSED AMENDED COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the following against defendants Frederick L. Sharp ("Sharp"), Zhiying Yvonne Gasarch ("Gasarch"), Courtney Kelln ("Kelln"), Mike K. Veldhuis ("Veldhuis"), Paul Sexton ("Sexton"), Jackson T. Friesen ("Friesen"), William T. Kaitz ("Kaitz"), Avtar S. Dhillon ("Dhillon"), and Graham R. Taylor ("Taylor") (collectively, the "Defendants").

## SUMMARY

1.      This case concerns a sophisticated, multiyear, multi-national attack on the United States financial markets and retail United States investors by foreign and domestic actors. These actors schemed to sell fraudulently hundreds of millions of dollars in stocks in the United States markets.

2.      In exchange for lucrative fees, a group headed by defendant Sharp provided services to various groups of public company control persons to help those control persons dump United States-quoted stocks—typically penny stocks—on retail investors. These services

included providing networks of offshore shell companies to conceal stock ownership, arranging stock transfers and money transmittals, and providing encrypted accounting and communications systems.

3.      Other defendants named in this Complaint were control persons who dumped their shares, a complicit public company chairman, and a promoter who touted the stocks to retail investors.

4.      The Defendants' fraudulent conduct deprived investors of the full and fair disclosure mandated by the federal securities laws.

**Sharp's, Kelln's and Gasarch's Participation in the Fraudulent Scheme**

5.      Beginning in or before 2010 and continuing through the present, Sharp, Gasarch, and Kelln (the "Sharp Group") were in the business of facilitating illegal stock sales in the public securities markets.  The Sharp Group provided a variety of services to help corporate control persons conceal their identities when selling the stock of penny stock companies they controlled.  By disguising their identities and their controlling positions, the Sharp Group's clients fraudulently concealed the fact that public company control persons were selling large blocks of stock to investors.

6.      The Sharp Group deliberately concealed the identities of its clients through the array of services it offered, including forming and providing offshore nominee companies that could hold shares for undisclosed control persons; providing and administering an encrypted communication network; purchasing, configuring and delivering devices that the Sharp Group referred to as "xPhones," which were designed to be used only for communications on the Sharp Group's encrypted communications network; and arranging for clients to deposit stock in

offshore trading platforms, including Wintercap SA[1] and Blacklight SA,[2] both Swiss-based, to obfuscate the control persons' association with their public company stock.  The Sharp Group also provided various additional services to its clients in furtherance of the fraudulent scheme such as: administering a proprietary accounting system that tracked clients' total stock holdings and sales across various nominee shareholders and trading platforms; paying out the proceeds of illegal stock sales at clients' direction to accounts around the world; arranging to route such payments by circuitous methods designed to conceal the source of funds; and fabricating documents, such as invoices, to conceal the nature and source of the payments.

### Veldhuis', Sexton's, and Friesen's Participation in the Fraudulent Scheme

7.      Working together, Veldhuis, Sexton, and Friesen (hereinafter referred to as the "Veldhuis Control Group") were one group of control persons (hereinafter referred to as a "control group") that teamed with the Sharp Group to run lucrative, fraudulent schemes to sell stock surreptitiously in the public markets.

8.      At various times, the Veldhuis Control Group collaborated with defendants Dhillon, Taylor, and Kaitz.  In particular, the Veldhuis Control Group sold illegally the stock of Stevia First Corp. ("Stevia First"), Stevia First's successor company Vitality Biopharma, Inc. ("Vitality"), Arch Therapeutics, Inc. ("Arch"), and OncoSec Medical Incorporated ("OncoSec") in concert with Dhillon.  The Veldhuis Control Group and Dhillon also sold illegally the stock of Vitality and Arch in concert with Kaitz and Taylor.

---

[1] The Commission charged Wintercap SA and its principal, Roger Knox, on October 2, 2018, with violating the antifraud provisions of the Securities Act of 1933 ("Securities Act") and Securities Exchange Act of 1934 ("Exchange Act") as a result of engaging in a multiyear scheme that generated more than $165 million from the illegal sale of stock of at least 50 publicly traded companies.

[2] The Commission charged Blacklight SA and its principals, Anthony Killarney and Kenneth Ciapala, on January 2, 2020 with violating the Securities Act and Exchange Act antifraud provisions as a result of engaging in a multiyear scheme that generated more than $35 million from the illegal sale of stock of at least 45 publicly traded companies.

**Dhillon's Role in the Scheme**

9.      Dhillon served as the chairman of the board of directors of Stevia First, Vitality,

Arch, and OncoSec.  Dhillon's status as a high-level corporate insider enabled him to obtain

and/or direct the issuance of millions of shares of each company's stock to his undisclosed

associates.  Dhillon knew that, because he was a corporate insider, federal securities laws

prohibited him from selling his stock into the securities markets without complying with various

registration and disclosure rules designed to protect investors.

10.      At various times, Dhillon coordinated with the Veldhuis Control Group and

Taylor to sell surreptitiously stock in the companies atop whose boards he sat.  These sales were

conducted through various nominee shareholders and involved sales of stock that Dhillon was

legally prohibited from selling without registering the sales with the Commission.  In certain

instances, the nominee shareholders that effectuated the illegal sales of Dhillon's shares included

entities administered by the Sharp Group.

11.      Dhillon abused his senior corporate role—a position of trust and confidence—in

order to conceal his own and others' fraudulent conduct from investors, securities market

intermediaries, securities regulators, and law enforcement.

**Kaitz's Role in the Scheme**

12.      Kaitz owned and operated Full Service Media LLC, a company that promoted the

stock of public companies to retail investors.  Kaitz substantially assisted the Veldhuis Control

Group by touting stocks that the Veldhuis Control Group sought to dump.  Kaitz promoted as

urgent and bullish investment opportunities the stock of various publicly traded companies that

the Veldhuis Control Group simultaneously planned to sell surreptitiously—including Vitality

and Arch stock.  A key component of Kaitz's touting efforts was concealing the role of the

4

Veldhuis Control Group, which paid Kaitz for his services.  For example, Kaitz falsely claimed when touting the stock of public companies like Vitality that third parties (which appeared to be unaffiliated with the public companies) paid for his services.  This concealment enabled the Veldhuis Control Group to anonymously sell its stock to the investors whom it simultaneously encouraged, through Kaitz's stock promotional efforts, to buy the stock and thus trade in the very opposite direction.

13.     During an SEC investigation into one of the promotional campaigns Kaitz had run for the Veldhuis Group, Kaitz appeared for testimony.  During that testimony, Kaitz made false and misleading statements, including claims (i) that he had not received payment for the promotion in question from any entity other than that identified as the paying party in the promotion (despite having received such payments, arranged by Veldhuis, from other entities); and (ii) that he had no communications devices other than the two he identified to Commission staff (despite having had, and used in connection with the promotions in question, one of the Sharp Group-supplied "xPhones" that are described below).

**Taylor's Role in the Scheme**

14.     Taylor, among other things, arranged to merge a public company with one of Dhillon's private companies, ultimately resulting in the distribution and fraudulent sale of shares associated with the resulting public company, Stevia First.  Taylor also controlled nominee shareholders who held and traded stock surreptitiously in concert with Dhillon and the Veldhuis Control Group.  In exchange for these services, Taylor received a significant cut of the illegal stock sale proceeds.

**Dhillon's Additional Illegal Stock Sales through Person A's Companies**

15.     At various times between 2011 and 2017, an individual identified herein as Person A operated at least two nominee companies that he created to hold and trade stock of two public companies atop whose boards Dhillon sat: Arch and OncoSec.  Person A illegally sold shares in both Arch and OncoSec on Dhillon's behalf.

**Dhillon's False Statements During the Commission's Investigation**

16.     In October 2018, the Commission charged Wintercap SA—one of the Veldhuis Control Group's primary conduits for the illegal sale of stock—with engaging in securities fraud, and Wintercap SA's illegal sale of Vitality stock was cited in the Commission's Complaint in that action.  Early the following month, the Commission suspended trading in Vitality.  During the Commission's investigation leading to the filing of the instant action, the Commission sought information from Dhillon about his involvement in the Vitality scheme, and Dhillon twice appeared for testimony (in August 2019 and July 2020).  During that testimony, Dhillon made false statements that are illustrated below.

**The Defendants Violated Various Securities Laws**

17.     As a result of the conduct alleged herein, Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor violated Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5(a) and (c) thereunder; Sharp, Kelln, Veldhuis, Sexton, Friesen, and Dhillon violated Sections 5(a) and 5(c) of the Securities Act; Veldhuis, Sexton, and Friesen violated Section 13(d) of the Exchange Act and Rule 13d-1 thereunder; Dhillon violated Sections 13(d) and 16(a) of the Exchange Act and Rules 13d-2 and 16a-3 thereunder; Taylor violated Section 15(b) of the Securities Act by aiding and abetting Dhillon's violations of Sections 5(a) and 5(c) of the

Securities Act; Sharp and Kelln violated Section 15(b) of the Securities Act and Section 20(e) of

the Exchange Act by aiding and abetting others' violations of Sections 5(a), 5(c), 17(a)(1) and

17(a)(3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and

10b-5(c) thereunder; Gasarch violated Section 17(a)(3) of the Securities Act, and also violated

Section 15(b) of the Securities Act and Section 20(e) of the Exchange Act by aiding and abetting

others' violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act and Section 10(b) of the

Exchange Act and Rules 10b-5(a) and 10b-5(c) thereunder; and Kaitz violated Section 17(a)(3)

of the Securities Act, and also violated Section 15(b) of the Securities Act and Section 20(e) of

the Exchange Act by aiding and abetting others' violations of Sections 17(a)(1) and 17(a)(3) of

the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c)

thereunder.

18.     The Commission seeks a temporary restraining order prohibiting the Defendants

from future violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange

Act and Rule 10b-5 thereunder; prohibiting Veldhuis, Sexton, and Friesen from future violations

of Section 13(d) and Rule 13d-1 thereunder; prohibiting Dhillon from violations of Section 13(d)

of the Exchange Act and Rule 13d-2 thereunder; prohibiting Dhillon from future violations of

Exchange Act Section 16(a) and Rule 16a-3 thereunder; prohibiting Sharp, Kelln, Veldhuis,

Sexton, Friesen, Dhillon and Taylor from violations of Securities Act Sections 5(a) and 5(c), and

if entered, a preliminary injunction order for the same; and (ii) a repatriation order, and an order

freezing the assets of the Defendants held for their direct or indirect benefit, and/or subject to

their direct or indirect control.

19.     The Commission seeks permanent injunctions against the Defendants, enjoining

them from engaging in the transactions, acts, practices, and courses of business alleged in this

Complaint; disgorgement of all ill-gotten gains from the unlawful conduct set forth in this

Complaint, together with prejudgment interest pursuant to Section 21(d) of the Exchange Act;

civil penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the

Exchange Act; an order barring the Defendants from participating in any offering of a penny

stock, pursuant to Section 20(g) of the Securities Act and/or Section 21(d) of the Exchange Act;

conduct-based injunctions enjoining the Defendants from directly or indirectly, including, but

not limited to, through an entity owned or controlled by any of them, participating in the

issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall

not prevent defendants from purchasing or selling securities listed on a national securities

exchange for their own personal account; and such other relief as the Court may deem

appropriate.  Further, as to Dhillon, the Commission seeks an officer and director bar pursuant to

Section 20(e) of the Securities Act and Section 21(d) of the Exchange Act.

## **JURISDICTION AND VENUE**

20.     This Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act [15 U.S.C. §77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15

U.S.C. §§78u(d), 78u(e), 78aa].

21.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C.

§77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa].  Certain of the acts, practices,

transactions and courses of business alleged in this Complaint occurred within the District of

Massachusetts, and were affected, directly or indirectly, by making use of means or

instrumentalities of transportation or communication in interstate commerce, or the mails.  For

example, Dhillon sat atop the board of Arch, a Massachusetts-based issuer.

### DEFENDANTS

22.     **Frederick L. Sharp**, age 69 and born in Los Angeles, California, resides in West Vancouver, British Columbia, Canada.

23.     **Zhiying Yvonne Gasarch a/k/a Zhiying Chen**, age 49 and born in China, is a dual citizen of Canada and China, and resides in Richmond, British Columbia, Canada.  On information and belief, at all times relevant to this Complaint, Gasarch spent most of her time in Canada.

24.     **Courtney Kelln**, age 41, resides in Surrey, British Columbia, Canada.

25.     **Mike K. Veldhuis**, age 41 and born in the Netherlands, resides in Vancouver, Canada.

26.     **Paul Sexton**, age 53 and born in the United Kingdom, resides in Anmore, British Columbia, Canada.

27.     **Jackson T. Friesen**, age 33, lives in Delta, British Columbia, Canada.

28.     **William T. Kaitz**, age 40, lives in Arnold, Maryland.

29.     **Graham R. Taylor**, age 51 and born in the United Kingdom, resides in Vancouver, British Columbia, Canada on information and belief.  On information and belief, at all times relevant to this Complaint, Taylor spent most of his time in Canada.

30.     **Avtar Singh Dhillon, MD**, age 60 and born in India, is a Canadian citizen residing in Long Beach, California.  Dhillon is currently the chairman of the board of directors of Emerald Health Therapeutics, Inc., a Canadian company that publicly trades in the United States markets.  Further:

   a.   Between approximately April 2013 and July 2018, Dhillon was the chairman of the board of directors of Arch.

b.  Between approximately March 2009 and January 2019, Dhillon was the chairman of the board of directors of Inovio Pharmaceuticals, Inc. ("Inovio").

c.  Between approximately January 2012 and April 2019, Dhillon was the chairman of the board of directors of Vitality, including its predecessor, Stevia First Corp.

d.  Between approximately March 2011 and April 2020, Dhillon was the chairman of the board of directors of OncoSec.

## RELATED PARTIES

31.    **Vitality Biopharma, Inc.** ("**Vitality**"), formerly known as **Stevia First Corp.** ("**Stevia First**"), currently trades on the Over-the-Counter ("OTC") Markets Group, Inc. ("OTC Markets"), an interdealer quotation service that provides a platform to buy and sell securities. Vitality was incorporated in Nevada in 2007 and its principal place of business is in Los Angeles, California.  Throughout its history, Vitality has undergone several changes to its business plan and now purports to be in the business of developing cannabinoid drugs for medical treatment.  At all times relevant to this Complaint, Vitality's common stock was registered under Section 12(g) of the Exchange Act, and it files Exchange Act reports with the Commission pursuant to the reporting requirements of Section 13(a) of the Exchange Act.

32.    **Arch Therapeutics Inc. ("Arch")** currently trades on OTC Markets.  It was incorporated in Nevada in September 2009, and its principal place of business is in Massachusetts.  The company has had different purported business objectives over the years; it currently purports to be focused on "developing a novel approach to stop bleeding ("hemostasis"), control leaking ("sealant") and manage wounds during surgery, trauma and interventional care."  Arch's common stock is, and has been since June 2013, registered with the Commission pursuant to Section 12 of the Exchange Act.

33.     **OncoSec Medical Incorporated ("OncoSec")** currently trades on NASDAQ (to which it was uplisted, from the OTC Markets, in May 2015).  It is a Nevada corporation headquartered in Pennington, New Jersey and San Diego, California.  The company purports to be a biotechnology company focused on designing, developing and commercializing innovative therapies and proprietary medical approaches to stimulate and to guide an anti-tumor immune response for the treatment of cancer.  OncoSec's common stock is, and has been since March 2011, registered with the Commission pursuant to Section 12 of the Exchange Act.

34.     **Garmatex Holdings, Ltd. ("Garmatex")**, now known as Evolution Blockchain Group, Inc., currently trades in the grey market.  It was incorporated in Nevada in 2014 and is located in Las Vegas, Nevada.  In 2018, the company announced a change in its business plan, purportedly to pivot from textiles to holding intellectual property related to blockchain technology, and changed its name to Evolution Blockchain.  The Commission suspended trading in the securities of Evolution Blockchain on June 25, 2018.  During the time period of the trading described in this Complaint, the company voluntarily filed periodic reports with the Commission.

## BACKGROUND

35.     Before selling stock, control persons are required to: (a) register such sales with the Commission pursuant to Section 5 of the Securities Act [15 U.S.C. §77e]; (b) sell the stock pursuant to an applicable exemption from registration; or (c) sell the stock pursuant to conditions set forth in SEC Rule 144 [17 C.F.R. §240.144], including limitations on the amount of stock a control person can legally sell.  In addition, investors in certain public companies are required publicly to disclose any ownership interest in excess of 5% of the company's publicly traded stock.  Such registration requirements, sale restrictions, and disclosure obligations are safeguards designed to protect the market for purchases and sales of stock, and to inform investors about the

nature of the stock they are holding or considering buying, and from whom they would be buying that stock.

36.     An "affiliate" of an issuer is a person or entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such issuer (i.e., a control person).  "Control" means the power to direct management and policies of the company in question.  Affiliates include officers, directors and controlling shareholders, as well as any person who is under "common control" with or has common control of an issuer.  As used herein, the term "control group" means a group that collectively is an "affiliate" of an issuer.

37.     "Restricted stock" includes stock of a publicly traded company (also known as an "issuer") that has been acquired from an issuer, or an affiliate of an issuer, in a private transaction that is not registered with the Commission.  All stock held by an issuer or affiliate of an issuer is restricted stock.  Absent an exemption under the federal securities laws and rules, restricted stock cannot legally be offered or sold to the public unless a registration statement has been filed with the Commission (for an offer) or is in effect (for a sale).  A registration statement contains important information about an issuer's business operations, financial condition, results of operation, risk factors, and management.  It also identifies any person or group who is the beneficial owner of more than 5% of the company's securities.

38.     "Unrestricted stock" is stock that may legally be offered and sold in the public securities marketplace by a non-affiliate, ordinarily after having previously been subject to a registration statement.  Registration statements are transaction specific, and apply to each separate offer and sale as detailed in the registration statement.  Registration, therefore, does not attach to the security itself, and registration at one stage for one party does not necessarily suffice

to register subsequent offers and sales by the same or different parties. Thus, when a control person buys publicly traded or otherwise unrestricted shares in a company that s/he controls, those shares automatically become subject to the legal restrictions on sales by an affiliate. Such legal restrictions include strict limits on the quantity of shares that may be sold in the public markets absent registration. Without registration, affiliates are prohibited from selling large quantities of an issuer's shares, regardless of how the affiliates obtained those shares.

39.     A "transfer agent" is a business that facilitates certain types of securities transactions. Among other things, transfer agents issue and cancel certificates of a company's stock to reflect changes in ownership. Many companies that have publicly traded securities use transfer agents to keep track of the individuals and entities that own their stock. Transfer agents routinely keep track of whether particular shares are restricted from resale.

40.     "Penny Stock," as used herein, generally refers to a security issued by a very small company that trades at less than $5 per share.

41.     "S-1 Registration Statement(s)" refer(s) to SEC Form S-1, which is a registration statement filed publicly by an issuer in connection with the sale of stock to shareholders. "S-1 Shareholders," as used herein, means shareholders who acquired stock pursuant to an S-1 Registration Statement.

## OVERVIEW OF THE SHARP GROUP'S CONDUCT

### Obfuscating Beneficial Ownership and Control

42.     From approximately 2010 through at least 2019, the Sharp Group facilitated illegal sales of stock in hundreds of penny stock companies.

43.     As reflected in the table below, the Sharp Group's stock sales generated over one billion dollars in gross proceeds:

| YEAR | STOCK SALES ($) | STOCK PURCHASES ($) | NET SALES ($) |
|---|---|---|---|
| 2010 | $ 40,452,026 | $ (7,344,138) | $ 33,107,888 |
| 2011 | $ 198,245,334 | $ (67,424,315) | $ 130,821,019 |
| 2012 | $ 205,403,649 | $ (60,952,750) | $ 144,450,899 |
| 2013 | $ 290,452,161 | $ (62,460,290) | $ 227,991,871 |
| 2014 | $ 64,960,760 | $ (6,612,156) | $ 58,348,605 |
| 2015 | $ 22,057,413 | $ (2,631,013) | $ 19,426,400 |
| 2016 | $ 68,171,713 | $ (9,861,177) | $ 58,310,536 |
| 2017 | $ 86,158,566 | $ (15,867,701) | $ 70,290,865 |
| 2018 | $ 31,155,352 | $ (4,674,550) | $ 26,480,802 |
| 2019 | $ 1,702,074 | $ (889,639) | $ 812,435 |
| **TOTAL** | **$ 1,008,759,049** | **$ (238,717,730)** | **770,041,319** |

44.     Sharp, who used the code name "Bond" (styling himself after the fictional character *James Bond*), was the mastermind and leader of the Sharp Group.  Among other things, Sharp cultivated relationships with the Sharp Group's clients—that is, individuals seeking fraudulently to sell stock in the markets to retail investors—and with various offshore trading platforms.  Sharp also routinely served as a liaison between dozens of clients (like the Veldhuis Control Group) and the trading platforms (like Wintercap SA).

45.     During the period of the scheme detailed herein, Sharp described in a communication to a client the following about the Sharp Group's services: "The service provided is comprehensive; it is not limited to trading.  It includes pyaments [sic], loans, private placements **and keeping clients out of jail.**" (Emphasis added).

46.     Sharp oversaw the creation and deployment of various front companies, which served as nominee shareholders used to disguise his clients' stock ownership and to sell stock surreptitiously.

47.     One of the services provided by the Sharp Group was making available offshore corporate nominee shareholders and individuals who would serve as the nominal owners of those entities.  Sharp installed these various nominal owners to pose as the beneficial owners of the

14

various entities that served as nominee shareholders.  In actuality, these individuals did not own

or control the stock held by the nominee shareholders and generally had no role other than

offering their names, passports, and signatures, which the Sharp Group used to incorporate and

open accounts for the corporate nominees.  In dealing with banks, brokerages, and other financial

services providers, these individuals were held out as actual beneficial owners.  In this way, the

Sharp Group kept the identities of control groups hidden, while fraudulently appearing to satisfy

the compliance requirements of the banking and securities firms where the Sharp Group opened

these accounts.

48.     In 2002, Sharp wrote a fictionalized book about securities fraud and money

laundering in which he described illegal conduct that parallels the Sharp Group's business

model.  Sharp's book (*Footloose:  Charlie Smith's Offshore Chronicles*) includes the following

passage:

> Eventually [the client] took greater positions in the stocks, sharing the
> take with fewer partners.  This meant he had to disguise his
> shareholdings in order to avoid securities disclosure requirements and
> trading restrictions.
>
> Offshore companies were ideal for his purpose.  They came from
> around the world with nominee directors, but were still subject to his
> control.  The perfect situation for his masterly stock manipulations.

49.     Sharp hired and directed various individuals to operate the administrative services

offered by the Sharp Group.  For example, Sharp oversaw the creation of a network of encrypted

communications, including code-names for the users, encrypted electronic chat functions, and

encrypted email functions.[3]  The Sharp Group purchased, configured and delivered devices that

---

[3] Encrypted communications sent and received through the Sharp Group-administered server are hereinafter referred
to as "Encrypted Communication(s)."

the Sharp Group referred to as "xPhones," which were designed to be used only for the Encrypted Communications.

50.    Sharp also hired and directed individuals who created and administered the Sharp Group's accounting system, which Sharp called "Q" (thereby expanding his *James Bond* affectations – "Q" being another fictional character in *James Bond*).  Given the extensive efforts by the Sharp Group and its clients to conceal and obscure the actual ownership and control of the stock they were surreptitiously selling, the Q system was essential in keeping track of the amounts of stock to be sold and the total proceeds being collected for each deal Sharp's clients ran.  Accordingly, the Sharp Group accounted for all of the nominee shareholders' assets in Q by tracking which of the nominee shareholders held which stocks (and which stocks' sales proceeds) for which particular client or client group, like the Veldhuis Control Group.  The Sharp Group also relied on the Q system to calculate the commissions and fees it collected for facilitating its clients' illegal stock sales.

51.    Sharp arranged for the Encrypted Communication services and the Q accounting system to be hosted on a server that was physically located on the island of Curaçao, in the belief that, there, it would be unreachable by U.S. securities regulators and law enforcement officials.

52.    Kelln is one of the individuals who worked for Sharp.  Kelln routinely performed a variety of complex administrative tasks associated with obtaining, allocating, and distributing blocks of shares across multiple nominee shareholders in a manner designed to conceal the Sharp Group's clients' common control of all the stock so distributed.

53.    In particular, Kelln—at the direction of Sharp and others—routinely split Sharp Group clients' shareholdings into blocks of stock, each comprising less than five percent of each public company's outstanding shares, to be held in the names of various nominee entities.  Kelln

sent an Encrypted Communication on or about February 8, 2013 to a client describing her work:

> The process is: I group certs [stock certificates] together that keep the total under 5%. Then I sen[d] them in for transfer to the TA [transfer agent]. Once processed the TA fedex's them to the broker. Then we wait for the shares to clear [i.e., become available for trading]. We only submit 1 transfer a day per broker until we have submitted all the shares.

54.     These acts enabled the Sharp Group's clients to further conceal their control by making it seem as if multiple different, unrelated offshore corporate entities each held less than five percent of the stock of a public company when, in actuality, those offshore corporate entities were all under common control by the Sharp Group, and their stock in the public company was all held in coordinated fashion for the benefit of the Sharp Group's clients. In this manner, the clients concealed the fact that they routinely held far greater than five percent of such public companies' stock through the various Sharp Group-supplied nominee entities.

55.     Breaking the shares into blocks of less than five percent avoided scrutiny by brokerage firms and other market participants. Brokerage firms routinely consider the 5% ownership threshold in determining whether particular stock sales may be part of a distribution that must be registered pursuant to Section 5 of the Securities Act. Further, the OTC Markets requires public companies to disclose its five percent (or greater) shareholders to meet certain listing requirements.

56.     Once blocks of shares were broken up and dispersed among multiple nominee shareholders, the Sharp Group coordinated with offshore trading platforms, such as Wintercap SA and Blacklight SA, which specialized in depositing and liquidating stock through various domestic and foreign brokerage firms. By so doing, the Sharp Group further obscured both the identities of the true beneficial owners and the fact that they were selling in concert.

57.     Gasarch is another one of the individuals who worked for Sharp and managed the

complex administrative tasks that were necessary to the fraudulent scheme.  Her duties included

arranging for transfers—typically in the form of wire transfers—of the proceeds of illegal stock

sales, such as the sales referenced in the table appearing at ¶43 above.  In this role, Gasarch

routinely arranged to transfer stock sale proceeds to accounts as directed by the Sharp Group's

clients in a manner designed to conceal the fact that undisclosed control persons were, in fact, the

actual beneficial owners of the stock being sold, and the ultimate recipients of the sales proceeds.

When she sent these wires, Gasarch also recorded them in the Q accounting system.  She thus

observed and maintained the records showing how the Sharp Group's clients were generating,

receiving and disbursing their revenue from securities trading.  Because of her role, Gasarch was

routinely referred to by others involved in the scheme by the nickname "Wires."

58.     One of the ways that Gasarch accomplished the distribution of fraudulent trading

proceeds to, and for the benefit of, the Sharp Group's clients was by routinely creating false

invoices, loan and subscription agreements, and other documents that purported to originate from

Sharp Group-administered nominees, and that could serve as the "back up" to support these

payments if they were questioned by the banks and brokerage firms from which the proceeds

were being sent.  Some examples include:

a)  On August 23, 2016, Gasarch created an invoice (on which she left "Company

Name" at the top) purportedly to Sharp Group-administered nominee Quezon Group

LLC, in the amount of CAD $125,000 from a builder in Canada that was renovating a

property for one of the Sharp Group's clients.  About a minute after Gasarch last

modified the invoice, she sent it, using an email address for Quezon Group

administered by the Sharp Group, to Wintercap SA and requested payment from a

Wintercap SA account.  Gasarch informed Wintercap SA that the reference on the

wire to the builder should read "Subscription Agreement 500,000 shares."  Wintercap

SA paid the invoice as directed by Gasarch.

b)  On May 16, 2017, Gasarch modified an invoice from a law firm so that the invoice

appeared to have been issued to Sharp Group-administered nominee Riverfall Group

Ltd.  The invoice requested payment for work done in connection with NewGen

Biopharma Corp. and its predecessor company.  As discussed in paragraph 237

below, the Veldhuis Control Group engaged in fraudulent sales of the securities of

NewGen Biopharma Corp in 2016 and 2017.  The Sharp Group debited the amount of

this payment in its Q accounting system from the NewGen account.  Gasarch also

was the last person who edited the cover memo to Wintercap SA (which purported to

be written by the beneficial owner of Riverfall Group) asking that Wintercap SA

make a partial payment of $129,000 on this invoice.  Several hours later, using an

email address for Riverfall Group administered by the Sharp Group, Gasarch sent the

invoice and the cover memo to Wintercap SA and requested payment from a

Wintercap SA controlled-account.  Wintercap SA paid the invoice as directed by

Gasarch.

c)   On or about October 11, 2017, Gasarch created an invoice purportedly to Sharp

Group-administered nominee Hilton Capital Inc., in the amount of $28,000 from an

entity named SkyLeap Industries, Inc. in Canada.  The invoice states that it is for

"data encryption tool for internal use."  About 5 minutes later, Gasarch was the last

person to modify a cover memo, purportedly from the beneficial owner of Hilton

Capital, to Wintercap SA, asking Wintercap SA to pay the invoice.  The cover memo

stated that the purpose of the invoice was "payment of consulting services."  The next

day, using an email address for Hilton Capital administered by the Sharp Group,

Gasarch sent the invoice and cover memo to Wintercap SA and requested payment

from a Wintercap SA account.  Wintercap SA paid the invoice as directed by

Gasarch.  In the Q accounting system, this payment was charged to the account for

Liberty One Lithium, another issuer whose stock was sold fraudulently by the

Veldhuis Control Group (see paragraph 237).

59.     Gasarch understood that her job was to obfuscate the source and destination of

distributions that the Sharp Group's clients were taking from their fraudulent trading proceeds

and that they were laundering through the Sharp Group.  Her communications with Sharp

demonstrate Gasarch's understanding.  For example, in August of 2013, Gasarch engaged in the

following Encrypted Communication with Sharp:

| Sharp to Gasarch | On aug 12 u wrote a draft for grand yachts against cash.  C[ou]ld u pls explain to me how this is a legitimate payment?  My concern is money laundering: hells angels gives us cash, we give them a draft to buy a boat. Later, boat is seized, polic[e] investigate, find out charterhouse [a Sharp Group-administered nominee] paid for it; visit us and ask why.  What will u say? |
|---|---|
| Gasarch to Sharp | Can we lend money to them?  Thomas asks them sign loan agreement for us. Thomas will call me back. |
| Sharp to Gasarch | Who r they? |
| Gasarch to Sharp | Thomas s client |
| Sharp to Gasarch | Yes but who?  A person, a company, what business? |
| Gasarch to Sharp | Waiting Thomas reply |

60.     Gasarch's communications demonstrate her understanding that the Sharp Group

was controlling the Sharp Group-administered nominees for the benefit of the Sharp Group

clients.  For example, on February 18 and 19, 2015, Gasarch engaged in a series of Encrypted

Communications with Sharp and others about the urgency of responding to an attorney's request

for documents to be signed by the purported control persons of a Sharp Group-administered

nominee.  Gasarch informed Sharp that "we" signed the documents for all of the directors, but

20

she didn't know who should sign the documents for the notary.  Sharp chided Gasarch: "Of

course u do; his name is on the stamp!," thus telling Gasarch to sign for the notary.

62. Similarly, communications between Sharp Group clients and Wintercap SA report

instances demonstrating that Gasarch knowingly, recklessly, or negligently sent emails

pretending to be from the nominal owners of Sharp Group-administered nominees in furtherance

of the Sharp Group's clients' fraudulent schemes.

      a.  On July 7, 2017, Sharp Group client Benjamin Kirk[4] and a Wintercap SA

          employee communicated about an email message seeking to transfer CAD

          $60,000 that Gasarch had sent to Wintercap SA a week earlier at Kirk's

          request.  Gasarch's email purported to be written by the beneficial owner of a

          Sharp-administered nominee and came from an email address for that

          nominee that was administered by the Sharp Group.

      b.  On July 12, 2018, Sharp Group client Luis Carrillo and a Wintercap SA

          employee communicated about what to do about a rejected wire that Gasarch

          had requested on June 22, 2018 for a Sharp Group-administered nominee

          named Santos Torres LLC.  The Wintercap SA employee told Carrillo to get

          Gasarch to email Wintercap SA from the Santos Torres account to inform

          Wintercap SA that the wire was rejected and why.

62. Gasarch was also involved in the movement of Sharp Group clients' shares to

Wintercap SA.  For example:

      a.  On June 16, 2016, Veldhuis wrote to Gasarch to ask for her help in getting

          Wintercap SA to sign documents that would make it appear as if Wintercap

---

[4] *SEC v. Lee, et al.*, No. 21-cv-11997 (D. Mass. filed Dec. 9, 2021).

SA was purchasing for itself 5 million shares of Stevia First/Vitality, when Veldhuis was just using Wintercap SA to conceal the Veldhuis' Control Group's ownership of those shares.  The same day, Gasarch forwarded Veldhuis' request to Wintercap SA's operations employees and asked them to sign the documents and return them to her.

b. On September 23, 2016, Veldhuis wrote to Gasarch that he was sending 2,375,000 warrants of StartMonday Technology Corp. to Wintercap SA (StartMonday was an issuer whose securities the Veldhuis Control Group sold fraudulently in 2016 through 2018 – see paragraph 237).  Veldhuis also informed Gasarch that "[b]ecause they are still in the 4 month hold period we will need Silverton SA [the former name of Wintercap SA] to sign the attached document.  Please arrange."  Gasarch forwarded Veldhuis' message to Wintercap SA, which then asked Gasarch for some supporting documentation.

63.     Gasarch knew, or recklessly or negligently disregarded, that the Sharp Group's clients were paying for promotions for the stocks they were involved in selling, and that it was important to separate the Sharp Group-administered nominees that paid for stock promotions from the Sharp Group-administered nominees that held and traded stock for the Sharp Group's clients.  Gasarch's knowledge is demonstrated in at least the following two Encrypted Communications:

a. On or about April 29, 2014, Gasarch communicated with Sharp Group client Benjamin Kirk regarding an outgoing wire he was requesting in the amount of $281,233.  Kirk informed Gasarch that he had "very good paper work" but

needed the name and address for the account from which the Sharp Group would send the wire (showing that the source of the payment was arbitrary). Gasarch asked Kirk if the payment was for a stock promotion because if it was, "I need to find a safe account for wire."

b.  Similarly, on or about September 5, 2014, Gasarch communicated with Sharp Group client Steve Bajic[5] regarding what account would be used to send an outgoing wire he was requesting in the amount of $100,000.  Gasarch asked Bajic if the payment was for a stock promotion, and if so, she needed to know which stock.  Bajic responded that it was not for a stock promotion so Gasarch told him that he could use Peregrine Capital (the entity for which she was the listed as the owner).  Bajic asked again:  "Does peregrine trade stocks?  I want $ to come from bank that has no links to trading, if that's even possible?" Gasarch reassured him: "I asked u what stock for, U answer not promote.  So I can use any account."

64.    Gasarch also implemented Sharp's plan to protect the identities of the Sharp Group's clients.  For example, (a) Gasarch helped to disguise the identities of actual shareholders by personally serving as the purported owner of a nominee shareholder—Peregrine Capital Corp. f/k/a Peaceful Lion Holdings—that the Sharp Group routinely used to facilitate the illegal stock sales on behalf of control group clients; and (b) in late 2015, around the time the Sharp Group distributed to clients a new set of xPhones for their use in Encrypted Communications, Gasarch drafted a memo with instructions about how to "delete all secure chats when xphone is shut down (e.g., to cross a border)."

---

[5] *SEC v. Bajic, et al.*, No. 20-cv-007 (S.D.N.Y. filed Jan. 2, 2020).

65.     Kelln likewise made it a point to remind Wintercap SA principals of these security protocols, as in a November 2016 Encrypted Communication in which she noted, after traveling back to Canada from Switzerland, "I had to delete my phone going through customs." A Wintercap SA principal responded "[w]e approve of your security."

### The Sharp Group Benefited from Illegal Stock Sales

66.     Sharp, Kelln, and Gasarch profited handsomely from their illicit services to the Sharp Group's clients.

67.     For example, between just August 2017 and July 2018, Wintercap SA transferred approximately $7 million to a Marshall Islands company called Cortona Equity, Inc. ("Cortona") for Sharp's benefit.  Sharp had installed his wife's tennis coach as the purported beneficial owner of Cortona.

68.     On various dates between 2010 and 2019, Kelln and Gasarch were the beneficiaries of more than $1 million each of funds derived from the Sharp Group's conduct.  By way of example:

   a.   On or about January 2, 2019, a Sharp Group-administered nominee named Inland Trading wired $49,861.10 to a United States-based corporate entity owned jointly by Gasarch and her husband.  The primary source of Inland Trading's income was fraudulent trading on behalf of Sharp Group clients. The wire payment to the company owned by Gasarch and her husband listed Gasarch's home address in Canada as the "Beneficiary address."

   b.   On or about May 2, 2018, Gasarch, using the email account for Sharp Group-administered nominee Hilton Capital Inc., asked Wintercap SA to send $100,016 from Hilton Capital's account to Gasarch's account at Sun Life

Assurance Co.  Gasarch attached copies of her passport and driver's license to the request as backup for the transaction.

69.     Further, between at least September 2011 and April 2019, the Sharp Group would perform a month-end sweep, using its Q accounting system, of commissions and fees that it earned from the securities transactions, securities deposits, and other securities-related services it performed for its clients in that month.  The sweep allocated a portion of the commissions and fees that were paid into the Bond account (the account associated with Sharp) to accounts in the names of Kelln and Gasarch, from which Kelln and Gasarch could then withdraw funds.  Between August 2016 and April 2019, Gasarch's portion of these monthly commissions and fees totaled over $300,000.  In addition, Gasarch received Christmas bonuses of CAD $100,000 in 2016 and 2017 and a Christmas bonus of CAD $70,000 in 2018.

## SHARP GROUP EXAMPLE ONE:
## ILLEGAL SALES OF STEVIA FIRST/VITALITY BY DHILLON,
## VELDHUIS CONTROL GROUP AND TAYLOR

70.     By August 2011, Dhillon had become the Interim Principal Executive and Financial Officer of Stevia First and, by January 2012, had become its Chairman.  As detailed below, during and after his securing of these roles, Dhillon coordinated with the Veldhuis Control Group and Taylor fraudulently to sell Stevia First/Vitality[6] stock to retail investors at inflated prices on various occasions over several years.  Further, Sharp, Kelln, Veldhuis, Friesen, Sexton, Taylor and Dhillon failed to register their sales of Stevia First/Vitality stock described herein pursuant to Section 5 of the Securities Act.

---

[6] Stevia First changed its name to Vitality in 2016, and the company still operates under that name.  Stevia First and Vitality stock is referred to as "Stevia First/Vitality" in this Complaint.

71.     Defendants' successive campaigns to sell Stevia First/Vitality stock fraudulently were very successful.  The following table reflects the proceeds that several of the Defendants' illicit sales of Stevia First/Vitality stock generated during the scheme (the "quantity sold" in the table below reflects the number of shares sold, and incorporates a 1-for-10 reverse stock split in 2016).

| Year | Quantity Sold | Trading Proceeds |
|---|---|---|
| 2012 | 19,600,000 | $      24,718,428 |
| 2013 | - | - |
| 2014 | 1,320,511 | 566,715 |
| 2015 | 2,424,661 | 770,492 |
| 2016 | 5,474,517 | 5,503,691 |
| 2017 | 4,904,846 | 10,570,537 |
| 2018 | 2,045,146 | 3,509,479 |
| Grand Total | 35,769,681 | $      45,639,343 |

**Background**

72.     By early 2011, Dhillon controlled a private company called Stevia First.  Around that time, Dhillon looked for an opportunity to convert that business to a publicly traded company in a process known as a "reverse merger."  In a reverse merger transaction, an existing public company having a ticker symbol cleared for quoting on OTC Markets, but with little, if any, operations (often referred to as a "shell company"), acquires a private operating company. After the private operating company is absorbed into the public shell company, the shell company typically undergoes a name, ticker-symbol, and business-plan change, to align with the name and purported business of the formerly private operating company.  In such transactions, shareholders of the formerly private company frequently receive shares in the newly merged

26

public company.  In many instances, those shares comprise a controlling interest in the post-merger public company.

73.     In or about early 2011, Taylor introduced Dhillon and the then-Chief Executive Officer (the "CEO") of Dhillon's private company to certain of Taylor's contacts in China and to an attorney in Vancouver.  Dhillon and the CEO eventually merged the private company with a public shell company.  On paper, the bulk of the shares in the shell company were held by various Chinese nationals who were identified in an S-1 registration statement that had previously been filed by the shell company (hereinafter the "Stevia S-1 Shareholders").

74.     According to public filings, on July 28, 2011, the purported president, chief executive officer, treasurer and director of the public shell company agreed to sell all of his 4,500,000 shares to Dhillon pursuant to a stock purchase agreement.  The stock purchase agreement contemplated that, immediately upon closing of the reverse merger, Dhillon would be appointed as a director, and as the President, Chief Executive Officer, Secretary, and Treasurer, of the surviving public company.

75.     On or about October 10, 2011, the reverse merger went effective and the surviving public company was re-named Stevia First, thereby assuming the name of Dhillon's private company.

76.     On or about October 12, 2011, Stevia First effected a 7-for-1 forward stock split, which caused Dhillon's 4,500,000 shares (referenced in ¶74) to convert to 31,500,000 shares of Stevia First/Vitality stock.

77.     Dhillon was the sole signer of Stevia First's filing with the Commission, which reported the 7-for-1 forward stock split.  The stock split had the effect of increasing the number of shares held by Dhillon considerably.

78.     In or about January 2012, Dhillon assumed the role of chairman of Stevia First's board of directors.  Stevia First/Vitality's stock was registered pursuant to Section 12 of the Exchange Act.

79.     Dhillon was an affiliate of Stevia First (and, subsequently, Vitality) because he had the power to control the company through his role as chairman of its board.  As a public company affiliate, Dhillon was legally required to register any sales of his Stevia First/Vitality stock unless Dhillon elected to comply with the safe harbor provisions set forth in Commission Rule 144.  Dhillon testified, under oath, during the Commission's investigation leading to the filing of this action that he understood these legal requirements at all times relevant to this Complaint.  As described in more detail in this Complaint, Dhillon repeatedly sold shares of Stevia First/Vitality without registering such sales.

80.     As a director of Stevia First (and, eventually, Vitality), Dhillon was required to file various "Form 4" statements (i.e., a "Statement of Changes of Beneficial Ownership of Securities"), which is a public form required by the Commission pursuant to Section 16(a) of the Exchange Act and Rule 16a-3 thereunder.  Dhillon was required to file an updated Form 4 to reflect any change in his beneficial ownership of Stevia First/Vitality stock, regardless of the amount of that change.  Dhillon understood these legal requirements at all times relevant to this Complaint.  Dhillon testified, under oath, during the Commission's investigation leading to the filing of this action that "[a]nytime there's sales by insiders, you have to file appropriate forms to disclose your purchases or sales."

81.     Dhillon was also legally required to file a public disclosure report—a "Schedule 13D"—with the Commission pursuant to Section 13(d) of the Exchange Act and Rules 13d-1 and 13d-2 thereunder, to the extent he was the beneficial owner of greater than five percent of

Stevia First/Vitality's common stock.  Dhillon was likewise required to disclose, via a Schedule 13D filing, any agreements he entered into concerning disposition of Stevia First stock, as well as the combined holdings of all participants in any such agreements.  Dhillon was further required to file a Schedule 13D Amendment whenever his position materially changed.  Dhillon understood these legal requirements at all times relevant to this Complaint.  For example, on or about August 17, 2011, Dhillon filed a Schedule 13D with the Commission disclosing that he was the beneficial owner of 4,500,000 *restricted* shares of Stevia First/Vitality stock, which comprised more than five percent of the company's outstanding common shares at that time.  As described in more detail in this Complaint, Dhillon intentionally failed to disclose his beneficial ownership interest in additional shares of Stevia First/Vitality stock, which were purportedly *unrestricted*; and he never made any disclosure concerning his agreements with the Veldhuis Group concerning Stevia First stock.

### Round One: 2012 Stevia First/Vitality Stock Sales

82.     Beginning in January 2012, shortly after Dhillon took over Stevia First, Dhillon, Taylor, and the Veldhuis Control Group arranged to sell surreptitiously Stevia First/Vitality's purportedly unrestricted stock and share in the proceeds of those unregistered sales.

83.     First, Taylor, working in concert with others, facilitated the transfer of Stevia First/Vitality's purportedly unrestricted stock from the Stevia S-1 Shareholders (defined in ¶73) to, initially, fifteen Sharp Group-administered nominee companies that held the stock for the Veldhuis Control Group.  Shortly thereafter, the Sharp Group consolidated or further transferred shares held by several of these Sharp Group-administered shareholders into other Sharp Group-administered shareholders, including Peaceful Lion Holdings, a nominee shareholder for which

Gasarch personally served as purported owner, and thus as purported owner of any shares held by it.  The flow chart below reflects these transfers:[7]



84.     Between January and March 2012, the Sharp Group-administered nominee shareholders (including Gasarch's Peaceful Lion Holdings) received 19,600,000 shares of Stevia First/Vitality stock, representing over 37% of the company's total outstanding stock and over 97% of its purportedly unrestricted stock.  These particular shares, which were all issued without restrictive legend, are hereinafter referred to as the "'Unrestricted' Stevia First Merger Shares."

---

[7] The entities color coded in green in this chart and other charts within this Complaint were administered or otherwise utilized, directly or indirectly, by the Sharp Group.

(Shares issued without restrictive legend are commonly treated by securities brokers and transfer agents as immediately and freely tradeable.  In reality, however, these 'Unrestricted' Stevia First Merger Shares were held by affiliates of the issuer who were acting in league with its Chairman. As such, these shares were, as a matter of law, restricted, and thus were subject to the federal securities laws' limitations and restrictions on unregistered sales of such shares.)

85.     In March 2012, Stevia First—with Dhillon serving as the chairman of its board of directors—began to issue press releases claiming various positive business developments for the company while, at or about the same time, the Veldhuis Control Group orchestrated a promotional campaign touting Stevia First's stock.

86.     For example, the Veldhuis Control Group paid for promotional materials touting Stevia First that were disseminated to investors during approximately March through May 2012. These Stevia First promotional materials urged investors to buy and buy quickly, saying things like, "***Get in now; this is huge!***" (emphasis in original) and "***Buy STVF right now!***" (emphasis in original; "STVF" was Stevia First's ticker symbol).  These promotional materials misleadingly claimed both that "Conmar Capital Inc." was the paying party, and that Conmar Capital "will not trade in the securities of Stevia First."  In fact (i) it was the Veldhuis Group, which controlled the overwhelming majority of Stevia First's free-trading shares, that paid for the promotions; (ii) the Veldhuis Control Group had paid the Sharp Group to incorporate Conmar Capital; and (iii) although no Stevia First trading took place (at the time of the campaign) through Conmar Capital, the Veldhuis Control Group was indeed "trad[ing] in the securities of Stevia First" by massively unloading them on the very retail investors who were buying in response to that campaign.

31

87.     The Veldhuis Control Group also engaged Kaitz to promote Stevia First, including through paying Kaitz's stock promotion company over $200,000 on or about April 3, 2012.

88.     Overall, from approximately March 6, 2012 to May 23, 2012, the Veldhuis Control Group, with Kaitz's substantial assistance, unloaded every share of the 'Unrestricted' Stevia First Merger Shares into the market, generating illicit proceeds of over $24 million.

89.     Both Taylor and Dhillon contemporaneously shared in the illicit proceeds stemming from the Veldhuis Control Group's March-May 2012 lucrative unloading of Stevia First stock, described above.  In particular, between approximately April and June 2012, the Veldhuis Control Group used the Sharp Group to remit eight wire payments, all funded by Stevia First stock-sale proceeds, and totaling over $4.2 million, to the Swiss bank account of an offshore front company that Taylor controlled; and Taylor, in turn, promptly transferred over 60% of that money to Dhillon as follows:

| Date | Veldhuis Control Group Transfers to Taylor's Company | Taylor Transfers to Dhillon's Companies |
|---|---|---|
| April 12, 2012 | $610,200 | |
| April 12, 2012 | $498,900 | |
| April 13, 2012 | $496,800 | |
| April 17, 2012 | | $498,000 |
| May 4, 2012 | | $400,000* |
| May 11, 2012 | | $496,000* |
| June 8, 2012 | $475,000 | |
| June 8, 2012 | $800,000 | |
| June 8, 2012 | $900,000 | |
| July 16, 2012 | | $1,300,000* |

*Each of these transfers went to the Swiss bank account of a front company incorporated in Panama called Ortivo Enterprises Corp. ("Ortivo") that Dhillon controlled.

90.     To further conceal the identities of the people sharing in the illicit proceeds from the unregistered sale of the 'Unrestricted' Stevia First Merger Shares, as well as the illicit source

of those proceeds, the Veldhuis Control Group distributed portions of those proceeds in cash obtained from the Sharp Group on various dates.  These cash withdrawals were recorded in the Q system and allocated to the Stevia First deal.

### Round Two: 2014 Stevia First/Vitality Stock Sales

91.     On or about March 30, 2012, May 25, 2012, and February 13, 2014, Stevia First issued a total of 1,320,511 shares of Stevia First/Vitality stock to a Sharp Group-administered nominee shareholder.  The Sharp Group, in turn, divided those shares between two additional Sharp Group-administered nominee shareholders.  The table below reflects these transfers.



92.     Thereafter, the Veldhuis Control Group sold these shares through Sharp Group-administered nominee shareholders for the benefit of Dhillon, the Veldhuis Control Group, and Taylor.  Specifically, between approximately January 14, 2014 and July 14, 2014, the Veldhuis Control Group sold all 1,320,511 of these Stevia First/Vitality shares through at least two offshore brokerage firms, obscuring the shares' ownership and the disposition of their proceeds by running the trades through two Sharp Group-administered nominee shareholders.

93.     Kelln facilitated the unregistered sale of the 1,320,511 Stevia First/Vitality shares.  For example, on or about October 9, 2013, Kelln provided Stevia First's transfer agent with the required paperwork to transfer 625,000 of the 1,320,511 shares of Stevia First/Vitality shares to Nautilus Growth Fund.  Kelln also provided a check to pay for the transfer.  The documents

provided by Kelln to Stevia First's transfer agent included an attorney opinion letter that falsely represented that Nautilus Growth Fund was not an affiliate of Stevia First. Kelln knew, or recklessly disregarded, that Nautilus Growth Fund was merely a nominee shareholder holding stock for the Veldhuis Control Group, which was an affiliate of Stevia First.

94.     As the Veldhuis Control Group sold shares, Veldhuis, Sexton, and Friesen discussed distributing the proceeds from the sale of the 1,320,511 shares of Stevia First/Vitality stock in a furtive manner that was designed to conceal the funds' source as well as their ultimate recipients.

95.     For example, on or about February 25, 2014, Sexton and Veldhuis discussed in an Encrypted Communication their plan to distribute a pool of proceeds from the sale of the 1,320,511 shares of Stevia First/Vitality stock in "cash" and noted that "AV will be fine with [our so distributing] it." "AV" is a reference to Avtar Dhillon.

96.     On or about March 6, 2014, Veldhuis sent the following Encrypted Communication to Friesen: "u r getting 173k today. A cut from MDDD [the ticker symbol of another public company stock the Veldhuis Control Group fraudulently sold through the Sharp Group] and STVF [the ticker symbol of Stevia First in 2014]. Buy a boat [expletive]. Rich mother [expletive]." Of the "173k" (i.e. $173,000) referred to by Veldhuis in the Encrypted Communication to Friesen, $100,000 came from proceeds of selling the 1,320,511 shares of Stevia First/Vitality stock.

97.     On or about March 6, 2014—around the same time that Veldhuis was coordinating the distribution of Stevia First/Vitality stock sale proceeds to Friesen (and others)— the Veldhuis Control Group caused the Sharp Group to send $124,000 in Stevia First/Vitality stock-sale proceeds to the same Taylor Swiss bank account referenced in ¶89 above.

98.     On various dates later in 2014, the Veldhuis Control Group continued to sell Stevia First/Vitality stock.  For example:

>   a.   On or about May 28, 2014, Friesen sent an Encrypted Communication, copying Veldhuis, directing a trader working for Sharp to sell 25,000 shares of Stevia First/Vitality stock that was held in an account in the name of a Sharp Group-administered nominee shareholder.
>
>   b.   On or about July 7, 2014, Friesen sent an Encrypted Communication directing a trader working for Sharp to sell 25,000 shares of Stevia First/Vitality stock.

99.     On or about August 5, 2014, Veldhuis sent an Encrypted Communication asking Gasarch the following: "How much cash do you have in total.  We might cut the balance of STVF [Stevia First] that's left.  So we would need about $110K.  Do you have or be able to get?"

100.    On or about August 6, 2014, Veldhuis sent a follow up Encrypted Communication to Gasarch: "Can I please get $120K cash from STVF?"

101.    On or about August 6, 2014, Veldhuis picked up $120,000 in cash from Sharp's office.

102.    On or about August 6, 2014, Sexton and Veldhuis continued to discuss, via Encrypted Communications, the planned distribution of proceeds from selling the 1,320,511 shares of Stevia First/Vitality stock.  Veldhuis wrote: "so STVF with the two wires being added back is 126,693.74 . . . Avtar 50,000 (40%) . . . [there is] enough cash to do it might [sic] be easier to transfer."

103.    During the same August 6, 2014 Encrypted Communication, Sexton replied: "You should cut up the 120,000 [in] cash.  Which would allow for . . . Avtar/GT [Dhillon and

Taylor] 42,000[.] So if you want to bring me 96k on Friday I can distribute?  GT [Taylor] will be up here shortly . . . ."

104.    During the same August 6, 2014 Encrypted Communication, Veldhuis asked Sexton how he should transmit the cash, writing, "U want me to put in the safety deposit box or bring it to you."  Sexton replied: "You can do either.  I have a safe here.  I can distribute mind [sic] and grahams [Taylor] from here.  I can hold . . . av's [Avtar Dhillon's] for next meeting."

105.    On or about August 7, 2014, Veldhuis reported to Sexton via an Encrypted Communication that "I pick up [sic] that cash yesterday.  Its [sic] all 50's."

106.    Similarly, between approximately November 2013 and January 2015, Taylor arranged to transfer approximately $1.7 million to third parties for Dhillon's benefit.

107.    Dhillon failed to file any Form 4 disclosing the sales of Stevia First stock directed by the Veldhuis Control Group, despite having a pecuniary interest in Stevia First stock sales effected through the Veldhuis Group, and despite knowing of his obligations, as Chairman of Stevia First, to report any and all of his Stevia First stock sales on Forms 4 filed with the Commission.

**Round Three:  2015 and 2016 Stevia First/Vitality Stock Sales**

108.    In connection with the 2011 merger of Dhillon's private company into the public shell company, Dhillon received 4,500,000 restricted shares of Stevia First/Vitality stock (hereinafter referred to as the "March 2012 Stevia First/Vitality Stock").  After Stevia First, directed by Dhillon, issued a 7-for-1 forward split of Stevia First/Vitality stock, Dhillon held 31,500,000 shares of the March 2012 Stevia First/Vitality Stock, all of which was restricted.

109.    The scheme by the Veldhuis Control Group, Taylor and Dhillon to unload this March 2012 Stevia First/Vitality Stock through another round of illicit stock sales began in March 2012.

110.    The first step in this facet of the scheme was to move Stevia First/Vitality stock into the hands of the Veldhuis Control Group, while concealing the common ownership and control of this large block of shares.

111.    As with prior illegal sales of Stevia First/Vitality stock, several of the Defendants used multiple Sharp Group-supplied entities as nominee shareholders, each purporting to hold less than 5% of the company's shares, in order to conceal the fact that affiliates of the issuer were, in concert, controlling, and would be illegally selling, unregistered shares of Stevia First/Vitality stock.

112.    To that end, in or about March 2012 (i) Sharp authorized, through a wire request he signed, a payment to Dhillon in the amount of $33,800, and (ii) Taylor also directed two payments totaling $9,450 to Dhillon.  These payments were all made to Dhillon's personal bank account.

113.    Sharp's March 2012 $33,800 payment to Dhillon—which was funded by proceeds from the Veldhuis Control Group's sale of the 'Unrestricted' Stevia First/Vitality Merger Shares earlier that month—was for the purchase of 15,750,000 shares of Dhillon's March 2012 Stevia First/Vitality Stock.  Meanwhile, Taylor's March 2012 payments (for a total of $9,450) were for the purported purchase of another 4,227,500 shares of Dhillon's March 2012 Stevia First/Vitality Stock.  Taylor purchased 2,227,500 of these shares in the name of Heng Hong Investments, a nominee entity he controlled.

114.     To conceal the common control and disposition of the roughly 20 million shares of March 2012 Stevia First/Vitality Stock shares that Dhillon had transferred based on the aforementioned Sharp- and Taylor-arranged payments, Dhillon disguised his transfers as a series of smaller sales to (i) various Sharp Group-administered shareholders—all of which would hold, and ultimately sell, the Stevia First/Vitality stock for the benefit of the Veldhuis Control Group and Dhillon—and (ii) two nominee shareholders that were controlled by Taylor, which would hold, and ultimately sell, the Stevia First/Vitality stock for Taylor's and Dhillon's benefit.  The chart below illustrates Dhillon's sale of these shares, as well as Dhillon's division of the remaining shares that were derived from the March 2012 Stevia First/Vitality Stock.  (In fact, however, as detailed below, Dhillon did not fully relinquish his interest in the March 2012 Stevia First/Vitality Stock.):



115. The roughly 20 million shares of the March 2012 Stevia First/Vitality Stock that
Dhillon transferred to nominee shareholders administered by the Sharp Group or Taylor
comprised approximately 39 percent of the company's outstanding shares. But, by spreading
these shares among various nominee shareholders, each shown as holding under five percent of
the company's outstanding shares, Dhillon obscured the facts that (i) he had not, in truth,
relinquished his interests in all of these shares; and (ii) these shares were, in truth, held by the
Veldhuis Control Group, himself, and Taylor, all of whom were acting in concert.

116.    The Veldhuis Control Group and Taylor did not immediately sell the shares held by the nominee shareholders referenced in ¶114 and 115 above, at least partly because the stock was initially marked as restricted by Stevia First's transfer agent since it was acquired directly from Dhillon, an affiliate of the company.  SEC Rule 144 provides a safe harbor from registering the sale of restricted stock acquired directly from an affiliate if, among other things, the acquirer(s) hold those shares for at least six months.  In the meantime, the Veldhuis Control Group sold the other Stevia First/Vitality stock that they had obtained, as described in ¶¶83 to 84 ("Round 1") and ¶¶91 to 92 ("Round 2"), above.

117.    Beginning in the fall of 2014, the Veldhuis Control Group arranged for the unregistered sale of the March 2012 Stevia First/Vitality Stock in concert with Taylor and Dhillon.

118.    In an Encrypted Communication on or about October 24, 2014, Veldhuis, Sexton and Friesen discussed their plans to sell the March 2012 Stevia First/Vitality Stock into the public markets.  In particular, Sexton summarized the Veldhuis Control Group's plans to sell the 15,750,000 shares that Dhillon had transferred to the various Sharp Group-administered nominee shareholders, which included 1,000,000 shares to be sold for Dhillon's benefit, and raised the possibility of coordinating those sales with sales of the shares Dhillon had transferred to Taylor's nominee shareholders, writing: "There was 31,500,000 in total. We have 15,750,000 minus the 1mm to Avtar [Dhillon].  GTaylor is **outside the 15.75**.  He would consider blending back if Av [Dhillon] agrees to the plan."  (Emphasis added).

119.    Taylor, as illustrated in ¶113 above, held approximately 4.2 million additional shares via two nominee shareholders, which is consistent with Sexton's referring to Taylor's

position, in the above-quoted Encrypted Communication, as "outside the 15.75" million shares held by various Sharp Group-administered nominee shareholders.

120.    On or about October 28, 2014, Sexton met with Dhillon in California, and summarized their meeting in an Encrypted Communication between Sexton and Veldhuis the following day in these words:

a.    Dhillon "said that stv [Stevia First] is working 2 big food producers and they feel that one has a very good chance to come to table.  He would like to be more aggressive and get the price and volume up. . . . He's also sharing in part of grahams [Taylor's] retained [sic] position."

b.    "Also, av [Dhillon] said that he would prefer if we took the shares in gt [Taylor's] names and sold them all together.  Lol."

121.    On various dates thereafter, Taylor, directly or indirectly, transferred the March 2012 Stevia First/Vitality Stock held by his two nominee shareholders to Sharp Group-administered nominee shareholders that were used by the Veldhuis Control Group.  Though Taylor allowed the Veldhuis Control Group to trade these shares on his behalf, he retained a beneficial ownership interest in the proceeds of those trades.  For its part, in or about December 2014, the Veldhuis Control Group arranged to sell March 2012 Stevia First/Vitality Stock through Wintercap SA and Blacklight SA using Sharp Group-administered nominee shareholders.  The chart below reflects the transfers to various Sharp Group-administered nominee shareholders:



122.    On or about December 2, 2014, Veldhuis sent an Encrypted Communication to

Gasarch, copying Sharp, to determine if the nominee shareholders his team had been using to

hold March 2012 Stevia First/Vitality Stock were administered by the Sharp Group, or some

other offshore nominee shareholder provider.  Veldhuis wrote: "[w]e are in the process of

receiving approximately 20 million shares of [Vitality] that were held in ESCROW.  At the time

of ESCROW agreement we may have put some of the stock in NON BOND [i.e. non-Sharp] [nominee] entities.  Can you please go through the list below and let me know which entities you guys administer."  (Veldhuis's reference to "approximately 20 million" comports with the sum of (i) the 15,750,000 shares of March 2012 Stevia First/Vitality Stock that Dhillon transferred to the various Sharp Group-administered nominee shareholders in 2012, plus (ii) the approximately 4.2 million shares of March 2012 Stevia First/Vitality Stock that Dhillon transferred to two nominee shareholders controlled by Taylor.)

123.    Sharp, copying Kelln, replied to Veldhuis's December 2, 2014 Encrypted Communication by writing: "This [message] shld have gone to celtic."  "Celtic" was Kelln's pseudonym.  Kelln promptly replied: "I confirm they [nominee shareholders] are all ours [i.e, Sharp Group-administered nominee shareholders]."

124.     Kelln subsequently arranged for the Veldhuis Control Group's stock, which now included the approximately 4.2 million shares initially held by Taylor's two nominee shareholders, to be deposited into accounts controlled by Wintercap SA and Blacklight SA.

125.    Thereafter, during the course of 2015 and through the end of 2016, the Veldhuis Control Group directed the unregistered sales of their and Taylor's March 2012 Stevia First/Vitality Stock in coordination with another stock promotional campaign run by Kaitz.

126.    In or about January 2015, via an Encrypted Communication, Veldhuis asked Kaitz who Kaitz would identify as the "third party" payer on the Stevia First/Vitality stock promotional alerts.  Kaitz replied, "Conmar Capital," which was the name of a Sharp Group-administered entity that the Veldhuis Control Group had paid to incorporate in 2012.  Ultimately, the January 2015 promotions identified "Full Service Media" (Kaitz's own company), as well as an unidentified "third party," as each having supplied funds to pay for those stock promotions.

Kaitz knew that the Veldhuis Control Group was paying for the stock promotions and concealed this by listing "Conmar Capital" as the party paying for his promotional campaign.  Kaitz further knew, or recklessly disregarded, that the Veldhuis Control Group intended to sell stock surreptitiously and was paying for the promotional campaign in order to facilitate such sales.

127.    The members of the Veldhuis Control Group each knew or recklessly disregarded that stock promoters, like Kaitz, falsely identified third party payers in order to conceal the fact that control groups and other affiliates were sponsoring promotional campaigns in order to surreptitiously dump stock in the markets.  Similarly, Dhillon and Taylor knew, or recklessly disregarded, that the Veldhuis Control Group would retain a stock promoter to tout Stevia First/Vitality stock and would conceal (i) their role in funding the stock promotional campaign, (ii) the fact that they were part of a group that controlled the issuer, and (iii) the fact that they intended to trade, and were trading, in the opposite direction to which the touts urged retail investors to trade.

128.    On or about March 13, 2015, Sexton and Veldhuis exchanged Encrypted Communications concerning Dhillon and continuing the Stevia First/Vitality stock promotion:

> Sexton to Veldhuis: "Avtar said they got additional things going for stvf [the ticker symbol for Stevia First at the time].  To keep going with [a stock promoter] and they only have another 1mm to chew thru and it should clean up real nice.
>
> Veldhuis to Sexton: "Nice."

129.    Veldhuis, on behalf of Dhillon, the Veldhuis Control Group, and Taylor, continued to orchestrate stock promotions concerning Stevia First/Vitality stock later in 2015. To that end, Veldhuis sought to identify a nominee entity that could be cited as the paying party for the promotional campaign in order to conceal the fact that the Veldhuis Control Group actually paid for the stock promotional campaign.

44

130.    For example, on or about March 31, 2015, Veldhuis sent an Encrypted Communication, subject line "promo," to Sharp asking if one of eight Sharp Group-administered nominees "can be used . . . as the payee [sic] for the promotion.  Or should we set up a new company?"  Sharp responded and instructed Veldhuis to use one of the preexisting nominee companies.

131.    On or about the same day, Veldhuis forwarded Sharp's Encrypted Communication to Kelln and asked: "[c]an u please send me on[e] of the 8 companies including the address?"  Kelln, in turn, copied Gasarch on the Encrypted Communications chain and wrote: "Wire [Gasarch]: pls provide [Veldhuis] a current 2015 holding co with address."  Later that day, Gasarch confirmed that she emailed the requested information to Veldhuis.

132.    On or about April 7, 2015, Veldhuis communicated with Kaitz by Encrypted Communications about issuing promotions concerning Stevia First/Vitality stock.

133.    On or about May 6, 2015, Veldhuis and Sexton discussed, via Encrypted Communications, arrangements for additional stock promotions to tout Stevia First/Vitality stock.  Veldhuis wrote: "I been [sic] back and forth with [Kaitz] on it today.  He had trouble getting ads approved on new network.  He has spent 2k this week so far and trying to get other stuff approved today.  Was supposed to be done by Tuesday afternoon."

134.    On various dates in 2015 and 2016, including through at least December 2016, during the promotional campaign that Veldhuis coordinated through Kaitz, the Veldhuis Control Group and Taylor sold, via Sharp Group-administered nominee shareholders, in total, millions of shares of the March 2012 Stevia First/Vitality Stock.

135.    Dhillon received a cut of these proceeds, just as he had received distributions from the proceeds of the defendants' Stevia First/Vitality stock sales in at least 2012 and 2014.

On or about October 28, 2015, for example—consistent with Dhillon's instruction that his cut of the proceeds be transferred to third parties on his behalf to obscure the fact that they were redounding to his benefit—the Veldhuis Control Group arranged for Wintercap SA to pay a third party approximately $25,000 toward an expense incurred by Dhillon's family.

136.    Similarly, on or about June 21, 2016, Wintercap SA remitted $110,431.86 to a loan servicing company in Colorado.  This payment, sent from a Sharp Group-administered nominee entity, Morris Capital, was applied to pay a mortgage loan for Sexton's benefit on a property in California.

137.    Taylor also participated in the Veldhuis Control Group's sales of Stevia First/Vitality stock in at least December 2016.  In conjunction with their promotional activities, the Veldhuis Control Group sold shares of Stevia First/Vitality through Sharp-administered nominees between December 1 and 22, 2016 for proceeds of more than $1.7 million.  Taylor received some of the proceeds of these sales.

138.    Specifically, on or about December 22, 2016, Taylor created an invoice seeking payment of $10,000 for "consulting services for introduction of marketing" and for "Intro VBIO."  VBIO was Stevia First/Vitality's ticker symbol at that time.  The invoice was directed to one of the Sharp-administered nominee entities that was selling Stevia First/Vitality shares. The invoice asked that payment be made to an individual in Singapore ("Taylor Nominee B") who served as a nominee owner for some of Taylor's Heng Hong accounts (*see* ¶113).

139.    The metadata for the invoice shows that about 1.5 hours after Taylor created the invoice, Gasarch modified it.  In her role as the coordinator of clients' wire requests, two minutes after she last modified the invoice, Gasarch sent Taylor's invoice to Wintercap SA using an email address for the Sharp Group-administered nominee named on the invoice.  Wintercap SA

paid the invoice out of the proceeds that the Veldhuis Control Group earned by selling Vitality stock in December 2016.  Gasarch recorded the wire request in the Q accounting system and debited the amount of the wire from the Stevia First/Vitality account.

140.    Taylor Nominee B received the $10,000 Wintercap SA wire on or about December 27, 2016.  Contemporaneously, Taylor Nominee B paid CAD $10,000 to a Canadian law firm.  The wire to the law firm stated, in the remittance information section, that the payment related to a company of which Taylor was the CEO, CFO and founder.  The processing date of this wire was January 4, 2017.  Using the obfuscation provided by the Sharp Group, Taylor thus orchestrated a payment recorded for the benefit of his company with his portion of fraudulent Stevia First/Vitality stock sales.

**Round Four: 2016 – 2018 Illegal Vitality Stock Sales**

141.    On or about July 10, 2016, Stevia First changed its name to Vitality and executed a 1-for-10 reverse split of its common stock.  The reverse split meant that shareholders were required to exchange 10 shares for one share, which had the effect of reducing the total number of outstanding shares of the company by a factor of 10.  This also had the effect of drastically reducing the holdings of retail investors whom Defendants had prompted to purchase shares in Stevia First through their previous promotional campaigns.

142.    On various dates in 2016, the Veldhuis Control Group sent numerous wire payments to Vitality, or to third parties on behalf of Vitality, totaling approximately $4.4 million. In exchange, Vitality—with Dhillon operating as the chairman of its board of directors—issued millions of shares (the "Vitality Stock") to nominee entities that the Sharp Group once again provided for use by the Veldhuis Control Group.

143. The Vitality Stock shares acquired by the Veldhuis Control Group from the financing described in ¶142, above, were initially issued with restricted legends. In order to facilitate the liquidation of these shares, Kelln retained an attorney on behalf of each of the nominee shareholder entities to prepare opinion letters that falsely represented that the nominee shareholders were not affiliates of Vitality.

144. On various dates ranging between 2016 and 2018, the attorney retained by Kelln on behalf of the Veldhuis Control Group issued opinion letters to Vitality's transfer agent, representing that none of the Sharp Group-administered nominee shareholders were affiliates of Vitality. Based on these false representations, Vitality's transfer agent removed the restricted legends from the Vitality Stock, thereby enabling the Veldhuis Control Group to sell the Vitality Stock to the public. In actuality, the Vitality Stock was controlled by affiliates of the company and was legally restricted from resale. Among other points of affiliation, the Veldhuis Control Group was acting in concert with Dhillon, who was the chairman of Vitality's board.

145. After Vitality's transfer agent removed the restricted legend for one of the nominee shareholders, Kelln advised Wintercap SA of an incoming deposit of 750,000 shares of Vitality in the name of a Sharp Group-administered nominee shareholder called Hilton Capital.

146. At that time, Kelln noticed from reviewing Q records that Wintercap SA was already holding Vitality shares (that had been previously deposited) in the name of Hilton Capital. The 750,000 additional shares would have brought the total shares held by that nominee to more than 5% of Vitality's issued shares. As Kelln knew or recklessly disregarded, any shareholder who was the beneficial owner of more than 5% of Vitality's outstanding stock was legally required to publicly disclose its holdings. Such disclosures would have frustrated Dhillon's and the Veldhuis Control Group's efforts to conceal their stock holdings and sales.

48

147.    On or about February 28, 2017, Kelln instructed Wintercap SA to allocate all Vitality Stock sales Wintercap was making that day to the Hilton account, thereby reducing the number of Vitality shares that Hilton Capital was shown as holding.  This ruse prevented Hilton Capital from showing share ownership in excess of 5%.  Specifically, Kelln wrote: "allocate all VBIO [ticker symbol of Vitality] to the [Hilton Capital] account today.  We need to make room for pending 750k.  Again 5% rule is biting me in the ass."

148.    The 750,000 shares were subsequently deposited with Wintercap SA.  Thereafter, Veldhuis provided trading instructions to Wintercap SA to sell the Vitality Stock.

149.    In or about December 2016, during the course of another Veldhuis Group-funded, Kaitz-managed stock promotion touting Vitality's stock, Wintercap SA's principal asked Veldhuis through an encrypted messaging application if the Vitality Control Group could "switch selling to another outlet to let us [Wintercap SA] breath[e]" and slow the pace of selling. Veldhuis responded that he could slow the pace "on the next batch, but that's a week out.  In the meantime, sell 15k VBIO @ 2.11."  Wintercap SA's principal suggested, in response, "[m]aybe 2 days on, 1 day off . . . ."  In response, Veldhuis suggested that he could move the stock held at Wintercap SA to a competitor, Blacklight SA ("BL").  This exchange followed:

| Veldhuis to Wintercap | I will figure out how to move some elsewhere.  It pains me to give BL business. |
|---|---|
| Wintercap to Veldhuis | Ok.  I don't wish you to do that ;) |
| Veldhuis to Wintercap | Lol |
| Wintercap to Veldhuis | We can stay on point |

150.    In connection with their efforts to sell Vitality Stock in 2016 and later, the Veldhuis Control Group again retained Kaitz to conduct a promotional campaign.  Between October 2016 and March 2017, Veldhuis directed Wintercap SA to wire $530,000, which was

derived from financial accounts associated with four Sharp Group-administered nominee shareholders, to Kaitz's entity for the purpose of promoting Vitality.

*** 

151.     Overall, the Sharp Group allocated Stevia First/Vitality stock sale proceeds as follows during the period of time subject to this Complaint:

| Defendant | Approximate Amount (Millions) |
|---|---|
| Sexton | $5.5 |
| Veldhuis | $3.1 |
| Friesen | $2.3 |
| Taylor | $4.3 (of which Taylor, in turn, promptly forwarded approximately $2.6 million to Dhillon, as noted in ¶89) |
| Kaitz | $1.4 |

152.     Dhillon benefited by receiving millions of dollars from the proceeds of these illegal stock sales, including through payments made by the Veldhuis Control Group and Taylor to various third parties on Dhillon's behalf.

**The Veldhuis Control Group's Omissions in Furtherance of the Scheme**

153.     Veldhuis, Sexton and Friesen acted as a group for purposes of acquiring, holding, and ultimately disposing of Vitality shares, and consequently became subject to regulation as a single person pursuant to Exchange Act Section 13(d)(3). Veldhuis, Sexton and Friesen failed to file any report on behalf of the group as required under Rule 13d-1(k)(2), even though they collectively acquired, held, and were responsible for directing the disposition of, far more than 5% of Vitality's outstanding stock through nominee entities that were under their group's control.

154.     In failing to make required Schedule 13D/G filings, Veldhuis, Sexton, and Friesen violated Section 13(d) and Rule 13d-1 thereunder.

### Dhillon's Failures to Disclose in Furtherance of the Scheme

155.     On August 17, 2016, Dhillon filed an untimely and inaccurately amended Schedule 13D (specifically, a Schedule 13D/A) with the Commission.  Dhillon reported that he was the beneficial owner of 1,530,585 shares (post stock split) consisting of:

        a.   515,000 shares issued directly by Vitality in 2012.

        b.   50,000 in stock options issued by Vitality in 2012.

        c.   40,000 shares of common stock issued by Vitality in 2015.

        d.   925,585 shares of common stock issued by Vitality in 2016.

156.     In actuality, as of August 17, 2016, Dhillon was also a beneficial owner of a significant number of shares of the stock held by the Veldhuis Control Group.  Dhillon did not report, among other things, these shares in his Schedule 13D.

157.     Dhillon also failed to file any Forms 4 reflecting the sales of Vitality stock that had been sold on his behalf, directly or indirectly, by the Veldhuis Control Group.  For example, on or about January 13, 2017, the Veldhuis Control Group caused Wintercap SA to sell 44,661 shares of Vitality, which sales generated proceeds of $105,551.21.  On or about January 27, 2017, the Veldhuis Control Group caused Wintercap SA to transfer $100,000 to pay an expense incurred by Dhillon.  Dhillon failed to file a Form 4 reflecting either of these January 2017 Vitality stock sales, or any other sales by the Veldhuis Control Group in 2017 or 2018 from which he benefitted.

### Dhillon's False and Misleading Testimony in Furtherance of the Scheme

158.     On or about August 29, 2019, during the investigation leading to the filing of this action, Dhillon provided sworn testimony to the Commission staff.  Seeking to conceal his illegal conduct, Dhillon falsely denied being the beneficiary of any undisclosed Stevia First/Vitality

stock sales, and falsely denied knowing that the Veldhuis Control Group had sold Stevia First/Vitality stock.

159.    For example, during the August 2019 testimony, the Commission asked Dhillon if he ever received the proceeds of any sales of Stevia First/Vitality stock.  Dhillon falsely replied, "I have not."  In actuality, the Veldhuis Control Group and Taylor had distributed Stevia First/Vitality stock trading proceeds to Dhillon, directly and indirectly, through cash payments and through payments to third parties on Dhillon's behalf.

160.    Similarly, during the August 2019 testimony, the Commission asked Dhillon if he knew anyone who sold Stevia First/Vitality stock.  Dhillon falsely replied, "I'm not aware."  In actuality, Dhillon knew that the Veldhuis Control Group and Taylor had sold Stevia First/Vitality stock, and had shared the resulting proceeds with him.

## SHARP GROUP EXAMPLE TWO:
## ILLEGAL ARCH STOCK SALES INVOLVING DHILLON, THE VELDHUIS CONTROL GROUP, AND TAYLOR

161.    Beginning in or about 2013, the Veldhuis Control Group schemed with Dhillon, Taylor and Kaitz to sell illegally the stock of Arch.

162.    In 2013, Dhillon arranged for a private company he controlled to merge (as a reverse merger) into a publicly traded shell company controlled by the Veldhuis Control Group.  Following the reverse merger, which closed in or about June 2013, the surviving public company was called Arch.

163.    By April 2013, Dhillon had become an officer or director of Arch; and by June 2013, Dhillon had assumed the role of chairman of Arch's board of directors.

164.    Prior to the 2013 Arch reverse merger, Arch had issued shares to various S-1 Shareholders (hereinafter referred to as the "Arch S-1 Shareholders") in 2012.  By early 2013,

following a stock split, the Arch S-1 Shareholders collectively held 20 million shares of Arch stock (which traded under the ticker symbol "ARTH").

165.    Leading up to, and shortly after, the closing of the reverse merger, the Veldhuis Control Group directed the transfer of 16,920,000 Arch shares, held in the names of several Arch S-1 Shareholders, to eleven Sharp Group-administered nomine shareholders for the benefit of the Veldhuis Control Group.

166.    Kelln arranged, on behalf of the Veldhuis Control Group, to transfer an additional 2,310,000 shares, held in the names of several additional Arch S-1 Shareholders, to an entity controlled by Wintercap SA called "Victory Capital" on behalf of the Veldhuis Control Group.

167.    Combined, the Veldhuis Control Group held at least 19,230,000 purportedly unrestricted shares of Arch, representing over 48% of Arch's total issued and outstanding stock, which constituted close to 100% of Arch's unrestricted shares that were available for trading, at or around the time of the reverse merger.

168.    Shortly before the reverse merger closed, the Veldhuis Control Group controlled, through a Sharp Group-administered nominee, an additional 20,000,000 shares that were marked as restricted.  In anticipation of the reverse merger, the Veldhuis Control Group transferred these shares to Dhillon (10,000,000) and a company controlled by the CEO of Arch (10,000,000). Dhillon, in turn, transferred 2,750,000 shares to a domestic corporate entity ("Company A"), an entity that was controlled by Dhillon's associate, Person A.

169.    The chart below illustrates the transfers described in ¶¶165 through 168.



170.    The Veldhuis Control Group provided financing to Arch around the time of the reverse merger.  Specifically, the Veldhuis Control Group funneled approximately $1.75 million through an attorney's escrow account, which was remitted to Arch in the form of equity subscription agreements.  Dhillon, through his same Swiss-banking Ortivo account referenced in ¶89, also contributed $250,000 as part of this financing, but concealed this involvement from Arch's principals.

171.    Following the reverse merger, the Veldhuis Control Group engaged Kaitz to

promote Arch and paid Kaitz approximately $1.2 million from June 2013 to August 2013 for this promotion.

172.     As Kaitz knew or recklessly disregarded, these payments were derived from money held by Sharp Group-administered nominee shareholders on behalf of the Veldhuis Control Group.  For example, on or about July 24, 2013, Kaitz sent the following Encrypted Communication to Veldhuis: "Are you able to capture anything on arth?"  Kaitz was asking Veldhuis, in substance, how much money, if any, the Veldhuis Control Group made from the sale of Arch stock during the course of the stock promotion.

173.     Some of the promotions managed by Kaitz falsely identified the promotions' funding source.  For example, the landing page for an Arch promotion cited "Advantage Media Corp" as the "paying party" of a $790,000 "total production budget."  As Kaitz knew or recklessly disregarded, Advantage Media was a front company used to disguise the identity of the parties actually paying for the promotion, i.e. the Veldhuis Control Group.

174.     On September 27, 2013, Kaitz asked Veldhuis in an Encrypted Communication what to do if other stock promoters hired by Kaitz to distribute touts about Arch refused to identify Advantage Media as the supposed paying party.  Kaitz wrote to Veldhuis: "Am trying to have them put Advantage media, if they won't then what?"  Later that day, Kaitz explained that the other stock promoters said that "[t]hey will go if they get the invoice signed and sent back to them via email from advantage."  Veldhuis responded and directed Kaitz to send the invoice to an email address created for the purpose of making it appear as if Advantage Media Corp. was an actual third party: "send to marketing@advantagemedia.co."

175.     Sharp substantially assisted the Veldhuis Control Group's use of Advantage Media Corp. to disguise the Veldhuis Control Group's Arch-related conduct.  For example, on or

about January 21, 2014, Sharp asked Veldhuis in an Encrypted Communication whether he should continue to pay incorporation fees associated with Advantage Media Corp., and, if so, whether he (Sharp) should use Arch stock sale proceeds to make such payments: "Do we pay the 2014 annual fees for advantage media corp (belize)?  Debit arth?"  Veldhuis responded: "Kill it." By that time, Advantage Media Corp. had served its purpose: the Veldhuis Control Group used it as a front company to fund a stock promotional campaign touting Arch stock.

176.   The chart below illustrates the success of the Veldhuis Control Group's paid promotion of Arch between June and September 2013:



177.   During the period of the promotional campaign, the Veldhuis Control Group surreptitiously sold millions of Arch shares into the market through nominee shareholders administered by the Sharp Group.  Specifically, between June 11, 2013 and September 30, 2013, the Veldhuis Control Group sold approximately 16.6 million shares of Arch stock through Sharp Group-administered nominee shareholders, generating proceeds of at least $11.5 million.  The

Veldhuis Control Group sold another approximately 1.4 million shares generating proceeds of approximately $574,000 through a nominee shareholder administered by Wintercap SA.

178.    Throughout the period of these unregistered sales, the Veldhuis Control group was an affiliate of Arch, by virtue of its control over a significant percentage of Arch's stock and/or because it was acting in concert with Dhillon, the chairman of the company.  Sharp, Kelln, Veldhuis, Friesen, and Sexton failed to register their sales of Arch stock described herein pursuant to Section 5 of the Securities Act.  In selling these shares, the Veldhuis Control Group, through Sharp Group-administered nominee shareholders, surreptitiously sold unregistered shares of stock, and schemed to defraud investors by concealing the fact that public company affiliates were dumping stock into the markets.

179.    The Veldhuis Control Group coordinated with Dhillon on the stock promotions. For example, Sexton had one or more discussions with Dhillon where he discussed sharing the promotional materials with Dhillon before they were published, and Sexton reported to Dhillon the budget for promotions.  In addition, shortly before the merger closed, Friesen asked Sexton and Veldhuis whether Dhillon would "have a set of news releases to begin issuing next week?", to which Sexton responded, "I asked for that yesterday.  He said he would deliver."  Dhillon played this role in order to benefit from the Veldhuis Control Group's sale of stock, since, as the Veldhuis Control Group and Dhillon knew, promotional campaigns tend to be more effective when they coincide with news releases by the issuer whose stock is being promoted.

180.    Dhillon directly participated in the Veldhuis Control Group's sales of Arch, while failing to register those sales pursuant to Section 5 of the Securities Act.  For example, on or about August 13, 2013 in an Encrypted Communication, Sexton relayed a conversation he had with Dhillon to Veldhuis: Sexton reported that he told Dhillon that the Veldhuis Control Group

"would be active in the market" until the first week of September and that they "wouldn't sell

below \$0.40 [per share]."  Sexton also relayed to Dhillon that the Veldhuis Control Group would

first distribute the proceeds of such sales as a repayment for the private placements they had

made (including Dhillon's anonymous \$250,000 investment) into Arch, but that a broader

distribution would take place in September.  Sexton noted Dhillon was "disappointed it wasn't

bigger success as we all are but I explained sometimes things out of control and we were

squeezing this out in short timeframe so it may have hurt us a bit in that we weren't able to stop

once we started."  Sexton continued, "I said we worked well together and everyone did what they

said they would and that we would continue to look at his projects in future."

181.    On or about September 6, 2013, Veldhuis instructed Gasarch to wire \$250,000

from the Arch proceeds to the same Dhillon owned Swiss-banking Ortivo account referenced in

¶¶89 and 170, thereby reimbursing Dhillon for his undocumented private placement investment.

Consistent with Sexton's description above, the Veldhuis Control Group caused a further

distribution to be made from the Group's illicit Arch stock sale proceeds for Dhillon's benefit in

September 2013.

182.    In particular, on or about September 26, 2013, Wintercap SA wired \$200,000 to a

Canadian company controlled by Dhillon's tax accountant, who, in turn, wired the very same

amount, on or about the same day, to a U.S.-based corporate account that Dhillon controlled.

This money was derived from the sale of Arch stock.

183.    Taylor also schemed with the Veldhuis Control Group on the Arch deal and

received at least \$600,000 of the proceeds generated by its Arch sales, while also failing to

register those sales pursuant to Section 5 of the Securities Act.  On or about August 20, 2013,

Sexton wrote to Veldhuis and instructed him to "send 600k from ARTH" to the same Taylor-

controlled Swiss bank account as that referenced in ¶89.  Two days later, at Veldhuis's direction, Gasarch wired the funds, to that same destination, from a Cayman Islands brokerage account. This $600,000 distribution derived from the illegal sales of Arch stock.

184.    The Veldhuis Control Group and Taylor continued to engage in fraudulent sales of Arch stock into 2017.

185.    For example, Taylor, through Heng Hong, received Arch shares in 2014, 2015 and 2016.  The shares and warrant rights that Heng Hong purchased from Arch in 2014 were funded by the Veldhuis Control Group.  In August 2013, the Veldhuis Control Group directed the Sharp Group to send $600,000 derived from its previous fraudulent trading in Arch securities to Heng Hong.  Heng Hong used these funds to pay for the Arch shares and warrants it acquired from the issuer in the January 2014 round of financing.

186.    Taylor arranged for many of these Arch shares to be deposited into Heng Hong accounts managed by Blacklight SA, and he sold those shares over time, including between December 24, 2015 and June 6, 2016, generating proceeds of approximately $616,000.  Taylor shared a portion of these proceeds with Dhillon, by arranging for two payments of approximately $100,000 each to a creditor of Dhillon's (Dhillon Creditor A) in February and March 2016. Blacklight SA sent another approximately $159,000 of these proceeds to Taylor Nominee B (*see* ¶138).  Those transfers occurred in May through October 2016.  Taylor Nominee B, in turn, paid at least some of those proceeds to Taylor, including: $5,000 wired on or about November 2, 2016 to an account controlled by Taylor, and CAD $65,000 wired on or about December 8, 2016 to a Canadian law firm trust account stating that it was "in favour of Graham Taylor".

187.    In addition, Arch issued a total of 4,458,608 new shares to Taylor's Heng Hong entity on or about June 28, July 5, August 8, September 27, and November 8, 2016.  Within

59

several weeks of each new issuance to Heng Hong, Heng Hong transferred those shares to Trius Holdings Ltd., a Sharp Group-administered nominee that was being used by the Veldhuis Control Group.  The share issuance to Taylor's Heng Hong entity on or about November 8, 2016 was funded by the Veldhuis Control Group.  In particular, the $220,000 owed to Arch for the shares issued to Heng Hong on that date was charged to the Arch account in the Q accounting system, was funded out of the Veldhuis Control Group's fraudulent proceeds from sales of Vitality stock, and was sent by wire to Arch from an account managed by Wintercap SA.

188.    The Veldhuis Control Group, through Trius Holdings, deposited the Arch shares it received from Heng Hong into an account controlled by Blacklight SA and sold those shares to unsuspecting investors in the market between about June 9, 2016 and May 17, 2017, for total proceeds of at least $2.5 million.  These sales were recorded in the Sharp Group's Q accounting system into the Arch account, from which distributions were directed by the Veldhuis Control Group including payments for the benefit of Dhillon.  By furnishing his Heng Hong entity to facilitate the Veldhuis Control Group's concealment of their ownership and sales of these shares, Taylor knew, or recklessly disregarded that he was substantially assisting the scheme to defraud the market about the control of Arch shares then being sold.

189.    The Sharp Group allocated Arch stock sale proceeds to the Veldhuis Control Group as follows during the period of time subject to this Complaint:

| Veldhuis Control Group Member | Approximate Amount (Millions) |
| --- | --- |
| Sexton | $1.7 |
| Veldhuis | $1.5 |
| Friesen | $1.5 |

***

190.    The table below reflects payments directed by the Veldhuis Control Group to

Dhillon and Taylor or entities with whom they were associated, sourced from the sale of Stevia First/Vitality and Arch stock through Sharp Group-administered nominee shareholders from 2012 to 2018:[8]

| Year | Dhillon | | Taylor | | Total | |
|------|------|------|------|------|------|------|
| 2012 | $ | 33,890 | $ | 4,225,531 | $ | 4,259,421 |
| 2013 | | 259,770 | | 600,200 | | 859,970 |
| 2014 | | 10,000 | | 124,200 | | 134,200 |
| 2015 | | 25,030 | | - | | 25,030 |
| 2016 | | 231,672 | | 10,000 | | 241,672 |
| 2017 | | 2,157,330 | | - | | 2,157,330 |
| 2018 | | 300,500 | | - | | 300,500 |
| Total | $ | 3,018,192 | $ | 4,959,931 | $ | 7,978,123 |

191.     Once Taylor became aware of the Commission's investigation into the schemes described in this complaint, he signed false documents that were intended to provide false explanations for his payments to Dhillon of the proceeds from the sales of Stevia First/Vitality and Arch securities.  Specifically, Taylor signed a fraudulent and backdated Option Agreement that purported to justify his payments to Dhillon as purchases of interests in a parcel of land owned by Dhillon.  In April 2021, Taylor then provided that false document to Canadian regulators who had requested documents from him on behalf of the Commission.  Taylor's provision of this false document was designed to obfuscate his role in the scheme and shows his consciousness of guilt.

192.     As described in ¶182, Dhillon was also the beneficiary of another $200,000 in Arch stock sale proceeds in 2013, at the Veldhuis Control Group's direction, but these funds were sourced from a Wintercap SA-administered, rather than a Sharp Group-administered, nominee shareholder.

---

[8] The table does not include payments made in cash to Dhillon or Taylor's payments to Dhillon.

***

193.     During the period of April 2014 through March 2016, the table below reflects various distributions of money, some of which were derived from Stevia First/Vitality and Arch stock sale proceeds, directed by Taylor to third parties for the benefit of Dhillon or otherwise associated with Dhillon:

| DATE | PAID TO | AMOUNT |
|---|---|---|
| 3/1/2012 | AVTAR DHILLON | $      4,450 |
| 3/2/2012 | AVTAR DHILLON | 5,000 |
| 4/17/2012 | SUTTER BUTTES LLC* | 498,000 |
| 5/4/2012 | ORTIVO (Defined at ¶ 82) | 400,000 |
| 5/11/2012 | ORTIVO | 496,000 |
| 7/16/2012 | ORTIVO | 1,300,000 |
| 11/20/2013 | DHILLON RELATIVE A | 90,000 |
| 11/26/2013 | DHILLON RELATIVE B | 40,000 |
| 11/26/2013 | DHILLON CONTRACTOR | 95,000 |
| 12/2/2013 | DHILLON CREDITOR A | 95,000 |
| 12/18/2013 | DHILLON CONTRACTOR | 65,000 |
| 1/15/2014 | DHILLON CREDITOR B | 65,000 |
| 1/21/2014 | DHILLON CREDITOR B | 35,000 |
| 4/25/2014 | DHILLON CREDITOR A | 94,980 |
| 6/19/2014 | CHALMERS GROUP LLC* | 60,000 |
| 6/24/2014 | CHALMERS GROUP LLC* | 210,000 |
| 7/7/2014 | CHALMERS GROUP LLC* | 120,000 |
| 7/24/2014 | DHILLON CREDITOR A | 294,475 |
| 9/17/2014 | DHILLON CREDITOR A | 247,000 |
| 9/17/2014 | DHILLON CREDITOR A | 96,500 |
| 2/26/2016 | DHILLON CREDITOR A | 99,965 |
| 3/28/2016 | DHILLON CREDITOR A | 99,965 |
| **TOTAL** | | **$ 4,511,335** |

***

194.     On or about July 30, 2020, Dhillon appeared for further testimony before the Commission in connection with the investigation leading to the filing of this action, and again made false and misleading statements, including claims that (i) prior to 2014, his interactions

with Sexton had been limited to seeing him from a distance "in social circles … [like] hockey games", "at charity events with his own tables [and] at restaurants entertaining people" and that (ii) since 2014, his substantive interactions with Sexton have been limited to several discrete topics that he characterized as innocent in nature.

***

195.    In addition to their schemes to sell Arch and Vitality stock illegally that are described above, Taylor and Dhillon also schemed to sell the stock of at least two other Dhillon-chaired issuers:  Inovio and OncoSec.  Taylor's and Dhillon's Inovio scheme is described in the following paragraph; the pair's OncoSec scheme is described at ¶¶235 and 236.

196.    At the time of Taylor's and Dhillon's Inovio scheme, Dhillon was the chairman of Inovio's Board of Directors.  Similarly to Taylor and Dhillon's other schemes, Dhillon facilitated the transfer of Inovio shares to a nominee company controlled by Taylor, who then directed the unregistered sale of those shares from at least approximately August 23, 2013 to September 13, 2013.  Taylor's sales generated at least $2.5 million in proceeds.  On various dates during approximately November 2013 through January 2014, Taylor paid hundreds of thousands of dollars to Dhillon or for Dhillon's benefit.  Also, similarly to Taylor and Dhillon's other schemes, Dhillon failed to register the Inovio shares or report his beneficial ownership interest in them or sale of them on either Schedule 13D or Form 4.

## **DHILLON'S SCHEME TO SELL ARCH STOCK ILLEGALLY THROUGH PERSON A**

197.    Dhillon illegally sold the stock of companies atop whose boards he sat through different channels, apart from the Veldhuis Control Group and Taylor.  To that end, Dhillon enlisted Person A to establish and manage a front company through which Dhillon surreptitiously sold such stock, without Dhillon appearing associated with those stock sales in

any public record or filing.  Dhillon's scheme to sell Arch stock illegally with Person A is described in detail below.

198.    Dhillon schemed to sell the stock of Arch fraudulently by, among other things, concealing from securities intermediaries such as brokers that he was selling, through a nominee shareholder, stock that was legally required to be registered, and concealing from Arch's shareholders that he—Arch's highest-level insider—was selling Arch stock into the market.

199.    In or about April 2013, Dhillon became a director of Arch, and, by June of that year, became chairman of its board.  Dhillon was an affiliate of Arch in that he had the power to control the company through his role as its chairman.  As a public company affiliate, Dhillon was legally required to register any sale of Arch stock unless Dhillon elected to comply with the safe harbor provisions set forth in Commission Rule 144, which strictly limit the quantity of securities an affiliate may sell to the public.  Dhillon testified, under oath, during the Commission's investigation that he understood these legal requirements at all times relevant to this Complaint.

200.    As a director of Arch, Dhillon was required to file public reports—including a Form 4—with the Commission pursuant to Section 16(a) of the Exchange Act and Rule 16a-3 thereunder disclosing any change in his beneficial ownership of Arch stock, regardless of amount.  Dhillon understood these legal requirements at all times relevant to this Complaint. Dhillon failed to file any Forms 4 reflecting sales of Arch stock by the Veldhuis Control Group (described above) or Person A from which he benefitted.

201.    Dhillon was legally required to file a Schedule 13D with the Commission pursuant to Section 13(d) of the Exchange Act and Rule 13d-1 thereunder to the extent he was the beneficial owner of greater than five percent of Arch's common stock.  Dhillon understood

these legal requirements at all times relevant to this Complaint.  Dhillon failed to file an accurate Schedule 13D reflecting his beneficial ownership of Arch's stock.

202.    Shortly after Dhillon became the chairman of Arch's board in April 2013, he arranged for at least one *alter ego* corporate shareholder to hold Arch stock on his behalf. Specifically, in or about June 2013, Dhillon arranged for the transfer of 2,750,000 Arch shares to Company A, a corporate nominee that Dhillon directed Person A to form.  In order to disguise Dhillon's association with Company A, Person A, as directed by Dhillon, identified only Person A as Company A's director in its incorporation papers.  Company A was, in actuality, holding Arch stock for Dhillon.

203.    On or about April 6, 2016, Person A caused Company A to open an account with a United States brokerage firm for the purpose of selling Arch stock.  Person A represented to the United States brokerage firm that he (as the sole director of Company A), was not an "officer, director, or more than a 10% shareholder of [Arch] or in any other way an 'affiliate' of [Arch]." Person A's representation was false and misleading in that Company A was actually holding, and was created in order to sell, Arch stock on behalf of Dhillon, who was a director and affiliate of Arch.  Dhillon knew, or recklessly disregarded, that Person A misled the United States brokerage firm as part of their scheme to sell Arch stock surreptitiously.

204.    The table below reflects Company A's sales of Arch stock, all of which occurred during a four-month period in 2016.  Dhillon failed to register these sales pursuant to Section 5 of the Securities Act:

| Month | Arch Shares Sold | Arch Sale Proceeds |
|-------|-----------------|--------------------|
| Apr-16 | 210,000 | $ 79,711 |
| May-16 | 460,000 | 181,925 |
| Jun-16 | 1,035,000 | 444,567 |
| Jul-16 | 1,045,000 | 631,133 |
| **Total** | **2,750,000** | **$ 1,337,336** |

205.    At or about the same time that Company A sold Arch stock, Person A caused Company A to transfer at least $850,000 of Arch stock sale proceeds to third parties identified by Dhillon, his assistant, or both, all to benefit Dhillon.  These transfers included paying various business and personal expenses Dhillon had incurred.

206.    Examples of Arch proceeds-funded payments routed by Company A through Dhillon's assistant to a bank account controlled by Dhillon in the name of One World Ranches LLC, as directed by Dhillon, are below.



207.    Dhillon did not disclose the stock that Company A held on Dhillon's behalf, or Dhillon's agreements with Person A concerning the holding and sale of those shares, on a Schedule 13D, as legally required.  Nor did Dhillon disclose any of Company A's Arch sales executed on Dhillon's behalf on any Form 4 filing with the Commission.

208.    On or about July 8, 2013, Dhillon filed a Schedule 13D with the Commission purportedly reflecting all of the Arch shares in which he held a beneficial interest.  This is the only Schedule 13D Dhillon filed concerning Arch.  Dhillon reported that he was the beneficial owner of 7,160,373 of Arch shares, consisting of:

      a.   7,000,000 shares that he received in a private transaction in or about June 2013.

b.  160,373 shares of common stock in exchange for the cancellation of debt

Dhillon was owed by a private company that had merged with Arch.

209.    Dhillon's July 8, 2013 Schedule 13D was materially misleading in that it failed to reflect that Dhillon was also a beneficial owner of Arch stock held on Dhillon's behalf by Company A and additional Arch stock held on Dhillon's behalf by the Veldhuis Control Group. The Schedule 13D was also materially misleading in that it failed to disclose Dhillon's agreements with Person A and with the Veldhuis Control Group concerning the sale of Arch shares, or his and their respective combined holdings in Arch securities.  Dhillon knowingly failed to make any of these disclosures in his Schedule 13D in order to conceal that information from investors and securities market intermediaries.

210.    Dhillon also knowingly failed to file any Forms 4 reflecting the sales of Arch stock that had been effected on his behalf, directly or indirectly, by Company A or the Veldhuis Control Group.  For example, on various dates in April through June 2016, Company A sold Arch shares in the market on Dhillon's behalf.  Dhillon intentionally failed to file a Form 4 reflecting any of these 2016 Arch stock sales in order to conceal his conduct form Arch investors.

211.    On or about August 29, 2019, during the investigation leading to the filing of this action, Dhillon provided sworn testimony to the Commission staff.

212.    During that August 2019 testimony, the Commission asked Dhillon if he knew of anyone who sold Arch stock prior to 2019.  Dhillon, seeking to conceal his illegal conduct from the Commission, falsely replied, under oath: "I'm not aware."  In actuality, and as Dhillon well knew, Person A caused Company A to sell Arch shares on Dhillon's behalf.  As described above,

and as Dhillon likewise well knew, the Veldhuis Control Group also sold Arch shares on Dhillon's behalf.

### SHARP GROUP EXAMPLE THREE: ILLEGAL ONCOSEC STOCK SALES INVOLVING DHILLON AND THE VELDHUIS CONTROL GROUP

**The Veldhuis Control Group's Scheme to Sell OncoSec Stock Fraudulently**

213.     Prior to the Stevia First/Vitality and Arch fraudulent conduct described above, the Veldhuis Control Group schemed with the Sharp Group and Dhillon to sell fraudulently the stock of another issuer, OncoSec.  Further, Sharp, Kelln, Veldhuis, Friesen, Sexton, and Dhillon failed to register the sales of OncoSec stock described herein pursuant to Section 5 of the Securities Act.

214.     In or about February 2011, the Veldhuis Control Group directed the transfer to seven Sharp Group-administered nominee shareholders of 12,800,000 purportedly unrestricted OncoSec shares sourced from 20 original individual investors.  At the time, OncoSec had 52,656,000 shares outstanding.  The Veldhuis Control Group, therefore, held over 24% of the total common stock outstanding across the Sharp Group-provided nominee shareholders to which the Veldhuis Control Group directed OncoSec shares, and was an affiliate of the issuer. The Veldhuis Control Group knew that its 24% stake in OncoSec was legally restricted from resale absent an effective registration statement.  The table below reflects the transfers summarized in this paragraph.[9]

---

[9] Monterra Investments, Cliffside Partners, and Dartmore International are nominee shareholders utilized by the Veldhuis Control Group.



215.    Between approximately March 2011 and November 2011, the Veldhuis Control Group sold, via various Sharp Group-administered nominee shareholders, approximately 2.2 million shares of OncoSec stock through offshore brokerage firms for proceeds of approximately $3 million.

216.    Later, the Veldhuis Control Group sold through the Sharp Group approximately 11 million more OncoSec shares between approximately February 2012 and August 2012 for approximately $2.4 million more in illicit proceeds.

**Dhillon's Scheme to Sell OncoSec Fraudulently through Person A**

217.    Around the same time that the Veldhuis Control Group sold OncoSec securities, Dhillon schemed to sell the stock of OncoSec fraudulently through Person A.  Dhillon concealed from securities intermediaries, such as brokers, that he was selling, through a nominee shareholder, stock that was legally required to be restricted, and concealed from OncoSec's investors that he was selling OncoSec stock into the market.

218.     On or about March 10, 2011, Dhillon became the chairman of OncoSec's board of directors.

219.     Dhillon was an affiliate of OncoSec because he was the chairman of its board. Through that role, he had the power to control the company.  As a public company affiliate, Dhillon was legally required to register any sale of OncoSec stock unless Dhillon elected to comply with the safe harbor provisions set forth in Commission Rule 144.  Dhillon testified, under oath, during the Commission's investigation that he understood these legal requirements at all times relevant to this Complaint.

220.     As a director of OncoSec, Dhillon was required to file public reports—including a Form 4—with the Commission pursuant to Section 16(a) of the Exchange Act and Rule 16a-3 thereunder disclosing any change in his beneficial ownership of OncoSec stock, regardless of amount.  Dhillon understood these legal requirements at all times relevant to this Complaint.

221.     Dhillon was legally required to file a Schedule 13D with the Commission pursuant to Section 13(d) of the Exchange Act and Rule 13d-1 thereunder to the extent he was the beneficial owner of greater than five percent of OncoSec's common stock.  On or about March 22, 2011, Dhillon received 9,910,496 restricted shares of OncoSec, which comprised greater than 5% of the company's outstanding stock.

222.     Dhillon understood these legal requirements at all times relevant to this Complaint.  Dhillon intentionally failed to file an accurate Schedule 13D reflecting his beneficial ownership of OncoSec's stock, his agreement with Person A concerning the sale of OncoSec stock, or his and Person A's combined holdings in OncoSec, despite being the beneficial owner of greater than five percent of the company's outstanding common stock.

223.   Around the time that Dhillon became the chairman of OncoSec's board in March 2011, he arranged for Person A to hold OncoSec stock on his behalf through a nominee shareholder.

224.   On or about March 2, 2011, Person A incorporated a corporate entity at Dhillon's direction, hereinafter referred to as Company B, to serve as Dhillon's nominee shareholder. Shortly thereafter, Dhillon facilitated Company B's nominal acquisition of 2,354,880 OncoSec shares.  At Dhillon's direction, Person A identified himself as Company B's sole director, in order to conceal Dhillon's association with Company B.

225.   By December 2012, Person A opened a brokerage account in the name of Company B.

226.   On or about January 19, 2013, Person A represented to Company B's brokerage firm that Company B was never an "Officer, Director, Control Person, 10% owner or Affiliate of the issuer being presented for deposit [i.e., OncoSec]," which was a confirmation required by the brokerage firm when the OncoSec shares were deposited for resale.

227.   Person A's representations to the brokerage firm were false and misleading because Company B was, in actuality, holding shares for Dhillon, who was a Director, Control Person, and Affiliate of OncoSec.  Dhillon knew, or was reckless in not knowing, that Person A would make these types of material misrepresentations to brokerage firms.  Indeed, Dhillon directed Person A to establish Company B for precisely this purpose: to conceal the fact that Dhillon was actually the beneficial owner of Company B's OncoSec stock.

228.   In or about January 2013, Person A caused Company B to deposit 2,354,880 shares of OncoSec into its brokerage account.  Person A, working in concert with Dhillon, subsequently caused Company B to sell these shares on Dhillon's behalf.

71

229.    The table below reflects Company B's sales of all 2,354,880 of its shares of OncoSec stock, between 2013 and 2017.  Dhillon failed to register these stock sales pursuant to Section 5 of the Securities Act.

| Month | OncoSec Shares Sold | OncoSec Sale Proceeds |
|---|---|---|
| Feb-13 | 50,000 | $      9,979 |
| Mar-13 | 81,400 | 16,878 |
| Apr-13 | 193,600 | 43,728 |
| May-13 | 280,000 | 78,159 |
| Jul-13 | 50,000 | 14,127 |
| Aug-13 | 375,000 | 118,681 |
| Feb-14 | 50,000 | 37,800 |
| Mar-14 | 250,000 | 204,406 |
| Apr-14 | 60,000 | 43,820 |
| May-14 | 250,000 | 198,535 |
| Jun-14 | 80,000 | 69,434 |
| Feb-17 | 54,880 | 3,705 |
| Jul-17 | 370,000 | 21,185 |
| Sep-17 | 110,000 | 6,415 |
| Oct-17 | 100,000 | 5,650 |
| **Total** | **2,354,880** | **$      872,502** |

230.    Person A, acting through Company B, distributed the majority of the OncoSec sale proceeds at Dhillon's direction to third parties identified by Dhillon.  Dhillon directed the transfers to third parties, instead of directly to his own bank accounts, to conceal that he was the actual beneficiary of the stock sales.

231.    The flow chart below reflects examples of Company B's OncoSec proceeds-funded transfers to Dhillon's assistant for the benefit of Dhillon, as directed by Dhillon:



232.    To conceal his conduct from investors, Dhillon never filed a Schedule 13D with the SEC disclosing his agreement with Person A concerning the sale of OncoSec stock through Company B, or his and Person A's combined holdings in OncoSec stock, or any of the many material changes to those combined holdings.

233.    Dhillon knew that OncoSec's public filings concealed from OncoSec's shareholders and securities market intermediaries the true extent of Dhillon's beneficial ownership position.  For example, OncoSec's Form 10-K for the year ended July 31, 2011 only reported Dhillon's ownership of 9,910,496 shares, and failed to disclose Dhillon's further beneficial ownership of, at a minimum, the Company B shares.  As a further example, OncoSec's Form 10-K for the year ended July 31, 2017 failed to disclose the existence or extent of Dhillon's Form 4 filing delinquencies stemming from his failure to file any Forms 4 concerning his OncoSec share sales that year through Company B.

234.    Indeed, to conceal his conduct from investors, Dhillon never filed any Forms 4 reporting Company B's sales of OncoSec stock on his behalf, as legally required.

## DHILLON'S SCHEME TO SELL ONCOSEC STOCK ILLEGALLY VIA TAYLOR

235.    During the course of his scheme with Person A to sell illegally OncoSec stock, described above, Dhillon also schemed with Taylor to sell illegally even more OncoSec stock. At the time of this Dhillon-Taylor OncoSec scheme, Dhillon was the chairman of OncoSec's

Board of Directors.  As part of this scheme, between at least April 2 and June 19, 2014, Taylor

sold at least 827,000 shares of OncoSec stock, through a Singapore-banking nominee

shareholder that he controlled, for proceeds totaling approximately $586,000.  Taylor failed to

register these stock sales pursuant to Section 5 of the Securities Act.

236.    During that same period, and from the same account in which he had realized the

aforementioned approximately $586,000 in sale proceeds, Taylor, in turn, sent out two wires

totaling $155,000 for Dhillon's benefit.  For examples, Taylor wired approximately $95,000 to

pay a creditor Dhillon owed, and $60,000 to a private company Dhillon owned.  And, as with his

other, similar schemes, Dhillon never disclosed—through any Form 4 or any other filing—his

OncoSec trading through Taylor.

***

## ADDITIONAL SHARP GROUP AND VELDHUIS CONTROL GROUP DEALS

237.    The Veldhuis Control Group utilized the Sharp Group's services to disguise their

stock sales in deals beyond the Vitality, Arch, and OncoSec conduct detailed above.  In each

such case, the Sharp Group provided the infrastructure necessary to obfuscate the Veldhuis

Control Group's ownership of a significant percentage of the public companies' shares.  The

table below reflects a non-exhaustive list of stock sold by the Veldhuis Control Group using

Sharp Group-administered nominee shareholders to disguise their control.

| Issuer | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| Vitality / Stevia First | $ - | $ 24,718,428 | $ - | $ 566,715 | $ 770,492 | $ 5,503,691 | $ 10,570,537 | $ 3,509,479 | $ 45,639,343 |
| Echo Automotive, Inc. | - | 48,115 | 23,582,539 | 30,221 | - | - | - | - | 23,660,874 |
| Arch | - | 189 | 11,755,408 | 257,689 | 1,220,451 | 2,738,550 | 84,091 | - | 16,056,376 |
| Stevia Corp | 6,905,120 | 2,172,356 | 971,330 | 3,175,474 | - | - | - | - | 13,224,281 |
| Liberty One Lithium Corp | - | - | - | - | - | (54,767) | 8,576,091 | 222,194 | 8,743,519 |
| Oryon Technologies, Inc. | - | 7,668,439 | 898,616 | - | - | - | - | - | 8,567,054 |
| Makism 3D Corp | - | - | 6,070,042 | 2,423,056 | - | - | - | - | 8,493,098 |
| Graphite Corp | - | 4,457,264 | 1,796,167 | (1,590) | - | - | - | - | 6,251,841 |
| OncoSec | 2,925,270 | 2,356,056 | - | - | - | - | - | - | 5,281,325 |
| NewGen Biopharma Corp | - | - | - | - | - | 7,627 | 3,859,972 | - | 3,867,599 |
| StartMonday Technology Corp | - | - | - | - | - | 296,664 | 2,133,104 | 6,339 | 2,436,107 |
| Lexington Biosciences Holdings Corp | - | - | - | - | - | - | 422,552 | 947,039 | 1,369,592 |
| BreathTec Biomedical, Inc. | - | - | - | - | - | 421,745 | - | - | 421,745 |
| RightsCorp | - | - | 124,926 | 5,402 | - | - | - | - | 130,328 |
| **TOTAL** | $9,830,390 | $41,420,845 | $45,199,028 | $6,456,966 | $1,990,943 | $8,913,509 | $25,646,347 | $4,685,052 | $144,143,081 |

238. The Veldhuis Control Group paid Kaitz to promote several of the issuers listed in the table in ¶237, including (in addition to Stevia First/Vitality and Arch, both detailed above) the stock of Echo Automotive, Liberty One Lithium Corp., Oryon Technologies, Inc., NewGen Biopharma Corp., StartMonday Technology Corp., and BreathTec Biomedical, Inc.

239. In each instance, Kaitz knowingly or recklessly substantially assisted the Veldhuis Control Group by materially omitting or materially misrepresenting the facts that the Veldhuis Control Group (i) actually paid for the stock promotional campaign, and (ii) was actively trading, and planned to trade, in the very opposite direction to which the promotions urged investors to trade.

## SHARP GROUP EXAMPLE: LUIS CARRILLO

240. As described in ¶43, above, the control group clients of the Sharp Group generated over one billion dollars in stock sales through the Sharp Group between approximately 2010 and 2019. One such client is a repeat offender, Luis Carrillo.[10] Carrillo generated, in concert with others, at least $75 million in illegal stock sale proceeds using the Sharp Group's encrypted communications and nominee shareholders as cover. One such example is described

---

[10] See *SEC v. Carrillo et al.*, No. 13-cv-1735-GBD (S.D.N.Y. March 2013); *SEC v. Carrillo et al.*, No. 21-cv-11272 (D. Mass. Aug. 2021).

below.

241.     On August 4, 2021, the Commission filed a Complaint against Luis Carrillo in connection with his illegal sale of the stock of Garmatex Holdings, Ltd.  Carrillo, acting in concert with others, amassed approximately 88% of Garmatex's unrestricted shares that were available for trading, and they used the Sharp Group, Wintercap SA, Blacklight SA, and a separate broker to execute the scheme.

242.     In particular, Kelln, at Sharp's direction, deposited three blocks of Garmatex stock—each consisting of 1,750,000 Garmatex shares, or just under five percent of Garmatex's total outstanding stock—with Wintercap SA in the name of three Sharp Group nominee shareholders.  As Sharp and Kelln knew, or recklessly disregarded, brokerage firms typically inquire about whether a shareholder owns more than five percent of a public company's stock because holding more than five percent may trigger additional questions about whether the sales are part of a distribution that must be registered pursuant to Section 5 of the Securities Act.

243.     Sharp and Kelln arranged for these deposits in the names of separate Sharp Group nominee shareholders well knowing that Carrillo and his team were actually the beneficial owners of the shares. For example, on or about March 9, 2017, Kelln replied to an Encrypted Communication from Wintercap SA's principal about the status of selling Garmatex stock: "Changing the [transfer agent] first . . . [Carrillo is] up my butt to get grmx [the ticker of Garmatex] all in."

244.     The Sharp Group's provision of these nominee shareholders enabled Carrillo, acting in concert with others, to conceal from brokerage firms that they actually controlled greater than five percent of the company's outstanding shares.

245.     Overall, during approximately March and April 2017, Kelln coordinated with

Carrillo, acting in concert with others, to transfer a total of 12,233,337 shares of Garmatex nominally held by six different Sharp Group-administered nominee shareholders to Wintercap SA, Blacklight SA, and a third party.  Collectively, these positions accounted for approximately 88% of Garmatex's purportedly unrestricted shares that were available for trading, and approximately 34% of Garmatex's total issued and outstanding stock.  Carrillo, therefore, was an affiliate of Garmatex.



247.    Carrillo, acting in concert with others, coordinated the trading of Garmatex stock at Wintercap SA, Blacklight SA and a separate broker during a stock promotional campaign, generating proceeds as a result of these unregistered sales in excess of $7 million.

248.     In addition to Carrillo's conduct relating to Garmatex, he used the Sharp Group and its network of nominees to facilitate fraudulent trading in the stock of many other issuers he controlled.  He also used the Sharp Group to coordinate the payment of expenses associated with his fraudulent sales, and other payments to or for his benefit.  Carrillo frequently corresponded with Gasarch about payments he was seeking the Sharp Group's assistance in effecting, and payments that had been charged to his account in the Q accounting system.  Carrillo sometimes communicated with Gasarch using bespoke email addresses created and administered by the Sharp Group called the "xmeridian" or "xmail" system.  Gasarch's address on this system was "wires@secure.xmeridian.com."  Carrillo and Gasarch engaged in email correspondence about invoices he had asked her to pay, invoices that had been improperly charged to his Q account, incorrect amounts of invoices he had asked her to send, and related subjects, on at least the following dates:  August 8, 9, and 12, 2016, September 28 and 29, 2016 and multiple dates in October 2016.

## TOLLING AGREEMENTS

249.     Between January and June 2020, Dhillon entered into two separate tolling agreements with the Commission.  Each tolling agreement specifies a period of time (a "tolling period") in which "the running of any statute of limitations applicable to any action or proceeding against Dhillon authorized, instituted, or brought by … the Commission… arising out of the [Commission's investigation of Dhillon's conduct], including any sanctions or relief that may be imposed therein, is tolled and suspended . . . ."  Each tolling agreement further provides that Dhillon "shall not include the tolling period in the calculation of the running of any statute of limitations or for any other time-related defense applicable to any proceeding, including any sanctions or relief that may be imposed therein, in asserting or relying upon any such time-

related defenses."  Collectively, these agreements tolled the running of any limitations period or any other time-related defenses available to Dhillon for a period of approximately seven months and three days.

### FIRST CLAIM FOR RELIEF
### FRAUD IN THE OFFER OR SALE OF SECURITIES
**(Violations of Sections 17(a)(1) and (3) of the Securities Act by Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor)**

250.    Paragraphs 1 through 249 above are re-alleged and incorporated by reference as if fully set forth herein.

251.    By reason of the conduct described above, defendants Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly or negligently (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

252.    By reason of the conduct described above, defendants Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor violated Securities Act Sections 17(a)(1) and (3) [15 U.S.C. §77q(a)(1) and (3)] and will continue to violate those sections unless enjoined.

### SECOND CLAIM FOR RELIEF
### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES
**(Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) by Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor)**

253.    Paragraphs 1 through 249 above are re-alleged and incorporated by reference as if fully set forth herein.

254.     By reason of the conduct described above, defendants Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

255.     By reason of the conduct described above, defendants Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor violated Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §240.10b-5(a) and (c)] thereunder.

### THIRD CLAIM FOR RELIEF
### UNREGISTERED OFFERINGS OF SECURITIES
**(Violations of Sections 5(a) and 5(c) of the Securities Act by Sharp, Kelln, Veldhuis, Friesen, Sexton, and Dhillon)**

256.     Paragraphs 1 through 249 above are re-alleged and incorporated by reference as if fully set forth herein.

257.     By reason of the conduct described above, defendants Sharp, Kelln, Veldhuis, Friesen, Sexton, and Dhillon, directly or indirectly:  (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been filed and for which no exemption from registration has been available.

258.     As a result, Sharp, Kelln, Veldhuis, Friesen, Sexton, and Dhillon violated

Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§77e(a), (c)].

### FOURTH CLAIM FOR RELIEF
### FAILURE TO REPORT OVER 5% BENEFICIAL OWNERSHIP
### (Violations of Section 13(d) of the Exchange Act and Rule 13d-1 Thereunder by Veldhuis, Sexton, and Friesen)

259.     Paragraphs 1 through 248 above are re-alleged and incorporated by reference as if

fully set forth herein.

260.     During the Relevant Period, the stock of Vitality was a security under Section

3(a)(1) of the Exchange Act [15 U.S.C. §78c(a)(10)], and a penny stock.

261.     During the Relevant Period, Vitality had equity securities that were registered

pursuant to Section 12 of the Exchange Act [15 U.S.C. §78l].

262.     By reason of the conduct described above, defendants Veldhuis, Sexton, and

Friesen, after acquiring directly or indirectly beneficial ownership of more than 5 percent of a

class of Vitality equity securities, failed to file a statement with the Commission containing the

information required by Schedule 13D [17 C.F.R. §240.13d-101] within ten days after they

acquired such shares, or at all.

263.     As a result, defendants Veldhuis, Sexton, and Friesen violated Section 13(d) of

the Exchange Act and Rule 13d-1 thereunder [15 U.S.C. §78m(d); 17 C.F.R. §240.13d-1].

### FIFTH CLAIM FOR RELIEF
### FAILURE TO REPORT OVER 5% BENEFICIAL OWNERSHIP
### (Violation of Section 13(d) of the Exchange Act and Rule 13d-2 Thereunder by Dhillon)

264.     Paragraphs 1 through 249 above are re-alleged and incorporated by reference as if

fully set forth herein.

265.     During the Relevant Period, the stock of Vitality was a security under Section

3(a)(1) of the Exchange Act [15 U.S.C. §78c(a)(10)], and a penny stock.

266.     During the Relevant Period, Vitality had equity securities that were registered pursuant to Section 12 of the Exchange Act [15 U.S.C. §78l].

267.     By reason of the conduct described above, defendant Dhillon, after acquiring directly or indirectly beneficial ownership of more than 5 percent of a class of Vitality equity securities and filing a Schedule 13D, acquired beneficial ownership of 1 percent or more of that class of equity securities and failed to file with the Commission a timely and accurate amendment disclosing this material change.

268.     As a result, defendant Dhillon violated Section 13(d) of the Exchange Act and Rule 13d-2 thereunder [15 U.S.C. §78m(d); 17 C.F.R. §240.13d-2].

**SIXTH CLAIM FOR RELIEF**
**<u>FAILURE TO FILE</u>**
**(Violation of Section 16(a) of the Exchange Act and Rule 16a-3 Thereunder by Dhillon)**

269.     Paragraphs 1 through 249 above are re-alleged and incorporated by reference as if fully set forth herein.

270.     During the Relevant Period, the stock of Arch and OncoSec was each a security under Section 3(a)(1) of the Exchange Act [15 U.S.C. §78c(a)(10)], and a penny stock.

271.     During the Relevant Period, Arch and OncoSec had equity securities that were registered pursuant to Section 12 of the Exchange Act [15 U.S.C. §78l].

272.     Defendant Dhillon violated Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)], and Rule 16a-3 thereunder [17 C.F.R. § 240.16a-3], in that as a director of Arch and OncoSec and having acquired more than 10% of a registered class of Arch's and OncoSec's equity securities, Dhillon failed to file reports of ownership and changes of ownership with the Commission as required.

### SEVENTH CLAIM FOR RELIEF
### AIDING AND ABETTING
**(Violations of Section 15(b) of the Securities Act by Taylor)**

273.     Paragraphs 1 through 248 above are re-alleged and incorporated by reference as if fully set forth herein.

274.     By reason of the conduct described above, Dhillon, directly or indirectly: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities, including, but not limited to, the securities of Vitality, as to which no registration statement has been filed and for which no exemption from registration has been available.

275.     Taylor knowingly or recklessly provided substantial assistance to Dhillon in his violation of Sections 5(a) and 5(c) of the Securities Act.

276.     As a result, Taylor violated Section 15(b) the Securities Act [15 U.S.C. §§ 77o(b)].

### EIGHTH CLAIM FOR RELIEF
### AIDING AND ABETTING
**(Violations of Section 15(b) of the Securities Act by Sharp and Kelln)**

277.     Paragraphs 1 through 248 above are re-alleged and incorporated by reference as if fully set forth herein.

278.     By reason of the conduct described above, Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients, directly or indirectly, in the offer or sale of securities, by the use

of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

279.    By reason of the conduct described above, Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients, directly or indirectly:  (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities, including, but not limited to, the securities of Vitality, Arch, OncoSec, and Garmatex, as to which no registration statement has been filed and for which no exemption from registration has been available.

280.    Sharp and Kelln knowingly or recklessly provided substantial assistance to Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients in their violations of Sections 5(a), 5(c), and 17(a)(1) and (3) of the Securities Act.

281.    As a result, Sharp and Kelln each violated Section 15(b) of the Securities Act [15 U.S.C. §§ 77o(b)].

### NINTH CLAIM FOR RELIEF
### AIDING AND ABETTING
**(Violations of Section 20(e) of the Exchange Act by Sharp and Kelln)**

282.    Paragraphs 1 through 248 above are re-alleged and incorporated by reference as if fully set forth herein.

283.    By reason of the conduct described above, Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

284.    Sharp and Kelln knowingly or recklessly provided substantial assistance to Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients in their violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

285.    As a result, Sharp and Kelln each violated Section 20(e) the Exchange Act [15 U.S.C. § 78t(e)].

### TENTH CLAIM FOR RELIEF
### FRAUD IN THE OFFER OR SALE OF SECURITIES
**(Violations of Section 17(a)(3) of the Securities Act by Gasarch)**

286.    Paragraphs 1 through 248 above are re-alleged and incorporated by reference as if fully set forth herein.

287.    By reason of the conduct described above, defendant Gasarch, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly or negligently

engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

288.    By reason of the conduct described above, defendant Gasarch violated Securities Act Section 17(a)(3) [15 U.S.C. §77q(a)(3)].

## ELEVENTH CLAIM FOR RELIEF
## FRAUD IN THE OFFER OR SALE OF SECURITIES
### (Violations of Section 17(a)(3) of the Securities Act by Kaitz)

289.    Paragraphs 1 through 248 above are re-alleged and incorporated by reference as if fully set forth herein.

290.    By reason of the conduct described above, defendant Kaitz, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

291.    By reason of the conduct described above, defendant Kaitz violated Securities Act Section 17(a)(3) [15 U.S.C. §77q(a)(3)].

## TWELFTH CLAIM FOR RELIEF
## AIDING AND ABETTING
### (Violations of Section 15(b) of the Securities Act by Gasarch)

292.    Paragraphs 1 through 248 above are re-alleged and incorporated by reference as if fully set forth herein.

293.    By reason of the conduct described above, Sharp, Kelln, Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients, directly or indirectly, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly,

(i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

294.    Gasarch knowingly or recklessly provided substantial assistance to Sharp, Kelln, Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients in their violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act.

295.    As a result, Gasarch violated Section 15(b) the Securities Act [15 U.S.C. §§ 77o(b)].

## THIRTEENTH CLAIM FOR RELIEF
## AIDING AND ABETTING
### (Violations of Section 15(b) of the Securities Act by Kaitz)

296.    Paragraphs 1 through 248 above are re-alleged and incorporated by reference as if fully set forth herein.

297.    By reason of the conduct described above, Veldhuis, Sexton, and Friesen, directly or indirectly, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

298.    Kaitz knowingly or recklessly provided substantial assistance to Veldhuis, Sexton, and Friesen in their violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act.

299.    As a result, Kaitz violated Section 15(b) the Securities Act [15 U.S.C. §§ 77o(b)].

### FOURTEENTH CLAIM FOR RELIEF
### AIDING AND ABETTING
**(Violations of Section 20(e) of the Exchange Act by Gasarch)**

300.    Paragraphs 1 through 248 above are re-alleged and incorporated by reference as if fully set forth herein.

301.    By reason of the conduct described above, Sharp, Kelln, Veldhuis, Sexton, Friesen,  Carrillo, and other Sharp Group clients directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

302.    Gasarch knowingly or recklessly provided substantial assistance to Sharp, Kelln, Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients in their violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

303.    As a result, Gasarch violated Section 20(e) the Exchange Act [15 U.S.C. § 78t(e)].

### FIFTEENTH CLAIM FOR RELIEF
### AIDING AND ABETTING
**(Violations of Section 20(e) of the Exchange Act by Kaitz)**

304.    Paragraphs 1 through 248 above are re-alleged and incorporated by reference as if fully set forth herein.

305.    By reason of the conduct described above Veldhuis, Sexton, and Friesen directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or

artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

306.    Kaitz knowingly or recklessly provided substantial assistance to Veldhuis, Sexton, and Friesen in their violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

307.    As a result, Kaitz violated Section 20(e) the Exchange Act [15 U.S.C. § 78t(e)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

A.    Enter a permanent injunction restraining the defendants Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, Gasarch, Kaitz and Taylor, their agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Sections 17(a) of the Securities Act [15 U.S.C. §§77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

B.    Enter a permanent injunction restraining defendants Sharp, Kelln, Veldhuis, Sexton, Friesen, Taylor and Dhillon, their agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§77e(a), (c)].

C.    Enter a permanent injunction restraining defendants Veldhuis, Sexton, and Friesen, their agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or

otherwise, from violating Section 13(d) of the Exchange Act [15 U.S.C. §78m(d)] and Rule 13d-1 thereunder.

D.      Enter a permanent injunction restraining defendant Dhillon, his agents, servants, employees and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from violating Section 13(d) of the Exchange Act [15 U.S.C. §78m(d)] and Rule 13d-2 thereunder.

E.      Enter a permanent injunction restraining defendant Dhillon, his agents, servants, employees and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from violating Section 16(a) of the Exchange Act [15 U.S.C. §78p(a)] and Rule 16a-3 thereunder.

F.       Order the defendants to disgorge, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint pursuant to Section 21(d)(7) of the Exchange Act [15 U.S.C. §78u(d)(7)];

G.      Order the defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

H.      Enter an order barring the defendants from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

I.      Enter an order barring the defendants from directly or indirectly, including, but not limited to, through an entity owned or controlled by any of them, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall

not prevent defendants from purchasing or selling securities listed on a national securities exchange for their own personal account;

J.      Enter an order barring defendant Dhillon from serving as an officer or director of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

K.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

L.      Grant such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The Commission demands a jury in this matter for all claims so triable.


DATED: February 3, 2022

Respectfully submitted,

/s/ Eric A. Forni
Eric A. Forni (Mass Bar No. 669685)
Kathleen B. Shields (Mass Bar No. 637438)
Katherine Bromberg (New York Bar No. 4154555)
J. Lee Buck II (DC Bar No. 421878)
Edward B. Gerard (CA Bar No. 248053)
Amy Gwiazda (Mass Bar No. 663494)
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch St., 24th Floor
Boston, MA 02110
Phone: (617) 573-8904 (Shields direct),
(617) 573-8827 (Forni direct)
Fax: (617) 573-4590 (fax)
ShieldsKa@sec.gov (Shields email)
ForniE@sec.gov (Forni email)