UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                              )
SECURITIES AND EXCHANGE COMMISSION,)
                              )
              Plaintiff,      )
                              )
         v.                   )       CIVIL ACTION
                              )       NO. 21-11276-WGY
FREDERICK L. SHARP, ZHIYING YVONNE )
GASARCH, COURTNEY KELLN, MIKE K.   )
VELDHUIS, PAUL SEXTON, JACKSON T.   )
FRIESEN, WILLIAM T. KAITZ, AVTAR S. )
DHILLON, and GRAHAM R. TAYLOR,     )
                              )
              Defendants.     )
_____)
```

YOUNG, D.J.                          September 6, 2022

**MEMORANDUM & ORDER**

## I.    INTRODUCTION

In this case, the Securities and Exchange Commission (the "SEC") brings an enforcement action against nine defendants for their alleged violation of several securities laws and regulations.  Six of these nine defendants move to dismiss the case against them based on two main arguments: (1) the claims against them are untimely because the SEC (a) is applying the incorrect statute of limitations and (b) does not allege sufficient facts within the applicable time-period to impose liability; and (2) the SEC does not state facts with sufficient particularity plausibly to allege violations of the aforementioned statutes and regulations.

First, the SEC applies the correct statute of limitations to scienter-based disgorgement claims. The limitations period is governed by Section 6501 of the William M. Thornberry National Defense Authorization Act for Fiscal Year 2021 ("NDAA"), which applies retroactively to extend the statute of limitations to ten years for claims commenced after its passage. This conclusion is necessitated by the clear mandate provided by Congress in the text of the statute.

Furthermore, as to timely pleading on the face of the complaint, the defendants are incorrect on two bases: (1) the SEC alleges sufficient facts within both the ten- and five-year time periods -- the latter being still applicable to other types of claims relevant to this action; and (2) the five-year statute of limitations may not even apply to, or have start to run for, several of the defendants, as exceptions to the statute of limitations apply for those who have been absent from the United States.

Second, the SEC has alleged sufficient facts with particularity as to all defendants to buttress the violations claimed. This Court therefore DENIES all six of the defendants' motions to dismiss in their entirety.

## II.    PROCEDURAL HISTORY

On August 5, 2021, the SEC brought this enforcement action for violation of securities and exchange laws against nine

defendants: Frederick L. Sharp ("Sharp"), Zhiying Yvonne Gasarch
("Gasarch"), Courtney Kelln ("Kelln"), Mike K. Veldhuis
("Veldhuis"), Paul Sexton ("Sexton"), Jackson T. Friesen
("Friesen"), William T. Kaitz ("Kaitz"), Avtar S. Dhillon
("Dhillon"), and Graham R. Taylor ("Taylor") (collectively, the
"Defendants").  See Compl., ECF No. 1.  On the same day the SEC
filed an emergency ex parte motion for a temporary restraining
order ("TRO") freezing assets and requesting equitable relief
against all the Defendants.  See Pl.'s Emergency Ex Parte Mot.
TRO, Order Freezing Assets, & Order Other Equitable Relief, ECF
No. 3.  Judge Gorton entered an order granting the TRO on August
6, 2021.  See TRO Order, Order Freezing Assets, & Order Other
Equitable Relief, ECF No. 7.  Subsequently, a series of
preliminary injunctive orders were sought and granted.[1]

---

[1] On August 13, 2021, the SEC filed a motion for a
preliminary injunction against four of the Defendants: Sharp,
Veldhuis, Sexton, and Taylor.  See Pl.'s Mot. Prelim. Inj.,
Asset Freeze, & Order Other Equitable Relief, ECF No. 24; Pl.'s
Status Report Prelim. Inj. Hearing 6, ECF No. 29; Revised
Proposed Prelim. Inj. Order 1, ECF No. 36.  Judge Gorton entered
an order allowing the motion for a preliminary injunction.  See
Sharp, Veldhuis, Sexton, & Taylor Prelim. Inj. Order, ECF No.
39.
    Judge Gorton also allowed motions for extension of the TRO
as to Kaitz, Gasarch, Kelln, Dhillon, and Friesen.  See
Extension TRO Kaitz, ECF No. 30; Extension TRO Gasarch, Kelln, &
Dhillon, ECF No. 40; Extension TRO Friesen, ECF No. 42.
Subsequently, Judge Sorokin allowed another motion to extend the
TRO as to Friesen.  See Second Extension TRO Friesen, ECF No.
45.
    The SEC moved for a preliminary injunction against Dhillon
on August 28, 2021.  See Joint Mot. Entry Prelim. Inj., Order

After these preliminary injunctions were issued, six of the defendants -- Friesen, Taylor, Sexton, Gasarch, Kelln, and Veldhuis -- moved to dismiss the case.  See Def. Jackson T. Friesen's Mot. Dismiss Compl., ECF No. 109; Def. Graham R. Taylor's Mot. Dismiss Strike Pl.'s Compl., ECF No. 126; Def. Paul Sexton's Mot. Dismiss Compl., ECF No. 132; Def. Yvonne Gasarch's Mot. Dismiss Compl., ECF No. 143; Def. Courtney Kelln's Mot. Dismiss SEC's Compl., ECF No. 147; Def. Mike K. Veldhuis's Mot. Dismiss Compl., ECF No. 151.

The Defendants have fully briefed these motions.  See Mem. Supp. Def. Jackson T. Friesen's Mot. Dismiss Compl. ("Friesen Mem."), ECF No. 110; Mem. Supp. Def. Graham R. Taylor's Mot. Dismiss Strike Pl.'s Compl. ("Taylor Mem."), ECF No. 127; Def. Paul Sexton's Mem. Supp. Mot. Dismiss Compl. ("Sexton Mem."), ECF No. 133; Mem. Supp. Def. Yvonne Gasarch's Mot. Dismiss Compl. ("Gasarch Mem."), ECF No. 144; Mem. Law Supp. Def. Courtney Kelln's Mot. Dismiss SEC's Compl. ("Kelln Mem."), ECF

_____

Freezing Assets, & Order Other Equitable Relief Def. Dhillon, ECF No. 48.  Judge Sorokin also granted this preliminary injunction on August 30, 2021.  See Dhillon Prelim. Inj. Order, ECF No. 54.  Kaitz's TRO was further extended two more times.  See Second Extension TRO Kaitz, ECF No. 60; Third Extension TRO Kaitz, ECF No. 97.  This Court also granted preliminary injunctions against Friesen, Gasarch, and Kaitz.  See Order Entry Prelim. Inj. Friesen, ECF No. 91; Order Entry Prelim. Inj. Kaitz, ECF No. 100; Order Entry Prelim. Inj. Gasarch, ECF No. 101.

No. 148; Mem. Supp. Mot. Dismiss Mike K. Veldhuis ("Veldhuis
Mem."), ECF No. 152.  The SEC opposed these motions.  See Pl.'s
Opp'n Friesen's Mot. Dismiss Compl. ("SEC's Opp'n Friesen"), ECF
No. 124; Pl.'s Opp'n Sexton's Mot. Dismiss Compl. ("SEC's Opp'n
Sexton"), ECF No. 157; Pl.'s Opp'n Def. Taylor's Mot. Dismiss
Compl. ("SEC's Opp'n Taylor"), ECF No. 158; Pl.'s Opp'n Def.
Gasarch's Mot. Dismiss Compl. ("SEC's Opp'n Gasarch"), ECF No.
162; Pl.'s Opp'n Def. Kelln's Mot. Dismiss Compl. ("SEC's Opp'n
Kelln"), ECF No. 167; Pl.'s Opp'n Def. Veldhuis's Mot. Dismiss
Compl. ("SEC's Opp'n Veldhuis"), ECF No. 171.

At the same time, the SEC moved for entry of default as to
Frederick Sharp, see Pl.'s Mot. Entry Default Def. Frederick L.
Sharp, ECF No. 116, which this Court granted, see Electronic
Order Granting Mot. Entry Default Sharp, ECF No. 122.  This
Court later entered final judgment against Sharp.  See Final J.
Def. Frederick L. Sharp, ECF No. 211.

At a hearing held on January 20, 2022, this Court heard
argument on the Defendants' six motions to dismiss and
tentatively denied all of them pending further review.[2]  See
Electronic Clerk's Notes ("Clerk's Notes"), ECF No. 189; see

--------

[2] This Court has federal question subject matter
jurisdiction pursuant to section 22(a) of the Securities Act, 15
U.S.C. § 77v(a), and sections 21(d), 21(e) and 27 of the
Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e), 78aa.

<u>also</u> Hearing Tr. 22:6-9, ECF No. 193.  The Court also allowed
the SEC to file a motion for leave to file an amended complaint
as to Gasarch and Taylor.  <u>See</u> Clerk's Notes; Hearing Tr. 22:10-
13.  The SEC so moved, submitting a proposed Amended Complaint
containing more specific allegations as to Taylor and Gasarch.
<u>See</u> Pl. Mot. Leave File Am. Compl., ECF No. 195; <u>id.</u> Ex. 1,
Proposed Am. Compl. ("Am. Compl."), ECF No. 195-1.  Taylor and
Gasarch both oppose the Amended Complaint on the ground that it
is futile, as it would not redress the insufficiency of the
Complaint's factual allegations.  <u>See</u> Def. Taylor's Opp'n Pl.'s
Mot Leave File Am. Compl. ("Taylor's Opp'n Am. Compl.") 4-11,
ECF No. 199; Gasarch's Opp'n SEC's Mot. Leave Am. Compl.
("Gasarch's Opp'n Am. Comp.") 1-6, ECF No. 205.  Taylor also
suggests that these new allegations are "manufactured."  <u>See</u>
Taylor's Opp'n Am. Compl. 1.

This Court hereby **GRANTS** the SEC's motion to amend the
complaint.  The issues of futility will be dealt with on the
merits by determining whether the allegations raised in the
Amended Complaint are sufficient to pass muster under Federal
Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)").  As to the
allegation that these claims are manufactured, this is an issue
of fact to be dealt with at the fact-finding stage.  All of the
motions to dismiss, <u>see</u> Def. Jackson T. Friesen's Mot. Dismiss
Compl.; Def. Graham R. Taylor's Mot. Dismiss Strike Pl.'s

Compl.; Def. Paul Sexton's Mot. Dismiss Compl.; Def. Yvonne
Gasarch's Mot. Dismiss Compl.; Def. Courtney Kelln's Mot.
Dismiss SEC's Compl.; Def. Mike K. Veldhuis's Mot. Dismiss
Compl., filed as to the prior complaint, Compl., will be treated
as applying to the Amended Complaint with equal force, as it is
identical in nearly all material respects to the original
complaint, with the exception of allegations against Taylor and
Gasarch, see generally Am. Compl.  As to any additional
objections raised by Taylor and Gasarch in their oppositions to
the SEC's motion for leave to amend, these objections shall be
construed as additional possible grounds for dismissal pursuant
to Rule 12(b)(6).

## III.   FACTS ALLEGED

### A.   Background

This SEC-enforcement action targets a specific type of
securities violation pertaining to stock registration and sale
requirements.  See Am. Compl. ¶ 35.  Securities must be
registered pursuant to Section 5 of the Securities Act of 1933
("Securities Act"), 15 U.S.C. § 77e, unless (1) they fall under
an applicable exemption or (2) the stock is sold in accordance
with the conditions of SEC Rule 144, 17 C.F.R. § 240.144.

One registration exemption is that securities need not be
registered if the individual selling the stocks is **not** an
"issuer, underwriter, or dealer."  15 U.S.C. § 77d(a)(1).

Section 2(a) of the Securities Act defines an issuer as any "person who issues or proposes to issue a security" and an underwriter as "any person who has purchased from an issuer with a view to . . . the distribution of any security."  15 U.S.C. § 77b(a)(4), (11).  Rule 144 dictates that an individual is not an underwriter if he is not an affiliate of the issuer at the time of sale and has not been an affiliate for the last three months -- as long as one year has elapsed from when the securities were obtained from the issuer or an affiliate.  See 17 C.F.R. § 230.144(b)(1)(i).  An "affiliate" is "a person that directly, or indirectly . . . controls, or is controlled by, or is under common control with, such issuer."  Id. § 230.144(a)(1).

When referring to a "control group" this Court describes individuals who are affiliates or controlled by the issuer. This Court utilizes the term "restricted stock" as shorthand for stock that has been acquired from an issuer or affiliate, absent one of the above exemptions, or is held by an issuer or affiliate that has not been registered; this stock cannot be sold to the public without violating securities laws.  When referring to "unrestricted stock" this Court describes stock that can be sold in the public market.  "Unrestricted stock" can become restricted if it is purchased by an affiliate.  This Court also refers to stock as "registered" or "unregistered"

depending on whether a registration statement has been filed with respect to that stock's sale transaction.

Another securities requirement, relevant to this suit, mandates that an individual must file a disclosure statement if she becomes the beneficial owner of more than five percent equity stock of a company. See 17 C.F.R. 240.13d-1(a).

### B.   The Scheme

This SEC-enforcement action centers around a "scheme[] to sell fraudulently hundreds of millions of dollars in stocks in the United States markets" over a period that spanned 2010 to 2019. Am. Compl. ¶¶ 1, 42. The scheme generated more than one billion dollars in gross proceeds. Id. ¶ 43. "In exchange for lucrative fees," a sophisticated enterprise, the Sharp Group, provided a series of services to public company control persons -- shell companies to conceal stock ownership, nominal beneficial shareholders, offshore accounts, stock transfers, money transfers, encrypted accounting and communication systems, and fabricated documents -- in order to facilitate the dumping of penny stocks[3] to the detriment of unsuspecting investors, without full and fair disclosure. See id. ¶¶ 2, 4-6. This enforcement action targets both the sophisticated enterprise and

_____

[3] "[P]enny stocks" refers to stocks traded at less than $5 per share. See Am. Compl. ¶ 40.

the public company control persons who were complicit.  See id.
¶¶ 2-3.

In brief, the scheme allegedly worked as follows.  Sharp,
Gasarch, and Kelln (the "Sharp Group") helped facilitate illicit
stock sales of large, unregistered blocks of restricted penny
stocks by helping conceal their clients' identities as control
persons.  See id. ¶¶ 5-6.  Veldhuis, Sexton, and Friesen (the
"Veldhuis Control Group") were affiliates who collaborated with
the Sharp Group to sell restricted unregistered stocks on the
public market in collaboration with Dhillon, Taylor, and Kaitz.
See id. ¶¶ 7-8.

For example, blocks of stock actually controlled by Sharp
and other control groups were grouped into small blocks and
"sold" to offshore dummy entities (all in actuality controlled
by Sharp Group and other control groups) which would then sell
the shares to the public.  Id. ¶¶ 54-55.  Engaging in this shell
game allowed the stocks to go unregistered and prevented the
need for disclosure by individuals who held more than five
percent of the companies' stock.  See id.  Sharp further
utilized offshore trading platforms to obscure the identities of
the true beneficial owners.  Id. ¶ 56.

C.  **The Players**

**Sharp** was the "mastermind" of this operation.  Id. ¶ 44.
Sharp cultivated relationships with clients -- individuals

seeking to sell stock while skirting securities laws --
connected them with offshore trading platforms, created "front
companies" to serve as nominee shareholders, and facilitated the
surreptitious fraudulent sales of unregistered restricted
stocks.  See id. ¶¶ 44-47.  Sharp also hired individuals to
operate administrative services and created encrypted
communication and accounting systems which he housed physically
outside the United States, hoping they would be unreachable by
SEC investigators.  Id. ¶¶ 49-51.

     **Kelln**, one of Sharp's employees, helped obtain, allocate,
and distribute shares to conceal their common control.  Id. ¶¶
52.  Much of Kelln's work was grouping stocks for transmission
to transfer agents[4] such that the totals appeared under five
percent to avoid disclosure and registration requirements.  Id.
¶¶ 53-55.

     **Gasarch**, another employee of Sharp's, organized wire
transfers of the proceeds from the illegal stock sales while
concealing the beneficiaries, maintained records in the
encrypted accounting system, and routinely created false
invoices to support the payments.  Id. ¶¶ 57-58.

---

     [4] "[T]ransfer agents" are individuals or businesses that
facilitate the transfer of securities -- and who keep track of
whether a stock is restricted or unrestricted.  See Am. Compl. ¶
39.

"**Veldhuis, Sexton, and Friesen** acted as a group for purposes of acquiring, holding, and ultimately disposing of [] shares . . . ." Id. ¶ 153.  They teamed up with Sharp and his employees surreptitiously to sell the stock of several corporations sometimes in concert with Dhillon, Taylor, and Kaitz.  See id. ¶¶ 7-8.  In short, the Veldhuis Control Group was a Sharp Group client, which used its services to sell restricted stock to the public.  See id. ¶ 50.

**Dhillon** assisted by chairing the board of four of the companies whose stocks were subject to these illegal sales; he utilized his insider corporate status to issue shares to his associates and direct their sale to the public, while leaving them unregistered, in violation of several federal securities laws.  Id. ¶¶ 9-11.  When questioned about his involvement in these sales by the SEC, Dhillon allegedly made false statements. Id. ¶ 16.

**Taylor** participated by "arrang[ing] to merge a public company with one of Dhillon's private companies, ultimately resulting in the distribution and fraudulent sale of shares," for which he received a portion of the proceeds.  Id. ¶ 14. Additionally, Taylor "controlled nominee shareholders who held and traded stock surreptitiously in concert with Dhillon and the Veldhuis Control Group."  Id.

**Kaitz** participated by using a media company he owned and operated, Full Services Media LLC, to promote stock that the Veldhuis Control Group was looking to dump.  Id. ¶ 12.  In promoting sale of this stock, Kaitz concealed the Veldhuis Control Group's control over the stock as well as their involvement in paying for the advertisements; when questioned by the SEC he denied his involvement.  Id. ¶¶ 12-13.

Sharp, Gasarch, Kelln, Veldhuis, Sexton, Friesen, and Taylor all currently reside in Canada, whereas Kaitz and Dhillon reside in the United States -- Maryland and California, respectively.  Id. ¶¶ 22-30.

### D.   Iterations of the Scheme

#### 1.   OncoSec

In 2011 Dhillon became the chairman of OncoSec Medical Incorporated's ("OncoSec") board of directors and therefore an affiliate of the company.  Id. ¶¶ 218-19.

Dhillon used an individual to conceal his control of the stock ("Person A") and organized the sale of OncoSec stock through a front company -- illegally skirting registration restrictions.  See id. ¶¶ 217-24.  Person A misrepresented Dhillon's connection to the shares held by the front company and sold shares on Dhillon's behalf from 2013 to 2017 to the public.  Id. ¶¶ 225-29.  Between April and June 2014 Taylor also sold hundreds of thousands of OncoSec shares through a nominee entity

he controlled without registering them and paid Dhillon the profits.  Id. ¶¶ 235-36.

During the same period the Veldhuis Control Group was executing similar trades.  In 2011, "the Veldhuis Control Group directed the transfer" of OncoSec shares "to seven Sharp Group-administered" nominee entities -- at the time the Veldhuis Control Group was an affiliate of OncoSec due to the proportion of shares it held.  Id. ¶ 214.  Between 2011 and 2012 the Veldhuis Control Group sold millions of dollars in restricted OncoSec shares on the United States markets, without ever registering the shares.  See id. ¶¶ 215-16.

### 2. Stevia First/Vitality

In 2012 Dhillon became the Chairman of a Company called Stevia First Corp. ("Stevia First"), which was later renamed Vitality Biopharma, Inc. ("Vitality") (collectively, "Stevia First/Vitality").  Id. ¶¶ 8, 70.  Through a reverse merger,[5] Dhillon combined Stevia First/Vitality with a public shell company, became a director of the new company, purchased the former CEO's shares, and engaged in a seven-for-one forward stock split which considerably increased the number of shares he

---

[5] A "reverse merger" is shorthand for a public shell company acquiring a private company -- generally awarding the private company's shareholders shares in the process -- in order to make the private company public (the merger often comes with a name change aligning with the private company).  Am. Compl. ¶ 72.

held of the company; he later also became the chairman of the
company's board of directors.  Id.  ¶¶ 72-78.  Dhillon, although
an affiliate of Stevia First/Vitality due to his control
position on the board, repeatedly failed to register the
company's stock before selling it, a violation of securities
laws.  See id. ¶¶ 79-80.  Dhillon also failed to file Schedule
13D Disclosure statements -- required due to his greater than
five percent share of stock in the company.  Id. ¶ 81.

     In 2012, Dhillon distributed his shares to the nominee
entities controlled by the Sharp Group (including individually
by Gasarch), the Veldhuis Control Group, and Taylor to obscure
his interest in the shares and skirt the registration and
disclosure requirements; these individuals worked in concert to
sell the stocks on the public market.  See id. ¶¶ 83-84, 110-15.
This was all part of the plan to make these stocks appear
unrestricted when they were, in reality, still restricted.  See
id. ¶ 84.  At the same time, the Veldhuis Control Group promoted
the sale of Stevia First/Vitality by issuing misleading
materials about the stock.  Id. ¶¶ 85-86.  Kaitz was involved in
this effort and received payments from the Veldhuis Control
Group to publicize the stock.  Id. ¶ 87.  From March to May 2012
the Veldhuis Control Group with Kaitz's assistance unloaded
thousands of shares generating $24,000,000 in profits;
meanwhile, Taylor and Dhillon "shared in these illicit proceeds"

which were funneled by the Veldhuis Control Group through the Sharp Group. Id. ¶¶ 88-89.

Later in 2012 and in 2014 Stevia First/Vitality issued more shares to a Sharp-nominee shareholder. Id. ¶ 91. The Sharp Group had those stocks divided among two other nominee shareholders, who then sold those stocks to the public "for the benefit of Dhillon, the Veldhuis Control Group, and Taylor." Id. ¶¶ 91-92. Throughout 2013 and 2014 Kelln facilitated the sale of these shares, helped make transfers, and provided false documentation to legitimize the sales. Id. ¶ 93. In 2014, the Veldhuis Control Group discussed via encrypted communications the distribution of these illegitimate funds with each other as well as with Gasarch and continued to sell Stevia First/Vitality Stock while utilizing the Sharp Group's services. Id. ¶¶ 94-106, 117-18. Beginning in 2014 and continuing into 2016, Taylor held additional shares via nominee shareholders, which would then be transmitted to Sharp Group nominee shareholders and eventually transfer agents for sale to the public -- a process facilitated by Kelln. See id. ¶¶ 119-25.

Between 2015 and 2016 the Veldhuis Control Group directed millions in unregistered sales of restricted Stevia First/Vitality stock in coordination with another stock promotional campaign run by Kaitz, which the Veldhuis Control Group funded. Id. ¶¶ 125-27, 132-34. The Veldhuis Control

[16]

Group coordinated with Sharp, Gasarch, and Kelln, as shown by encrypted communications in 2015. See id. ¶¶ 130-31.

In 2016 "Stevia First changed its name to Vitality and executed a 1-for-10 reverse split of its common stock." Id. ¶ 141. The Veldhuis Control Group sent several payments to Stevia First/Vitality and in exchange Dhillon issued millions of shares to nominee entities controlled by the Sharp Group. Id. ¶ 142. During this time the Veldhuis Control Group sold the Stevia First/Vitality stock to the public, even though it was restricted. Id. ¶ 144. Between 2016 and 2018 Kelln retained an attorney to create opinion letters that falsely reported these nominee entities were not affiliates of Stevia First/Vitality, thereby enabling these restricted sales. Id. ¶¶ 143-44. In 2017, Kelln also strategically transmitted sets of shares from nominal shareholders to transfer agents to ensure that the shareholders always appeared to be in possession of less than five percent of the company's shares, effectively skirting the disclosure requirements. Id. ¶¶ 145-48. Around December 2016 the Veldhuis Control Group again funded a stock promotion touting Stevia First/Vitality's stock and once again utilized Kaitz's services. Id. ¶ 149.

Sexton, Veldhuis, Friesen, Taylor (who forwarded proceeds to Dhillon), and Kaitz each received the proceeds from these illicit sales. Id. ¶¶ 136, 151-52.

[17]

3.   **Arch**

Dhillon, alongside the Veldhuis Control Group, and with the assistance of Taylor and Kaitz, replicated his efforts on Stevia First/Vitality with a company named Arch Therapeutics, Inc. ("Arch") in 2013.  Id. ¶¶ 8, 161.  In 2013 Dhillon organized a reverse merger between one of his private companies and a public shell company, controlled by the Veldhuis Control Group, creating Arch.  Id. ¶ 162.  Dhillon became Arch's chairman, and Arch began issuing shares and underwent a stock split.  Id. ¶¶ 163-64.  Prior to the merger, the Veldhuis Control Group with Kelln's assistance directed the transfer of Arch shares to several Sharp-controlled nominee-entities for their benefit. Id. ¶¶ 164-69.

After the merger, "the Veldhuis Control Group engaged Kaitz to promote" the stock.  Id. ¶ 171.  Kaitz's promotion included false statements that misrepresented who was paying for the promotion and that disguised the Veldhuis Control Group's involvement in the stock sales -- these promotions were coordinated with the Sharp Group and Dhillon's assistance.  See id. ¶¶ 173-75, 179.

The Veldhuis Control Group sold millions of Arch shares to the public without registration although they were Arch affiliates -- either because of their majority shareholder status or because of their concerted actions with Dhillon, the

[18]

company's chairman.  Id. ¶¶ 177-78.  Dhillon and Taylor
participated actively in these sales and received the proceeds.
Id. ¶¶ 180-83.  "The Veldhuis Control Group and Taylor continued
to engage in fraudulent sales of Arch stock into 2017" in
coordination with the Sharp Group and Dhillon.  Id. ¶ 184, 188.
The Veldhuis Control Group reaped the proceeds and issued
payments to Dhillon and Taylor from 2012 to 2018.  See id. ¶¶
189-90.  Dhillon also received direct proceeds of sales
orchestrated by Taylor.  See id. ¶ 193.

Furthermore, Dhillon schemed to sell Arch stock through
another individual, Person A, who established a front company
used to sell stock surreptitiously, while concealing from
intermediaries and purchasers the provenance of these shares and
the fact they were restricted due to Dhillon's affiliate status.
Id. ¶¶ 197-99, 202.  Sale of stock through this front company
occurred from April to July 2016.  See id. ¶¶ 203-04.

### 4.   Other Events

The Sharp Group provided services to disguise stock sales
apart from those involving Stevia First/Vitality, Arch, and
OncoSec.  Id. ¶ 237.  Specifically, the Sharp Group provided
nominee-entities to disguise Veldhuis, Sexton, and Friesen's
control of other issuing companies from 2011 to 2018.  See id.
Kaitz was involved in promoting these companies while materially
omitting or misrepresenting the reality of Veldhuis, Sexton, and

Friesen's control of these nominee-entities.  See id. ¶¶ 238-39.
Kelln helped deposit stock via brokerage firms in small blocks
in order to skirt the five percent limit -- in particular the
SEC cites instances of Kelln doing so in 2017.  Id. ¶¶ 242-45.

### IV.   PLEADING STANDARD

To withstand a motion to dismiss, a complaint must "state a
claim upon which relief can be granted . . . ."  Fed. R. Civ. P.
12(b)(6).  The complaint must include sufficient factual
allegations that, accepted as true, "state a claim to relief
that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550
U.S. 544, 570 (2007).  Courts "draw every reasonable inference"
in favor of the plaintiff, Berezin v. Regency Sav. Bank, 234
F.3d 68, 70 (1st Cir. 2000), but they disregard statements that
"merely offer legal conclusions couched as fact or threadbare
recitals of the elements of a cause of action," Ocasio-Hernández
v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (brackets,
ellipsis, and quotations omitted).

### V.   ANALYSIS

The Defendants seek to dismiss the SEC enforcement action
against them on two key bases: (1) the SEC applies the wrong
statute of limitations to certain claims, and thus the SEC does
not plead timely facts on the face of the complaint; and (2) the
SEC does not plead sufficient facts with particularity to
establish violations.  This Memorandum addresses each issue in

turn and concludes that neither is meritorious.  Therefore, this Court denies each defendant's motion to dismiss.

### A.   Timeliness

The Court addresses two key issues with regard to timeliness: (1) whether the SEC utilizes the proper statute of limitations for scienter-based disgorgement claims; and (2) whether the allegations in the SEC's complaint are timely on their face as to each defendant for each violation.

This Court concludes, first, that the SEC applies the correct statute of limitations, as the NDAA **applies retroactively** to cases commenced after its passage, given the express mandate by Congress.  Second, while some claims at issue are subject to a five-year statute of limitations, and others are subject to a ten-year statute of limitations, all are timely pled.

### 1.   The Applicable Statute of Limitations for Scienter-Based Disgorgement Claims

Six of the Defendants[6] move to dismiss the SEC's scienter-based securities claims for disgorgement on the basis that they are time-barred.  See Friesen Mem. 7-10; Taylor Mem. 8-20; Sexton Mem. 7-18; Gasarch Mem. 5-8; Kelln Mem. 20 & n.7;

---

[6] Dhillon entered into a tolling agreement with the SEC that "tolled the running of any limitations period or any other time-related defenses available to [him] for a period of approximately seven months and three days."  Am. Compl. ¶ 249.

Veldhuis Mem. 11.[7]   The Defendants argue that in seeking
disgorgement for securities violations that took place between
five and ten years ago, the SEC is applying the NDAA
retroactively.   See Taylor Mem. 1-2.   In essence, the Defendants
assert that claims based on conduct that occurred between 2011
and January 1, 2016, are untimely because the NDAA's new statute
of limitations cannot apply retroactively to revive stale
claims.   See Friesen Mem. 7-10; Taylor Mem. 10-20; Sexton Mem.
7-18; Gasarch Mem. 7-8; Kelln Mem. 20 n.7; Veldhuis Mem. 11.
The Defendants support this argument by comparing the NDAA's
language to that of the Public Company Accounting Reform and
Investor Protection Act of 2002 ("Sarbanes-Oxley"), "which
courts have consistently held is not sufficient to revive time-
barred claims," and by arguing that applying the NDAA
retroactively in this way would violate the Ex Post Facto Clause
because disgorgement is penal in nature.   See Taylor Mem. 2.
The SEC rebuts that Sarbanes-Oxley ought not bear on the Court's
analysis, as it is distinguishable from the NDAA; and that
disgorgement is not akin to criminal punishment and thus that

---

[7] Taylor and Sexton brief this issue at the greatest length
and level of specificity.   See Taylor Mem. 1-20; Sexton Mem. 7-
18.   To the extent the other defendants challenge the timeliness
of the SEC's action, their arguments are similar to or
duplicative of Taylor's, see Friesen Mem. 7-10; Gasarch Mem. 5-8;
Kelln Mem. 20 & n.7; Veldhuis Mem. 11; thus, Taylor's brief,
arguably the most complete of the motions on this issue, will be
used as a reference point throughout this Memorandum.

the Ex Post Facto Clause does not apply.  See SEC's Opp'n Taylor 9.

This Court holds that the NDAA's ten-year statute of limitations on disgorgement for scienter-based claims applies retroactively to both cases pending on and cases commenced after its passage, because the statute contains an express retroactivity command from Congress.  In arriving at this conclusion this Court: (a) provides a brief overview of the status of the law before and after the passage of the NDAA; (b) explains why an analysis of the NDAA's language demands retroactive application; and (c) determines that retroactive application of the new statute of limitations is not violative of the Ex Post Facto Clause.

**a.   The Background of the NDAA**

The Supreme Court has twice restricted the SEC's disgorgement power in recent years.  The first time in Kokesh v. SEC, 137 S. Ct. 1635 (2017), and the second in Liu v. SEC, 140 S. Ct. 1936 (2020).  In Kokesh the Supreme Court decided whether "[d]isgorgement in the securities-enforcement context is a 'penalty' within the meaning of [28 U.S.C.] § 2462 [("Section 2462")]."  137 S. Ct. at 1639.  It answered the question in the affirmative; thus, it concluded that "disgorgement actions must be commenced within five years of the date the claim accrues," because a "[five]-year statute of limitations applies to any

[23]

'action, suit or proceeding for the enforcement of any civil
fine, **penalty**, or forfeiture, pecuniary or otherwise.'" Id.
(quoting 28 U.S.C. § 2462) (emphasis added).  The Supreme Court
in Liu addressed an "antecedent question," that is, "whether,
and to what extent, the SEC may seek 'disgorgement' in the first
instance through its power to award 'equitable relief' under 15
U.S.C. § 78u(d)(5), a power that historically excludes punitive
sanctions."  140 S. Ct. at 1940.  The Supreme Court held that if
the disgorgement "does not exceed a wrongdoer's net profits and
is awarded for victims," then it is equitable relief.  Id.  In
short, Kokesh, 137 S. Ct. at 1639, and Liu, 140 S. Ct. at 1940,
limited the SEC's disgorgement power such that the SEC could not
seek disgorgement for wrongful acts committed more than five
years before filing of the SEC's enforcement action, could not
receive disgorgement as equitable relief in amounts that
exceeded the wrongdoer's profits, and was required to award such
equitable relief to the victims.

This state of affairs changed when Congress renewed the
NDAA on January 1, 2021, over the President's Veto.  See All
Information for H.R. 6395 – William M. (Mac) Thornberry National
Defense Authorization Act for Fiscal Year 2021, Congress.gov,
https://www.congress.gov/bill/116th-congress/house-
bill/6395/all-info (last visited Aug. 11, 2021).  The NDAA
provides that:

[24]

> The Commission may bring a claim for disgorgement under paragraph (7) . . . not later than **10 years** after the latest date of the violation that gives rise to the action or proceeding in which the Commission seeks the claim if the violation involves conduct that violates --
>
> > (I)  section 10(b);
> > (II) section 17(a)(1) of the Securities Act of 1933 (15 U.S.C. 77q(a)(1));
> > (III) section 206(1) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-6(1))
> > (IV) any other provision of the securities laws for which scienter must be established.

William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 6501, 134 Stat. 3388, 4626 (2021) (codified in part at 15 U.S.C. § 78u(d)(8)(A)) ("NDAA § 6501").  Section 6501 of the NDAA ("Section 6501") departed from the status quo by extending the <u>Kokesh</u> five-year statute of limitations to ten years.[8]  This change left an unanswered question: can the SEC disgorge profits from

---

[8] Observers have raised several other questions regarding Section 6501.  For example, another portion of Section 6501 states: "In any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement."  NDAA § 6501.  This has created confusion as to whether the SEC can now seek disgorgement for any unjust enrichment, or whether it is still cabined by the wrongdoer's profits.  It has also opened questions as to whether the SEC must return funds to the defendant's victims or whether it can place those disgorged funds into the Treasury.  <u>See, e.g.</u>, Ike Adams, Chris Mills, & David Petron, <u>SEC Disgorgement Authority May Be Limited Even After Recent Amendments to the Exchange Act</u>, ABA: Business Law Today (Jan. 27, 2021), https://www.americanbar.org/groups/business_law/publications/blt/2021/02/sec-disgorgement-authority/.

individuals who committed conduct between five and ten years
before the NDAA's passage against whom actions are now being
filed?

This appears to be an issue which the First Circuit has yet
to consider.[9]   Furthermore, the precise matter of concern in this

---

[9] The SEC has previously attempted to litigate the NDAA's
retroactive applicability to a case pending on appeal in the
First Circuit.  See Brief of the SEC, Appellee at 23, SEC v.
Morrone, 997 F.3d 52 (1st Cir. 2021) (Nos. 19-2006, 19-2007)
("The 2021 NDAA makes clear that, to the extent the Court finds
it necessary to do so, it would be appropriate to consider those
acts [now covered by the ten-year statute of limitations].").
The SEC argued such an assessment would be necessary in a
decision adverse to the SEC, because the District Court had only
considered conduct within the five-year statute of limitations.
See id. ("[A] decision in this appeal that is adverse to the
Commission may warrant a remand to the district court for
reconsideration of [the defendants'] misconduct within the
expanded limitations period.").

The defendants in that case countered that consideration of
the new ten-year statute of limitations was unnecessary given
that the conduct that occurred before the five-year statute of
limitations -- by the SEC's own admission -- impacted none of
the claims on appeal and was only directly relevant to claims
for which the appeals period had expired.  See Reply Brief for
Defendants-Appellants Jonathan Morrone and Z. Paul Jurberg at
19-20, Morrone, 997 F.3d 52 (Nos. 19-2006, 19-2007).

Ultimately, the First Circuit affirmed the District Court's
decision in favor of the SEC and declined to rule on the matter
of retroactivity given the fact that the larger limitations
period did "not impact [the] case" at bar.  See Morrone, 997
F.3d at 55 n.3, 62.  In short, as noted by the District of
Connecticut, "the First Circuit declined to analyze the
application of the NDAA beyond" noting its inapplicability to
the case at hand, because the issue on appeal did "not appear to
reach disgorgement."  SEC v. Ahmed, No. 3:15-675 (JBA), 2021 WL
2471526, at *4 n.4 (D. Conn. June 16, 2021).  At least one other
Circuit has similarly declined to consider the expanded statute
of limitations when unnecessary for resolving the matters at

case -- whether the NDAA applies retroactively to actions **commenced after** its passage -- is an issue of first impression for this Court.[10]

This action was commenced after the passage of the NDAA -- the SEC filed the Complaint on August 5, 2021, <u>see</u> Compl. 1 -- and seeks to reach conduct between five and ten years before the NDAA's passage, <u>see generally</u> Am. Compl.  Therefore, this Court must consider the NDAA's retroactivity.

### b. Retroactivity Analysis for the NDAA

The relevant provision of the NDAA details that the amendments, including the Act's alteration of the statute of limitations, "apply with respect to any action or proceeding that is **pending on, or commenced on or after**" January 1, 2021. NDAA § 6501 (emphasis added); <u>see also</u> <u>SEC</u> v. <u>Ahmed</u>, No. 3:15-675 (JBA), 2021 WL 2471526, at *3 (D. Conn. June 16, 2021).

---

issue in the case.  <u>See</u> <u>SEC</u> v. <u>Camarco</u>, No. 19-1486, 2021 WL 5985058, at *2 n.3 (10th Cir. Dec. 16, 2021) (declining to consider the issue in a pending action, as "the SEC did not contend that the amendments permitted recovery of monies [the defendant] embezzled outside the five-year statute-of-limitations period that controlled the proceedings in the district court").

[10] Another session of this Court has, however, applied the ten-year statute of limitations retroactively to a case **pending** at the NDAA's passage.  <u>See</u> <u>SEC</u> v. <u>Navellier & Assocs., Inc.</u>, No. 17-CV-11633-DJC, 2021 WL 5072975, at *4 (D. Mass. Sept. 21, 2021) (Casper, J.).

"Retroactive application of a new statute . . . occurs whenever the statute is applied to causes of action already accrued prior to its enactment date." Lieberman v. Cambridge Partners, L.L.C., 432 F.3d 482, 487–88 (3d Cir. 2005), as amended (Feb. 8, 2006).  Without a provision to the contrary, "statutes operate only prospectively" to conduct occurring after their passage.  United States v. Sec. Indus. Bank, 459 U.S. 70, 79 (1982).  Consequently, there is a presumption against reading statutes retroactively to burden private rights.  See United States v. Heth, 3 Cranch 399, 413 (1806); Landgraf v. USI Film Prod., 511 U.S. 244, 270 (1994) ("The presumption against statutory retroactivity has consistently been explained by reference to the unfairness of imposing new burdens on persons after the fact.").

"There is no doubt," however, "that Congress has the raw power to enact statutes that operate retroactively."  Lattab v. Ashcroft, 384 F.3d 8, 14 (1ˢᵗ Cir. 2004).  To determine whether Congress has exercised this power, courts engage in a two-step inquiry set out in Landgraf v. USI Film Production, 511 U.S. at 272-273.  First, this Court must assess whether Congress "expressly prescribed the statute's proper reach" or clearly "command[ed]" retroactive application.  Id. at 280.  Second, if the Court concludes Congress has not done so, it must consider

"whether the application [of the statute] in question would have an impermissibly retroactive effect."  Lattab, 384 F.3d at 15.

Beginning at the first step of the Landgraf test, this Court assesses whether Congress "clearly stated an intention to have the [NDAA] apply retrospectively."  Id. at 14.

This requires scrutinizing the NDAA's text, starting with the word "pending" in the phrase "pending on, or commenced on or after" and applying the normal rules of construction.  See Lindh v. Murphy, 521 U.S. 320, 326 (1997).  This Court utilizes the "fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary, contemporary, common meaning . . . at the time Congress enacted the statute."  Wisconsin Cent. Ltd. v. United States, 138 S. Ct. 2067, 2074 (2018) (quotations omitted and alterations in original).  A case is pending until the "last court in the hierarchy [of Article III courts] [] rules on the" matter. Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 227 (1995); see also Griffith v. Kentucky, 479 U.S. 314, 321-22 (1987); see also Georgia Ass'n of Retarded Citizens v. McDaniel, 855 F.2d 805, 813 (11th Cir. 1988) ("When it so intends, [Congress'] ability to affect the content of a nonfinal judgment in a civil case, through retroactive legislation ceases only when a case's journey through the courts comes to an end.").  Any claim pending at the NDAA's enactment would have been filed under the

[29]

Kokesh five-year statute of limitations –- therefore, under a
plain reading, the application of the NDAA's new ten-year
statute of limitations to "pending" actions would necessarily
require retroactive application of the statute.

There appears no doubt then that the language "pending on,
or commenced on or after" suggests an express mandate of
retroactivity for **pending cases**.  In fact, the parties both
imply as much.  See Taylor Mem. 1, 12 n.6; SEC's Opp'n Taylor
10.  Furthermore, several courts in a variety of circuits agree
that the NDAA applies retroactively to pending claims.  See SEC
v. Gallison, No. 15-cv-5456, 2022 U.S. Dist. LEXIS 35810, at
*13-17 (S.D.N.Y. Feb. 28, 2022) (taking for granted that the
NDAA's new statute of limitations is "applicable to any action
pending at the date of the NDAA's enactment" and applying it to
the case at bar which was filed in 2015 and thus was pending at
the Act's passage in 2021); SEC v. Fowler, 6 F.4th 255, 260 n.5
(2d Cir. 2021) (identifying the retroactivity of the NDAA's ten-
year statute of limitations for disgorgement claims in the
context of a pending case); SEC v. Navellier & Assocs., No. 17-
cv-11633, 2021 U.S. Dist. LEXIS 212209, at *10 (D. Mass. Sep.
21, 2021) (Casper, J.) (applying the ten-year statute of
limitations in a pending case); SEC v. Sneed, No. 3:20-cv-2988,
2021 U.S. Dist. LEXIS 179239, at *30 n.6 (N.D. Tex. Sept. 10,
2021) (same); Ahmed, 2021 WL 2471526, at *11 n.4 (same); SEC v.

[30]

_Liberty_, No. 2:18-cv-00139, 2021 U.S. Dist. LEXIS 31296, at *21 (D. Me. Feb. 19, 2021) (same); SEC v. Sidoti, EDCV 20-2178, 2021 U.S. Dist. LEXIS 80055, at *17-18 (C.D. Cal. Mar. 19, 2021) (acknowledging the longer statute of limitations as applicable to pending claims, although the defendants had conceded this point).  For example, the Central District of California explicitly addressed this issue by holding -- in the context of a case pending at the NDAA's passage, filed on April 28, 2020 -- that "[b]ecause [the] Action was pending on January 1, the SEC [could] revive previously time-barred claims and" thus that it could reach the "Defendant's alleged violations dating back to 2011." SEC v. Kellen, No. CV 20-3861-RSWL-AGR, 2021 U.S. Dist. LEXIS 204153, at *10 (C.D. Cal. Sep. 14, 2021).

Where the parties diverge, and what they argue has yet to be determined by any court, is whether the language "pending on, or commenced on or after" creates the same explicit mandate of retroactivity for cases **"commenced . . . after"** the statute's passage.  This Court holds that it does.

First, "pending on, or commenced on or after" indicates an express mandate of retroactivity, given the explicit temporal scope suggested by the word "pending"; the words "commenced . . . after" cannot be divorced from the context of their placement adjacent to the word "pending". See Yates v. United States, 574 U.S. 528, 543 (2015) (discussing the well-known statutory canon

[31]

"of noscitur a sociis -- a word is known by the company it keeps").

Second, the Supreme Court has identified nearly the precise language used in the NDAA -- "pending on or commenced on or after" the date of the statute's enactment -- as explicitly suggesting an express mandate of retroactivity from Congress. See Landgraf, 511 U.S. at 259-60 (holding that Section 402(a) of Title VII did not apply to pending cases, because Congress would have included language such as the following if that had been its intent: "shall apply to all proceedings pending on or commenced after the date of enactment of this Act"); see also id. at 255-56 & n.8 (citing to the 1990 draft of the Civil Rights Act's language, which stated that its amendments would apply to "all proceedings pending on or commenced after," as an example of a statute mandating retroactive application); Martin v. Hadix, 527 U.S. 343, 354-55 (1999) (holding the Prison Litigation Reform Act's fee limitation did not apply to cases pending on its enactment, because it lacked language as specific as "pending on or commenced after"); Rivers v. Roadway Exp., Inc., 511 U.S. 298, 303, 307-08 (1994) (citing the absence of language such as "pending on or commenced after" as an indicator that a statutory mandate of retroactivity did not apply to cases pending at its passage).  This Supreme Court precedent alone is sufficient to support this Court's conclusion.

Third, simple logic demands this reading.  If this Court read only "pending on" to apply retroactively, and not "commenced on or after," it would lead to an irrational outcome: (1) a case filed before or on December 31, 2020 seeking disgorgement for pre-January 1, 2016 conduct would receive the extended statute of limitations and be timely, and (2) a case filed January 2, 2021 seeking to reach the very same conduct would be untimely.  SEC-enforcement actions would be able to reach more -- or less -- allegedly violative conduct, simply by virtue of their filing date under the exact same statutory scheme.  Furthermore, reading the statute in this way would reward the SEC for filing what the Defendants argue are stale claims before the statute's enactment and penalize it for doing so once it arguably possessed such authority.  The Supreme Court has previously rejected such nonsensical readings of retroactive mandates.  See Int'l Union of Elec., Radio & Mach. Workers, Loc. 790 v. Robbins & Myers, Inc., 429 U.S. 229, 242-43 (1976) (rejecting the argument that a case was not "pending" if it included claims that would have been "untimely" at the time of filing and noting that courts "should not presume Congress created [an] odd hiatus in retroactivity. . .  unless congressional intent to do so was conveyed by" precise language).  Therefore, this Court's conclusion is demanded by the maxim that courts must "construe statutes so as to avoid

[33]

results [that are] glaringly absurd." Griffin v. Oceanic
Contractors, Inc., 458 U.S. 564, 586 n.16 (1982).

Furthermore, in the context of similar statutory mandates,
courts have held that statutory retroactivity must be applied to
cases "commenced after" an Act's passage in a way that is
congruous to how it is applied in pending cases. See, e.g.,
Heaven v. Gonzales, 473 F.3d 167, 174-75 (5th Cir. 2006)
(holding in the context of the Illegal Immigration Reform and
Immigrant Responsibility Act's pronouncement that the section
would "apply to notices issued before, on, or after the date of
the enactment of [the] Act" that it would be "incongruous" to
treat pending cases differently from those commenced after);
United States v. Wall, 794 F. Supp. 350, 352 (D. Or. 1992)
(reading an amendment to the Higher Education Act of 1965
eliminating the statute of limitations for student loan
collections as applying retroactively "to any action, whether
currently pending or not," because an alternative
"interpretation would create an irrational distinction between
types of claims which were already time barred under the prior
law, based only on the happenstance of whether an action had
been filed or not").

Fourth, the legislative history of the NDAA supports this
conclusion. "Where the text of a statute is clear, as it is
here, we need not go on to consider the act's legislative

history to divine Congress's intent."  Telecommunications Regul.
Bd. of P.R. v. CTIA-Wireless Ass'n, 752 F.3d 60, 66 (1st Cir.
2014).  In conducting a retroactivity analysis, however, courts
often also look to legislative history to ascertain intent.  See
Lattab, 384 F.3d at 14.  Here, there is an indication that
Congress' intent was to reverse the effects of the Supreme
Court's decision in Kokesh.  First, the clear consequence of the
Act's extension of the ten-year statute of limitations was to
undo the Supreme Court's Kokesh decision, which severely cabined
the formerly unlimited statute of limitations for SEC
disgorgement actions to five years.  137 S. Ct. 1635.[11]  Second,
the amendment came on the heels of multiple pleas from the SEC
to Congress to overturn Kokesh and Liu.[12]  Finally, some Members

---

[11] Some observers have argued that Congress was motivated
directly by Kokesh.  See Adams, Mills, & Petron, supra note 8.

[12] The Director of the SEC's Division of Enforcement
complained of the challenges in the agency's enforcement efforts
in a post-Kokesh world.  See Stephanie Avakian, Remarks at the
Institute for Law and Economics, University of
Pennsylvania Carey Law School Virtual Program, SEC (Sept. 17,
2020), https://www.sec.gov/news/speech/avakian-protecting-
everyday-investors-091720.  Furthermore, a former SEC Chairman
has several times pleaded with Congress to establish lengthier
limitations periods for SEC disgorgements.  See Letter from SEC
Chairman Jay Clayton, Nov. 17, 2019, reprinted in 165 Cong. Rec.
H8931-32 (daily ed. Nov. 18, 2019),
https://www.congress.gov/116/crec/2019/11/18/CREC-2019-11-18-
pt1-PgH8929.pdf; Testimony on "Oversight of the Securities and
Exchange Commission: Hearing Before the S. Comm. on Banking,
Housing, & Urban Affs., 116th Cong. 24 (Nov. 17, 2020)
(statement of Jay Clayton, Chairman, SEC),

of Congress previously sought to amend the Securities and

Exchange Act ("Exchange Act") to extend the statute of

limitations on disgorgement actions.  See, e.g., Investor

Protection and Capital Markets Fairness Act, H.R. 4344, 116th

Cong. (2019); Securities Fraud Enforcement and Investor

Compensation Act, S. 799, 116th Cong. (2019).[13]  Retroactivity

adequately fulfills Congress' intent to undo the effects of

Kokesh.

Therefore, the text, context, and legislative history of

the NDAA all suggest an explicit mandate for retroactive

application of the ten-year statute of limitations.

---

https://www.banking.senate.gov/imo/media/doc/Clayton%20Testimony
%2011-17-202.pdf.

[13] Before the NDAA's passage Congressmen decried Kokesh as a
"boon to white collar criminals" and described expanding the
statute of limitations for disgorgement as a solution that
"would ensure the SEC [had] the tools it [needed] to hold bad
actors accountable."  165 Cong. Rec. H8930 (daily ed. Nov. 18,
2019) (statement of Rep. Green).  After its passage, some
members of Congress touted Section 6501 as an effort to
strengthen the SEC.  See Press Release, House Committee on
Financial Services, Waters Statement on Inclusion of Key
Democratic Financial Services Bills in FY 2021 NDAA (Dec. 3,
2020),
https://financialservices.house.gov/news/documentsingle.aspx?Doc
umentID=407049 (citing the NDAA as one of the "measures that
will help law enforcement prevent these criminals from using
shell companies to hide their activities and will close
loopholes and increase penalties on those bad actors who are
using our system for activities that threaten the U.S. and our
allies").

The Defendants raise two main counterarguments to the conclusion that Congress' language indicates an express mandate of retroactivity; this Court finds both unpersuasive.

First, the Defendants argue that the language **"commenced on or after"** has already been considered insufficient to allow retroactive application in the context of Sarbanes-Oxley, Pub. L. No. 107-204, § 804, 116 Stat. 745, 801 (codified in part at 28 U.S.C. § 1658(b)) (emphasis added). Taylor Mem. 12-13. The Defendants are correct that several circuit and district courts have held that the language "commenced on or after" **alone** is not an "express retroactivity command." Aetna Life Ins. Co. v. Enter. Mortg. Acceptance Co., 391 F.3d 401, 406-07 (2d Cir. 2004), as amended (Jan. 7, 2005); Lieberman, 432 F.3d at 487-91; Foss v. Bear, Stearns and Co., Inc., 394 F.3d 540, 542 (7th Cir. 2005); In re ADC Telecommunications, Inc. Sec. Litig., 409 F.3d 974, 977-78 (8th Cir. 2005); Quaak v. Dexia S.A., 357 F. Supp. 2d 330, 336-37 (D. Mass. 2005) (Saris, J.) (listing cases).

These cases, however, are distinguishable from the case at bar. Notably absent from the language of Sarbanes-Oxley are the words "pending on," which provide a key indication of Congress' intent to address temporal scope. See Landgraf, 511 U.S. at 259-60. In this vein, courts have specifically distinguished the language "pending on, or commenced on or after" from that of Sarbanes-Oxley, while describing why Sarbanes-Oxley lacks an

express mandate of retroactivity.  See Enter. Mortg. Acceptance Co., 391 F.3d at 406-07.  The text of Sarbanes-Oxley is also distinct from that of the NDAA because it contains specific language indicating that nothing in the statute ought be read as creating a new cause of action; courts have held that this language weighs against finding a clear Congressional retroactivity mandate.  See, e.g., id. at 407 ("Plaintiff's argument that Sarbanes-Oxley unambiguously revived previously expired securities fraud claims is also not assisted by Section 804(c), which states: 'Nothing in this section shall create a new, private right of action.'" (quoting Sarbanes-Oxley, Pub. L. No. 107-204, § 804, 116 Stat. 745, 801 (codified in part at 28 U.S.C. § 1658(b)))).

Second, the Defendants claim that the SEC-enforcement action at issue here is unique because it seeks to revive moribund or stale claims.  See, e.g., Taylor Mem. 1, 13.  This argument falls short.  For one, it is unclear whether the NDAA can in actuality be classified as reviving a lost right.  Cases that discuss the revival of stale claims distinguish between statutes of limitations and statutes of repose, highlighting the latter as "unequivocally creat[ing] a new cause of action."  See Lieberman 432 F.3d at 490 (describing how the claims at issue in that case "had been extinguished by a statute of repose, not merely by a statute of limitations" (emphasis omitted)).  In

general, statutes of limitations "bear on the availability of
remedies," whereas statutes of repose affect the "underlying
right." See P. Stolz Fam. P'ship L.P. v. Daum, 355 F.3d 92, 102
(2d Cir. 2004) (citing Calvin W. Corman, Limitation of Actions,
§ 1.1, at 4-5 (1991)).  The statute at hand expands a statute of
limitations, not a statute of repose, as it affects the
availability of a remedy.  See NDAA § 6501 (defining when the
SEC may bring a claim for "disgorgement"); Kokesh, 137 S. Ct. at
1639 (defining the NDAA's predecessor statute as a "statute of
limitations").  Liability in a SEC enforcement action can exist
without disgorgement -- they are separate elements of a SEC
action.  See John D. Ellsworth, Disgorgement in Securities Fraud
Actions Brought by the SEC, 1977 Duke L. J. 641, 641 & n.1, 647
(1977) (discussing SEC v. Texas Gulf Sulphur Co., 258 F. Supp.
262 (S.D.N.Y. 1966), the case in which the SEC first argued for
the "right to seek restitution of the ill-gotten profits of
securities law violators").  In fact, before the district courts
began issuing disgorgement as a remedy, the SEC had to resort to
other forms of recourse such as injunctive relief and voluntary
restitution.  See id. at 642-43.  Therefore, the NDAA's
expansion of the statute of limitations for **disgorgement**
addressed the limitations on a remedy -- not a right.

Furthermore, even if this case were construed as reviving a
stale claim via the NDAA, Congress has the power to revive stale

[39]

claims as long as it does so clearly.  See Resol. Tr. Corp. v. Seale, 13 F.3d 850, 853 (5th Cir. 1994) ("Congress can revive stale claims but must do so clearly."); see also Robbins & Myers, Inc., 429 U.S. at 243 (holding that amendment to limitations period for filing complaints with Equal Employment Opportunity Commission ("EEOC") applied to previously expired but currently pending claim because of clear language); Bank Markazi v. Peterson, 578 U.S. 212, 229 (2016) ("Congress may indeed direct courts to apply newly enacted, outcome-altering legislation in pending civil cases.").  This is precisely what Congress has done here through its express language.[14]

Given this Court's holding that the language of the NDAA constitutes an express mandate of retroactivity as to both pending claims and claims commenced after the statute's passage, this Court need not and does not proceed to the second step of the Landgraf test.

### a. **Ex Post Facto** Concerns

The Defendants also object to the applicability of the ten-year statute of limitations by claiming that it violates the Ex

---

[14] The Defendants also raise the argument that the NDAA's attempted revival of stale claims "[u]ndercuts the [v]ery [p]urpose of [s]tatutes of [l]imitations.  Taylor Mem. 17.  This argument fails for similar reasons as their other objections.  Given Congress' clear power retroactively to alter statutes of limitations, see Seale, 13 F.3d at 853, it is simply unpersuasive.

Post Facto Clause of the Constitution.  See, e.g., Taylor Mem. 14-17.[15]  The first step of the Ex Post Facto analysis is to determine whether a statute is civil or criminal.  Smith v. Doe, 538 U.S. 84, 92 (2003).  In making this determination courts ask "whether the legislature, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other" -- criminal or civil.  Hudson v. United States, 522 U.S. 93, 100 (1997) (quotations omitted).  "If the intention of the legislature was to impose punishment, that ends the inquiry."  Smith, 538 U.S. at 92.

Here, disgorgement is denominated as a civil remedy by the Exchange Act.  See 15 U.S.C. § 78u(d).  The "ordinary meaning,"

_____

[15] While the Defendants do not raise this objection, a common objection to applying statutes retroactively is that they may cause a due process violation.  The retroactive application of a statute that restores a lost remedy via expanding the statute of limitations does not violate due process.  See Chase Securities Corp. v. Donaldson, 325 U.S. 304, 315-316 (1945) (ruling that extension of a state law's statute of limitations did not offend 14th Amendment due process); see also Robbins & Myers, Inc., 429 U.S. at 241-44 (ruling that "Congress might constitutionally provide for retroactive application of the extended limitations period" for filing charges with the EEOC, provided by the 1972 amendments to Title VII, which professed to "be applicable with respect to charges pending with the [EEOC] on the date of enactment of [the amendments] and all charges filed thereafter").  Importantly, "[t]his is not a case where [the Defendants'] conduct would have been different if the present rule had been known and the change foreseen."  Donaldson, 325 U.S. at 316 (1945) ("It does not say, and could hardly say, that it sold unregistered stock depending on a statute of limitation for shelter from liability.").  Therefore, applying retroactively the NDAA's extended limitations period does not violate due process.

Mohamad v. Palestinian Auth., 566 U.S. 449, 454 (2012), of the text demands this conclusion.  The Exchange Act allows disgorgement "of any unjust enrichment by the person who received such unjust enrichment as a result of such violation." 15 U.S.C. § 78u(d)(3)(ii).  Unjust enrichment claims lie in equity, not law, Fed. Deposit Ins. Corp. v. Bank of Am., N.A., 308 F. Supp. 3d 197, 202 (D.D.C. 2018), making them civil and non-punitive in nature.  Furthermore, "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  Davis v. Mich. Dep't of Treasury, 489 U.S. 803, 809 (1989).  The Exchange Act empowers district courts with the authority to order disgorgement, and the SEC to pursue disgorgement, **alongside** other civil remedies.  See id. § 78u(d)(3)(A); see also Kellen, 2021 U.S. Dist. LEXIS 204153, at *9-10 (arguing that both of these pieces of evidence support that the NDAA does not violate the Ex Post Facto Clause).

The Court's inquiry does not stop here, however.  Even if "the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is 'so punitive either in purpose or effect as to negate [the State's] intention to deem it civil.'"  Smith, 538 U.S. at 92 (quoting Kansas v. Hendricks, 521 U.S. 346, 361 (1997)).  The

Supreme Court has determined that this analysis turns on whether the regulatory scheme:

> has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose.

Id. at 97.  The Court "ordinarily defer[s] to the legislature's stated intent," Hendricks, 521 U.S. at 361, and "only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty," Hudson, 522 U.S. at 100 (quotations omitted); see also United States v. Ward, 448 U.S. 242, 249 (1980).

First, disgorgement has not been historically regarded as punishment.  As discussed earlier, disgorgement that seeks to remedy unjust enrichment is equitable in nature and equity "historically excludes punitive sanctions."  Liu, 140 S. Ct. at 1940.  The Supreme Court's decision in Liu further anchored this historical notion by cabining disgorgement to a wrongdoer's net profits and requiring that such awards be returned to the victims.  See id.  Well before the cabining of SEC enforcement power by Liu, however, courts "repeatedly stressed that [] disgorgement is an equitable, not a punitive, remedy" and applied this concept in limiting the boundaries of the disgorgement remedy.  See Elaine Buckberg & Frederick C. Dunbar, Disgorgement: Punitive Demands and Remedial Offers, 63 Bus. Law

[43]

347, 357 (2007-2008).  In fact, several sister circuits agree
that disgorgement has not "historically been viewed as
punishment."  See SEC v. Palmisano, 135 F.3d 860, 866 (2d Cir.
1998); see also United States v. Bank, 965 F.3d 287, 299 (4th
Cir. 2020) (concluding so based on an analysis of double
jeopardy); United States v. Dyer, 908 F.3d 995, 1002-03 (6th
Cir. 2018) (adopting SEC v. Palmisano's rationale as persuasive
in concluding disgorgement is civil).

Second, the law does not impose an affirmative disability
or restraint.  The paradigmatic test for whether a statute
burdens defendants in this way is whether it "restrain[s] [the]
activities" in which defendant may engage.  See Smith, 538 U.S.
at 100.  There is no doubt that disgorgement simply imposes
duties of monetary repayment and, unlike bars, does not limit
what types of behaviors or work in which defendants may engage.
See Rizek v. SEC, 215 F.3d 157, 161 (1st Cir. 2000) (discussing
the conditions upon which the SEC may impose a bar).

Third, disgorgement has a rational connection to a non-
punitive purpose.  It seeks to make violations less profitable
by "depriving violators of the fruits of their illegal conduct."
SEC v. Contorinis, 743 F.3d 296, 301 (2d Cir. 2014).  The
Supreme Court has entrenched disgorgement's non-punitive
character in the context of securities violations, by requiring
that it be used to make victims whole.  See Liu, 140 S. Ct. at

1947-49.  Other courts are in accord that disgorgement does not have a punitive purpose or result.  See SEC v. Happ, 295 F. Supp. 2d 189, 198 (D. Mass. 2003) (Keeton, S.J.) (acknowledging disgorgement as not punitive), aff'd, 392 F.3d 12 (1st Cir. 2004); SEC v. Gordon, 822 F. Supp. 2d 1144, 1159-61 (N.D. Okla. 2011) (holding disgorgement to be non-punitive in nature and rejecting the argument that it triggered application of the Double Jeopardy clause when levelled in tandem with a criminal conviction for insider trading violations), aff'd, 522 F. App'x 448 (10th Cir. 2013).

Disgorgement does not necessarily promote the aims of traditional punishment -- such as "incapacitation [or] retribution," Doe v. Snyder, 834 F.3d 696, 704 (6th Cir. 2016) -- and is not excessive here in light of the violation in question.  That a statute might deter crime is not determinative of whether it serves the functions of traditional punishment. Smith, 538 U.S. at 102.  In ordering disgorgement "the court may exercise its equitable power only over property causally related to the wrongdoing." SEC v. First City Fin. Corp., 890 F.2d 1215, 1231 (D.C. Cir. 1989).  Such a measured imposition of liability is neither retributive, nor does it seek to incapacitate defendants.  Furthermore, it does not exceed the bounds of the violative conduct.

Finally, for reasons similar to those outlined by this Court, two other district courts have ruled that retroactive application of the NDAA's ten-year statute of limitations does not violate the Ex Post Facto Clause.  See Gallison, 2022 U.S. Dist. LEXIS 35810, at *16 ("Accordingly, the NDAA's extension of the statute of limitations applicable to disgorgement does not violate the Ex Post Facto Clause."); Kellen, 2021 U.S. Dist. LEXIS 204153, at *10 (concluding the same).

The Defendants have, therefore, in no way met their burden of providing the "clearest proof" that disgorgement is "punitive in either purpose or effect."  Ward, 448 U.S. at 251.  The Defendants' primary counterargument is that, because Kokesh held disgorgement to be a penalty within the meaning of 28 U.S.C. § 2462, it must be punitive in nature.  See Taylor Mem. 15.  This is unpersuasive for at least two reasons: (1) Kokesh "is limited to its interpretation of Section 2462 and does not inform whether disgorgement is a criminal penalty for purposes of the Ex Post Facto Clause," Gallison, 2022 U.S. Dist. LEXIS 35810, at *13-14; and (2) Kokesh provides no insight into Congressional intent as to the 2021 amendments to the Exchange Act -- which is the center of this Court's Ex Post Facto inquiry, see Hudson, 522 U.S. at 99-100 (delineating that the analysis for determining whether a statute is violative of the Ex Post Facto Clause begins not with the Supreme Court's reasoning, but with

[46]

the **legislature's** intent and whether it meant to impose a punitive sanction).

### 2. Whether the Allegations Are Timely Pled

Having now determined the appropriate statute of limitations for scienter-based disgorgement claims, this Court next moves to determining: (a) what is the relevant statute of limitations for each claim alleged by the SEC; and (b) whether each claim contains sufficient allegations within the applicable limitations period.

#### a. What Statute of Limitations Applies to Each Claim

The SEC seeks injunctive relief, civil monetary penalties, disgorgement, and orders barring the defendants from engaging in future trades. See Am. Compl. ¶ 307(A)-(L).

First, this Court holds that Section 6501 applies retroactively to expand the statute of limitations to **ten-years** as to **scienter-based** claims for **disgorgement**, which include violations of:

> (I) section 10(b);
> (II) section 17(a)(1) of the Securities Act of 1933 (15 U.S.C. 77q(a)(1));
> (III) section 206(1) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-6(1)); or
> (IV) any other provision of the securities laws for which scienter must be established.

15 U.S.C. 78u(d)(8)(A)(ii). **Non-scienter-based** claims for **disgorgement** continue to require a **five-year** statute of limitations under the NDAA, see id. § 78u(d)(8)(A)(i), as they

did under Kokesh, see 28 U.S.C. § 2462; Kokesh, 137 S. Ct. at
1639.[16]

Second, the statute of limitations for **civil penalties** has
always been set at five-years under 28 U.S.C. § 2462.  See
Gabelli v. SEC, 568 U.S. 442, 445 (2013).  As the SEC concedes,
this statute of limitations remains unchanged by the NDAA.  See
SEC's Opp'n Veldhuis 15; see also Gallison, 2022 U.S. Dist.
LEXIS 35810, at *13 n.14 (noting the same).

Third, it was previously unclear what statute of
limitations applied to claims for **injunctive relief**, for both
scienter and non-scienter-based violations.  Compare SEC v.
Graham, 823 F.3d 1357, 1362 (11th Cir. 2016) (applying no
statute of limitations "[b]ecause injunctions are equitable,
forward-looking remedies and not penalties within the meaning of
§ 2462" and therefore "the five-year statute of limitations is
inapplicable") with SEC v. Cohen, 332 F. Supp. 3d 575, 594
(E.D.N.Y. 2018) (applying a five-year statute of limitations
depending on the nature of the injunction).  The SEC argues that
there was previously no statute of limitations for these claims.
See SEC Opp'n Gasarch 6-7.  Under the NDAA, these remedies are

---

[16] Although it does not make a practical difference, the
NDAA also applies retroactively to govern the statute of
limitations of non-scienter-based disgorgement claims, see NDAA
§ 6501, for the same reasons described above, see supra Section
V.A.1.

currently subject to the ten-year statute of limitations.  See
15 U.S.C. § 78u(d)(8)(B).  Sexton argues that the injunctions at
issue in this case are subject to a five-year statute of
limitations because they operate as penalties under Kokesh and
pursuant to Section 2462.  See Sexton Mem. 19; see also Cohen,
332 F. Supp. 3d at 594-95.  The NDAA applies retroactively as to
equitable remedies including injunctions and does not violate
the Ex Post Facto Clause for the same reasons as those stated
for disgorgement, see supra Section V.A.1.  Therefore, the ten-
year statute of limitations applies, and this Court need not
assess whether the injunctions in the case at bar would be
deemed penalties under the Kokesh standard.

The SEC filed the original Complaint on August 5, 2021.
See Compl. 1.  The applicable limitations period thus runs **from
August 5, 2016 to August 5, 2021** for **civil penalties and non-
scienter-based disgorgement claims**.  The applicable limitations
period for **scienter-based disgorgement claims and injunctions**
spans from **August 5, 2011** to **August 5, 2021**.  No briefing or
objections have been raised as to the bars; thus, this Court
reserves any concomitant questions on those particular remedies
for a later stage.

The SEC raises claims under Sections 17(a)(1) and (3), 5(a)
& (c), 15(b) of the Securities Act and Sections 10(b), 13(d),
and 20(e) of the Exchange Act.  Am. Compl. 250-307.  Claims

brought pursuant to sections 10(b) of the Exchange Act and Rule 10b-5 thereunder, and 17(a)(1) of the Securities Act are explicitly defined as claims to which the ten-year statute of limitations applies for disgorgement under the NDAA, see NDAA § 6501, although the five-year statute of limitations continues to apply to civil penalties sought pursuant to these acts, see 28 U.S.C. § 2462.

The NDAA's ten-year statute of limitations also applies to "any other provision of the securities laws for which scienter must be established."  NDAA § 6501.  "Scienter is a mental state embracing intent to deceive, manipulate, or defraud.  [The First Circuit] has held that a plaintiff can demonstrate scienter by showing that defendants either consciously intended to defraud, or that they acted with a high degree of recklessness."  Mississippi Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp., 523 F.3d 75, 85 (1st Cir. 2008) (citations and quotations omitted).

Sections 17(a)(3) and 5(a) & (c) of the Securities Act, and Section 13(d) of the Exchange Act are not scienter-based because neither their governing statutes nor the caselaw interpreting them require scienter.  See 15 U.S.C. § 77q(a)(3) (governing Section 17(a)(3) of the Securities Act and not requiring scienter); SEC v. Ficken, 546 F.3d 45, 47 (1st Cir. 2008) (requiring only a showing of negligence for 17(a)(3) claims); 15 U.S.C. § 77e(a),(c) (governing Sections 5(a) and (c) of the

Securities Act and not requiring scienter); SEC v. CMKM
Diamonds, Inc., 729 F.3d 1248, 1256 (9th Cir. 2013) (noting that
a majority of circuit courts have concluded that "scienter is
not an element of Section 5 liability"); 15 U.S.C. § 78m(d)
(governing Section 13(d) of the Exchange Act and requiring no
scienter); SEC v. Levy, 706 F. Supp. 61, 69 (D.D.C. 1989)
("[S]cienter is not an element that plaintiff must prove under
section 13(d)."). These are therefore subject to the five-year
statute of limitations regardless whether disgorgement or civil
penalties are sought. See NDAA § 6501; 28 U.S.C. § 2462.

The only remaining claims are those brought under Section
20(e) of the Exchange Act and 15(b) of the Securities Act.
These types of claims require knowing or reckless behavior. 15
U.S.C. § 78t(e) (governing Section 20(e) of the Exchange Act and
requiring knowledge or recklessness); 15 U.S.C. § 77o(b)
(governing Section 15(b) of the Securities Act and requiring
knowledge or recklessness). Claims that require knowledge or
recklessness constitute scienter-based claims, see Bos. Sci.
Corp., 523 F.3d at 85, therefore these claims are governed by
the ten-year statute of limitations for disgorgement. They
nevertheless remain subject to the five-year statute of
limitations for civil penalties. See 28 U.S.C. § 2462.

      **b.**   **Sufficient Allegations Exist Under Either Statute of
Limitations.**

[51]

Several of the Defendants argue that at least some claims against them ought be dismissed because, even if the ten-year statute of limitations applies for scienter-based disgorgement claims, the SEC has not alleged sufficient facts in the complaint to establish that violations occurred within the five-year statute of limitations for purposes of the civil penalty- and non-scienter-based disgorgement claims.  See Sexton Mem. 20; Taylor Mem. 6-10; Gasarch Mem. 5-6; Friesen Mem. 7; Kelln Mem. 20; Veldhuis Mem. 11 (incorporating arguments from other memoranda by reference).

The SEC rebuts that, where applicable, the five-year statute of limitations should be tolled for time spent outside the United States and that it has alleged sufficient facts within the five-year period sustain its claims.  See SEC's Opp'n Taylor 16-18; SEC's Opp'n Sexton 1, 18-19; SEC's Opp'n Gasarch 4-5, 9-10; SEC's Opp'n Kelln 17-18; SEC's Opp'n Veldhuis 15-16.

This Court concludes that the allegations are timely under both the ten-year and the five-year statute of limitations, for each respective type of claim, for the following reasons: (i) the SEC has timely pled facts on the face of the Amended Complaint for each Defendant; and (ii) the five-year statute of limitations for non-scienter-based disgorgement and civil penalties is not applicable for individuals who have not been present within the United States for the last five years --

therefore it is unclear whether the SEC even needed to plead facts within the five-year period for all Defendants.

> ### i.   Allegations are Timely on the Face of the Complaint.

Generally, seeking dismissal based on a statute of limitations having run is an affirmative defense. <u>See</u> Fed. R. Civ. P. 8(c); <u>Martínez-Rivera</u> v. <u>Puerto Rico</u>, 812 F.3d 69, 73 (1st Cir. 2016) (citing <u>Bowles</u> v. <u>Russell</u>, 551 U.S. 205, 218-19 (2007)) ("As a general matter, statutes of limitations are affirmative defenses rather than jurisdictional bars.").  A Court can consider affirmative defenses at the motion to dismiss stage and may dismiss a complaint if the allegations taken as true show the action is time barred. <u>Jones</u> v. <u>Bock</u>, 549 U.S. 199, 215 (2007).  More specifically, if the face of the complaint "**conclusively establish[es]** the affirmative defense" then the Court may grant dismissal on that basis.  <u>In re Colonial Mortg. Bankers Corp.</u>, 324 F.3d 12, 16 (1st Cir. 2003) (emphasis added); <u>Poirier v. Massachusetts Dep't of Corr.</u>, 160 F. Supp. 3d 399, 404 (D. Mass. 2016) (Hillman, J.) (citing <u>In re Colonial</u>, 324 F.3d at 16) (describing it as a two-step process: determining whether (1) facts that buttress the affirmative defense are ascertainable from the complaint, incorporated documents, matters of public record, and facts of which the Court may take judicial notice; and (2) these facts conclusively

establish the affirmative defense), on reconsideration, 186 F. Supp. 3d 66 (D. Mass. 2016), aff'd, No. 16-1587, 2018 WL 11337451 (1st Cir. Feb. 22, 2018).  "Where the dates included in the complaint show that the limitations period has been exceeded and the complaint fails to sketch a factual predicate that would warrant the application of either a different statute of limitations period or equitable estoppel, dismissal is appropriate."  Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 320 (1st Cir. 2008) (quotations omitted).

In securities cases, however, "[t]he [SEC] has the burden of pleading and proving facts demonstrating the timeliness of its action . . . ."  SEC v. Tambone, 802 F. Supp. 2d 299, 304 (D. Mass. 2011) (Gorton, J.) (citing Young v. Lepone, 305 F.3d 1, 8 (1st Cir. 2002)) ("When the defendant in a securities fraud case pleads the statute of limitations as an affirmative defense, the plaintiff normally has the burden of pleading and proving facts demonstrating the timeliness of her action.")).  Furthermore,

> This general rule applies with particular force to §
> 2462, which prohibits the court from "entertain[ing]"
> actions that accrued more than five years earlier and
> seeking certain forms of relief.  Allowing discovery
> to proceed with respect to claims that appear to be
> time-barred on the face of a plaintiff's complaint
> would constitute "entertain[ing]" those claims, which
> § 2462 clearly prohibits.

Cohen, 332 F. Supp. 3d at 587 (alterations in original).  The
SEC, then, must meet a high bar when objections as to timeliness
are raised.  The SEC has, however, met this burden; in other
words, "based on timely-pled allegations alone" the SEC alleges
sufficient facts to support its claims.  SEC v. Fiore, 416 F.
Supp. 3d 306, 331 (S.D.N.Y. 2019).

There appears to be little argument that the allegations
are timely under the ten-year statute of limitations.  See
generally Taylor Mem.; SEC Opp'n Taylor.  Therefore, this Court
focuses its inquiry on whether there are sufficient allegations
within the five-year statute of limitations for the SEC to raise
civil penalties and disgorgement for non-scienter-based claims.

The SEC states several times in its complaint that all of
the Defendants committed an assortment of violations from 2010
to 2019 -- which contains the relevant five-year time period
starting in August 2016.  See Am. Compl. ¶¶ 1, 5, 42-43, 68.
Furthermore, the complaint contains specific allegations as to
every defendant within the relevant time period.  For example,
at the end of 2016 **Veldhuis**, **Sexton** and **Friesen** conducted
unregistered sales of millions of Stevia First/Vitality shares.
Id. ¶¶ 125, 134.  At the same time, the Veldhuis Control Group
also surreptitiously funded a promotional campaign by Kaitz,
which encouraged these stock sales by disseminating allegedly
false information.  Id. ¶ 125, 149.  At various times in 2016

Veldhuis, Sexton, and Friesen sent numerous wire transfers to Stevia First/Vitality, which in exchange issued shares to Sharp-controlled nominee entities; this and other services provided by Sharp enabled the Veldhuis Control Group to sell restricted Stevia First/Vitality stock to the public, without registering it, even though the nominees were Stevia First/Vitality affiliates.  Id. ¶¶ 142-43.

At least until December 2016 **Taylor** sold millions in Stevia First/Vitality stocks via Sharp-Group administered nominee entities.  Id. ¶ 134.  He also received funds, and redistributed part of them to Dhillon, during this period.  Id. ¶ 152.  Taylor engaged in fraudulent sales of another company, Arch's, stock into 2017 directing sales through nominee entities to skirt registration requirements.  Id. ¶ 184.  He also signed and backdated fraudulent Option Agreements to justify his payments to Dhillon and provided these documents to Canadian regulators in 2021.  Id. ¶ 191.

**Kelln** helped recruit attorneys for the Sharp Group in 2016 and 2018 to create fraudulent opinion letters to legitimize the unregistered sale of restricted Stevia First/Vitality stock. Id. ¶ 144.  In 2017, Kelln directed the redistribution of funds among nominee entities to help clients skirt the five percent disclosure required of Section 13(d) of the Exchange Act.  Id. ¶ 147.

Throughout 2016 and 2017, **Gasarch** created fictitious invoices, loan and subscription agreements, and other documents for Sharp Group nominee entities that were used to cover up the fraudulent payments to clients from the Sharp-Group.  Id. ¶ 58. Specifically, the SEC cites four documents that Gasarch made and sent from August 2016 to October 2017.  Id.  Gasarch also communicated with transfer agents pretending to be the nominal owner of Sharp-Group administered entities in furtherance of the scheme and helped move clients' shares to the transfer agents in 2016, 2017, and 2018.  Id. ¶¶ 61-62.  It ought be noted that Gasarch claims she gave birth in 2016 and took leave from the Sharp Group, see Gasarch Mem. 1 n.1; this court must, however, accept the SEC's well pled allegations as true at the motion to dismiss stage.

Gasarch and Kelln received $1,000,000 each of funds from the Sharp Group's conduct and some of these payments continued on from 2016 to 2019.  Id. ¶ 68.

This is by no means an exhaustive list of the SEC's post-2016 allegations, yet these facts alone establish a sufficient basis for the timeliness of the SEC's complaint -- even in the absence of application of tolling provisions.  To the extent that there is doubt regarding whether these claims are sufficient to allege "violations" within the relevant time period, this memorandum later addresses the sufficiency of the

allegations with respect to each claim.  See infra Section V.B.2.

The Defendants argue that certain factual allegations are insufficient to establish timeliness, because they are only indicative of residual benefits from a much earlier violation; for example, funds received in 2016 are simply benefits from violations which occurred mainly in 2012.  See, e.g., Sexton Mem. 3.  This is unpersuasive for two reasons: (1) first, as discussed in more detail below, the SEC makes sufficient allegations of **violations** not just receipt of funds within the five-year statute of limitations for each Defendant, see infra Section V.B.2; (2) second, to the extent the Defendants challenge the accuracy of the SEC's timeline, determination of this issue would be premature.  It is well-established in this Circuit that "[w]here questions of fact are presented, statute of limitations defenses are ordinarily submitted to the jury." Melendez-Arroyo v. Cutler-Hammer de P.R. Co., 273 F.3d 30, 38 (1st Cir. 2001).  In particular, "when accrual actually occurred in a particular case is a question of fact to be resolved by the fact finder."  Duke v. Cmty. Health Connections, Inc., 355 F. Supp. 3d 49, 56 (D. Mass. 2019) (Hillman, J.) (quotations omitted).

ii.  **The Five-Year Statute of Limitations Does Not Apply to Individuals Who Have Been Absent from the United States.**

For several of the Defendants the five-year statute of limitations may not apply to civil penalties and may not have begun to run for non-scienter-based disgorgement claims.  Both civil penalties and non-scienter-based claims for disgorgement continue to be subject to a five-year statute of limitations, notwithstanding Section 6501.  See 28 U.S.C. § 2462 (imposing a five-year statute of limitations on civil penalties); 15 U.S.C. § 78u(d)(8)(A)(i) (imposing a five-year statute of limitations on non-scienter-based disgorgement claims).  Each statute, however, includes modifications to the limitations provisions for time spent outside the United States.

**Civil penalties** are governed by 28 U.S.C. § 2462, which dictates that an action "shall not be entertained **unless** commenced within five years from the date when the claim first accrued **if, within the same period, the offender or the property is found within the United States** in order that proper service may be made thereon."  28 U.S.C. § 2462 (emphasis added).  How this requirement ought be applied is matter of first impression within the Circuit.

The Southern District of New York, however, has read this requirement to mean that if a Defendant has not been found in the United States at any time during the limitations period, or within five years of when the claim first accrued, then a claim

is actionable -- even if more than five years have elapsed since the SEC's claims first accrued.  SEC v. Straub, 921 F. Supp. 2d 244, 259-61 (S.D.N.Y. 2013); see also SEC v. Wey, 246 F. Supp. 3d 894, 935 (S.D.N.Y. 2017) ("For the reasons cited in Judge Sullivan's opinions [Straub, 921 F.Supp.2d at 260], the Court finds that the limitations period has not run as to claims for civil penalties against [the defendant] as he has not been present in the United States during the five-year period."). The Southern District of New York also clarified that the statute does not operate like a tolling provision:

> For the foregoing reasons, the Court finds that actions covered by Section 2462 are subject to a five-year statute of limitations that applies if the defendant is present in the United States at any time during that five-year period, which begins to run on the date the subject claim accrues and does not toll while the defendant is absent from the United States. The Court also finds that the limitations period does not apply at all if the defendant is not present in the United States at any point during the five-year period.

SEC v. Straub, No. 11 CIV. 9645 (RJS), 2016 WL 5793398, at *19 (S.D.N.Y. Sept. 30, 2016).

**Non-scienter-based disgorgement** claims are governed by Section 6501, which provides that, for purposes of calculating the limitations period, "any time in which the person against which the action or claim, as applicable, is brought is outside of the United States shall not count towards the accrual of that

period." See NDAA § 6501; 15 U.S.C. § 78u(d)(8)(C).[17]  A date of accrual is when a statute of limitations begins to run.  See Carreras-Rosa v. Alves-Cruz, 127 F.3d 172, 174 (1st Cir. 1997). Taking the "ordinary" meaning of the statute's text, Wisconsin Cent. Ltd., 138 S. Ct. at 2074, this Court reads this provision to entail that the statute of limitations does not **begin to run** until the defendant sets foot in the United States.

The Amended Complaint makes several allegations that are relevant to whether the five-year statute of limitations does not apply to (as to civil penalties), or has not yet begun to run for (as to non-scienter-based disgorgement), the Defendants: (1) the Complaint alleges that Taylor, Friesen, Veldhuis, Sexton, Kelln, and Gasarch all reside in Canada and spend most of their time there, Am. Compl. ¶¶ 23-29; (2) Sexton visited Dhillon in the United States once in 2014 and claims to have made several other trips to the United States since, id. ¶ 120; Sexton Mem. 6 n.5; (3) while the face of complaint makes no mention of Taylor or Gasarch's presence in the United States,

---

[17] The five-year statute of limitations for non-scienter-based disgorgement claims remained constant, at five years, pre- and post-adoption the NDAA, although it was previously governed by 28 U.S.C. § 2462 and later became governed by 15 U.S.C. § 78u(d)(8)(C).  See supra Section V.A.2.a.  Because the statutes of limitations for disgorgement claims (and the manner in which they are to be calculated) are governed by Section 6501 and it applies retroactively, see supra Section V.A., it controls the standard for time spent outside the United States.

see SEC Opp'n Gasarch 5; see generally Am. Compl., Taylor claims he visited the United States on numerous occasions, Taylor's Opp'n Am. Compl. 7, and Gasarch's counsel represents that she "traveled to the United States for personal reasons during the limitations period," see Gasarch's Opp'n Am. Compl. 7 n.2; and (5) as to the remaining Defendants -- Friesen, Veldhuis, and Kelln -- neither the Defendants nor the SEC ever allege that Plaintiffs visited the United States between 2011 and 2019, see generally Am. Compl.; Kelln Mem. 17 ("There is no allegation that Kelln ever . . . traveled to the United States during the relevant time."); SEC Opp'n Kelln 17 (noting Kelln's concession); SEC's Opp'n Veldhuis 16; Friesen Mem. 2 (noting the general absence of allegations against Friesen).

As already discussed, see supra Section V.A.2.b.i., although the SEC has an affirmative duty to make timely pleadings on the face of the complaint, Tambone, 802 F. Supp. 2d at 304, untimeliness is an affirmative defense, see Fed. R. Civ. P. 8(c)(1); Martínez-Rivera, 812 F.3d at 73, which must be established conclusively on the face of the complaint, see In re Colonial, 324 F.3d at 16.  This Court has previously identified other defenses, such as allegations that the SEC neglected its duty to investigate fraud, as the defendant's burden.  See Tambone, 804 F. Supp. 2d at 304.  With the exception of Sexton, who the SEC admits on the face of the complaint visited the

United States in 2014, see Am. Compl. ¶ 120, the SEC alleges all
other Defendants were residents of Canada, who spent most of
their time in Canada, see id. ¶¶ 23-29.  The SEC then meets its
affirmative burden for timeliness, by raising the plausible
applicability of these limitations-modifying provisions.

Although Taylor and Gasarch claim they have visited the
United States multiple times, both fail to provide any evidence
to support their claims, see Taylor's Opp'n Am. Compl. 7;
Gasarch's Opp'n Am. Compl. 7 n.2, and none of the remaining
Defendants even argue they were present in the United States
during the period.  Therefore, Taylor, Gasarch, Kelln, Veldhuis,
and Friesen have failed to meet their burden for levelling this
affirmative defense at the motion to dismiss stage; this entails
that the five-year statute of limitations may either not apply
to, or not have start to run for, these Defendants.
Accordingly, dismissal on this basis would be premature.

### B.    Sufficiency of the Allegations on the Merits

Almost all of the Defendants move to dismiss the SEC's
claims based on the factual sufficiency of the allegations.
Friesen, Veldhuis, Gasarch, and Kelln challenge the SEC's claims
on the basis that they do not sufficiently plead the elements of
the alleged violations.  See Friesen Mem. 10-20; Veldhuis Mem.
8-10; Gasarch Mem. 9-15; Kelln Mem. 7-16.  Sexton raises the
Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") pleading

standard in his motion to dismiss but does not brief the issue,
and Taylor does not make claims steeped in factual sufficiency
in his motion to dismiss or memorandum in support but does so in
his opposition to the SEC's motion for leave to amend the
complaint.  See Sexton Mot. Dismiss 1; Taylor Opp'n Am. Compl.
4-11; see generally Sexton Mem.; Taylor Mem.

This Court concludes that the SEC has sufficiently pled
each claim against each Defendant in accordance with the
requisite standards.  In so ruling, the Court first, addresses
the appropriate pleading standard under Rule 9(b); and second,
considers each of the claims raised against the Defendants.  In
conducting the latter analysis this Court focuses on the five-
year statute of limitations, as the sufficiency of the
allegations within this time-period was most contested by the
Defendants.

### 1.   Standard to be Applied Pursuant to Federal Rule of Civil Procedure 9(b)

This Court applies the Rule 9(b) pleading standard for SEC
enforcement actions.  See SEC v. Durgarian, 477 F. Supp. 2d 342,
347 (D. Mass. 2007) (Gorton, J.), aff'd sub nom. SEC v. Papa,
555 F.3d 31 (1st Cir. 2009).  "In the securities context, this
[C]ircuit has strictly applied Rule 9(b)."  Driscoll v. Landmark
Bank for Sav., 758 F. Supp. 48, 51 (D. Mass. 1991) (Caffrey,
J.).  Rule 9(b) requires that cases sounding in fraud "state

with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  Under Rule 9(b) "[m]alice, intent, knowledge and other conditions of the mind of a person may be averred generally." Id.  To satisfy Rule 9(b) a pleading must specify the "time, place and content of an alleged false representation, but not the circumstances or evidence from which the fraudulent intent could be inferred." Hayduk v. Lanna, 775 F.2d 441, 444 (1st Cir. 1985).  "In regards to claims alleging a scheme involving deceptive or manipulative acts, plaintiffs must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and what effect the scheme had on investors in the securities at issue." SEC v. Lee, 720 F. Supp. 2d 305, 338 (S.D.N.Y. 2010). This pleading standard applies to all of the claims brought by the SEC here as they all sound in fraud.  See SEC v. Thompson, 238 F. Supp.3d 575, 591 (S.D.N.Y. 2017) (requiring claims brought under Section 10(b) and 17(a) to be pled with particularity); SEC v. Alternative Green Techs., Inc., No. 11 CIV. 9056 SAS, 2012 WL 4763094, at *3 (S.D.N.Y. Sept. 24, 2012) (applying the 9(b) pleading standard to Section 5(a) & (c) claims).

It is important to note that Congress has "impose[d] heightened pleading requirements" even more severe than those laid out in Rule 9(b) "in actions brought pursuant to § 10(b)

and Rule 10b-5," if the case is a **private enforcement action**.
Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S.
71, 81 (2006).  In these cases, the pleaded facts must give rise
to a "strong inference" of scienter -- meaning the plaintiff
must plead with particularity the facts that give rise to that
inference.  Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S.
308, 322-24 (2007); see also In re Boston Sci. Corp. Secs.
Litig., 686 F.3d 21, 30 (1st Cir.2012) (emphasizing the
statute's requirement that complaints must "state with
particularity facts giving rise to a **strong inference** that the
defendant acted with the required state of mind" (emphasis in
original) (quoting 15 U.S.C. 78u-4(b)(2)).  A "plaintiff
alleging fraud in a § 10(b) action . . . must plead facts
rendering an inference of scienter **at least as likely as** any
plausible opposing inference."  Tellabs, Inc., 551 U.S. at 328
(emphasis in original).  The Defendants argue that the SEC must
meet this heightened pleading standard in this action.  See
Veldhuis Mem. 10 ("[T]he SEC's fraud claims fail to plead facts
that could support a 'strong inference' of scienter against
Veldhuis individually."); Kelln Mem. 11 (seeking application of
'strong inference' standard); Friesen Mem. 17 (same).  As the
SEC appropriately argues, this heightened pleading standard does
not apply to enforcement actions.  See SEC Opp'n Veldhuis 15
("Veldhuis is incorrect when he argues that the Commission needs

to plead a 'strong inference of scienter.'" (quoting Veldhuis Mem. 9)).

The First Circuit has **outright rejected** that the "strong inference" requirement is applicable to SEC enforcement actions. Papa, 555 F.3d at 35 n.1 (citing SEC v. Tambone, 550 F.3d 106, 119-20 (1st Cir. 2008), reh'g en banc granted, opinion withdrawn, 573 F.3d 54 (1st Cir. 2009), and opinion reinstated in part on reh'g, 597 F.3d 436 (1st Cir. 2010)).  This comports with common practice by other Courts.  See, e.g., SEC v. Dunn, 587 F. Supp. 2d 486, 501-02 (S.D.N.Y. 2008) (declining to apply the heightened standard in the SEC enforcement context); SEC v. Landberg, 836 F. Supp. 2d 148, 154 n.4 (S.D.N.Y. 2011) ("Although the Second Circuit has not directly addressed the issue, courts in this Circuit have declined to extend the Supreme Court's interpretation of the PSLRA's 'strong inference' standard."); SEC v. Steffes, 805 F. Supp. 2d 601, 617 (N.D. Ill. 2011) (listing cases that "stand for the proposition that the strong inference standard applies only to private securities action" (quotations omitted)).  But see Wey, 246 F. Supp. 3d at 922 ("In order to adequately plead scienter in the context of securities fraud, the SEC must allege facts that give rise to a strong inference of fraudulent intent." (quotations omitted)). Thus, this Court applies, the Rule 9(b) standard.

### 2.   Analysis for Each Claim

[67]

### a.  Claims Brought Under 10(b) of the Exchange Act and 17(a)(1) of the Securities Act

Kelln, Veldhuis, Sexton, Friesen, and Taylor face counts brought under both sections 10(b) of the Exchange Act and 17(a)(1) of the Securities Act.  See Am. Compl. ¶¶ 250-55.

Section 10(b) of the Exchange Act establishes that it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b).  The SEC's interpretive Rule 10b-5(a), issued under its rulemaking authority states "[i]t shall be unlawful for any person, directly or indirectly, . . . [t]o employ any device, scheme or artifice to defraud" and subsection (c) makes it unlawful "[t]o engage in any act, practice, course of business which operates or would operate as a fraud or deceit upon any person.  17 C.F.R. § 240.10b-5(a)-(c).  Section 17(a)(1) of the Securities Act makes it "unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly" to "employ any device, scheme, or artifice to defraud."  15 U.S.C. § 77q(a)(1).

"The elements of an action for securities fraud under Section 10(b) of the Exchange Act (and Rule 10b-5 thereunder)

and Section 17(a)(1) of the Securities Act are substantially the same under the Supreme Court's precedents." SEC v. Tambone, 417 F. Supp. 2d 127, 131 (D. Mass. 2006) (Gorton, J.); see also SEC v. Patel, No. CIV. 07-CV-39-SM, 2008 WL 781914, at *7 (D.N.H. Mar. 24, 2008) (collapsing the analysis). "[I]f a complaint is sufficient to state a claim under section 10(b) and Rule 10b-5, it is also sufficient to state a claim under section 17(a)(1)"; therefore, this Memorandum proceeds to analyze only the requirements under Section 10(b). SEC v. Collins & Aikman Corp., 524 F. Supp. 2d 477, 490 (S.D.N.Y. 2007); see also Aaron v. SEC, 446 U.S. 680, 695-96 (1980) (specifying both Section 10(b) and Section 17(a)(1) require pleading scienter).

In order to commit a Section 10(b) violation a plaintiff must have: "(1) made a material misrepresentation or a material omission . . . or used a fraudulent device [scheme or artifice]; (2) with scienter; (3) in connection with the purchase or sale of securities." SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999); see also Deka Int'l S.A. v. Genzyme Corp. (In re Genzyme Corp. Sec. Litig.), 754 F.3d 31, 40 (1st Cir. 2014).

As to the first requirement of this test, the SEC alleges a fraudulent scheme, rather than a misrepresentation or omission. Am. Compl. ¶¶ 251, 254. "Conduct itself can be deceptive" under Rule 10b-5; statements are not required for liability. Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc., 552 U.S.

[69]

148, 158 (2008); <u>In re DVI, Inc. Sec. Litig.</u>, 639 F.3d 623, 643 n.29 (3d Cir. 2011) ("We refer to claims under Rule 10b-5(a) and (c) as 'scheme liability claims' because they make deceptive conduct actionable, as opposed to Rule 10b-5(b), which relates to deceptive statements."). Section 10(b) and Rule 10(b)-5 impose "primary liability[18] on any person who **substantially participates** in a manipulative or deceptive scheme by directly or indirectly employing a manipulative or deceptive device (like the creation or financing of a sham entity) intended to mislead investors, even if a material misstatement by another person creates the nexus between the scheme and the securities market." <u>In re Lernout & Hauspie Sec. Litig.</u>, 236 F. Supp. 2d 161, 173 (D. Mass. 2003) (Saris, J.). "Participation in a scheme can [however, only] be sufficient for liability under section 10(b) . . . if that participation took the form of actions or statements that were independently deceptive or fraudulent." <u>Collins & Aikman Corp.</u>, 524 F. Supp. 2d at 486 (explaining how mere participation in a scheme via performance of purely administrative duties is insufficient). It is also true, however, that actions which are not deceptive in a vacuum -- for

---

[18] Private plaintiffs can only bring suit under Rule 10b-5 against primary violators, whereas the SEC has the right to bring aiding and abetting claims pursuant to Section 20(e) of the Exchange Act. <u>See</u> <u>Tambone</u>, 597 F.3d at 445. Regardless, because Section 20(e) liability is addressed in a later section, this sub-section addresses primary violators.

example transmitting a prospectus -- may be deceptive in concert

with other actions -- for example transmitting a prospectus to

investors that an individual knows was created fraudulently.

See id. 486-87.  In short:

> [i]n order to state a claim that a defendant is a
> "primary violator", the complaint must allege not only
> a fraudulent scheme but also facts to demonstrate that
> the defendant under consideration "substantially
> participated" in the alleged scheme . . . .  In other
> words, the SEC must allege how each of the defendants'
> actions had a principal purpose and effect upon
> creating a false appearance in fact in furtherance of
> the scheme to defraud.

Durgarian, 477 F. Supp. 2d at 352-53 (internal citations

omitted).

As to the second requirement of this test, "[s]cienter is a

mental state embracing intent to deceive, manipulate, or

defraud.  This Circuit has held that a plaintiff can demonstrate

scienter by showing that defendants either consciously intended

to defraud, or that they acted with a high degree of

recklessness."  Bos. Sci. Corp., 523 F.3d at 85 (internal

citations and quotations omitted).  Recklessness encompasses

"highly unreasonable" conduct, "involving not merely simple, or

even inexcusable[ ] negligence, but an extreme departure from

the standards of ordinary care, and which presents a danger of

misleading buyers or sellers that is either known to the

defendant or is so obvious the actor must have been aware of

it."  SEC v. Fife, 311 F.3d 1, 9-10 (1st Cir. 2002) (alterations

in original) (quoting <u>Greebel</u> v. <u>FTP Software</u>, 194 F.3d 185, 198 (1st Cir.1999)).

The third requirement simply demands that the "deceptive devices and contrivances" be used in connection with "the purchase of sale or securities"; this reaches sales regardless "whether conducted in the organized markets or face to face." <u>Superintendent of Ins. of State of N. Y.</u> v. <u>Bankers Life & Cas. Co.</u>, 404 U.S. 6, 12 (1971). This requirement is easily met in the case at bar, as the Amended Complaint discusses schemes to defraud relevant to the stock sales of several companies: Stevia First/Vitality, OncoSec, Arch, and others. <u>See generally</u> Am. Compl. Therefore, of interest to this Court, is whether the first and second requirements are met.

The SEC successfully alleges facts for these remaining requirements as to all of the Defendants. What follows is an analysis of whether the SEC pleads the following from 2016 to 2021, for each Defendant: (1) involvement in a scheme to defraud and **substantial participation** via actions that were independently deceptive or fraudulent (alleged with particularity), and (2) the requisite scienter -- intentional or reckless (alleged generally).

As to **Kelln** first, the SEC alleges she was a member of the Sharp Group. <u>See</u> Am. Compl. ¶ 5. Kelln allegedly "routinely performed a variety of complex administrative tasks associated

with obtaining, allocating, and distributing blocks of shares across multiple nominee shareholders in a manner designed to conceal the Sharp Group's clients' common control of all the stock so distributed." Id. ¶ 52. These acts, if alleged with particularity, would constitute "substantial participation" in a scheme to defraud as they involve active efforts to create and conceal entities such that SEC regulations can be skirted. See SEC v. Frohling, 851 F.3d 132, 138 (2d Cir. 2016) (concluding skirting of Rule 144 registration requirements can form the basis of Section 10(b) liability); see also Lorenzo v. SEC, 139 S. Ct. 1094, 1101 (2019) (defining a "scheme" as a "project, plan, or program of something to be done" (quotations omitted)).

The next question is whether the SEC alleges these fraudulent acts with particularity during the relevant time period (August 2016-2021). The complaint alleges the following relevant facts: (1) on various dates in 2016 and 2018 Kelln retained an attorney to prepare false opinion letters, which attempted to hide that nominee entities were affiliates of one of the companies that was selling stocks, Am. Compl. ¶ 144; (2) in 2017 Kelln aided in the transfer of Stevia First/Vitality shares from a Sharp Group administered nominee entity to an offshore trading platform (Wintercap SA), id. ¶ 145; (3) in 2017, Kelln instructed Wintercap SA to assign all the sales of shares made to a specific account in order to reduce the number

[73]

of shares one of Sharp's nominee entities was shown as holding -
- "[t]his ruse prevented Hilton Capital from showing share
ownership in excess of 5%.  Specifically, Kelln wrote: 'allocate
all VBIO [ticker symbol of Stevia First/Vitality] to the [Hilton
Capital] account today.  We need to make room for pending 750k.
Again 5% rule is biting me in the ass,'" id. ¶ 147.  These
allegations are just a sample of the allegations that are
sufficient to establish the particularity needed here.

Second, the question is whether the SEC alleges Kelln
possessed the requisite scienter.  The SEC alleges "Kelln knew
or recklessly disregarded" that transferring funds from the
nominee entities controlled by the Sharp Group to Wintercap SA
would have brought the total shares held by the nominee entity
to more than five percent in violation of SEC regulations.  Id.
¶ 146.  This was demonstrated via her communications with Sharp,
indicating the difficulty of skirting this regulation.  Id. ¶
147.  This is sufficient to establish the requisite scienter.

As to **Veldhuis**, **Sexton**, and **Friesen**, the members of the
Veldhuis Control Group, allegedly illegally sold Stevia
First/Vitality, Arch, OncoSec and other Company's stock.  See
id. ¶¶ 7-8.  These individuals "teamed up with the Sharp Group
to run lucrative, fraudulent schemes to sell stock
surreptitiously in the public markets." Id. ¶ 7.  This conduct
spans beyond "substantial participation" by providing the

[74]

necessary infrastructure for the entire scheme; without these individuals' surreptitious sales the shell game would not have been possible.  Therefore, if alleged with particularity, the claims against Veldhuis, Sexton, and Friesen are sufficient for Section 10(b) liability.

First, the SEC successfully alleges this participation with particularity.  At various points in 2016 the Veldhuis Control Group sent wire payments to Stevia First/Vitality, amounting to $ 4.4 million in exchange for the issuance of millions of shares to nominee entities.  Id. ¶ 142.  From 2016 to 2018 the Veldhuis Control Group acted in concert with Dhillon to sell Stevia First/Vitality's stock to the public even though it was unregistered and restricted.  Id.  ¶ 144.  Still in 2017 Veldhuis provided trading instructions to Wintercap SA to sell Stevia First/Vitality shares to the public.  Id. ¶ 147-48.  In an effort to pump up the value of Stevia First/Vitality stock between October 2016 and March 2017 the Veldhuis Control Group retained Kaitz to run promotional campaigns; Veldhuis wired money from Sharp Group nominee shareholders to foot the bill. Id. ¶ 150.  Again, although these allegations are only in reference to one part of the scheme, they sufficiently provide the when, where, and how needed for particularity.

Second, by alleging that Veldhuis, Sexton, and Friesen (1) acted in concert with Dhillon, while representing to the public

they were not affiliates of Dhillon's company Stevia
First/Vitality, id. 144, and (2) hired Kaitz to promote the
stock sales as legitimate, while selling from affiliates of
Stevia First/Vitality, the SEC sufficiently alleges the scienter
necessary for this type of violation, id. ¶ 150.

As to **Taylor**, the SEC first alleges "Taylor [] controlled
nominee shareholders who held and traded stock surreptitiously
in concert with Dhillon and the Veldhuis Control Group." Id. ¶
14. This constitutes "substantial participation," as
controlling a "dummy entity" and transferring funds to skirt SEC
regulations is precisely the type of participation that other
sessions of this Court have contemplated as being substantial.
See In re Lernout, 236 F. Supp. 2d at 173 (listing creation of a
"sham entity" as an example of utilizing a deceptive device
under Section 10(b)).

Furthermore, the SEC alleges Taylor's participation with
particularity. Taylor participated in the fraudulent sales of
Stevia First/Vitality in December 2016 in conjunction with the
stock promotion directed by the Veldhuis Control Group; in fact,
he received a portion of the $1.7 million in profits obtained.
Id. ¶ 137. In December 2016, Taylor used "the obfuscation
provided by the Sharp Group" to orchestrate payments garnered
from the fraudulent Stevia First/Vitality sales, for the benefit
of his company. Id. ¶ 140. Taylor was also associated with

nominee entities who received payments from the sale of Stevia First/Vitality shares well into 2018.  Id. ¶ 190.  From 2015 to June 2016 Taylor sold Arch shares via an intermediary (Blacklight SA) generating $775,000 in proceeds -- these profits were funneled through Taylor's nominee entities in May through October 2016 for Taylor and Dhillon's benefit.  Id. ¶ 186.  On several dates in 2016 (June 28, July 5, August 8, September 27, November 2016) Arch issued millions of shares to a nominee entity controlled by Taylor (Heng Hong) which then transferred the shares to a Sharp Group nominee -- these shares were then utilized by the Veldhuis Control Group, which sold to unsuspecting investors in the public market.  Id. ¶¶ 187-88.

Second, the SEC alleges that Taylor participated in the scheme with scienter.  Taylor's provision of Heng Hong to allow for the obfuscation of Dhillon and other's control, alongside his use of fraudulent invoices to receive payments for sales made through nominee entities associated with Heng Hong is sufficient to establish knowing or reckless scienter.  See id. ¶¶ 138, 189.  Furthermore, the SEC alleges that once Taylor became aware of its investigation, he signed false documents to obfuscate his involvement and provide legitimate explanations for his payments to Dhillon; he provided these documents to Canadian regulators.  Id. ¶ 191.

###### i.   Counterarguments

Veldhuis and Friesen raise two main counterarguments to the sufficiency of the SEC's allegations: (1) the SEC fails to allege sufficient deceptive acts, see Friesen Mem. 15; Veldhuis Mem. 9-10; and (2) allegations that "lump multiple defendants together" as the "Veldhuis Control Group" are not sufficient to establish violations, see Friesen Mem. 1, 18; Veldhuis Mem. 5 (decrying the improper "group[ing]" of defendants).

As to the first counterargument, manipulation of securities markets constitutes a section 10(b) and 17(a) violation and "fictitious transactions" that "do not result in any change in beneficial ownership" or that artificially alter stock price constitute market manipulation. SEC v. Masri, 523 F. Supp. 2d 361, 366 (S.D.N.Y. 2007). The Defendants' intentional efforts to conceal their and others' identities as affiliates of companies in order to sell more shares falls within this type of market manipulation.

As to the second, the Defendants correctly highlight that complaints may not "clump[] [defendants] together in vague allegations," as such pleadings fail to meet Rule 9(b) particularity. Three Crown Ltd. P'ship v. Caxton Corp., 817 F. Supp. 1033, 1040 (S.D.N.Y. 1993) (concluding references to "some or all of the defendants" were insufficient). This is not, however, what the SEC has done here. The SEC initially listed

the constituent members of the Veldhuis Control Group, Am.
Compl. ¶ 7, it then went on to define each individual's role in
the scheme, id. ("Working together, Veldhuis, Sexton, and
Friesen . . . were one group of control persons . . . that
teamed up with the Sharp Group to run lucrative, fraudulent
schemes to sell stock surreptitiously in the public markets."),
and finally it mentioned with particularity when the Group took
part in the larger exchange of securities, see, e.g., id. ¶¶ 58,
237 (describing how in 2016 and 2017 "[t]he Veldhuis Control
Group utilized the Sharp Group's services to disguise their . .
. ownership of a significant percentage of [certain] public
companies' shares," in other words "disguise[d] their control,"
while selling those shares in the public market without
registration).  These allegations suggest that each of the
Defendants bought and sold shares illegally by hiding their
identities as control persons of various companies.  Their
concerted efforts to do so is of key importance to the
functioning of the larger scheme -- which relied on buying and
selling large blocks of shares strategically.

Several courts have determined that using shorthand
abbreviations for multiple defendants, as was done here, is
acceptable, where the complaint explains the role of each member
of a group or when it is referring to collective conduct.  See
Monterey Bay Military Hous., LLC v. AMBAC Assurance Corp., 531

F. Supp. 3d 673, 729 (S.D.N.Y. 2021) (outlining how reference to "Jefferies" to summarize multiple "Jefferies Entities" was acceptable under Rule 9(b) because the basis of each entity's liability was "readily inferable" from other parts of the complaint); SEC v. Sugarman, No. 19cv5998, 2020 U.S. Dist. LEXIS 181034, at **14-15 (S.D.N.Y. Sep. 30, 2020) (concluding that the SEC's references to "Sugarman and Galanis," two defendants, in unison "throughout the Complaint" was acceptable in part because "many of these references . . . explain their collective scheme").  References to the Veldhuis Control Group properly describe "conduct in tandem," by Veldhuis, Sexton, and Friesen; "[t]his Court can hardy fault the SEC for the fact that [the defendants] acted in concert." Sugarman, 2020 U.S. Dist. LEXIS 181034, at *16.

Furthermore, the Defendants cite to SEC v. Durgarian, for the notion that "the SEC cannot simply group defendants together and make undifferentiated allegations against that group without providing facts specific to each defendants' alleged wrongdoing."  Friesen Mem. 12 (citing Durgarian, 477 F. Supp. 2d at 355).  In Durgarian another session of this Court held that the SEC's "general assertion[s] that the defendants attended [a] meeting" were "too attenuated to link them to the fraudulent scheme."  477 F. Supp. 2d at 355.  This is a far cry from the case at bar, where allegations refer to specific

actions taken in unison by members of the Veldhuis Control
Group.  To conclude otherwise would yield the absurd result that
the SEC's complaint would only be acceptable had it listed out
Veldhuis, Sexton, and Friesen's names individually for each of
hundreds of allegations.  See Friesen Mem. 15.

### b.    Claims Brought Under Section 17(a)(3) of the Securities Act

Gasarch, Kelln, Veldhuis, Sexton, Friesen, and Taylor are
accused of violating Section 17(a)(3) of the Securities Act.
Am. Compl. ¶¶ 250-52 (count II), 286-88 (count X).  Section
17(a)(3) of the Securities Act makes it unlawful in "the offer
or sale of any securities . . . by the use of any means of
communication in interstate commerce or by use of the mails
directly or indirectly" to "engage in any transaction, practice,
or course of business which operates or would operate as a fraud
or deceit upon the purchaser."  15 U.S.C. § 77q(a), (a)(3).
"[N]egligence," as opposed to proof of scienter, "is sufficient
to establish liability under . . . § 17(a)(3)."  Ficken, 546
F.3d at 47.

"A defendant may be liable under § 17(a)(3) if he undertook
a deceptive scheme or course of conduct that went beyond . . .
misrepresentations."  SEC v. Bio Def. Corp., Civ. No. 12-11669-
DPW, 2019 WL 7578525, at *25 (D. Mass. Sept. 6, 2019) (Woodlock,
J.) (internal quotation omitted), aff'd sub nom. SEC v. Morrone,

[81]

997 F.3d 52 (1st Cir. 2021).  Engagement in the deceptive scheme is met by participation alone -- "the participation need not have been substantial to satisfy the requirement."  Id.  For example, preparation and distribution of materials that were deceptive to investors is sufficient to meet this requirement.  Id.  Furthermore, another session of this Court has previously held that where the pleading requirements for 17(a)(1) and 10(b) are met, they are also met for 17(a)(3).  SEC v. Esposito, 260 F. Supp. 3d 79, 92 (D. Mass. 2017) (Burroughs, J.).

For the same reasons described above the SEC has alleged sufficient facts to establish a Section 17(a)(3) violation by the following defendants, for several reasons: (1) **Kelln** managed nominee entities, transfers, and the production of false documentation to legitimize the scheme; (2) **Veldhuis, Sexton,** and **Friesen** artificed several fraudulent transfers of shares; and (3) **Taylor** managed nominee entities and transferred unregistered stock to trading platforms for illegal sale to the public.  See supra Section V.B.2.a.

As to **Gasarch**, the SEC sufficiently alleges all of the requirements for a Section 17(a)(3) violation.  First, the SEC alleges generally that Gasarch participated in the scheme -- substantial participation is not necessary.  Gasarch was allegedly a key member of the Sharp group which facilitated illegal stock sales from 2010 to the present.  Am. Compl. ¶ 5.

[82]

> Gasarch routinely arranged to transfer stock sale
> proceeds to accounts as directed by the Sharp Group's
> clients in a manner designed to conceal the fact that
> undisclosed control persons were, in fact, the actual
> beneficial owners of the stock being sold, and the
> ultimate recipients of the sales proceeds.  When she
> sent these wires, Gasarch also recorded them in [the
> Sharp Group's encrypted] accounting system.  She thus
> observed and maintained the records showing how the
> Sharp Group's clients were generating, receiving, and
> disbursing their revenue from securities trading.

Id. ¶ 57.  The SEC also alleges with particularity Gasarch's

participation.  For example, Gasarch created false invoices,

loan subscription agreements, and other documents that could

back the illegitimate payments that emerged from the scheme: she

did so at least on (1) August 23, 2016, (2) May 16, 2017, and

(3) October 11, 2017.  Id. ¶ 58.  Gasarch also sent several

emails pretending to be an owner of Sharp Group-administered

nominee entities to further the Sharp Group's scheme and

legitimize the fraudulent transactions.  Id. ¶ 61.  For example,

she did so on July 7, 2017, and July 12, 2018.  Id.  Gasarch was

also a go-between for the movement of shares from clients to

Wintercap SA from June and September 2016.  Id. ¶ 62.

Finally, the SEC alleges that "Gasarch understood that her

job was to obfuscate the source and destination of

distributions" and cites to specific conversations Gasarch had

with Sharp that buttress this conclusion.  Id. ¶¶ 59-60.

Gasarch's understanding is further supported by the fact that

she also helped keep the Sharp Group's clients' identities

secret by personally serving as a nominee shareholder.  Id. ¶
64.  For example, Gasarch administered Peregrine Capital Corp.
f/k/a Peaceful Lion Holdings, a nominee shareholder.  Id.  The
SEC therefore alleges generally knowing, reckless, or negligent
scienter by Gasarch, going above and beyond the requirements for
Section 17(a)(3) violations, which only require negligence.  Id.
¶ 61.

### c.   Claims Brought Under Sections 5(a) and (c) of the Securities Act

Kelln, Veldhuis, Sexton, and Friesen are all accused of
violating Section 5(a) and (c).  Am. Compl. ¶¶ 256-58 (count
III).  Sections 5(a) and (c) of the Securities Act makes it
unlawful to sell unregistered securities through, or utilize in
connection with such sale, interstate commerce or the mails.
See 15 U.S.C. § 77e(a), (c); see also SEC v. N. Am. Rsch. & Dev.
Corp., 424 F.2d 63, 71 (2d Cir. 1970).[19]  "A prima facie case for

---

[19] Specifically, the text of Sections 5(a) & (c) provides:

(a) Unless a registration statement is in effect as to a
security, it shall be unlawful for any person, directly or
indirectly --
    (1) to make use of any means or instruments of
    transportation or communication in interstate
    commerce or of the mails to sell such security
    through the use or medium of any propsectus or
    otherwise; or
    (2) to carry or cause to be carried through the
    mails or in interstate commerce, by any means or
    instruments of transportation, any such security for
    the purpose of sale or for delivery after sale.
                        * * *

[84]

violation of Sections 5(a) and 5(c) requires a showing that: (1) no registration statement was in effect as to the securities; (2) the defendant directly or indirectly offered to sell the securities; and (3) the offer or sales were made in connection with the use of interstate transportation, communication, or the mails." SEC v. Tropikgadget FZE, 146 F. Supp. 3d 270, 280 (D. Mass. 2015) (Burroughs, J.). "Courts interpreting the 'sale' element have concluded that it may be satisfied by a showing that a defendant was a 'necessary participant' or a 'substantial factor' in the unregistered sale or offer of sale. SEC v. Jones, 300 F. Supp. 3d 312, 315–16 (D. Mass. 2018) (Stearns, J.).

First, the SEC has sufficiently alleged that hundreds of securities that were sold as part of this scheme were not registered. See, e.g., Am. Compl. ¶¶ 125, 144 (describing how the Veldhuis Control Group sold restricted Stevia First/Vitality shares), 144-45 (describing Kelln's involvement with these

---

(c) It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title.

15 U.S.C. § 77e (a),(c).

restricted shares) 245-47 (describing how Kelln coordinated the trading of "purportedly unrestricted" but unregistered share of Garmatex stocks in the excess of $7 million).

Second, **Kelln** as a member of the Sharp Group was in 2016 and 2017 helping administer the transfer of shares from nominee entities to Wintercap SA, which would then sell unregistered stocks to the public.  Id. ¶¶ 145, 147.  Furthermore, in 2016 and 2018 Kelln helped in the distribution of the unregistered shares by hiring attorneys to prepare opinion letters to falsely represent that nominee entities were not affiliates of Stevia First/Vitality.  Id.  ¶ 144.

The SEC also alleges with particularity the offer and sale of unregistered securities by **Veldhuis, Sexton, and Friesen.** The SEC's allegations that these individuals engaged in the sale of Stevia First/Vitality's unregistered stock in 2016 and 2018 alone is sufficient to sustain this claim.  Id. ¶¶ 134, 144 (mentioning Veldhuis, Sexton and Friesen's efforts to sell restricted shares), 111 (designating these stocks as unregistered).  As just one example of the Sharp Group and Veldhuis Control Group's participation in the sale of unregistered stock the SEC alleges that: "On various dates in 2016, the Veldhuis Control Group sent numerous wire payments to [Stevia First/]Vitality, or to third parties on behalf of [Stevia First/]Vitality, totaling approximately $4.4 million.

In exchange, [Stevia First/]Vitality -- with Dhillon operating
as the chairman of its board of directors -- issued millions of
shares . . . to nominee entities that the Sharp Group once again
provided for use by the Veldhuis Control Group." Id. ¶ 142.
Both these sets of allegations are more than enough to establish
Kelln, Veldhuis, Sexton, and Friesen were 'substantial factors'
in the sale of unregistered securities.

"Finally, the [Amended] Complaint adequately alleges that
these sales and offerings were made in connection with the use
of interstate transportation, communication, or the mails."
Esposito, 260 F. Supp. 3d at 89.  The Amended Complaint alleges
that several of these individuals communicated via encrypted
messaging platforms.  Am. Compl. ¶¶ 149 (discussing Veldhuis'
communications), 123 (listing a communication by Kelln).  The
sale of Veldhuis, Sexton, and Friesen's stocks were also
facilitated by use of interstate communication by Kaitz who
misleadingly publicized the stock.  Id. ¶ 150.  Finally, the
transfers of stocks and money occurred to offshore brokerage
firms.  Id. ¶¶ 6 (describing Wintercap SA and Blacklight SA as
Swiss-based offshore trading platforms), 145-47 (discussing
Kelln's use of Wintercap SA in 2017), 245 (describing Kelln's
use of Wintercap SA and Blacklight SA in connection with
Garmatex stock).

### c. Claims Brought Under Section 13(d) and Rule 13d-1 of the Exchange Act

Veldhuis, Sexton, and Friesen are accused of violating Section 13(d).  Am. Compl. ¶¶ 259-63 (count IV).  Section 13(d) and Rule 13d-1[20]  of the Exchange Act requires anyone who obtains beneficial ownership of more than five percent of any class of shares to file ownership reports with the SEC.  15 U.S.C. § 78m(d); 17 C.F.R. § 240.13d-1.  It states in relevant part:

> Any person who, after acquiring directly or indirectly the beneficial ownership of any equity . . . which would have been required to be so registered . . . . and is directly or indirectly the beneficial owner of more than 5 per centum of such class shall . . . file with the Commission, a statement . . . .

15 U.S.C. § 78m(d)(1).  Furthermore, "[w]hen two or more persons act as a . . . group for purposes of acquiring, holding, or disposing of securities" they are a "person" under the Exchange Act.  Id. § 78(d)(3).

The SEC alleges with particularity that the Sharp Group assisted the Veldhuis Control Group in skirting the "five percent" beneficial ownership rule.  Am. Compl. ¶¶ 146-48.  It states that at one-point Kelln even wrote in messages how

---

[20] "Rule 13d-1 of the Securities and Exchange Commission provides that the disclosure required by Section 13(d)(1) be set forth in a Schedule 13D." Gen. Aircraft Corp. v. Lampert, 556 F.2d 90, 92 n.1 (1st Cir. 1977); see also 17 C.F.R. §§ 240.13d-1, 240.13d-101.

difficult the rule was to navigate around, while assisting the Veldhuis Control Group.  Id. ¶ 147.  The SEC also explicitly states the following: "Veldhuis, Sexton and Friesen failed to file any report on behalf of the group as required under Rule 13d-1(k)(2), even though they collectively acquired, held, and were responsible for directing the disposition of, far more than 5% of [Stevia First/]Vitality's outstanding stock through nominee entities that were under their group's control."  Id. ¶ 153.

Although Veldhuis and Friesen argue that the Veldhuis control group is not sufficiently alleged as acting as a group for purposes of Section 13(d) liability, see Friesen Mem. 20; Veldhuis Mem. 10, "the existence of a section 13(d)(3) group may be demonstrated circumstantially" and "any arrangements [to act as a group] may be formal or informal."  SEC v. Savoy Indus., Inc., 587 F.2d 1149, 1162-63 (D.C. Cir. 1978).  The Veldhuis Control Group's concerted efforts to sell unregistered stock is sufficient to meet this requirement.

### d.   Section 20(e) of the Exchange Act and Section 15(b) of the Securities Act

Kelln and Gasarch are accused of violating Section 20(e) of the Exchange Act.  Am. Compl. ¶¶ 282-85 (count IX), 300-03 (count XIV).  Section 20(e) makes it unlawful to assist anyone in the violation of the Exchange Act:

> any person that knowingly or recklessly provides
> substantial assistance to another person in violation
> of a provision of this chapter, or of any rule or
> regulation issued under this chapter, shall be deemed
> to be in violation of such provision to the same
> extent as the person to whom such assistance is
> provided.

15 U.S.C. § 78t(e).  To survive a motion to dismiss the SEC must

allege: "(1) the existence of a securities law violation by the

primary (as opposed to the aiding and abetting) party; (2)

'knowledge' of this violation on the part of the aider and

abettor; and (3) 'substantial assistance' by the aider and

abettor in the achievement of the primary violation."  SEC v.

Apuzzo, 689 F.3d 204, 206 (2d Cir. 2012) (quotations omitted).

"Substantial assistance" requires the defendant to have

"associated himself with the venture, that he participated in it

as in something that he wished to bring about, and that he

sought by his action to make it succeed."  Id. (quotations and

alterations omitted).

Gasarch, Taylor, and Kelln are accused of violating Section

15(b) of the Securities Act.  Am. Compl. ¶¶ 273-76 (count VII),

277-81 (count VIII), 292-95 (count XII).  Section 15(b) makes it

unlawful to assist another in the violation of Securities Act:

> any person that knowingly or recklessly provides
> substantial assistance to another person in violation
> of a provision of this subchapter, or of any rule or
> regulation issued under this subchapter, shall be
> deemed to be in violation of such provision to the
> same extent as the person to whom such assistance is
> provided.

15 U.S.C. § 77o(b).  "Because the operative language in § 15(b) is nearly identical to that in § 20(e), the standard for aiding and abetting liability is the same under both statutes." SEC v. Lek Sec. Corp., 276 F. Supp. 3d 49, 61 (S.D.N.Y. 2017).

For the same reasons that the SEC plausibly alleges violations of 17(a)(1) and 10(b)(5) for Kelln and Taylor and 17(a)(3) for Gasarch, see supra Sections V.B.2.a.-b., it also alleges substantial assistance. Gasarch, Taylor, and Kelln all assisted the Sharp Group and the Veldhuis Control Group in the unregistered sale of Stevia First/Vitality Stock from 2016 to 2018.

### C.   Other Arguments Raised by Defendants

The Defendants raise several other arguments in support of their motions to dismiss.  The Court addresses them briefly here.

### 1.   The Appropriateness of Injunctions

More than one defendant -- Sexton and Kelln -- challenge the injunctions sought on the basis that they do not serve to enjoin any existing conduct and would simply compel the Defendants to obey the law.  See Sexton Mem. 19; Kelln Mem. 19. More specifically, Kelln posits that "there is nothing remaining to be enjoined" because she no longer "works for Mr. Sharp,

services his clients, or works in the securities industry in any way." Kelln Mem. 19 (quotations and citations omitted).

The SEC rebuts that "there is no requirement" that "conduct must be ongoing to warrant an injunction" and that the "likelihood of recurrence" and other factors weigh in favor of an injunction. See SEC Opp'n Kelln 15-17. Furthermore, it states that it plausibly alleges conduct to the present and that the proper time to evaluate injunctive relief is after the liability stage. Id.

"The Securities and Exchange Act permits the SEC to seek an injunction in federal district court to prevent violations of securities laws." SEC v. Sargent, 329 F.3d 34, 39 (1st Cir. 2003); see also 15 U.S.C. § 78u(d). "[T]he appropriate standard for issuance of an injunction in such cases is the reasonable likelihood of future violations of the statutory provisions." SEC v. John Adams Tr. Corp., 697 F. Supp. 573, 577 (D. Mass. 1988) (Woodlock, J.). "When predicting the reasonable likelihood of future violations in order to determine the appropriateness of injunctive relief, this court must assess the totality of the circumstances surrounding the defendant and his violation of the securities laws." SEC v. Ingoldsby, CIV. A. No. 88-1001-MA, 1990 WL 120731, at *2 (D. Mass. May 15, 1990) (Mazzone, J.). The following factors are all relevant to the inquiry: (1) "degree of scienter involved," (2) "the defendant's

[92]

recognition of wrongful conduct, [and] the sincerity of his
assurances against future violations," (3) "the isolated or
recurrent nature of the infraction," id. (quoting John Adams,
697 F. Supp. at 578) (quotations omitted), (4) the egregiousness
of the conduct, (5) the likelihood of future violations, id.
(citing SEC v. Blatt, 583 F.2d 1325, 1334 n. 29 (5th Cir. 1978))
and (6) the possible adverse impact and hardship on defendant
counterbalanced by the public interest which is "paramount," id.

Given the alleged scienter and the recurrent nature of the
infractions discussed above with reference to Kelln and Sexton,
see supra Section V.B.2.a., there are sufficient allegations for
the SEC's requests for injunctive relief to pass motion to
dismiss muster.  Further consideration of the appropriateness of
injunctive relief would be premature.

### 2.   The Appropriateness of Disgorgement

Kelln also challenges disgorgement as a remedy by arguing
she was not unjustly enriched by the scheme, because she only
received compensation in the form of an annual salary -- which
cannot be attributed to the scheme.  Kelln Mem. 18-19.

The SEC rebuts that Kelln "was the beneficiary of more than
1 million in funds **derived** from the Sharp Group's conduct," that
her argument disgorgement can be obtained only from those
directly enriched by the scheme is incorrect, and that her

"causal assertion[s]" are premature and ignore allegations in the complaint. SEC Opp'n Kelln 15 (quotations omitted).

"[C]ourts commonly order defendants to disgorge not only the proceeds of a fraud but also salary and bonuses earned during the period of a fraud and amounts equivalent to losses avoided as a result of the securities violation." SEC v. Johnston, 368 F. Supp. 3d 247, 254 (D. Mass. 2019) (Gorton, J.), aff'd, 986 F.3d 63 (1st Cir. 2021).

Kelln's arguments here are inapposite. As discussed earlier, see supra Section V.B.2.a., the SEC has sufficiently alleged Kelln's contribution to the scheme and the amount of ill-gotten gains she received, see Am. Compl. ¶ 68 (alleging she received $1 million). Limitation of the disgorgement remedy at this stage would be premature.

### 3.   Issues of Personal Jurisdiction

Kelln and Gasarch, both citizens and residents of Canada, see Am. Compl. ¶¶ 23-24; Kelln Mem. 17, argue this Court lacks personal jurisdiction over them, Kelln Mem. 16-18 (moving to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2)); Gasarch's Opp'n Am. Compl. 6-9 (opposing SEC's Amended Complaint on this ground). For her part, Gasarch did not raise her objection to personal jurisdiction in her first responsive

pleading and has therefore waived the defense.[21]  Kelln, on the

other hand, who properly raised the defense, see Kelln Mem. 16-

18, asserts the SEC has failed to establish minimum contacts

because Kelln communicated with and facilitated trades only

between foreign entities and "is not alleged to have ever sold

stock in the United States markets as part of the scheme or to

---

[21] Gasarch raised this objection for the first time in a
footnote in her reply to the SEC's opposition to her motion to
dismiss and discusses it at greatest length in her opposition to
the SEC's amended complaint.  See generally Gasarch's Mot.
Dismiss Compl.; Gasarch Mem.; see also Reply Supp. Gasarch's
Mot. Dismiss Compl. 8 n.4, ECF No. 184; Gasarch's Opp'n Am.
Compl. 6-9.  Rule 12, which governs the personal jurisdiction
defense, is subject to strict waiver, see Pilgrim Badge & Label
Corp. v. Barrios, 857 F.2d 1, 3 (1st Cir. 1988), which entails
that failure to raise the defense in one's answer or motion to
dismiss waives it, see Fed. R. Civ. P. 12(g),(h).  Therefore,
Gasarch has waived her personal jurisdiction defense.  Filing of
an amended complaint does nothing to revive this waived defense.
See Pruco Life Ins. Co. v. Wilmington Tr. Co., 616 F. Supp. 2d
210, 216 (D.R.I. 2009) ("[W]hile the amended complaints in both
cases supercede the original complaints for all intents and
purposes in the litigation, they do not revive Wilmington's
personal jurisdiction defense."); Credle-Brown v. Connecticut,
246 F.R.D. 408, 409 (D. Conn. 2007) ("A response to an amended
complaint is not sufficient to override a party's earlier
waiver.").  While Gasarch argues this defense was not available
at the time of her first responsive pleading, because the SEC's
original complaint was largely silent on the location of the
defendants and because, at the time, the SEC did not seek to
toll based on extraterritoriality, see Gasarch's Opp'n Am.
Compl. 7-8, this argument is unavailing.  Gasarch had knowledge
of her own whereabouts and her contacts with the United States,
and the purported dearth of sufficient allegations about her
contacts with the United States should have prompted her to
argue these issues of personal jurisdiction in her first
responsive pleading.  Even were this not the case, this Court
has sufficient basis to assert personal jurisdiction over
Gasarch regardless, as discussed later in this section of the
Memorandum.

have ever held bank accounts in the United States." Kelln Mem. 17.

"It is the plaintiff's burden to establish that personal jurisdiction exists over the defendants in this forum." LTX Corp. v. Daewoo Corp., 979 F. Supp. 51, 54 (D. Mass. 1997) (O'Toole, J.). Without an evidentiary hearing, the Court must base its personal jurisdiction ruling on the prima facie standard. See United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 618 (1st Cir. 2001). To meet this standard the plaintiff must "go beyond the pleadings and make affirmative proof." Id. at 619 (quoting United Elec. Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 987 F.2d 39, 44 (1st Cir. 1993)). Furthermore, the Court acts not "as a factfinder; rather, it accepts properly supported proffers of evidence by a plaintiff as true and makes its ruling as a matter of law." Id. (quoting 163 Pleasant St. Corp., 987 F.2d at 44).

For personal jurisdiction inquiries under federal question cases, like the one at bar, the First Circuit has held that "the constitutional limits of the [C]ourt's personal jurisdiction are fixed . . . not by the Fourteenth Amendment but by the Due Process Clause of the Fifth Amendment," United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1085 (1st Cir. 1992), meaning the "plaintiff need only show that the defendant has adequate contacts with the United States as a

[96]

whole, rather than with a particular state," Swiss Am. Bank, 274 F.3d at 618.  The plaintiff must satisfy "both the forum's long-arm statute and the Due Process Clause of the Constitution."  Id. (quoting Pleasant St., 987 F.2d at 44).

First, then, this Court assesses whether the SEC's claims "arise from a statute that provides for worldwide service."  SEC v. Spencer Pharm. Inc., 57 F. Supp. 3d 127, 133 (D. Mass. 2014) (Talwani, J.).  "The Securities Act and the Exchange Act include identical language providing in pertinent part that 'process . . . may be served in any other district of which the defendant is an inhabitant or **wherever the defendant may be found.**'"  Id. (emphasis and alterations in original)(quoting 15 U.S.C. §§ 77v(a); id. 78aa(a)).

Second, "[a] district court may exercise authority over a defendant by virtue of either general or specific jurisdiction." Massachusetts Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir.1998).  Specific jurisdiction exists where there is a "nexus" between the claims in question and "defendant's forum-based activities."  Id.  The SEC here bases its arguments on specific jurisdiction.  See SEC Kelln Opp'n 19.

Specific jurisdiction requires "minimum contacts" with the forum, "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)

[97]

(quotation marks omitted).  Establishing whether specific

jurisdiction exists involves a three-part analysis:

> First, an inquiring court must ask whether the claim
> that undergirds the litigation directly relates to or
> **arises out of** the defendant's contacts with the forum.
> Second, the court must ask whether those contacts
> **constitute purposeful availment** of the benefits and
> protections afforded by the forum's laws.  Third, if
> the proponent's case clears the first two hurdles, the
> court then must analyze the overall **reasonableness** of
> an exercise of jurisdiction in light of a variety of
> pertinent factors that touch upon the fundamental
> fairness of an exercise of jurisdiction.

Phillips Exeter Acad. v. Howard Phillips Fund, 196 F.3d 284, 288

(1st Cir. 1999) (emphasis added).  This sub-section will

consider whether the SEC meets each requirement.

### a.    Relatedness

"The evidence produced to support specific jurisdiction

must show that the cause of action either arises directly out

of, or is related to, the defendant's forum-based contacts."

Harlow v. Children's Hosp., 432 F.3d 50, 60–61 (1st Cir. 2005).

The "connection between the cause of action and the defendant's

forum-state contacts [cannot be] attenuated and indirect."

Pleasant Street, 960 F.2d at 1089.  "Instead, the defendant's

in-state conduct must form an 'important, or [at least]

material, element of proof' in the plaintiff's case." Id.

(alteration in original) (quoting Marino v. Hyatt Corp., 793

F.2d 427, 430 (1st Cir. 1986)).

Another session of this Court held that false
representations to investors in the United States via email or
in person were sufficient to establish such a nexus and that
even representations made by a defendant's agents to United
States individuals were sufficient to establish the Court's
jurisdiction. SEC v. Elliott, Civil No. 20-10860-LTS, 2020 WL
7185854, at *4 (D. Mass. Dec. 7, 2020) (Sorokin, J.). Other
cases involving securities violations found specific
jurisdiction even with only a few contacts. See, e.g., SEC v.
Gilbert, 82 F.R.D. 723, 725 (S.D.N.Y. 1979) (finding personal
jurisdiction over a Swiss Bank based on the existence of four
accounts maintained with three broker dealers in the United
States for the bank's customers).

In general, alleging "conduct that was designed to violate
United States securities regulations and was thus necessarily
directed toward the United States" allows the SEC to meet its
burden for a prima facie case of jurisdiction. Straub, 921 F.
Supp. 2d at 255-56 (holding trading on the NYSE along with
fraudulent SEC registration statements constituted sufficient
minimum contacts). For example, in In re Parmalat Securities
Litigation, the Southern District of New York held that
allegations that "Parmalat securities traded actively in the
United States, that Parmalat made note offerings here, and that
company documents including Statutory Board reports were posted

[99]

on company web sites in English" were sufficient to satisfy minimum contacts.  376 F. Supp. 2d 449, 456 (S.D.N.Y. 2005).  Furthermore, in In re CINAR Corporation Securities Litigation the Eastern District held the exercise of jurisdiction based solely on a Canadian General Counsel's signing an unlawful registration statement was sufficient because she "must have known that the Statement was made to comply with the laws governing securities offerings in American markets, and as such, it would be used and relied upon by American investors."  186 F. Supp. 2d 279, 305-06 (E.D.N.Y. 2002).

Kelln and Gasarch's actions were specifically directed at skirting SEC regulations in order to deceive American investors trading in United States markets.  For example, Kelln "routinely split Sharp Group clients' shareholdings into blocks of stock, each comprising less than five percent of each public company's outstanding shares to be held in the names of various nominee entities," Am. Compl. ¶¶ 53-55, in order to skirt Schedule 13D and Section 5 filing requirements and deceive United States markets by concealing the true control over these stocks, id. ¶¶ 31-33 (describing how the companies involved in these schemes are traded on OTC Markets).  Gasarch arranged for the transfer of stock sale proceeds from illegal sales, faked invoices and emails to help conceal the true identities of the owners of stock that would eventually be sold on United States markets,

and managed nominee entities to facilitate these stock sales. Id. ¶¶ 57-58, 61-62. These intentional schemes to skirt United States laws and regulations in order to sell stocks on United States markets are sufficient alone to establish minimum contacts. The SEC, however, provides more specific allegations of contacts with the United States for each Defendant.

For **Kelln**, the SEC provides evidence that Kelln routinely contacted United States-based transfer agents regarding the stock that Sharp Group clients sold in violation of SEC regulations and contacted a United-States based attorney several times between 2016 and 2018. Decl. Trevor T. Donelan ¶¶ 9-10, ECF No. 168; see also Am. Compl. ¶¶ 53, 93, 143-44. As to **Gasarch**, the SEC alleged that she owned a United States-based corporate entity through which she received the profits from fraudulent trades. Am. Compl. ¶ 68.

### b. Purposeful Availment

"The purposeful availment prong examines whether the defendant's contacts with the forum 'represent a purposeful availment of the privilege of conducting activities in the forum . . . .'" New Life Brokerage Servs., Inc. v. Cal-Surance Assocs., Inc., 222 F. Supp. 2d 94, 105-06 (D. Me. 2002) (quoting Pleasant St., 960 F.2d at 1089). "This prong is only satisfied when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue

of the benefit he receives, to be subject to the court's
jurisdiction based on these contacts."  Swiss Am. Bank, 274 F.3d
at 624.  Another session of this Court has held that "[t]he
defendant need not reside in or even spend substantial time in
the forum -- in cases where the defendant has not physically
entered the forum, First Circuit courts may 'look for some other
indication that the defendant reached into the forum, such as
mail or telephone contacts.'"  Elliott, 2020 WL 7185854, at *4
(quoting Swiss Am. Bank, 274 F.3d at 622).

Where defendants are aware that their misrepresentations or
deceptions would be "relied upon by American investors" there is
"no clearer example of purposeful availment."  See CINAR, 186 F.
Supp. 2d at 306; see also Straub, 921 F. Supp. 2d at 255
(holding "[d]efendants knew or had reason to know that any false
or misleading financial reports would be given to prospective
American purchasers of those securities"); SEC v. Sharef, 924 F.
Supp. 2d 539, 547 (S.D.N.Y. 2013) ("It is by now well-
established that signing or directly manipulating financial
statements to cover up illegal foreign action, with knowledge
that those statements will be relied upon by United States
investors satisfies [the personal jurisdiction] test.").  The
case at bar presents precisely the same type of purposeful
availment -- Kelln and Gasarch allegedly actively worked to
skirt SEC regulations and to deceive American investors.

### c.   Reasonableness

In assessing reasonableness, the Court looks to: "five gestalt factors: (1) the defendant's burden in appearing in the court; (2) the forum state's interest in hearing the suit; (3) the plaintiff's convenience and interest in effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all interested states in promoting substantive social policies." Hasbro, Inc. v. Clue Computing, Inc., 994 F. Supp. 34, 45 (D. Mass. 1997) (Woodlock, J.) (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985)). As to the first factor, the First Circuit has held that "staging a defense in a foreign jurisdiction is almost always inconvenient and/or costly . . . [therefore] this factor is only meaningful where a party can demonstrate some kind of special or unusual burden." Pritzker v. Yari, 42 F.3d 53, 64 (1st Cir.1994). Neither Kelln, nor Gasarch make any specific arguments with regard to reasonableness beyond stressing their residence and citizenship outside of the United States, failing to demonstrate such a "special or unusual" circumstance. See id.; Kelln Mem. 17-18; Gasarch Opp'n Am. Compl. 8-9. The second and third factor clearly weigh in favor of a ruling of personal jurisdiction. As to the fourth, and fifth prongs of the test, while this Court "recognizes that Canada has a strong interest in the enforcement

of its laws and the adjudication of disputes regarding its

citizens, [it holds] that this interest does not outweigh the

United States' interest in resolving cases related to a

violation of U.S. securities law and giving rise to injury

within this forum's borders." Spencer Pharm. Inc., 57 F. Supp.

3d at 137.

## VI.   CONCLUSION

Therefore, this Court DENIES all six of the Defendants'

motions to dismiss in their entirety.

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[22]

---

[22] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents. Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 44 years.