UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>                              **Plaintiff,**<br><br>        **v.**<br><br>**FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,**<br>                              **Defendants.** | **Civil Action No. 21-CV-11276-WGY** |

**PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANTS COURTNEY KELLN, MIKE VELDHUIS, PAUL SEXTON AND JACKSON FRIESEN**

Plaintiff United States Securities and Exchange Commission (the "Commission") submits this Local Rule 56.1 statement of undisputed facts in support of its motion for partial summary judgment against defendants Courtney Kelln ("Kelln"), Mike Veldhuis ("Veldhuis"), Paul Sexton ("Sexton") and Jackson Friesen ("Friesen") (collectively, for purposes of this briefing, the "Defendants"), on Claims 3 and 4 of the Amended Complaint.

**Defendants and Related Individuals**

1.      Frederick Sharp ("Sharp"), owned and operated a business that provided a range of services to his clients, who controlled the stock of numerous small, publicly-traded companies.  One of Sharp's primary services was to maintain and administer a group of nominee companies, incorporated in many foreign countries, that he allowed his clients to use to hold shares of stock on their behalf.  Sharp charged his clients fees for using his nominee companies to hold shares.  Sharp allowed his clients to direct the nominee companies' purchases and sales

of stock without revealing that the clients were the people actually directing those purchases and

sales.  Declaration ██████████ ("████████."), ¶6.[1]

2.       Kelln and Gasarch were employees of Sharp's business.  *See id.*, ¶5.

3.       Kelln was responsible for the stock transfer aspect of Sharp's business.  She

grouped shares controlled by Sharp's clients into blocks of less than 5% of the issuers'

outstanding shares.  She collected or created the supporting documents to send to the issuers'

transfer agents to document the transfer of those blocks of shares into the name of nominee

companies she helped to administer as part of Sharp's business.  Kelln often organized transfers

between nominee companies that were also administered by Sharp's business.  Often, there were

no actual payments by or between these nominee companies for the shares that Kelln transferred

into their names.  *See id.*, ¶7.

4.       Gasarch was responsible for many of the financial aspects of Sharp's business.

Gasarch prepared and sent the documents to Sharp's trading partners, banks and brokerage firms

when the clients of Sharp's business wanted payments made out of the proceeds of their trading.

Gasarch often sent communications requesting payments in the names of the nominee companies

administered by Sharp's business.  She also made and kept records relating to clients' payment

requests.  *See id.*, ¶9.

5.       Veldhuis, Sexton and Friesen were clients of Sharp's business.  Veldhuis, Sexton

and Friesen worked together as partners to own and sell the stocks of numerous public company

issuers whose shares were traded in the United States over-the-counter market.  *See id.*, ¶11.

Veldhuis, Sexton and Friesen worked with others, including Avtar Dhillon ("Dhillon") to gain

---

[1] All Declarations and their exhibits referenced herein are separately filed.  All other exhibits referenced
herein are filed with the accompanying Appendix of Exhibits.  All pin-cites are to the pdf page number of
the exhibit unless paragraph citations are used.

control over, and then sell, shares of the following companies:  Arch Therapeutics ("Arch"),

Stevia First Corp. (later known as Vitality BioPharma, Inc.) ("Stevia First/Vitality"), and

OncoSec Medical Inc., ("OncoSec").  *See* Declaration of Avtar Dhillon ("Dhillon Dec."), ¶¶7-8.

Veldhuis, Sexton and Friesen made these sales while concealing their identities as the sellers.

*See id.* ¶¶8, 14-16, 21, 26-27, 33-34, 41.  Dhillon was the Chairman of the Board of Arch, Stevia

First/Vitality and OncoSec.  *See id.* ¶¶3-5.

6.     Roger Knox ("Knox"), owned and operated an entity named Silverton SA (later

known as Wintercap SA) ("Silverton").  Silverton was based in Switzerland and purported to

manage assets for its clients.  Through Silverton, Knox engaged in a scheme fraudulently to sell

the stock of numerous companies that were traded in the United States over-the-counter markets.

Silverton provided a route to market for people who wished to sell large quantities of microcap

stocks into the United States securities markets while concealing that they owned, controlled,

and were directing sales of, those shares.  ▮▮▮▮▮▮ ¶¶2-4.

7.     Richard Targett-Adams ("Targett-Adams") worked for Knox and Silverton from

approximately 2014 to October 2018.  Ex. 2 at 18.  Targett-Adams assisted Knox with the

business of Silverton.  *See id*. at 18-19.

8.     William Kaitz ("Kaitz") was a stock promoter who worked with Veldhuis, Sexton

and Friesen to promote the stocks of at numerous public company issuers whose shares were

traded in the United States over-the-counter market.  *See* Declaration of William Kaitz ("Kaitz

Dec.), ¶¶4, 10.

9.     Fedir Nikolayev ("Nikolayev") provided information technology services to

Sharp.  Nikolayev managed a network of encrypted communication devices and an accounting

system for Sharp's business, named "Q.  Sharp created one of his nominee companies, Gotama

Capital ("Gotama"), by using Nikolayev's name and personal information to purportedly serve

as Gotama's beneficial owner.  Sharp allowed his clients to direct Gotama's purchases and sales of stock without revealing that the clients were the people actually directing those purchases and sale.  Ex. 3 at 21:4-9; 24:20-25:10; 31:17–32:3; 39:15-40:3; 43:25-44:21; 85:10-86:7; 87:19-88:4; 122:18-124:2; 128:18-129:1; 131:7-141:3; 151:3-153:15.

**Sharp's Encrypted Communications Network**

10.    One of the services that Sharp and his employees provided to his clients and business partners was an encrypted communications network called xphones.  Xphones were originally Blackberry devices, and they were later replaced with Samsung phones.  Xphones were part of a secure, encrypted communications network that Sharp provided to his clients and business partners.  Xphones could only communicate with other xphones.  ▮ ¶12; Kaitz Dec., ¶14; Ex. 3 at 59:2-6; 64:23-65:11.

11.    Xphone users were able to exchange text messages with other xphone users through code names and numbers.  Xphone users used code names or numbers in order to conceal their identity.  ▮ ¶13; Kaitz Dec., ¶15.

12.    Xphone user BOND was Sharp.  ▮ ¶14; Ex. 3 at 67:25-68:3; 72:16-18.

13.    Xphone user CELT was Kelln.  ▮ ¶14; Ex. 11 (xphone user CELT provides her xmail address as ckelln@securecuracao.xmeridian.com); Ex. 12 (xphone user CELT provides Kelln's home address and Kelln's phone number after saying "send them to me"); Ex. 13 (xphone user CELT discussing transfer agent that revealed her name, Courtney Kelln, to the SEC).

14.    Xphone user 76 or WIRES was Gasarch.  ▮ ¶14; Ex. 3 at 163:4-165:16; 169:11-170:20; Ex. 14 (xmail message from "Yvonne" as "wires"); Ex 15 (xphone message from Nikolayev to "Yvonne" at "wires"); Ex. 16 (xphone user WIRES telling Sharp client to send documents to her at attention "Yvonne Gasarch"); Ex. 17 (xphone user 76 or WIRES providing

her name, "Yvonne Gasarch" to a Sharp client who was sending an email from an entity of which she served as President); Ex. 18 (xphone user 76 or WIRES gives the username on her computer as "ygasarch@hotmail.com"); Ex. 19 (xphone user WIRES or 76 responds to "Hi Yvonne Are you back?" by saying "Yes" and provides Yvonne with address for video chat).

15.    Xphone user 4 or ACCO was Veldhuis. ███████ ¶14; Kaitz Dec., ¶15; Ex. 20 (xphone user 4 responding to a question about what contact information he wanted to provide and stating that his handle on silent circle (an encrypted communications application) is "mkveldhuis"); Ex. 21 (xphone user 4 providing his name, address and phone number for a shipment of expensive watches to be delivered to him as "Mike Veldhuis" and a phone number he uses); Ex. 22 (xphone user 4 and ACCO identifying the wifi password at his vacation house as Veldhuis_Bazan).

16.    Xphone user 3 or HEAR or SEXY was Sexton.  Kaitz Dec., ¶15; Ex. 23 (xphone user 3 or HEAR reports his date of birth (which is Sexton's date of birth) and also states that the payment is "to palm (paul sexton)"); Ex. 24 (xphone user 3 or HEAR reports the names and birth dates of Sexton's children to Sharp); Ex. 25, and 26 (xphone user 3 and HEAR tells Sharp that he wishes he was 32 when a compliance check for a 32-year old Paul Sexton flagged a payment that Blacklight was trying to send to him; Sharp reporting to Blacklight that "Our paul is partners with bill, mike + jackson."); Ex. 27 (xphone user 3 and SEXY saying that he and Mike will be on the call and later response saying "Just announce us both.  Paul sexton and mike. Veldhuis").

17.    Xphone user 2 or GARD was Friesen. ███████ ¶14; Kaitz Dec., ¶15; Ex. 28 (xphone user 2 or GARD provides his email address as jackson@secure.xmeridian.com" to get signature pages for Pine Strategies); Ex. 29 (xphone user 2 provides his email addresses as "jackson@vencapfirst.com, jackson@mfgsite.com and stockman00@gmail,com"); Ex. 30 (xphone user 2 states "Its Jackson.").

18.     Xphone user 66 was Kaitz.  Kaitz Dec., ¶15.

19.     Xphone users KASH and TRAD were traders employed by Sharp's business.
  ¶14.

**Veldhuis, Sexton and Friesen Sold Stocks Through Silverton**

20.     On January 13, 2020, Knox entered a guilty plea one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. §371, and one count of securities fraud in violation of 15 U.S.C. §§78j(b) and 78ff, and 17 C.F.R.  §240.10b-5.  *See United States v. Knox*, 18-cr-10385-NMG (D. Mass.); Ex. 1.

21.     When he pled guilty, Knox admitted that, from at least 2015 until his arrest in October 2018, he operated Silverton and through Silverton, "engaged in a scheme to fraudulently sell stock" of numerous publicly traded companies.  Ex. 1 at 17, 27-28.  The scheme to which Knox pled guilty involved Silverton's sale of stock for Sharp's business and the clients of Sharp's business, including Veldhuis, Sexton and Friesen.  ████████  ¶5.  In particular, when pleading guilty, Knox agreed with the following factual statements describing his crime:

a.      "Knox's company existed, at least in part, to flout the securities laws and provide a layer of disguise to public company control persons who, acting in concert with Knox, intended to defraud investors by secretly dumping large quantities of stock in circumvention of the registration and disclosure requirements imposed by the Federal securities laws."  Ex. 1 at 18.

b.      "Knox provided a platform through which control persons could conceal their identities while selling large amounts of stock to investors."  *Id.*

c.      Knox's control group clients acquired "most, if not all" of the stock of the public companies whose stock they manipulated.  *Id.* at 19.

d.      Knox's clients then transferred their stock to nominee companies, typically "in blocks of less than five percent of the total outstanding shares of the issuer in order

to evade disclosure obligations and deflect scrutiny by brokers."  Knox also created offshore

nominee entities for some clients for a fee.  *Id.*

> e.    Knox helped his clients further conceal their ownership by arranging to

transfer the stock from the nominee entities' names to Silverton's name, as its custodian.  *Id.* at

19, 24-25.

> f.    Knox coordinated the deposit of the shares into the U.S. electronic trading

system, and then transferred the shares into omnibus brokerage accounts in Silverton's name in

blocks of less than 5 percent of the total outstanding shares for that company.  "[b]rokers

generally do not require omnibus account-holders to reveal the identity of the underlying"

owners.  Further, "[b]y staying below five percent, Knox evaded disclosure obligations and

sought to avoid triggering direct inquiries by compliance personnel in the brokerage firms" that

Silverton used.  *Id.* at 19-20.

> g.    Through Silverton's brokerage accounts, Knox dumped his clients' stock

into the securities market.  "The dump phase of the scheme typically included a promotional

campaign funded by the control persons to generate public interest in the stock, which often

artificially inflated the market price of the stock."  *Id.* at 20.

> h.    Knox's scheme allowed his clients to conceal their identities, and dump

their stock, "often millions of shares at a time" into the market in a way that made their sales

appear as ordinary trading when they were really sales by control persons.  *Id.* at 20-21.

22.    While Knox disagreed about the number of companies involved in his scheme, he

agreed with the prosecutor's recitation of the other aspects of his scheme as described above.

*See id.* at 24-26.

23.    On June 21, 2019, Targett-Adams waived indictment and entered a guilty plea to

an information charging him with one count of conspiracy to commit securities fraud, in

violation of 18 U.S.C. §371, and one count of securities fraud in violation of 15 U.S.C. §§78j(b) and 78ff, and 17 C.F.R. §240.10b-5.  *See United States v. Targett-Adams*, 19-cr-10046-IT (D. Mass.); Ex. 2 at 26.

24.     When he pled guilty, Targett-Adams admitted to a description of Silverton's fraudulent scheme that was very similar to the scheme admitted by Knox.  *Id.* at 18-26.  In addition, Targett-Adams admitted that while Knox interacted with Silverton's control group clients, he transferred stock into Silverton accounts, helped create nominee shareholder companies, and "transferred the securities fraud proceeds to the control groups from [Silverton] upon the direction of clients and Knox."  *Id.* at 19.

25.     Silverton sold many different issuers' stocks on behalf of Sharp and his clients, including Veldhuis, Sexton and Friesen.  Silverton recorded those sales as being made by its clients, which were nominee companies administered by Sharp, Kelln and Gasarch.  In reality, those sales were made at the direction of, and for the benefit of, Veldhuis, Sexton and Friesen. Some of the stocks that Silverton sold on behalf of Veldhuis, Sexton and Friesen included: Stevia First/Vitality (ticker STVF/VBIO), Arch Therapeutics (ticker ARTH), Stevia Corp. (ticker STEV), RightsCorp (ticker RIHT), Lexington Biosciences (ticker LNB), BreathTec BioMedical (BHT), StartMonday Technology Corp (ticker JOB), Liberty One Lithium Corp (ticker LBY), Makism 3D Corp (MDDD), and NewGen Biopharma (NEWG).  ████████ ¶27.

26.     Silverton often received shares of stock to sell for Sharp and his clients through DWAC (Deposit/Withdrawal at Custodian) transfers.  DWAC transfers are an electronic method of transferring shares from one custodian to another, which was used instead of the transfer of paper stock certificates.  Transfer agents could send shares to Silverton's brokerage accounts via the DWAC system.  In order to use this system, the issuer's securities had to be eligible for deposit with the Depository Trust Corporation (DTC) in the United States.  ████████ ¶30.

**Veldhuis, Sexton and Friesen Sold Securities of At Least 14 Issuers Through Sharp's Business**

27.     Sharp's business kept an accounting system that was called MT and later Q (the "Q system").  The Q system kept track of Sharp's clients' stock holdings in the names of the various nominee companies Sharp and his employees administered.  Q also kept track of purchases and sales of his clients' stock through those nominees.  Q also kept track of all of the financial transactions for Sharp's business, including all payments sent at clients' direction out of the proceeds of their trading and all fees and commissions they were charged for using Sharp's services.  ▮▮▮▮▮  ¶21.  Silverton personnel used and reported data into, the Q system.  Knox reconciled his own accounting for stock Silverton sold on behalf of Sharp's clients with the data in the Q system, to confirm that both systems were accurate and consistent.  *Id.*, ¶22.  Knox was aware that Sharp and his employees entered information into the Q system at the time of, or very close in time to, the transactions recorded in the Q system and they all relied on the accuracy of the Q system.  *Id.*, ¶23.

28.     The Q system was created by Fedir Nikolayev, an IT professional working for Sharp, as a web-based platform where multiple users could input data concurrently and with more complex formulas that Sharp's prior accounting system.  Ex. 3 at 39:15-40:3; 43:25-44:21.  Nikolayev developed the Q system for Sharp to keep track of financial transactions, stock holdings, purchases and sales of stock, proceeds from stock sales, client and bank account information, and commissions distributed to Sharp's clients.  *Id.*, at 41:22-43:7; 48:12-49:10.  Sharp's regular practice in conducting his business was to keep all of this information on the Q server.  *Id.*, at 49:21-24; 51:24-52:1.

29.     The Q system has an account for each issuer's securities that are sold using Sharp's services.  The account for an issuer is typically named either the same as, or something

similar to, the ticker symbol under which that issuer's securities trade in the public markets.  *See* Declaration of Ryan Murphy ("Murphy Dec."), ¶8.  Each of the "issuer" accounts contains a separate line item showing each receipt of stock, each deposit of stock, each purchase or sale of stock, the cost of, or proceeds from those purchases or sales, and the disposition of the proceeds either to third parties or to other accounts in the Q system.  *See id.*, ¶9.  Each line item also indicates which through bank or brokerage firm each transaction occurred.  *See id.*, ¶12.  For example, portions of reports generated from the Q system from the "issuer" accounts for Stevia First/Vitality (named the STVF account) and for Arch Therapeutics (named the ARTH account) are provided to illustrate the detailed data contained in the Q system.  Murphy Dec., Ex. 1 (VBIO account excerpt); Murphy Dec., Ex. 2 (ARTH account excerpt).

30.     Based on the data contained in the Q system and on brokerage account records, the following entities administered by Sharp's business traded shares of Stevia First/Vitality during the time period from March 2012 to November 2018.  Murphy Dec., ¶¶16-18.

| Account Name | Financial Institution | Date of First Sale | Date of Last Sale | Qty - VBIO Shares Sold | Total VBIO Share Sales |
|---|---|---|---|---|---|
| LORNEX FINANCIAL LTD | VERDMONT CAPITAL | 3/7/2012 | 5/1/2012 | (4,406,000) | 22 |
| CALEDONIA PARTNERS LLC | LGT BANK (SINGAPORE) LTD | 3/6/2012 | 5/7/2012 | (4,220,000) | 24 |
| HILTON CAPITAL INC | WINTERCAP SA | 10/15/2015 | 9/4/2018 | (3,498,499) | 76 |
| MORRIS CAPITAL INC | BSI SA | 3/26/2012 | 3/28/2012 | (2,560,000) | 5 |
| MORRIS CAPITAL INC | WINTERCAP SA | 8/4/2016 | 2/2/2017 | (802,368) | 14 |
| TRIUS HOLDINGS LTD | BEAUFORT SECURITIES LTD | 1/21/2015 | 12/21/2016 | (3,105,366) | 82 |
| TRIUS HOLDINGS LTD | TENDALL CAPITAL MARKETS LTD | 6/23/2017 | 11/5/2018 | (90,645) | 6 |
| NAUTILUS GROWTH FUND LTD | VERDMONT CAPITAL | 3/29/2012 | 6/10/2014 | (3,075,000) | 29 |
| GOTAMA CAPITAL SA | BEAUFORT SECURITIES LTD | 3/7/2014 | 1/3/2018 | (1,899,278) | 52 |
| GOTAMA CAPITAL SA | HYPOSWISS | 5/15/2012 | 5/23/2012 | (900,000) | 7 |
| TANDEM GROWTH LLC (FKA TERRA EQUITY LLC) | BSI SA | 3/6/2012 | 3/28/2012 | (2,556,000) | 7 |
| PEREGRINE CAPITAL LTD (F.K.A. PEACEFUL LION HOLDINGS LTD) | HYPOSWISS | 3/22/2012 | 5/4/2012 | (2,462,000) | 17 |
| QUEZON GROUP LLC | WINTERCAP SA | 5/31/2016 | 7/20/2017 | (2,117,427) | 59 |
| LARAMEE HOLDINGS | WINTERCAP SA | 10/26/2017 | 9/24/2018 | (1,645,680) | 54 |
| RIVERFALL GROUP LTD | WINTERCAP SA | 7/20/2016 | 6/6/2018 | (1,449,409) | 43 |
| LOTHLORIEN INC | STERLING SECURITIES GROUP | 3/13/2012 | 3/20/2012 | (1,097,000) | 3 |
| SANTOS TORRES LLC | WINTERCAP SA | 2/1/2017 | 1/2/2018 | (898,039) | 22 |
| CORBY VENTURES INC | PETER PESIC & CO SECURITIES INC | 8/18/2016 | 6/26/2017 | (765,411) | 14 |
| VARESE CAPITAL INC | WINTERCAP SA | 5/26/2016 | 12/21/2016 | (500,000) | 7 |
| FINANCIAL PACIFIC, INC | COR CLEARING / LEGENT CLEARING | 3/20/2012 | 5/21/2012 | (345,400) | 3 |
| EGREDIOR HOLDINGS LTD | CANACCORD GENUITY | 10/6/2016 | 11/5/2018 | (90,000) | 4 |
| PEGASUS GLOBAL LTD (F.K.A. BAMFIELD EQUITIES) | BEAUFORT SECURITIES LTD | 10/11/2016 | 10/12/2016 | (25,000) | 2 |
| INLAND TRADING LTD | CANACCORD GENUITY | 12/22/2016 | 12/22/2016 | (5,000) | 1 |
| | | | **Total** | **(38,513,522)** | **553** |

31.     Based on the data contained in the Q system and on brokerage account records,

the following entities administered by Sharp's business traded shares of Echo Automotive during

the time period from November 2012 to April 2014.  Murphy Dec., ¶¶19-21.

| Account Name | Financial Institution | Date of First Sale | Date of Last Sale | Qty - ECAU Shares Sold | Total ECAU Share Sales |
|---|---|---|---|---|---|
| QUEZON GROUP LLC | CBH COMPAGNIE BANCAIRE HELVETIQUE | 1/25/2013 | 3/6/2013 | (953,200) | 9 |
| QUEZON GROUP LLC | VP BANK | 1/24/2013 | 11/26/2013 | (3,550,000) | 6 |
| TANDEM GROWTH LLC (FKA TERRA EQUITY LLC) | BSI SA | 11/28/2012 | 3/14/2013 | (3,976,960) | 18 |
| LORNEX FINANCIAL LTD | VERDMONT CAPITAL | 12/21/2012 | 1/24/2013 | (3,565,000) | 18 |
| NAUTILUS GROWTH FUND LTD | VERDMONT CAPITAL | 2/6/2013 | 2/7/2013 | (3,375,000) | 2 |
| GOTAMA CAPITAL SA | BEAUFORT SECURITIES LTD | 3/7/2014 | 4/8/2014 | (63,562) | 2 |
| GOTAMA CAPITAL SA | HYPOSWISS | 2/11/2013 | 3/8/2013 | (2,875,000) | 12 |
| MORRIS CAPITAL INC | BSI SA | 2/19/2013 | 12/6/2013 | (2,500,000) | 28 |
| INLAND TRADING LTD | HELLENIC BANK PUBLIC COMPANY LTD (CYPRUS) | 1/28/2013 | 2/25/2014 | (616,220) | 11 |
| PEGASUS GLOBAL LTD (F.K.A. BAMFIELD EQUITIES) | BEAUFORT SECURITIES LTD | 3/3/2014 | 3/7/2014 | (52,667) | 3 |
| PEREGRINE CAPITAL LTD (F.K.A. PEACEFUL LION HOLDINGS LTD) | HYPOSWISS | 2/6/2013 | 2/6/2013 | (20,000) | 1 |
| GRANT PARTNERS LLC | DMS BANK & TRUST LTD (LEGACY GLOBAL MARKETS) | 2/7/2013 | 2/7/2013 | (2,500) | 1 |
| SHERMAN CAPITAL LLC | DMS BANK & TRUST LTD (LEGACY GLOBAL MARKETS) | 1/29/2013 | 1/29/2013 | (2,000) | 1 |
| | | | Total | (21,552,109) | 112 |

32.     Based on the data contained in the Q system and on brokerage account records, the following entities administered by Sharp's business traded shares of Arch Therapeutics during the time period from December 2012 to May 2017.  Murphy Dec., ¶¶22-24.

| Account Name | Financial Institution | Date of First Sale | Date of Last Sale | Qty - ARTH Shares Sold | Total ARTH Share Sales |
|---|---|---|---|---|---|
| TRIUS HOLDINGS LTD | BEAUFORT SECURITIES LTD | 6/1/2015 | 11/7/2016 | (5,311,425) | 57 |
| TRIUS HOLDINGS LTD | TENDALL CAPITAL MARKETS LTD | 12/15/2016 | 5/22/2017 | (1,101,410) | 13 |
| GOTAMA CAPITAL SA | BEAUFORT SECURITIES LTD | 3/2/2015 | 12/17/2015 | (2,500,000) | 48 |
| GOTAMA CAPITAL SA | HYPOSWISS | 12/28/2012 | 7/30/2013 | (1,981,350) | 11 |
| LORNEX FINANCIAL LTD | VERDMONT CAPITAL | 6/18/2013 | 8/16/2013 | (4,040,000) | 5 |
| QUEZON GROUP LLC | CBH COMPAGNIE BANCAIRE HELVETIQUE | 7/9/2013 | 8/20/2013 | (544,100) | 4 |
| QUEZON GROUP LLC | VP BANK | 6/11/2013 | 8/19/2013 | (2,183,366) | 15 |
| QUEZON GROUP LLC | WINTERCAP SA | 1/17/2014 | 3/16/2015 | (936,799) | 26 |
| MIRABEAU COMPAGNIE SA | DMS BANK & TRUST LTD (LEGACY GLOBAL MARKETS) | 7/29/2013 | 8/20/2013 | (2,321,300) | 8 |
| BAMFIELD EQUITIES LTD | VERDMONT CAPITAL | 7/15/2013 | 8/16/2013 | (2,173,458) | 8 |
| MORRIS CAPITAL INC | BSI SA | 6/20/2013 | 7/26/2013 | (1,635,000) | 9 |
| TANDEM GROWTH LLC (FKA TERRA EQUITY LLC) | BSI SA | 7/8/2013 | 7/17/2013 | (1,540,000) | 5 |
| NAUTILUS GROWTH FUND LTD | VERDMONT CAPITAL | 6/18/2013 | 7/25/2013 | (1,540,000) | 3 |
| PEREGRINE CAPITAL LTD (F.K.A. PEACEFUL LION HOLDINGS LTD) | HYPOSWISS | 6/20/2013 | 1/16/2014 | (1,240,320) | 23 |
| PEREGRINE CAPITAL LTD (F.K.A. PEACEFUL LION HOLDINGS LTD) | ST. GALLER KANTONALBANK AG | 1/17/2014 | 11/18/2014 | (158,550) | 11 |
| PARAGON CAPITAL INC | DMS BANK & TRUST LTD (LEGACY GLOBAL MARKETS) | 7/25/2013 | 8/6/2013 | (750,000) | 3 |
| INLAND TRADING LTD | HELLENIC BANK PUBLIC COMPANY LTD (CYPRUS) | 7/17/2013 | 8/19/2013 | (526,516) | 3 |
| PEGASUS GLOBAL LTD (F.K.A. BAMFIELD EQUITIES) | BEAUFORT SECURITIES LTD | 12/9/2015 | 6/9/2016 | (454,387) | 8 |
| HILTON CAPITAL INC | WINTERCAP SA | 3/16/2015 | 4/14/2015 | (142,130) | 4 |
| | | | **Total** | **(31,080,111)** | **264** |

33.     Based on the data contained in the Q system and on brokerage account records, the following entities administered by Sharp's business traded shares of Stevia Corp. during the time period from October 2011 to April 2014.  Murphy Dec., ¶¶25-27.

| Account Name | Financial Institution | Date of First Sale | Date of Last Sale | Qty - STEV Shares Sold | Total STEV Share Sales |
|---|---|---|---|---|---|
| TANDEM GROWTH LLC (FKA TERRA EQUITY LLC) | BSI SA | 10/6/2011 | 12/8/2011 | (4,317,000) | 25 |
| PEREGRINE CAPITAL LTD (F.K.A. PEACEFUL LION HOLDINGS LTD) | HYPOSWISS | 1/13/2012 | 4/12/2013 | (2,039,300) | 19 |
| PEREGRINE CAPITAL LTD (F.K.A. PEACEFUL LION HOLDINGS LTD) | ST. GALLER KANTONALBANK AG | 1/22/2014 | 4/23/2014 | (2,159,475) | 9 |
| QUEZON GROUP LLC | CBH COMPAGNIE BANCAIRE HELVETIQUE | 11/4/2011 | 11/22/2011 | (1,810,434) | 9 |
| QUEZON GROUP LLC | WINTERCAP SA | 3/11/2014 | 3/26/2014 | (2,123,825) | 7 |
| LORNEX FINANCIAL LTD | DMS BANK & TRUST LTD (LEGACY GLOBAL MARKETS) | 3/6/2014 | 4/3/2014 | (673,745) | 5 |
| LORNEX FINANCIAL LTD | VERDMONT CAPITAL | 11/28/2011 | 1/13/2014 | (2,736,555) | 44 |
| NAUTILUS GROWTH FUND LTD | VERDMONT CAPITAL | 2/21/2014 | 3/20/2014 | (3,000,000) | 14 |
| PEGASUS GLOBAL LTD (F.K.A. BAMFIELD EQUITIES) | BEAUFORT SECURITIES LTD | 3/27/2014 | 4/7/2014 | (3,000,000) | 7 |
| MORRIS CAPITAL INC | WINTERCAP SA | 2/28/2014 | 3/20/2014 | (2,952,400) | 7 |
| GOTAMA CAPITAL SA | BEAUFORT SECURITIES LTD | 8/21/2014 | 11/20/2014 | (1,698,100) | 15 |
| GOTAMA CAPITAL SA | HYPOSWISS | 8/22/2012 | 1/14/2014 | (1,009,234) | 25 |
| GOTAMA CAPITAL SA | ST. GALLER KANTONALBANK AG | 3/28/2014 | 3/28/2014 | (8,191) | 1 |
| GRANT PARTNERS LLC | DMS BANK & TRUST LTD (LEGACY GLOBAL MARKETS) | 10/6/2011 | 11/23/2011 | (2,312,900) | 29 |
| LOTHLORIEN INC | STERLING SECURITIES GROUP | 12/28/2011 | 1/12/2012 | (2,100,000) | 10 |
| HAMPTON PARTNERS INC | WINTERCAP SA | 12/2/2014 | 12/8/2014 | (1,399,511) | 5 |
| CALEDONIA PARTNERS LLC | LGT BANK (SINGAPORE) LTD | 10/6/2011 | 1/13/2012 | (600,000) | 12 |
| FINANCIAL PACIFIC, INC | COR CLEARING / LEGENT CLEARING | 12/2/2011 | 1/13/2012 | (210,900) | 3 |
| | | | **Total** | **(34,151,570)** | **246** |

34.     Based on the data contained in the Q system and on brokerage account records,

the following entities administered by Sharp's business traded shares of Liberty One Lithium

Corp. during the time period from December 2016 to December 2017.  Murphy Dec., ¶¶28-29.

| Account Name | Financial Institution | Date of First Sale | Date of Last Sale | Qty - LBY Shares Sold | Total LBY Share Sales |
|---|---|---|---|---|---|
| VARESE CAPITAL INC | WINTERCAP SA | 3/10/2017 | 12/12/2017 | (2,509,675) | 32 |
| SANTOS TORRES LLC | WINTERCAP SA | 9/1/2017 | 12/4/2017 | (2,500,000) | 11 |
| EGREDIOR HOLDINGS LTD | CANACCORD GENUITY | 12/20/2016 | 10/11/2017 | (2,273,500) | 14 |
| TRIUS HOLDINGS LTD | BEAUFORT SECURITIES LTD | 7/14/2017 | 8/4/2017 | (1,723,000) | 15 |
| TRIUS HOLDINGS LTD | TENDALL CAPITAL MARKETS LTD | 10/16/2017 | 10/16/2017 | (490,000) | 2 |
| GOTAMA CAPITAL SA | BEAUFORT SECURITIES LTD | 3/7/2017 | 1/3/2018 | (1,895,000) | 14 |
| INLAND TRADING LTD | CANACCORD GENUITY | 6/1/2017 | 12/14/2017 | (1,864,334) | 13 |
| HILTON CAPITAL INC | WINTERCAP SA | 8/17/2017 | 12/11/2017 | (1,450,000) | 8 |
| PEGASUS GLOBAL LTD | PETER PESIC & CO SECURITIES INC | 10/5/2017 | 11/9/2017 | (588,833) | 4 |
| PEGASUS GLOBAL LTD (F.K.A. BAMFIELD EQUITIES) | BEAUFORT SECURITIES LTD | 7/12/2017 | 9/14/2017 | (519,500) | 5 |
| CORBY VENTURES INC | PETER PESIC & CO SECURITIES INC | 10/9/2017 | 10/12/2017 | (375,000) | 3 |
| | | | **Total** | **(16,188,842)** | **121** |

35.     Based on the data contained in the Q system and on brokerage account records, the following entities administered by Sharp's business traded shares of Oryon Technologies during the time period from May 2012 to October 2013.  Murphy Dec., ¶¶30-31.

| Account Name | Financial Institution | Date of First Sale | Date of Last Sale | Qty - ORYN Shares Sold | Total ORYN Share Sales |
|---|---|---|---|---|---|
| LORNEX FINANCIAL LTD | VERDMONT CAPITAL | 5/7/2012 | 4/2/2013 | (2,955,000) | 21 |
| NAUTILUS GROWTH FUND LTD | VERDMONT CAPITAL | 5/7/2012 | 10/9/2013 | (2,846,822) | 11 |
| PEREGRINE CAPITAL LTD (F.K.A. PEACEFUL LION HOLDINGS LTD) | HYPOSWISS | 5/8/2012 | 10/29/2012 | (2,191,833) | 18 |
| TANDEM GROWTH LLC (FKA TERRA EQUITY LLC) | BSI SA | 5/9/2012 | 10/15/2012 | (1,975,000) | 20 |
| CALEDONIA PARTNERS LLC | LGT BANK (SINGAPORE) LTD | 5/8/2012 | 5/8/2012 | (1,725,000) | 3 |
| GOTAMA CAPITAL SA | HYPOSWISS | 6/8/2012 | 10/3/2013 | (1,490,000) | 13 |
| MORRIS CAPITAL INC | BSI SA | 5/30/2012 | 4/22/2013 | (1,339,113) | 16 |
| GRANT PARTNERS LLC | DMS BANK & TRUST LTD (LEGACY GLOBAL MARKETS) | 10/26/2012 | 4/11/2013 | (1,323,300) | 12 |
| SHERMAN CAPITAL LLC | DMS BANK & TRUST LTD (LEGACY GLOBAL MARKETS) | 6/21/2012 | 9/26/2012 | (474,556) | 8 |
| QUEZON GROUP LLC | CBH COMPAGNIE BANCAIRE HELVETIQUE | 6/21/2012 | 5/24/2013 | (349,100) | 7 |
| QUEZON GROUP LLC | VP BANK | 9/26/2013 | 10/2/2013 | (113,896) | 2 |
| FINANCIAL PACIFIC, INC | COR CLEARING / LEGENT CLEARING | 5/29/2012 | 9/20/2012 | (231,176) | 4 |
| INLAND TRADING LTD | HELLENIC BANK PUBLIC COMPANY LTD (CYPRUS) | 5/1/2013 | 5/2/2013 | (192,065) | 2 |
| LOTHLORIEN INC | STERLING SECURITIES GROUP | 9/10/2013 | 10/1/2013 | (43,216) | 2 |
| | | | **Total** | **(17,250,077)** | **139** |

36.     Based on the data contained in the Q system and on brokerage account records, the following entities administered by Sharp's business traded shares of Makism 3D Corp. during the time period from October 2013 to September 2014.  Murphy Dec., ¶¶32-33.

| Account Name | Financial Institution | Date of First Sale | Date of Last Sale | Qty - MDDD Shares Sold | Total MDDD Share Sales |
|---|---|---|---|---|---|
| GOTAMA CAPITAL SA | BEAUFORT SECURITIES LTD | 2/19/2014 | 4/8/2014 | (1,696,235) | 14 |
| GOTAMA CAPITAL SA | HYPOSWISS | 11/7/2013 | 12/5/2013 | (2,957,500) | 12 |
| GOTAMA CAPITAL SA | ST. GALLER KANTONALBANK AG | 5/28/2014 | 7/8/2014 | (2,083,765) | 13 |
| BAMFIELD EQUITIES LTD (FKA PEGASUS GLOBAL AG) | BSI SA | 8/5/2014 | 9/4/2014 | (4,733,280) | 17 |
| INLAND TRADING LTD | HELLENIC BANK PUBLIC COMPANY LTD (CYPRUS) | 10/17/2013 | 12/12/2013 | (1,854,300) | 14 |
| NORTHERN DEALERS INC (F.K.A. NORTON) | DMS BANK & TRUST LTD (LEGACY GLOBAL MARKETS) | 12/2/2013 | 4/8/2014 | (1,660,451) | 8 |
| PEGASUS GLOBAL LTD (F.K.A. BAMFIELD EQUITIES) | BEAUFORT SECURITIES LTD | 3/7/2014 | 3/27/2014 | (1,564,495) | 13 |
| PEREGRINE CAPITAL LTD (F.K.A. PEACEFUL LION HOLDINGS LTD) | ST. GALLER KANTONALBANK AG | 4/21/2014 | 6/4/2014 | (1,308,549) | 9 |
| BAMFIELD EQUITIES LTD | VERDMONT CAPITAL | 12/5/2013 | 12/6/2013 | (884,199) | 2 |
| n/a | n/a | 11/11/2013 | 11/29/2013 | (341,148) | 9 |
| ARMOR SECURITIES INC | VERDMONT CAPITAL | 4/8/2014 | 4/21/2014 | (148,275) | 2 |
| LOTHLORIEN INC | STERLING SECURITIES GROUP | 4/2/2014 | 4/7/2014 | (120,000) | 4 |
| QUEZON GROUP LLC | VP BANK | 12/9/2013 | 12/9/2013 | (5,400) | 1 |
| FINANCIAL PACIFIC, INC | COR CLEARING / LEGENT CLEARING | 12/5/2013 | 12/5/2013 | (5,000) | 1 |
| | | | **Total** | **(19,362,597)** | **119** |

37.     Based on the data contained in the Q system and on brokerage account records, the following entities administered by Sharp's business traded shares of Graphite Corp. during the time period from October 2012 to September 2013.  Murphy Dec., ¶¶34-35.

| Account Name | Financial Institution | Date of First Sale | Date of Last Sale | Qty - GRPH Shares Sold | Total GRPH Share Sales |
|---|---|---|---|---|---|
| LORNEX FINANCIAL LTD | VERDMONT CAPITAL | 10/24/2012 | 9/18/2013 | (2,417,300) | 28 |
| TANDEM GROWTH LLC (FKA TERRA EQUITY LLC) | BSI SA | 10/18/2012 | 6/10/2013 | (2,113,750) | 14 |
| QUEZON GROUP LLC | CBH COMPAGNIE BANCAIRE HELVETIQUE | 2/13/2013 | 2/28/2013 | (205,470) | 2 |
| QUEZON GROUP LLC | VP BANK | 1/23/2013 | 3/11/2013 | (1,302,000) | 14 |
| PEREGRINE CAPITAL LTD (F.K.A. PEACEFUL LION HOLDINGS LTD) | HYPOSWISS | 10/29/2012 | 2/13/2013 | (1,400,000) | 19 |
| NAUTILUS GROWTH FUND LTD | VERDMONT CAPITAL | 11/15/2012 | 12/3/2012 | (1,050,000) | 12 |
| MORRIS CAPITAL INC | BSI SA | 11/16/2012 | 2/13/2013 | (900,000) | 13 |
| GOTAMA CAPITAL SA | HYPOSWISS | 11/13/2012 | 5/31/2013 | (800,000) | 16 |
| SHERMAN CAPITAL LLC | DMS BANK & TRUST LTD (LEGACY GLOBAL MARKETS) | 2/13/2013 | 6/19/2013 | (122,500) | 5 |
| INLAND TRADING LTD | HELLENIC BANK PUBLIC COMPANY LTD (CYPRUS) | 2/26/2013 | 2/26/2013 | (50,000) | 1 |
| LOTHLORIEN INC | STERLING SECURITIES GROUP | 6/19/2013 | 6/21/2013 | (40,461) | 3 |
| GRANT PARTNERS LLC | DMS BANK & TRUST LTD (LEGACY GLOBAL MARKETS) | 6/24/2013 | 6/24/2013 | (30,000) | 1 |
| ARMOR SECURITIES INC | VERDMONT CAPITAL | 3/1/2013 | 3/1/2013 | (30,000) | 1 |
| FINANCIAL PACIFIC, INC | COR CLEARING / LEGENT CLEARING | 6/12/2013 | 6/18/2013 | (20,000) | 2 |
| | | | Total | (10,481,481) | 131 |

38.     Based on the data contained in the Q system and on brokerage account records, the following entities administered by Sharp's business traded shares of OncoSec Medical Inc. during the time period from March 2011 to August 2012.  Murphy Dec., ¶¶36-37.

| Account Name | Financial Institution | Date of First Sale | Date of Last Sale | Qty - ONCS Shares Sold | Total ONCS Share Sales |
|---|---|---|---|---|---|
| MORRIS CAPITAL INC | BSI SA | 4/3/2012 | 8/21/2012 | (2,607,837) | 7 |
| GRANT PARTNERS LLC | DMS BANK & TRUST LTD (LEGACY GLOBAL MARKETS) | 4/8/2011 | 3/19/2012 | (2,318,223) | 73 |
| TANDEM GROWTH LLC (FKA TERRA EQUITY LLC) | BSI SA | 7/18/2011 | 3/20/2012 | (2,070,000) | 13 |
| CALEDONIA PARTNERS LLC | LGT BANK (SINGAPORE) LTD | 6/13/2011 | 4/18/2012 | (1,920,000) | 13 |
| PEREGRINE CAPITAL LTD (F.K.A. PEACEFUL LION HOLDINGS LTD) | HYPOSWISS | 4/18/2012 | 4/18/2012 | (1,920,000) | 1 |
| GOTAMA CAPITAL SA | HYPOSWISS | 4/18/2012 | 4/18/2012 | (1,920,000) | 1 |
| SHERMAN CAPITAL LLC | DMS BANK & TRUST LTD (LEGACY GLOBAL MARKETS) | 3/31/2011 | 3/26/2012 | (1,129,313) | 40 |
| FINANCIAL PACIFIC, INC | COR CLEARING / LEGENT CLEARING | 7/6/2011 | 3/26/2012 | (208,290) | 3 |
| QUEZON GROUP LLC | CBH COMPAGNIE BANCAIRE HELVETIQUE | 3/27/2012 | 3/27/2012 | (48,100) | 1 |
| LOTHLORIEN INC | STERLING SECURITIES GROUP | 3/26/2012 | 3/26/2012 | (25,000) | 1 |
| | | | **Total** | **(14,166,763)** | **153** |

39.     Based on the data contained in the Q system and on brokerage account records, the following entities administered by Sharp's business traded shares of NewGen Biopharma Corp. during the time period from December 2016 to March 2017.  Murphy Dec., ¶¶38-39.

| Account Name | Financial Institution | Date of First Sale | Date of Last Sale | Qty - NEWG Shares Sold | Total NEWG Share Sales |
|---|---|---|---|---|---|
| QUEZON GROUP LLC | WINTERCAP SA | 12/20/2016 | 2/14/2017 | (1,064,648) | 13 |
| PEGASUS GLOBAL LTD (F.K.A. BAMFIELD EQUITIES) | BEAUFORT SECURITIES LTD | 1/9/2017 | 1/25/2017 | (600,000) | 8 |
| HILTON CAPITAL INC | WINTERCAP SA | 1/27/2017 | 3/8/2017 | (461,450) | 20 |
| MORRIS CAPITAL INC | WINTERCAP SA | 8/11/2016 | 3/27/2017 | (459,176) | 9 |
| RIVERFALL GROUP LTD | WINTERCAP SA | 1/18/2017 | 3/23/2017 | (410,259) | 8 |
| SANTOS TORRES LLC | WINTERCAP SA | 3/13/2017 | 3/21/2017 | (147,074) | 4 |
| TRIUS HOLDINGS LTD | BEAUFORT SECURITIES LTD | 1/25/2017 | 2/1/2017 | (125,043) | 4 |
| | | | **Total** | **(3,267,650)** | **66** |

40.     Based on the data contained in the Q system and on brokerage account records, the following entities administered by Sharp's business traded shares of StartMonday Technology Corp. during the time period from November 2016 to February 2018.  Murphy Dec., ¶¶40-41.

| Account Name | Financial Institution | Date of First Sale | Date of Last Sale | Qty - JOB Shares Sold | Total JOB Share Sales |
|---|---|---|---|---|---|
| VARESE CAPITAL INC | WINTERCAP SA | 1/10/2017 | 3/1/2017 | (1,575,300) | 13 |
| SANTOS TORRES LLC | WINTERCAP SA | 1/3/2017 | 2/24/2017 | (1,077,520) | 9 |
| QUEZON GROUP LLC | WINTERCAP SA | 1/25/2017 | 2/24/2017 | (1,047,305) | 8 |
| GOTAMA CAPITAL SA | BEAUFORT SECURITIES LTD | 11/21/2016 | 8/17/2017 | (726,234) | 7 |
| PEGASUS GLOBAL LTD (F.K.A. BAMFIELD EQUITIES) | BEAUFORT SECURITIES LTD | 11/22/2016 | 2/14/2017 | (706,796) | 8 |
| INLAND TRADING LTD | CANACCORD GENUITY | 8/17/2017 | 8/17/2017 | (700,000) | 1 |
| TRIUS HOLDINGS LTD | BEAUFORT SECURITIES LTD | 11/7/2016 | 11/21/2016 | (512,500) | 8 |
| RIVERFALL GROUP LTD | WINTERCAP SA | 1/12/2018 | 2/7/2018 | (125,000) | 2 |
| MORRIS CAPITAL INC | WINTERCAP SA | 2/21/2017 | 5/2/2017 | (77,152) | 2 |
|  |  |  | **Total** | **(6,547,807)** | **58** |

41.     Based on the data contained in the Q system and on brokerage account records,

the following entities administered by Sharp's business traded shares of Lexington Biosciences

Holdings Corp during the time period from July 2017 to August 2018.  Murphy Dec., ¶¶42-43.

| Account Name | Financial Institution | Date of First Sale | Date of Last Sale | Qty - Lexington Biosciences Shares Sold | Total Lexington Biosciences Share Sales |
|---|---|---|---|---|---|
| SANTOS TORRES LLC | WINTERCAP SA | 1/24/2018 | 8/30/2018 | (1,625,000) | 22 |
| INLAND TRADING LTD | CANACCORD GENUITY | 8/4/2017 | 10/31/2017 | (1,383,332) | 20 |
| HILTON CAPITAL INC | WINTERCAP SA | 2/26/2018 | 3/8/2018 | (750,000) | 8 |
| TRIUS HOLDINGS LTD | BEAUFORT SECURITIES LTD | 7/25/2017 | 10/23/2017 | (307,500) | 4 |
| TRIUS HOLDINGS LTD | TENDALL CAPITAL MARKETS LTD | 11/6/2017 | 3/6/2018 | (413,155) | 7 |
| VARESE CAPITAL INC | WINTERCAP SA | 10/3/2017 | 10/23/2017 | (507,500) | 8 |
| CORBY VENTURES INC | PETER PESIC & CO SECURITIES INC | 10/9/2017 | 3/9/2018 | (404,543) | 12 |
| GOTAMA CAPITAL SA | BEAUFORT SECURITIES LTD | 7/26/2017 | 7/27/2017 | (137,000) | 2 |
| PEGASUS GLOBAL LTD (F.K.A. BAMFIELD EQUITIES) | BEAUFORT SECURITIES LTD | 7/26/2017 | 8/10/2017 | (123,833) | 2 |
|  |  |  | **Total** | **(5,651,863)** | **85** |

42.     Based on the data contained in the Q system and on brokerage account records,

the following entities administered by Sharp's business traded shares of BreathTec Biomedical

Inc. during the time period from February 2016 to December 2016.  Murphy Dec., ¶¶44-45.

| Account Name | Financial Institution | Date of First Sale | Date of Last Sale | Qty - BreathTec Biomedical Shares Sold | Total BreathTec Biomedical Share Sales |
|---|---|---|---|---|---|
| EGREDIOR HOLDINGS LTD | CANACCORD GENUITY | 3/4/2016 | 12/28/2016 | (782,500) | 7 |
| INLAND TRADING LTD | CANACCORD GENUITY | 2/1/2016 | 12/28/2016 | (691,666) | 5 |
| HILTON CAPITAL INC | WINTERCAP SA | 4/8/2016 | 10/24/2016 | (446,500) | 10 |
| GOTAMA CAPITAL SA | BEAUFORT SECURITIES LTD | 2/1/2016 | 10/19/2016 | (364,000) | 11 |
| PEGASUS GLOBAL LTD (F.K.A. BAMFIELD EQUITIES) | BEAUFORT SECURITIES LTD | 2/1/2016 | 12/28/2016 | (153,333) | 6 |
| TRIUS HOLDINGS LTD | BEAUFORT SECURITIES LTD | 2/1/2016 | 2/1/2016 | (150,000) | 1 |
| VARESE CAPITAL INC | WINTERCAP SA | 4/8/2016 | 8/30/2016 | (140,000) | 3 |
|  |  |  | **Total** | **(2,727,999)** | **43** |

43. Based on the data contained in the Q system and on brokerage account records, the following entities administered by Sharp's business traded shares of RightsCorp. during the time period from May 2013 to January 2014. Murphy Dec., ¶¶46-47.

| Account Name | Financial Institution | Date of First Sale | Date of Last Sale | Qty - RIHT Shares Sold | Total RIHT Share Sales |
|---|---|---|---|---|---|
| QUEZON GROUP LLC | VP BANK | 5/27/2013 | 11/25/2013 | (106,025) | 16 |
| PEACEFUL LION HOLDINGS LTD | DMS BANK & TRUST LTD (LEGACY GLOBAL MARKETS) | 11/22/2013 | 11/27/2013 | (105,000) | 4 |
| LORNEX FINANCIAL LTD | VERDMONT CAPITAL | 8/6/2013 | 1/16/2014 | (29,400) | 5 |
| | | | Total | (240,425) | 25 |

44. The entities listed in paragraphs 30 through 43 above were nominee entities administered by Sharp, Kelln and Gasarch for the benefit of their clients. While each of these companies was, on paper, owned by someone other than Veldhuis, Sexton and Friesen, those nominal owners did not direct the trading in those companies' accounts, nor did they receive the proceeds of the trading in those companies' accounts. ██████████ ¶¶24-28.

45. For example, Gotama Capital ("Gotama"), was a nominee entity administered by Sharp's business, whose purported beneficial owner was Nikolayev. Ex. 3 at 88:5-21; 128:1-6. Sharp created Gotama in Nikolayev's name using Nikolayev's personal identifying information, such as his passport. *See id.* at 31:23–32:3; 85:10-86:7; 87:19-88:4. Sharp used Gotama to make stock trades. *See id.* at 86:23-87:1. Nikolayev had no role in operating Gotama, all of its activities were conducted by Sharp or people working with Sharp. *See id.* at 88:5-21; 90:16-21. Nikolayev made no stock trades on behalf of Gotama. *See id.* at 122:18-124:2; 128:18-129:1; 131:7-141:3; 151:3-153:15. Moreover, Nikolayev never communicated or conducted any business with the transfer agents on behalf of Gotama (to obtain stock certificates in Gotama's name) or requested that the transfer agent issue free trading shares to Gotama. *See id.* at 141:23-144:14; 147:11-150:4. As shown in the charts above, Gotama traded in at least the securities of 12 of the 14 issuers described in paragraphs 30-43 above, on behalf of Sharp clients. *See supra,*

¶¶30-43.  Nikolayev provided Sharp with a digital image of Nikolayev's signature for Sharp to use with respect to Gotama.  Ex. 3 at 144:24-145:21.

46.     Another example of a nominee company administered by Sharp's business was Peaceful Lion Holdings Ltd. ("Peaceful Lion").  The purported beneficial owner of Peaceful Lion was Gasarch.  Peaceful Lion had an account with Silverton.  When Silverton traded stock for Peaceful Lion, Knox knew that the stock he was trading for Peaceful Lion was not controlled by Gasarch, but instead, was controlled by Sharp's clients.  ████████  ¶¶25-26.  As shown in the charts above, Peaceful Lion traded in at least the securities of 9 of the 14 issuers described in paragraphs 30-43 above, on behalf of Sharp clients.  *See supra*, ¶¶30-43.

47.     Dhillon worked with Sexton, Veldhuis and Friesen to own and sell shares of OncoSec, Stevia First/Vitality and Arch in the United States public markets.  Dhillon's primary contact was with Sexton and he also had discussions with Veldhuis about some of their deals.  Dhillon Dec., ¶¶7-9, 11, 19, 21, 30, 39-40.  Dhillon knew that Friesen was a partner in their deals.  *Id.* ¶¶7, 19, 40, 42.  For each of the OncoSec, Stevia First/Vitality and Arch deals, the basic arrangement is that Dhillon and other corporate officers would obtain restricted shares of the companies, while Sexton, Veldhuis and Friesen would obtain unrestricted, or purportedly "free-trading" shares to sell into the market.  *Id.* ¶¶13, 20-22, 40, 44.  Dhillon understood that Sexton, Veldhuis and Friesen were selling these shares through nominee companies they had the ability to control.  *Id.* ¶¶12, 13, 21, 26, 34, 41, 45.  Dhillon identified the nominee entities listed in paragraphs 83, 91, 114, 121, 169 and 214 of the Amended Complaint in green boxes as being used by Sexton and his associates to control their shares of Stevia First/Vitality, Arch and OncoSec.  *Id.* ¶¶12, 22, 26, 31, 32, 35, 45.

48.     Dhillon also discussed with Sexton and Veldhuis the importance of keeping each nominee's ownership of the issuer's shares under 5% of the issuer's total shares because

shareholders owning 5% or more of a company's shares needed to make public disclosures concerning their ownership interest and could be subject to restrictions on their ability to sell those shares in the public markets.  *Id.* ¶¶14, 21, 33, 41.

49.     Sexton and his associates sold Stevia First/Vitality, Arch and OncoSec shares that they controlled into the public markets without disclosing that they were the ones benefitting from those sales.  *Id.* ¶¶16, 24, 27, 36, 41-42, 46.  Dhillon shared in the proceeds of some of the Stevia First/Vitality, Arch and OncoSec share sales by Sexton and his associates.  The remaining proceeds were divided among Sexton, Veldhuis, Friesen and their other associates.  *Id.* ¶¶24, 28-29, 34, 37, 47.

50.     Veldhuis and Friesen directed the trading described in paragraphs 30 through 43 above, either directly or through traders employed by Sharp's business.  ███████ ¶¶15, 17, 19, 20, 28; ████ Ex. 1 (Veldhuis instructing Silverton to sell ARTH), ████ Ex. 3 (Veldhuis and Silverton discussing sales of ARTH and RIHT that Silverton made for him), ████ Ex. 6 at 2 (Friesen instructing Silverton to "Sell 35K LNB @ 0.145"), ████ Ex. 7 at 2 (Veldhuis instructing Silverton to "Please sell 5k VBIO @ $1.40"), at 4 (Veldhuis instructing Silverton to "Please sell 10K VBIO @ $1.36"); ████ Ex. 8 at 2 (Veldhuis instructing Silverton to "Please offer 25k LBY @ $0.60" followed by additional LBY orders); Ex. 31 (Veldhuis instructing Silverton to sell STEV); Ex. 32 (Veldhuis discussing test trade of RIHT with Silverton); Ex. 33 (Veldhuis directing trader employed by Sharp to sell RIHT on August 19, 2014) and Ex. 34 (trader employed by Sharp directing Silverton to sell RIHT on August 19, 2014); Ex. 35 (Veldhuis directing Silverton to sell MDDD); Ex. 36 (Veldhuis directing trader employed by Sharp to sell STVF) and Ex. 37 (trader employed by Sharp directing Silverton to sell STVF on same terms he was instructed by Veldhuis); Ex. 38 (Friesen directing trader employed by Sharp about how to sell ECAU); Ex. 39 (Veldhuis directing trader employed by Sharp about how to

sell ORYN); Ex. 40 (Veldhuis directing trader employed by Sharp about prices at which to sell GRPH and buy ECAU).

51.     Kaitz did stock promotion work for Veldhuis, Sexton and Friesen on the following companies:  Stevia First/Vitality, Echo Automotive, Arch, Stevia Corp., Liberty One Lithium, Oryon Technologies, Makism 3D, Graphite Corp., OncoSec, StartMonday Technology, Lexington Biosciences, BreathTec Biomedical and RightsCorp.  Kaitz Dec., ¶10.  Kaitz understood that Veldhuis, Sexton and Friesen were selling shares for their own benefit in the companies that Kaitz promoted for them.  *Id.* ¶19.  Dhillon also understood that Veldhuis, Sexton and Friesen were paying to promote the Stevia First/Vitality, Arch and OncoSec shares they were selling.  Dhillon Dec., ¶¶17, 25, 36, 42, 46.

52.     After trading in the shares of Stevia First/Vitality, Echo Automotive, Arch, Stevia Corp., Liberty One Lithium, Oryon Technologies, Makism 3D, Graphite Corp., OncoSec, NewGen Biopharma, StartMonday Technology, Lexington Biosciences, BreathTec Biomedical and RightsCorp., Veldhuis, Sexton and Friesen shared the proceeds of those sales between themselves and with others, after paying fees and commissions to Sharp and his employees. Murphy Dec., ¶¶49-54.

53.     For example, Veldhuis' account in the Q system received direct credits from the proceeds of trading in at least the securities of Stevia First/Vitality, Echo Automotive, Arch, Stevia Corp., Graphite Corp., Makism 3D, OncoSec, RightsCorp., NewGen Biopharma and StartMonday.  Murphy Dec., ¶¶51, 52.  Veldhuis periodically requested and received statements from his ACCO account in the Q system.  Ex. 41; Ex. 42.

54.     Sexton's account in the Q system received direct credits from the proceeds of trading in at least the securities of Stevia First/Vitality, Echo Automotive, Arch, Stevia Corp., Oryon Technologies, Graphite Corp., Makism 3D, OncoSec, NewGen Biopharma and

RightsCorp.  Murphy Dec., ¶¶51, 53.  Sexton periodically received statements from his HEAR account in the Q system.  Ex. 43; Ex. 44.

55.     Friesen's account in the Q system received direct credits from the proceeds of trading in at least the securities of Stevia First/Vitality, Echo Automotive, Arch, Stevia Corp., OncoSec, Graphite Corp., NewGen Biopharma and Makism 3D.  Murphy Dec., ¶¶51, 54.  Friesen periodically requested statements from his GARD account in the Q system.  Ex. 45; Ex. 46.  On at least one occasion, Friesen directed Knox to charge 1000 Swiss francs to the Vitality (VBIO) account in the Q system.  Ex. 73 at 1-2; ████████ ¶19.

**Kelln Played a Necessary and Substantial Role in Sales by Clients of Sharp's Business, Including Veldhuis, Sexton and Friesen**

56.     In a communication with a client of Sharp's business, Kelln described the process she followed regarding the transfer and deposit of Sharp clients' shares as follows: "The process is: I group certs [stock certificates] together that keep the total under 5%.  Then I send them in for transfer to the TA [transfer agent].  Once processed the TA fedex's them to the broker.  Then we wait for the shares to clear [i.e., become available for trading].  We only submit 1 transfer a day per broker until we have submitted all the shares."  Ex. 47.

57.     In a communication with Knox and Targett-Adams about getting shares of a company deposited at Silverton for a client of Sharp's business (whose code name was FIRE), Kelln also described her process: "I have to transfer all the stock to Noms [nominees] first.  Fire needs to relax.  There is a process."  Ex. 48 at 14; ████████ ¶¶17-18.

58.     Kelln interacted with Silverton personnel to organize the transfer of shares that Sharp clients wanted to sell into accounts managed by Silverton.  ████████ ¶7.  In particular, Kelln broke shares controlled by Sharp clients into blocks of less than 5% of each issuer's outstanding shares.  Kelln would then collect or create all of the supporting documents needed to

transfer each block of shares into the name of a nominee company controlled by Sharp's business.  Sometimes Kelln would organize the transfer of shares from a first nominee company to a second nominee company that had an account with Silverton.  Examples of supporting documents that Kelln would provide or create included powers of attorney and share purchase agreements. *Id.*

59.     One example of Kelln creating share purchase agreements (SPAs) to support a Sharp client's transfer of shares into the names of nominees with accounts at Silverton is shown by the exchange of messages between Kelln and Silverton personnel on December 6, 2017.  Ex. 49; ███████ ¶¶17-18.  In that exchange, Targett-Adams asked Kelln to create a share purchase agreement for a position of shares whose ticker was OLMM that "is to be put into a bond [Sharp] co," and after Kelln said that was ok, also asked for share purchase agreements to get two additional blocks of OLMM stock transferred into the names of other nominees with Silverton accounts.   Kelln replied "[j]ust send me all the specific details for each spa you need. . . I'll get it done." Ex. 49 at 1-2.

60.     Kelln worked with transfer agents to submit the packages of documents by which shares were transferred into the names of nominee entities administered by Sharp's business. *See, e.g.,* Ex. 50 (package of share transfer documents for Echo Automotive sent by, and billed to, Kelln, through Celtic Consultants); Ex. 4 at 87:23-88:7; Ex. 51 (package of documents sent by Kelln to Stevia First's transfer agent) at 31.  At least one transfer agent understood Kelln to be acting as the agent of the nominee entities who were acquiring or disposing of shares.  Ex. 4 at 89:1-20.

61.     One of the transfer agents to whom Kelln sent documents was Action Stock Transfer.  Ex. 4 at 18:9-17; 47:6-12.  Kelln, operating through a company named Celtic Consultants, gathered the documents to send to the transfer agent to facilitate share transfers. *Id.*

at 47:6-18.  Most of the share transfer requests that Kelln made were on behalf of foreign

shareholders and those same shareholders were transferred the stock of multiple issuers whose

transfer agent was Action Stock Transfer.  *Id.* at 49:2-50:18.

62.     Kelln also paid the transfer fees that transfer agents charged in order to transfer

shares into the names of nominee entities administered by Sharp's business.  For example, Kelln,

through Celtic Consultants, paid the fees to transfer Echo Automotive shares into the name of

Pegasus Global, a nominee administered by Sharp's business that had a brokerage account at

Beaufort Securities.  Ex.  52 at 1; Ex. 4 at 116:7-119:9; Murphy Dec., ¶19 (showing Echo

Automotive shares traded through Pegasus Global account at Beaufort).  As another example,

Kelln paid the fees to transfer Stevia First shares from Hartford Equity into the name of Nautilus

Growth Fund (both were nominee administered by Sharp's business).  Ex. 51 at 1, 29; Murphy

Dec., ¶16.  These Nautilus shares were requested to be delivered to Verdmont Capital, a

brokerage firm where Nautilus had an account, and from which these shares were sold.  *Id.* at 1;

Murphy Dec., ¶16.  Kelln coordinated with the broker at Verdmont to make sure the firm had

received these Stevia First shares in the name of Nautilus Growth Fund.  Ex. 53.  As a third

example, Kelln, through her entity Celtic Consultants, paid the fees to transfer Arch shares from

numerous Arch S-1 shareholders to Sharp-administered nominees including Peaceful Lion

Holdings Ltd., Morris Capital, Inc., Tandem Growth LLC, Lornex Financial Ltd., Quezon Group

LLC and Nautilus Growth Fund Ltd.  Ex. 54 at 2, 17, 32, 46, 60 (Almah Inc. was the former

name of Arch); *see also* ███████ ¶26 (identifying some Sharp-administered nominees).

63.     Sharp asked Nikolayev to set up Esquire Corporate Services SRL ("Esquire") in

the Dominican Republic to make payments for Sharp's business using an Esquire credit card and

to establish an Esquire FedEx account.  Ex. 3 at 78:15-79:12; 81:17-25.  The Esquire credit card

was used to pay expenses that transfer agents charged for transferring shares of companies.  *Id.* at

83:13-17.  Sharp provided Nikolayev with the funds to pay the Esquire credit card and FedEx bills.  *Id.* at 82:21-84:9.  The Esquire credit card was used to pay the transfer fees for transfers that were requested through Celtic Consultants.  Ex. 4 at 70:7-25.  The Esquire FedEx account (account number 48173416-9) was used to pay the fees to send share certificates to and from transfer agents and to and from Celtic Consultants.  Ex. 50 at 3; Ex. 55 at 3; Ex.  4 at 90:11-93:3; Ex. 51 at 1 (listing Fed. Ex. Account number to send Stevia First shares).

64.     In or around May 2012, Dhillon transferred shares of Stevia First stock into the names of multiple nominee entities administered by Sharp's business.  Ex. 56; Dhillon Dec., ¶32. The purpose of these transfers was to conceal the fact that the shares remained under common control and to allow them to be sold into the market without revealing that they were under common control.  Dhillon Dec., ¶33.  Kelln's name and address were listed as the address of the seven companies administered by Sharp's business to which Dhillon was transferring shares and the transfer agent was directed to send these companies' new Stevia First stock certificates to Kelln.  Ex. 56 at 3, 4; Dhillon Dec., ¶32.

65.     Once the defendants were ready to sell these Stevia First shares that had been transferred to the seven Sharp-administered entities, as described in paragraph 64 above, Veldhuis asked Sharp and Gasarch whether the seven entities to which the Stevia First shares had been transferred were all "entities you guys administer."  Ex. 57.  Sharp responded that the message should have gone to Kelln [Celtic] and forwarded it to her.  *Id.*  Though the sender of the top message is not identified, the reasonable inference from the message chain is that Kelln responded, confirming that the entities "are all ours."  *Id.*

66.     The next step to selling these Stevia First shares was to transfer them into the names of nominee entities administered by Sharp's business that actually had brokerage accounts or relationships.  Kelln sent packages of documents to Stevia First's transfer agent to facilitate

these transfers.  For example, on January 14 or 15, 2015, Kelln sent a package of documents requesting the transfer of 2,625,000 shares of Stevia First to Trius Holdings Ltd. from the seven Sharp-administered nominees discussed in paragraphs 64 and 65 above.  Ex. 58.  Kelln paid the fees for Trius Holdings to send the shares it acquired from these transfers to its brokerage firm, Beaufort Securities.  *Id.* at 29, 30; Ex. 59.  Trius Holdings sold these shares from its brokerage account at Beaufort Securities.  Murphy Dec., ¶16.

67.     Similarly, on or about June 1, 2015, Kelln sent a package of documents to Stevia First's transfer agent to facilitate the transfer of 1,664,794 shares of Stevia First to Silverton from the seven Sharp-administered nominees discussed in paragraphs 64 and 65 above and from two other nominees.  Ex. 60 at 53, 55.  Kelln used the Esquire FedEx account to send these documents to the transfer agent and to send the resulting share certificate in the name of Silverton to Silverton in Switzerland.  *Id.* at 51 ¶2, 55 (FedEx account number is 481734169).  Silverton sold these shares from its accounts.  Murphy Dec., ¶16; ██████████ ¶27.

68.     Kelln corresponded with Silverton personnel about sending DWACs of Vitality shares to Silverton in the names of various nominees administered by Sharp's business so the shares could be sold.  For example, between December 27 and 28, 2016, Kelln exchanged messages with Knox and Targett-Adams about DWAC transfers of Vitality (ticker VBIO) shares to Silverton for nominees including Europa Capital, Quezon Group and Redfern Investors.  Ex. 48 at 3-7; ██████████ ¶¶17-18.

69.     Kelln also exchanged messages with Silverton personnel about paying Vitality's transfer agent to have the restricted legends removed from Vitality shares in the names of Sharp-administered nominee entities removed so that the shares could be sold.  Kelln reported that she had tried to pay the fees but her credit card had been compromised.  Ex. 48 at 6.  The next day, Kelln asked again about whether Silverton had received, and was able to trade Vitality (VBIO)

28

shares. *Id.* at 7. Silverton responded that one of the DWACs (for nominee Quezon Group) had cleared and was trading. *Id.* Several days later, Silverton personnel asked Kelln if Silverton would get additional Vitality shares to sell because he could see them recorded in the internal Q system account named REST. *Id.* at 39; Murphy Dec., ¶12. Kelln responded that she thought Veldhuis (ACCO) had said that Silverton did not want any more shares of Vitality to sell and asked if Silverton personnel had changed their mind. *Id.* at 40. Knox responded minutes later and said that Silverton did not want to hold over 20% of Vitality's shares at any one time, but that at the rate Silverton was selling those shares, he would be ready to set up the next DWAC transfer to Silverton. *Id.* About 7 minutes later, Kelln responded and said that she would send additional Vitality shares to Silverton but that she needed documentation from Silverton to give to the lawyer who was writing opinion letters to get the restricted legends removed from Vitality shares. *Id.* at 41.

70.     Kelln, through both Celtic Consultants and Esquire, hired an attorney to write opinion letters to remove the restricted legends on shares of both Stevia First and Vitality that were held in the names of numerous shareholders, including Nautilus Growth Fund, Quezon Group and many others. Declaration of W. Scott Lawler ("Lawler Dec."), ¶¶6,7; Lawler Dec., Ex. A. Through Celtic Consultants and Esquire, Kelln paid that lawyer for his services in writing the opinion letters. Lawler Dec., ¶6. All of the work that the lawyer did to lift the restricted legends on Stevia First and Vitality shares was done for Celtic and Esquire. *Id.*, ¶10.

71.     Kelln also provided the lawyer with the factual information on which he relied to write the opinion letters and did not inform the lawyer either: 1) that she administered any of the shareholder entities on whose behalf the lawyer rendered opinion letters; or 2) that those entities were nominees controlled by Sharp and his employees which held shares for the benefit of clients of Sharp's business. Had the lawyer known that the multiple shareholders for which he

wrote opinion letters were under common control or were holding shares on behalf of the same group of individuals, he would not have drafted or signed the letters that Kelln asked him to prepare. *Id.*, ¶¶7-9.

72.     Kelln coordinated the deposit of shares with Silverton in the names of nominee companies administered by Sharp's business.  She also prepared DWAC paperwork to facilitate these deposits so that clients of Sharp's business could trade their shares through Silverton. ████████ ¶¶7, 18.  For example, Kelln and Silverton personnel engaged in a series of communications about the deposit of Vitality (VBIO) shares into Silverton's account in the name of Sharp-administered nominee Hilton Capital between February 3 and 28, 2017.  Ex. 48 at 8-33. On February 3, Silverton asked Kelln whether she meant to send more than 5% of Vitality stock to a single nominee's account and she checked with Veldhuis and provided information for Silverton to provide to its broker to demonstrate that the position was under 5%.  *Id.* at 8-9. Several weeks later, on February 21, Kelln exchanged messages with Silverton personnel in which she expressed concern about whether they would be holding over 5% of Vitality's shares in Silverton's Hilton Capital account (SIHI) if they did not sell all of the current Vitality shares out of that account before she sent additional DWAC transfers.  *Id.* at 16-19.  About a week later, on February 28, Kelln asked Silverton to allocate all of its Vitality share sales that day to its Hilton Capital [SIHI] account because she needed to "make room" for a pending DWAC of an additional 750,000 shares, commenting that "Again 5% rule is biting me ass."  *Id.* at 28, 33. Targett-Adams informed Kelln when DWAC transfers of securities settled in Silverton accounts and asked her to update the Q system to reflect these deposits.  *Id.* at 34 (message on Mar. 2, 2017 at 12:33:48), 35 (message on Mar. 6, 2017 at 11:41:59); *see also* Ex. 61 at 7, 12, 13; ████ ████ ¶18.

73.     Silverton personnel kept Kelln up to date on their progress in selling Vitality

shares and asked her to DWAC more shares to Silverton when they had sold out, or were close to

selling out. Ex. 48 at 36-38; *see also* Ex. 61 at 8 (relating to securities of another issuer sold for

Sharp's clients); ███████ ¶18.

74.     Kelln sent DWAC requests for clients of Sharp's business, including Veldhuis, to

get the clients' shares into brokerage accounts where the clients could direct trading of those

shares.  For example, on July 8, 2013, Veldhuis asked Kelln to "Please DWAC another 2.2MM

[million] ish ARTH [Arch] into the system tomorrow.  Somewhere that clears quickly."  Kelln

and Veldhuis then discussed difficulties arising from signature requirements of Arch's transfer

agent. Ex. 62 at 2.  Kelln also sent DWAC transfers of Arch shares to trading platforms other

than Silverton so they could be sold in the names of Sharp-administered nominees, like Pegasus

Global Ltd. Ex. 63; *see also supra* ¶32 (showing that Pegasus Global account at Beaufort

Securities sold Arch shares). When she sent such DWAC transfers, she made sure to keep the

number of shares for any nominee under 5%.  Ex. 63.

**No Registration Statements Were Filed for The Sales Made By Veldhuis, Sexton and Friesen Through Sharp's Nominee Companies**

75.     As discussed above, the Veldhuis Control Group transacted in the stock of at least

14 issuers.  During the relevant time period, no registration statements were filed that covered

sales by Veldhuis, Sexton or Friesen.  Murphy Dec., ¶¶56-58.  Stevia First/Vitality and Arch

filed five registration statements and related amendments (11 filings in total).  *Id.*, ¶¶57-58.

None of the other 12 issuers – Echo Automotive Inc., Stevia Corp., Liberty One Lithium Corp.,

Oryon Technologies, Inc., Makism 3D Corp., Graphite Corp., OncoSec Medical Inc., NewGen

Biopharma Corp., StartMonday Technology Corp., Lexington Biosciences Holdings Corp.,

BreathTec Biomedical Inc, and RightsCorp. – filed any registration statements.  *Id.*

76.     The only nominee companies appearing in Arch or Stevia First/Vitality registration statements for which a Notice of Effectiveness was filed were Armor Securities LLC, Riverfall Group Ltd. and Varese Capital Inc.  *Id.*, ¶58.  The five registration statements, as amended, are as follows:

- Arch Form S-1 dated 9/11/2015, as amended on 10/16/2015, naming Armor Securities LLC as a potential reseller of Arch stock; Murphy Dec., Ex. 12;

- Arch Form S-3 dated 10/31/2016, as amended on 11/17/2016, naming Armor Securities LLC as a potential reseller of Arch stock; Murphy Dec., Ex. 13;

- Vitality Form S-1 dated 8/19/2016, as amended on 10/11/2016, 11/2/2016, and 12/6/2016 (no Notice of Effectiveness filed); Murphy Dec., Ex. 14;

- Vitality Form S-1 dated 9/13/2017; Murphy Dec., Ex. 15;

- Vitality Form S-1 dated 1/19/2018, as amended on 2/27/2018; Murphy Dec., Ex. 16.

Murphy Dec. ¶58.

77.     The two Arch registration statements, which were each once amended, identified Armor Securities LLC as a potential reseller of Arch shares.  However, there are no transactions recorded in the Q system in which Armor Securities LLC transacted in Arch shares.  Murphy Dec., ¶59.

78.     The Vitality Form S-1 dated 8/19/2016, as amended three times, identified eight Sharp nominee companies as potential resellers of VBIO shares – Quezon Group LLC, Trius Holdings Ltd., Gotama Capital SA, Hampton Partners Inc., Corby Ventures Inc., Santos Torres LLC, Morris Capital Inc., and Armor Securities Inc.  Murphy Dec., ¶60.  However, no Notice of Effectiveness was filed by Vitality with respect to the 2016 Form S-1 as amended.  *Id.*

79.     The remaining two Vitality registration statements, filed in 2017 and 2018, as amended, identified nominee companies Riverfall Group Ltd. and Varese Capital Inc. as potential resellers of Vitality shares.  Murphy Dec., ¶61.

80.     Riverfall Group Ltd. sold 577,927 Vitality shares after the effective date of the 2017 registration statement and before the effective date of the 2018 registration statement—*i.e.*, more than the 200,000 shares referenced in the 2017 Stevia First/Vitality registration statement. Riverfall Group Ltd. also sold 140,000 Vitality shares after the 2018 registration statement was effective.  Murphy Dec., ¶62.

81.     As detailed in paragraph 30 above, Varese Capital Inc. did not sell any Vitality shares after the effective dates of the 2017 and 2018 Stevia First/Vitality registration statements. Varese's last sale was on 12/21/2016.  Murphy Dec., ¶63.

**Defendants' Sales Involved the Use of Interstate Commerce and Means of Communication**

82.     When Silverton sold the following stocks for Veldhuis, Sexton, and Friesen, Silverton was selling through its own omnibus brokerage accounts: Stevia First/Vitality BioPharma) (ticker STVF/VBIO), Arch Therapeutics (ticker ARTH), Stevia Corp (ticker STEV), RightsCorp (ticker RIHT), Lexington Biosciences (ticker LNB), BreathTec BioMedical (BHT), StartMonday Technology Corp (ticker JOB), Liberty One Lithium Corp (ticker LBY), Makism 3D Corp (MDDD), and NewGen Biopharma (NEWG). ▉▉▉▉▉ ¶¶27.  Each of these issuers is quoted through OTC Markets Group Inc., meaning that broker-dealers can publish bid and ask quotations to facilitate trading.  *See* https://www.sec.gov/answers/pink.htm.  OTC Markets Group Inc. is based in New York.  *See* https://www.otcmarkets.com/otcapi/company/financial-report/361123/content at 6.  "OTC Markets Group makes available and distributes market data to broker-dealers, investment professionals, market data re-distributors, and financial websites, in

addition to providing data through www.otcmarkets.com." *See*

https://www.otcmarkets.com/learn/market-101/market-structure.

83.     Several of Silverton's brokerage accounts were held at United States broker-

dealers such as Wedbush Securities.  When Silverton sent sale orders to Wedbush Securities, it

used phone and email to communicate with Wedbush, which is located in California.  Most of

Silverton's brokerage accounts were held by broker-dealers outside of the United States (for

example, in the United Arab Emirates, in the United Kingdom, and in Malta).  Those foreign

broker-dealers transmitted Silverton's sale orders to their correspondent broker-dealers in the

United States using a variety of interstate and international communications methods so that the

sale transactions could be executed in the United States.  ███████ ¶¶27, 29; *see* FINRA Rule

1021(d) (foreign broker-dealers must "utilize, either directly or indirectly, the services of a

broker-dealer registered with the SEC, a bank or a clearing agency registered with the SEC

located in the United States in clearing all transactions involving members of FINRA").

84.     Knox, through Silverton, coordinated with issuers' transfer agents to deposit the

stock that Silverton sold "in the United States electronic trading system, which enabled him to

designate multiple brokerage accounts to trade the shares electronically on US securities

markets."  Ex. 1 at 4.

85.     Kelln often transferred stock that clients of Sharp's business wanted to sell to

Silverton, and to brokers where Sharp-administered nominees had accounts, through DWAC

(Deposit/Withdrawal at Custodian) transfers.  Ex. 48 at 18, 20, 34, 35; Ex. 62; Ex. 63.  DWAC

transfers are an electronic method of transferring shares from one custodian to another instead of

transferring paper stock certificates.  Transfer agents could send shares to Silverton's brokerage

accounts via the DWAC system.  In order to use this system, the issuer's securities had to be

eligible for deposit with the Depository Trust Corporation (DTC) in the United States.  ███

██████ ¶30; Ex. 4 at 59:18-61:11, 41:4-13 (explaining that when a DWAC transfer is made, the transfer agent transfers the shares into the name of CEDE & Co. (another name used by DTC) and DTC holds the shares electronically); 141:3-19 (explaining that an issuer needs to be DTC eligible and be subjected to additional due diligence before its shares can be transferred using the DWAC system). DTC is a clearing house that holds shares on behalf of participating clearing brokers and other brokerage firms and enables shareholders to trade their shares electronically in the public markets. *Id.* at 40:5-42:17; *see also* www.dtcc.com/settlement-and-asset-services/settlement ("The Depository Trust Company (DTC), the central securities depository subsidiary of DTCC, provides settlement services for virtually all broker-to-broker equity and listed corporate and municipal debt securities transactions in the U.S., as well as institutional trades, money market instruments and other financial obligations. Settlement, a consolidated end-of-day process and the final step of a securities trade, completes the transfer between trading parties of securities ownership and cash."); Ex. 64 at 19.

86.     Many of the shares sold as described in paragraphs 30 to 43 above were sold by brokers who received those shares by DWAC and therefore sold those shares using the DTC's electronic clearing and settlement system. *See, e.g.,* Ex. 65, Ex. 66, Ex. 67. Many other share sales were made using the DTC's electronic clearing and settlement services (even if they were not originally transferred by DWAC), as shown by the transfer agents' records showing shares held in the name of CEDE & Co., another name of DTC. *See, e.g.*, Ex. 68 at 8-10, 15, 17 (transfer journal for Echo Automotive (ECAU) maintained by its transfer agent showing numerous transfers of shares previously held by Sharp-administered nominees into the name of CEDE & Co.), Ex. 69 (excerpt of transfer journal for NewGen BioPharma (NEWG) maintained by its transfer agent showing transfers of shares previously held by Sharp-administered nominees into the name of CEDE &Co.).

87.     Veldhuis and Friesen directed much of the trading described in paragraphs 30 through 43 above, either directly or through traders employed by Sharp's business.  Those trading instructions were often conveyed through the use of encrypted communications networks such as Threema or the xphone network.  *See supra* ¶50.

88.     Kaitz's promotions for the companies whose shares were sold by Veldhuis, Sexton and Friesen involved the use of advertisements sent out by email lists and posted on websites.  *See supra* ¶51; Kaitz Dec., ¶13.  Kaitz communicated with Veldhuis, Sexton and Friesen about the substance of these advertisements through the xphone encrypted communications network and by sending web-based encrypted emails through Sharp's xmail system.  *Id.* ¶¶13-14, 17.

**Veldhuis, Sexton and Friesen Failed to File Ownership Disclosures On Schedules 13(d)**

89.     Stevia First/Vitality's common stock was registered under Section 12(g) of the Exchange Act during the entire time period from March 31, 2011 to March 31, 2019.  Stevia First became a public company by merging into the public shell company Legend Mining Inc.  Dhillon Dec., ¶19.  At the time of the merger, Legend Mining's shares were already registered under Section 12(g) of the Exchange Act.  Ex. 70 (Legend Mining annual report on Form 10-K, stating "Securities registered pursuant to section 12(g) of the Act: Common Stock, Par Value $0.001 per share").  Stevia First maintained this registration, even after it changed its name to Vitality.  Ex. 71 (Stevia First annual report on Form 10-K, stating "Securities registered pursuant to section 12(g) of the Act: Common Stock, $0.001 par value"); Ex. 72 (Vitality annual report on Form 10-K, stating "Securities registered pursuant to section 12(g) of the Act: Common Stock, $0.001 par value").

90.     The cumulative Stevia First/Vitality stock held in the STVF/VBIO account in the Q system for the benefit of Sharp's clients was greater than 5% of the outstanding shares of

Stevia First/Vitality during a significant portion of the period when entities administered by Sharp's business were selling Stevia First/Vitality shares. Murphy Dec., ¶64 and Ex. 17. Specifically, Veldhuis, Sexton, and Friesen first acquired 16% of Stevia First/Vitality's total shares outstanding on January 18, 2012 and continued to own more than 5% of its shares outstanding through April 27, 2012. *Id.*, Ex. 17 at 1-2. Veldhuis, Sexton, and Friesen next acquired more than 5% of Stevia First/Vitality's total outstanding shares when it acquired control of 26% on April 18, 2016. They continued to own more than 5% of its shares outstanding through November 5, 2018. *Id.* at 5-12.

91.     Veldhuis, Sexton, and Friesen were the beneficial owners of these Stevia First/Vitality shares because, as clients of Sharp's business, they were permitted to use the nominee companies administered by Sharp to hold and direct the sale of Stevia First/Vitality securities. ████████ ¶¶6, 11, 24, 27; Murphy Dec., ¶16; Dhillon Dec., ¶¶19, 21, 22, 26, 31, 32, 34, 35, 41.

92.     Veldhuis, Sexton and Friesen, working together, had the power to sell, or direct the sale of, those Stevia First/Vitality shares. Dhillon Dec., ¶¶24, 27, 36, 42; ████ Ex. 7 at 2 (Veldhuis instructing Silverton to "Please sell 5k VBIO @ $1.40"), at 4 (Veldhuis instructing Silverton to "Please sell 10K VBIO @ $1.36"); Ex. 36 (Veldhuis directing trader employed by Sharp to sell STVF); Ex. 37 (trader employed by Sharp directing Silverton to sell STVF on same terms he was instructed by Veldhuis). Veldhuis, Sexton and Friesen shared the proceeds from their sales of Stevia First/Vitality shares. Murphy Dec., ¶¶52-54 (listing numerous transfers from Stevia First/Vitality accounts in the Q system to the Q system accounts of Veldhuis, Sexton and Friesen); Dhillon Dec., ¶¶24, 28-29. Veldhuis, Sexton and Friesen all asserted their Fifth Amendment right against self-incrimination and refused to answer whether they worked as partners in a number of deals by which they gained control of, and then directed sales of, large

blocks of penny stock using methods that did not reveal their ownership of those shares, and whether they received the proceeds of Stevia First/Vitality trading.  Ex. 7 at 12 (questions 241-249) (questions to Friesen); Ex. 8 at 8 (question 142), 17-18 (questions 241-242, 246-249) and 53 (Friesen's assertions of Fifth Amendment); Ex. 5 at 12 (question 90), 30-31 (questions 198-202) (Veldhuis' assertion of Fifth Amendment); Ex. 9 at 13 (question 88) and 33-34 (questions 212-215) (Sexton's assertion of Fifth Amendment).

93.     Veldhuis, Sexton and Friesen worked together as a group for the purpose of acquiring, holding and disposing of Vitality shares.  Dhillon Dec., ¶¶18-42; Kaitz Dec., ¶¶7, 8, 10, 19; ████ ¶¶11, 27, 31; *cf.* Murphy Dec., Ex. 11 (showing Veldhuis, Sexton and Friesen sharing proceeds of Echo Automotive stock sales).

94.     None of Veldhuis, Sexton, or Friesen, or any of the Sharp nominee companies who sold Stevia First/Vitality shares filed any Schedules 13D with the Commission at any time up until August 5, 2021, when the Complaint in this case was filed.  Murphy Dec., ¶65.

**Veldhuis' Assertion of His Fifth Amendment Right Against Self-Incrimination**

95.     On March 9, 2023 and March 20, 2023, Veldhuis asserted his Fifth Amendment right against self-incrimination in his written responses to the Commission's written deposition questions.  Ex. 5; Ex. 6.  Specifically, Veldhuis responded to each of the Commission's written deposition questions with the following response:  "Veldhuis invokes his rights under the Fifth Amendment to the United States Constitution and declines to answer this question upon advice of counsel."  *See id.*

96.     Veldhuis invoked his Fifth Amendment right against self-incrimination in his written responses to questions about using 4, 114, and ACCO as the code names he used to communicate by xphone and in the Q system.  *See* Ex. 5 at 5, 7, 17 (Questions 37, 47, 49, 119-125).

97.     Veldhuis invoked his Fifth Amendment right against self-incrimination in his written responses to questions that asked whether he, together with Friesen and Sexton, controlled and directed sales of blocks of shares of Stevia First/Vitality, Arch, and OncoSec, totaling more than 10% of the companies' outstanding shares, using methods that did not reveal that he, Friesen and Sexton owned those shares.  *See* Ex. 5 at 12-13, 27 (Questions 90, 93-95, 178).

98.     Veldhuis invoked his Fifth Amendment right against self-incrimination in his written responses to questions about using nominee companies administered by Sharp and his employees to conceal the facts that 1) he, working together with Friesen and Sexton, controlled large blocks of multiple issuers' stocks, including Stevia First/Vitality, Arch, and OncoSec, and 2) the three men were selling shares to the public without disclosing their ownership interests. *See* Ex. 5 at 28-30, 32-35, 37-39, 41-42, 45, 47, 49, 50-52, 57 (Questions 181-188, 198, 209-212, 215, 225-231, 246-249, 255, 272-276, 292, 302-304, 314, 328-338,  367); Ex. 6  at 1-2 (Questions 38-39, 66).

99.     Veldhuis invoked his Fifth Amendment right against self-incrimination in his written responses to questions that asked about directing the transfer of various issuers' stocks to nominee accounts at Silverton and Blacklight to conceal his, Sexton's, and Friesen's ownership of those shares, when in reality sales of those shares were made for his benefit and the benefit of Sexton and Friesen. *See* Ex. 5 at 23-25, 36, 41 (Questions 156-167, 236, 270).

100.    Veldhuis invoked his Fifth Amendment right against self-incrimination in his written responses to questions that asked whether he, or anyone on his behalf, filed any registration statements for any sales of shares of stock.  *See* Ex 5 at 27 (Stevia First/Vitality, Questions 178-180), 40 (Arch, Questions 262-265), 50 (OncoSec, Questions 322-325).

101.    Veldhuis invoked his Fifth Amendment right against self-incrimination in his written responses to questions that asked whether he made any public filings with the Commission disclosing that he, as part of a group, owned 5% or more of Stevia First/Vitality shares.  *See* Ex 5 at 23 (Question 146).

**Friesen's Assertion of His Fifth Amendment Right Against Self-Incrimination**

102.    On March 22, 2023, Friesen asserted his Fifth Amendment right against self-incrimination in his written responses to the Commission's written deposition questions. Ex. 7; Ex. 8.  Specifically, Friesen responded to the Commission's written deposition questions with the following response: "With respect to Questions 15 through 493, and without waiving the objections set forth above, Jackson Friesen declines to answer under the Fifth Amendment of the Constitution."  Ex. 8 at 53.

103.    Friesen invoked his Fifth Amendment right against self-incrimination in his written responses to questions about using 2 or GARD as the code names he used to communicate by xphone and in the Q system, and about using code name Stockman00 to communicate in Threema chats.  *See* Ex. 8 at 4-5, 10, 14, 44, 53 (Questions 97, 99, 167, 206, 445).

104.    Friesen invoked his Fifth Amendment right against self-incrimination in his written responses to questions that asked whether he, together with Veldhuis and Sexton, controlled and directed sales of blocks of shares of Stevia First/Vitality, Arch, and OncoSec, totaling more than 10% of the companies' outstanding shares, using methods that did not reveal that he, Friesen and Sexton owned those shares. *See* Ex. 8 at 9, 53 (Questions 145-147).

105.    Friesen invoked his Fifth Amendment right against self-incrimination in his written responses to questions about using nominee companies administered by Sharp and his employees to conceal the facts that 1) he, working together with Veldhuis and Sexton, controlled

large blocks of multiple issuers' stocks, including Stevia First/Vitality, Arch, and OncoSec, and 2) the three men were selling shares to the public without disclosing their ownership interests. *See* Ex. 7; Ex. 8 at 3, 6, 8, 15-17, 19-29, 31, 33, 34 (Questions 84-85, 111, 142, 223, 226-232, 241-244, 258-261, 268-270, 274, 276-280, 284, 287, 297-299, 308-310, 315, 321, 327-329, 331, 348-352, 360, 368, 374, 376-380, 382-384).

106.    Friesen invoked his Fifth Amendment right against self-incrimination in his written responses to questions that asked about directing the transfer of various issuers' stocks to nominee accounts at Silverton and Blacklight to conceal his, Veldhuis' and Sexton's ownership of those shares, when in reality sales of those shares were made for his benefit and the benefit of Veldhuis and Sexton.  *See* Ex. 7; Ex. 8 at 14, 24, 53 (Questions 195-199, 207, 213-216, 286, 323).

107.    Friesen invoked his Fifth Amendment right against self-incrimination in his written responses to questions that asked whether he, or anyone on his behalf, filed any registration statements for any sales of shares of stock.  *See* Ex. 7 at 11 and Ex. 8 at 14 (Stevia First/Vitality, Questions 220-222), Ex. 7 at 16 (Arch, Questions 315-318), Ex. 7 at 20 (OncoSec, Questions 368-371); Exhibit 8 at 53.

108.    Friesen invoked his Fifth Amendment right against self-incrimination in his written responses to questions that asked whether he made any public filings with the Commission disclosing that he, as part of a group, owned 5% or more of Stevia First/Vitality shares.  *See* Ex. 7 at 9 and Exhibit 8 at 13-14, 53 (Questions 190-191).

**Sexton's Assertion of His Fifth Amendment Right Against Self-Incrimination**

109.    On March 20, 2023, Sexton asserted his Fifth Amendment right against self-incrimination in his written responses to the Commission's written deposition questions.  Ex. 9. Specifically, Sexton responded to the Commission's written deposition questions with the

following response: "On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question." *See id.*

110.    Sexton invoked his Fifth Amendment right against self-incrimination in his written responses to questions about using 3 or HEAR or SEXY as the code names he used to communicate by xphone and in the Q system. *See* Ex. 9 at 8, 18 (Questions 48-49, 116-117).

111.    Sexton invoked his Fifth Amendment right against self-incrimination in his written responses to questions that asked whether he, together with Friesen and Sexton, controlled and directed sales of blocks of shares of Stevia First/Vitality, Arch, and OncoSec, totaling more than 10% of the companies' outstanding shares, using methods that did not reveal that he, Friesen and Sexton owned those shares. *See* Ex. 9 at 13-14 (Questions 88-90, 93-95).

112.    Sexton invoked his Fifth Amendment right against self-incrimination in his written responses to questions about using nominee companies administered by Sharp and his employees to conceal facts that: 1) he, working together with Veldhuis and Friesen, controlled large blocks of multiple issuers' stocks, including Stevia First/Vitality, Arch, and Oncosec, and 2) the three men were selling shares to the public without disclosing their ownership interests. *See* Ex. 9 at 13, 29-31, 33-37, 42-44, 49-50, 52-54 (Questions 88-89, 187, 190, 193-195, 198-199, 211-218, 220-235, 266, 272, 278-282, 306-310, 323, 329-339).

113.    Sexton invoked his Fifth Amendment right against self-incrimination in his written responses to questions that asked about directing the transfer of various issuers' stocks to nominee accounts at Silverton and Blacklight to conceal his, Veldhuis', and Friesen's ownership of those shares, when in reality sales of those shares were made for his benefit and the benefit of Veldhuis and Friesen. *See* Ex. 9 at 26-27, 38, 51 (Questions 162-163, 170, 176-177, 240, 316).

114.    Sexton invoked his Fifth Amendment right against self-incrimination in his written responses to questions that asked whether he, or anyone on his behalf, filed any

42

registration statements for any sales of shares of stock. *See* Ex. 9 at 29-30 (Stevia First/Vitality, Questions 187-189), 42-43 (Arch, Questions 266-269), 52 (OncoSec, Questions 323-326).

115. Sexton invoked his Fifth Amendment right against self-incrimination in his written responses to questions that asked whether he made any public filings with the Commission disclosing that he, as part of a group, owned 5% or more of Stevia First/Vitality shares. *See* Ex. 9 at 25 (Question 156).

**Kelln's Assertion of Her Fifth Amendment Right Against Self-Incrimination**

116. On March 20, 2023, Kelln asserted her Fifth Amendment right against self-incrimination in her written responses to the Commission's written deposition questions. Ex. 10. Specifically, Kelln responded to each of the Commission's written deposition questions with the following response: "[O]n the advice of counsel, Ms. Kelln respectfully declines to answer the below revised questions on the basis of the Fifth Amendment of the United States Constitution, which protects everyone, even innocent people, from the need to answer questions if the truth might be used to help create the misleading impression that they were somehow involved in a crime that they did not commit….Specifically, Ms. Kelln invokes her rights under the Fifth Amendment and declines to answer revised questions 1 [through] 429, including all subparts." *See id.,* at 2-3.

117. Kelln asserted her Fifth Amendment right against self-incrimination in her written responses to questions about using CELT as the code name she used to communicate by xphone and in the Q system, and about using codenames The Cuntessa and Celtic to communicate in Threema chats. *See* Ex. 10 at 8, 14, 19, 29, 50 (Questions 75, 78, 79, 137-138, 192, 264, 407).

118. Kelln asserted her Fifth Amendment right against self-incrimination in her written responses to questions about working with Sharp's business clients to transfer shares into the names of nominee companies that she and Sharp administered, whose brokerage accounts could

be used to sell the shares, and also to transfer shares into the name of Silverton.  *See* Ex. 10 at 7, 18, 19, 21, 24 (Questions 61, 173, 182, 212, 213, 214, 237, 238, 239).

119.    Kelln asserted her Fifth Amendment right against self-incrimination in her written responses to questions about the process of breaking up shares controlled by Sharp's clients into blocks of less than 5% of each issuer's outstanding shares, and then collecting or creating supporting documents needed to transfer each block of shares into the name of a nominee company controlled by Sharp's business.  *See* Ex. 10 at 13-14, 17, 29-30 (Questions 129-134, 167-169, 264).

120.    Kelln invoked her Fifth Amendment right against self-incrimination in her written responses to questions about working with transfer agents to submit packages of documents by which shares were transferred into the names of nominee entities administered by Sharp's business, and paying the fees that transfer agents charged in order to transfer shares.  *See* Ex. 10 at 23, 34 (Questions 231, 232, 290).

121.    Kelln invoked her Fifth Amendment right against self-incrimination in her written responses to questions about communicating with Silverton to deposit Vitality (VBIO) shares into Silverton's account in the name of Sharp-administered nominee Hilton Capital between February 3 and 28, 2017.  *See* Ex. 10 at 31 (Questions 269-271).

122.    Kelln invoked her Fifth Amendment right against self-incrimination in her written responses to questions about communicating with Silverton personnel on the progress of selling Vitality shares and transferring more shares to Silverton when they were close to selling out.  *See* Ex. 10 at 31 (Questions 272-273).

123.    Kelln invoked her Fifth Amendment right against self-incrimination in her written responses to questions about sending DWAC requests for Sharp's clients, including Veldhuis, to

get the clients' shares into brokerage accounts where the clients could direct their trading, including accounts at Silverton and Blacklight.  *See* Ex. 10 at 36 (Questions 305, 309).

124.    Kelln invoked her Fifth Amendment right against self-incrimination in her written response to a question about creating share purchase agreements to support a Sharp client's transfer of shares into the names of nominees with accounts at Silverton.  *See* Ex. 10 at 48 (Question 398).

125.    Kelln invoked her Fifth Amendment right against self-incrimination in her written responses to questions that asked whether she, or anyone on her behalf, filed any registration statements for any sales of shares of stock.  *See* Ex. 10 at 22 (Stevia First/Vitality, Questions 218-220), 33 (Arch, Questions 282-284), 37 (Garmatex, Questions 316-318).

126.    Kelln invoked her Fifth Amendment right against self-incrimination in her written responses to questions that asked whether she, or anyone on her behalf, made any public filings with the Commission disclosing that nominee entities that she administered, as part of a group, owned 5% or more of Stevia First/Vitality shares.  *See* Ex. 10 at 18 (Question 173-174).

April 17, 2023                              Respectfully submitted,

                                            SECURITIES AND EXCHANGE COMMISSION

                                            By its attorneys,

                                            /s/ Kathleen Shields
                                            Kathleen B. Shields (Mass. Bar No. 637438)
                                            Alfred Day (Mass. Bar No. 654436)
                                            David London (Mass. Bar No. 638289)
                                            Nita K. Klunder (Mass. Bar No. 689304)
                                            33 Arch Street, 24th Floor
                                            Boston, MA  02110
                                            Telephone: (617) 573-8904 (Shields); (617) 573-4537 (Day); (617) 573-8997 (London)
                                            Fax: (617) 573-4590
                                            Email: shieldska@sec.gov; daya@sec.gov; londond@sec.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on April 17, 2023, a true and correct copy of the foregoing document was filed through the Court's CM/ECF system, and accordingly, the document will be sent electronically to all participants registered to receive electronic notice in this case.

       /s/ Kathleen Shields
       Kathleen Shields