1

**SJ Exhibit 1**
21-cv-11276-WGY

**SJ Exhibit 22**
18-cv-12058-RGS

```
1           IN THE UNITED STATES DISTRICT COURT
2             FOR THE DISTRICT OF MASSACHUSETTS
3
4
   * * * * * * * * * * *    18CR10385-NMG
5  UNITED STATES OF AMERICA *
                            *
6  VS.                      *   JANUARY 13, 2020
                            *   11:05 A.M.
7  ROGER KNOX               *
                            *
8  * * * * * * * * * * *    BOSTON, MA
9
10       BEFORE THE HONORABLE NATHANIEL M. GORTON
11                    DISTRICT JUDGE
12                   (Rule 11 Hearing)
13
14 APPEARANCES:
15
   FOR THE GOVERNMENT:   ERIC S. ROSEN, AUSA
16                       JAMES R. DRABICK, AUSA
                         United States Attorney's Office
17                       1 Courthouse Way
                         Suite 9200
18                       Boston, MA 02210
19 FOR THE DEFENDANT:    MARK A. BERTHIAUME, ESQ.
                         Greenberg Traurig LLP
20                       One International Place
                         Boston, MA 02110
21
   Court Reporter:       Debra D. Lajoie, RPR-FCRR-CRI-RMR
22                       1 Courthouse Way
                         Boston, MA  02210
23
24
              Proceeding reported and produced
25             by computer-aided stenography
```

17

that?

THE DEFENDANT: Yes, I understand, Your Honor.

THE COURT: And do you further understand that, by entering of a plea of guilty, if that plea is accepted by this Court, there will be no trial, and you will have waived or given up your right to a trial by jury as well as those other rights associated with such a trial that I just described? Do you understand that?

THE DEFENDANT: I understand, Your Honor.

THE COURT: All right. Then, Mr. Rosen, will you please inform the Defendant of exactly what facts the Government would prove if this matter were to go to trial.

MR. ROSEN: If this case were to proceed to trial, cooperating witnesses, securities transfer documents, bank and brokerage records and consensual recordings would show that, beginning in at least 2015 and continuing up through the time of his arrest, the Defendant, Roger Knox, operated an asset-management business called Winter Cap, which was formerly known as Silverton, through which Knox engaged in a scheme to fraudulently sell the stock of at least 50 publicly traded companies.

The Government believes -- and I note that there's a disagreement in the plea agreement as to loss

amount, but the Government believes that Knox, through Winter Cap, generated approximately $165 million in fraudulent stock sale proceeds during this time period, which he primarily distributed out to the individuals or groups who benefited from the fraudulent stock sales.

The Federal securities laws to protect investors require so-called control persons or affiliates to register and disclose their ownership stakes in stocks. In addition, the laws prohibit control persons or affiliates from selling more than a small percentage of their stock in so-called micro-cap companies at a time. Knox's company existed, at least in part, to flout the securities laws and provide a layer of disguise to public company insiders or control persons who, acting in concert with Knox, intended to defraud investors by secretly dumping large quantities of stock in circumvention of the registration and disclosure requirements imposed by the Federal securities laws.

Knox provided a platform through which control persons could conceal their identities while selling large amounts of stock to investors in the open market. The fraudulent stock sales and Knox's role in providing the platform for consummating those sales followed the general pattern as follows:

          First, control persons acquired control of a
public company by acquiring most, if not all, of the
public company's stock.
          Second, control persons transferred the public
companies' purportedly unrestricted stock to nominee
entities.  These transfers were typically made in
blocks of less than five percent of the total
outstanding shares of the issuer in order to evade
disclosure obligations and deflect scrutiny by brokers.
Knox also offered his service to control persons
through which Knox directly or indirectly created
offshore nominee entities for control persons for a
fee.
          Third, Knox further concealed the control
person's ownership by typically arranging for the
issuer's transfer agent to transfer the shares from the
nominee entities into Winter Cap's name, creating the
appearance that Winter Cap was the owner of the stock
at that time.
          Fourth, Knox coordinated with issuer's transfer
agent to deposit the stock in the United States
electronic trading system, which enabled him to
designate multiple brokerage accounts to trade the
shares electronically on US securities markets.
          Fifth, Knox, directly or indirectly, transferred

1    the control persons' stock into omnibus brokerage
2    accounts in Winter Cap's name.  This step helped to
3    further obscure the control persons' ownership of the
4    stock because brokers generally do not require omnibus
5    account-holders to reveal the identity of the
6    underlying beneficial owners.
7            Sixth, Knox, directly or indirectly, distributed
8    the shares to the various omnibus brokerage accounts in
9    blocks of less than five percent of the total
10   outstanding shares of the issuer.  By staying below
11   five percent, Knox evaded disclosure obligations and
12   sought to avoid triggering direct inquires by
13   compliance personnel in the brokerage firms who may
14   inquire concerning their customers like Winter Cap
15   before allowing them to deposit the sale of securities.
16           Seventh, Knox, through brokerage accounts held
17   by Winter Cap, dumped the control persons' stock into
18   the securities market.  The dump phase of the scheme
19   typically included a promotional campaign funded by the
20   control persons to generate public interest in the
21   stock, which often artificially inflated the market
22   price of the stock.
23           The control persons with whom Knox's scheme
24   sought to evade registration and disclosure rules by
25   concealing their identities from the public, brokers

1    and regulators, concealing the control persons'
2    identities enabled them to secretly dump their stock,
3    often millions of shares at a time, into the securities
4    market to perpetrate a fraud on investors.  In effect,
5    the stock sales appeared as ordinary sales by ordinary
6    investors when the reality was that these were sales by
7    control persons, such as corporate insiders who were
8    dumping their holdings into the market.
9         The indictment provides the example of the stock
10   Environmental Packaging, or EPTI.  As the Court is
11   aware, two members of the control group here,
12   Morrie Tobin and Milan Patel, have pled guilty before
13   this Court as participants in the pump-and-dump of
14   EPTI.  Knox was their co-conspirator who facilitated
15   the sale of the stock through Silverton.
16        The control group, in August, 2013, acquired the
17   majority of the shares of a publicly traded company
18   with minimal assets and operations.  Then the control
19   group, beginning in about May of 2015, continuing
20   through 2017, distributed its free-traded shares in the
21   EPTI public shell among four offshore nominee entities
22   that were created to hold the shares.  In or about
23   December 16 of 2016, and June, 2017, the control group
24   merged the private company, Environmental Packaging,
25   into the public shell.  The control group caused the

 1          shares held in the name of the nominees to be
 2          transferred to Knox's Silverton.  Each of the nominees
 3          held under five percent of the company's total
 4          outstanding shares with the shares now placed with
 5          Knox.  Knox caused the shares to be deposited into
 6          Silverton's omnibus accounts and multiple brokerage
 7          firms.
 8                  While this was occurring, the control group
 9          raised about approximately 2.9 million in a private
10          placement of shares of Environmental Packaging.
11          Thereafter, Knox and others transferred a million
12          dollars from another offshore entity called Svarna,
13          S-v-a-r-n-a, to a third-party stock promoter, the
14          control group it hired to promote EPTI.
15                  On or about June 12 of '17, three days after the
16          reverse merger closed with the publicly traded EPTI and
17          the public shell, the promoter began touting the shares
18          of EPTI to US investors, including those in the
19          District of Massachusetts, prompting a significant
20          increase in the stock's price and average daily trading
21          volume.
22                  Between June 9th and June 27 of 2017, which is
23          when the SEC halted trading in EPTI shares, Knox,
24          acting at the direction of the control group, sold
25          shares of EPTI from the Silverton accounts, generating

```
 1      proceeds of approximately $1.3 million.
 2              THE COURT:  Now, Mr. Knox, do you have anything
 3      to add to what Mr. Rosen says the Government would be
 4      able to prove?
 5              MR. BERTHIAUME:  Your Honor, if I --
 6              THE COURT:  Wait a minute now, Mr. Berthiaume.
 7      I want the answers from the Defendant.  You can talk to
 8      him before he answers, but I don't want you answering
 9      for him.  I want his answers.  So if you want to
10      consult with him now for a minute, that's fine, but
11      then I want to ask him questions and have him answer
12      them directly to me.
13              MR. BERTHIAUME:  I understand, Your Honor.
14      There are certainly some clarifications that he would
15      like to make with respect to the statement that was
16      read by the Government that was provided to us in
17      advance.
18              THE COURT:  He's free to make any corrections
19      that he'd like to.
20              MR. BERTHIAUME:  May I just --
21              THE COURT:  Consult with him now, and then I'm
22      going to ask him the same question.
23              THE DEFENDANT:  Excuse me, Your Honor.
24              THE COURT:  Yes.
25              (Pause)
```

```
 1              THE DEFENDANT:  Thank you, Your Honor.
 2              THE COURT:  All right.  I'll ask the question
 3      again so the record is clear.
 4              Do you have anything to add to what Mr. Rosen
 5      says the Government would be able to prove if this
 6      matter were to go to trial?
 7              THE DEFENDANT:  Your Honor, I have a few things.
 8      Many of the items that Mr. Rosen said were correct.
 9              As we've already discussed it, the amount -- the
10      number of publicly traded companies, 50 publicly traded
11      companies, and the total proceeds of 165 million, I
12      question that total amount.
13              I also question the layer of disguise for public
14      company insiders.  To my knowledge, I have never dealt
15      with a public company insider as a client or a Svarna
16      client.  The control group, I was only ever -- I met
17      this gentleman Milan Patel, a lawyer from Zurich, in
18      Switzerland.  I had not met the Morrie Tobin who was
19      the head of the control group.
20              And another one is the appearance that Silverton
21      transferred the stock to be its beneficial owner.  That
22      was never the case.  If we became a beneficial owner,
23      then my company would be responsible for any profits
24      and any taxes on the profits, so we never did that.
25      It's common practice for a banker/brokerage to rename a
```

           stock from a transfer agent into the custodian's name
           before pulling it down from -- before dematerializing
           the stock in order to sell.
                   And the same with approaching any brokerage.  We
           provided any brokerage with the name of the beneficial
           owner, and the beneficial owner was not Silverton; it
           was -- they were Silverton accounts; but, again, that
           is commonplace for a financial institution with a
           banker/brokerage concierge custodian.
                   And the very final thing was we took
           instructions, as you know, myself -- we acted on
           instruction, acted on instruction at all points from
           the client.  The client instructed us what stock to
           deposit.  The client instructed us when to sell the
           stock, when to buy any stock, when to transfer funds
           and where to transfer funds.  So, as the Government
           rightly says in the last paragraph, I was acting on the
           instruction of the control group, albeit I knew just
           Mr. Patel.
                   THE COURT:  Are you through?
                   THE DEFENDANT:  Thank you, Your Honor.  Yes,
           sir.
                   THE COURT:  Mr. Rosen, does the Government
           accept that amendment to its statement of the facts
           that the Government would prove if this matter were to

```
 1   go to trial?
 2          MR. ROSEN:  We do, Your Honor.  Just with
 3   regards to Mr. Tobin, I don't believe -- I know that
 4   they haven't met, at least from my -- but they're still
 5   co-conspirators even though they haven't met, at least
 6   from our reading of the case.  I know he didn't meet
 7   Mr. Patel -- in terms of the -- you know, the transfer
 8   and the -- you know, into their names.  I think I just
 9   said, you know, brokers generally do not require
10   omnibus account-holders to reveal the identity of the
11   underlying beneficial owner, so just being one purpose
12   of the transfer into their name was to obscure
13   identity, but it was certainly not the only purpose of
14   doing that.  So we're fine with those amendments.
15          THE COURT:  All right.
16          My next question after "Do you have anything to
17   add" was, Do you disagree with anything that Mr. Rosen
18   says the Government would be able to prove?  Do I take
19   it that your previous answer will be the same with
20   respect to your disagreement with what Mr. Rosen says
21   the Government would be able to prove?
22          THE DEFENDANT:  Yes, Your Honor.  I have nothing
23   further to add.  Thank you, sir.
24          THE COURT:  All right.  Then, I would ask the
25   Deputy Clerk to inquire of the Defendant as to how he
```

1    now wishes to plead, and Mr. Knox, will you please
2    stand.
3            THE CLERK:  Mr. Knox, as to Count I of the
4    two-count indictment charging you with conspiracy to
5    commit securities fraud, in violation of Title 18 of
6    the United States Code, Section 371, you have
7    previously pled not guilty.  Do you now wish to change
8    your plea?
9            THE DEFENDANT:  Yes.
10           THE CLERK:  What say you now as to Count I,
11   guilty or not guildty?
12           THE DEFENDANT:  Guilty.
13           THE CLERK:  As to Count II of the two-count
14   indictment charging with you securities fraud, in
15   violation of Title 15 of the United States Code,
16   Section 78j(b) and 78ff, you have previously pled not
17   guilty.  Do you now wish to change your plea?
18           THE DEFENDANT:  Yes.
19           THE CLERK:  What say you now as to Count II,
20   guilty or not guilty?
21           THE DEFENDANT:  Guilty.
22           THE CLERK:  Thank you.  You may be seated.
23           THE DEFENDANT:  Thank you.
24           THE COURT:  That being so, it is the finding of
25   the Court, in the case of the United States v.

Roger Knox, that the Defendant is fully competent and capable of entering an informed plea and that his plea of guilty is a knowing and voluntary plea supported by an independent basis in fact containing each of the essential elements of the offenses charged. His plea is, therefore, accepted, and he is now judged guilty of that offense.

Mr. Knox, a written presentence report will be prepared for me by the Probation Department. You will be asked to give information for that report, and your attorney may be present if you wish.

Both you and your counsel will be given an opportunity to read that presentence report before the sentencing hearing, and at the sentencing hearing, not only your counsel, but you will be afforded the opportunity to speak. Do you understand all of that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Then we'll schedule the sentencing for Thursday, April 23rd, 2020, at 3:00 p.m. in this Courthouse.

Any known conflicts, Mr. Berthiaume?

MR. BERTHIAUME: No.

THE COURT: Mr. Rosen?

MR. ROSEN: No, Your Honor.

THE COURT: So it will be April 23rd, 2020, at