UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
SECURITIES AND EXCHANGE        )
COMMISSION,                    )
                               )
            Plaintiff,         )
                               )
v.                             )          CIVIL ACTION
                               )          NO. 21-11276-WGY
FREDERICK L. SHARP,            )
ZHIYING YVONNE GASARCH,        )
COURTNEY KELLN,                )
MIKE K. VELDHUIS,              )
PAUL SEXTON,                   )
JACKSON T. FRIESEN,            )
WILLIAM T. KAITZ,              )
AVTAR S. DHILLON, and          )
GRAHAM R. TAYLOR,              )
                               )
            Defendants.        )
                               )
_____)
```

YOUNG, D.J.                                 June 17, 2024

**MEMORANDUM & ORDER**

## I.   INTRODUCTION

Following a ten day civil securities fraud jury trial resulting in a verdict for the plaintiff Securities and Exchange Commission ("SEC"), the SEC now moves for remedies against the defendants Zhiying Yvonne Gasarch ("Gasarch"), Courtney Kelln ("Kelln"), Mike K. Veldhuis ("Veldhuis"), Paul Sexton ("Sexton"), and Jackson T. Friesen ("Friesen") (collectively, the "Defendants").  See generally Pl.'s Mot. for Remedies against Defs. ("Mot. Remedies"), ECF No. 425.  The Defendants

oppose the SEC's proposed remedies.  See Def. Sexton's Opp'n Mot. Remedies ("Sexton's Opp'n"), ECF No. 454; Defs. Kelln & Veldhuis' Opp'n Mot. Remedies ("Kelln & Veldhuis' Opp'n"), ECF No. 455; Def. Gasarch's Opp'n Mot. Remedies ("Gasarch's Opp'n"), ECF No. 464; Def. Friesen's Opp'n Mot. Remedies ("Friesen's Opp'n"), ECF No. 471.

The SEC filed replies to all of the above-mentioned opposition memoranda.  See Pl.'s Reply Mem. Supp. Mot. Remedies against Defs. Sexton, Veldhuis, and Kelln ("Pl.'s Reply to Sexton, Veldhuis & Kelln"), ECF No. 470; Pl.'s Reply Mem. Supp. Mot. Remedies against Def. Gasarch ("Pl.'s Reply to Gasarch"), ECF No. 474; Pl.'s Reply Mem. Supp. Mot. Remedies against Def. Friesen ("Pl.'s Reply to Friesen"), ECF No. 480.  Sexton and Gasarch filed sur-replies to the SEC's replies.  See Sexton's Sur-Reply Mot. Remedies ("Sexton's Sur-Reply"), ECF No. 473; Gasarch's Sur-Reply Mot. Remedies ("Gasarch's Sur-Reply"), ECF No. 481.

On September 27, 2023, a unanimous jury found Friesen and Gasarch to have committed various securities violations alleged by the SEC.  See Jury Verdict, ECF No. 402.[1]  As to the other defendants presently before the Court, Kelln, Veldhuis, and

---

[1] These were various violations of both the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act").

Sexton, the Court entered partial judgments against them before the trial.  <u>See</u> J. as to Kelln ("Kelln J."), ECF No. 317; J. as to Veldhuis ("Veldhuis J."), ECF No. 325; J. as to Sexton ("Sexton J."), ECF No. 378.  Pursuant to those judgments, the Court ordered Kelln, Veldhuis, and Sexton, and they each agreed, not to "contest liability under the claims filed by the [SEC]" at the remedies stage.  Kelln J. 5; Veldhuis J. 5; Sexton J. 1-2.  In the same partial judgments, however, the Court ordered that these three defendants, while accepting liability, would "be permitted to challenge the remedies and sanctions sought by the [SEC]," Kelln J. 5; Veldhuis J. 5, and that they would "be permitted to oppose the [SEC's] requested relief, including any calculations thereof."  Sexton J. 2.

The remedies now sought by the SEC are three-fold.  <u>See</u> <u>generally</u> Pl.'s Mem. Supp. Mot. Remedies ("Mem. Supp."), ECF No. 426.  <u>First</u>, the SEC requests injunctive relief against Sexton, Friesen, and Gasarch, asking this Court to (1) permanently restrain and enjoin them from violating securities laws; (2) issue specific conduct-based injunctions permanently barring them from professionally –– but not personally –– participating in a national securities exchange; and (3) issue penny stock

bars permanently barring them from trading in penny stocks.[2]  See id. at 2-11.

Second, the SEC requests this Court impose civil penalties against the Defendants in the following amounts: (1) $1,562,603 against Sexton; (2) $1,562,603 against Friesen; (3) $1,562,603 against Veldhuis; (4) $904,078 against Kelln; and (5) $558,072 against Gasarch.  Id. at 1.

Third, the SEC seeks disgorgement awards and prejudgment interest as to the Defendants in the following amounts: (1) $17,367,474 in disgorgement and $5,872,145 in prejudgment interest against Sexton; (2) $11,846,176 in disgorgement and $4,057,737 in prejudgment interest against Friesen; (3) $13,289,897 in disgorgement and $4,314,031 in prejudgment interest against Veldhuis; (4) $1,582,785 in disgorgement and $460,687 in prejudgment interest against Kelln; and (5) $2,522,367 in disgorgement and $646,366 in prejudgment interest against Gasarch.  Id.

Having reviewed the parties' briefs and having held a hearing on the question of remedies, see ECF No. 484, this Court (1) granted the SEC's request for injunctive relief against

---

[2] Penny stock "generally refers to a security issued by a very small company that trades at less than $5 per share."  Am. Compl. ¶ 40, ECF No. 230; see also Securities and Exchange Commission v. Sharp, 626 F. Supp. 3d 345, 366 n.3 (D. Mass. 2022).

Sexton, Friesen, and Gasarch in its entirety; (2) imposed civil penalties against Sexton, Friesen, Veldhuis, and Kelln in the amounts requested by the SEC, and as to Gasarch, having considered a downward variance from the SEC's requested amount of $558,072 equitable and appropriate, imposed a civil penalty of $269,651; and (3) took the issue of disgorgement and prejudgment interest as to all of the Defendants under advisement.  See id.

With this memorandum and order, the Court now provides its written disposition of the SEC's motion for remedies.  In addition to providing its explanation for imposing the above-mentioned injunctions and civil penalties against the Defendants, for the reasons elucidated below, the Court now **GRANTS** the SEC's motion for disgorgement in its entirety, but modifying it to hold the Defendants jointly and severally liable in the following manner, and **DENIES** the SEC's motion for prejudgment interest.

## II.  FACTUAL BACKGROUND

At its core, the present enforcement action centers around an elaborate securities fraud scheme involving a sequence of separate pump and dump endeavors.  Each proceeded in three steps.  Certain defendants (1) accumulated penny stocks in national markets in micro-cap companies; (2) promoted the penny stocks in these companies by using paid promotions to garner the

attention and interest of unwitting investors; and (3) sold their stocks to investors, not in their own names but through so-called shell or nominee companies they formed in order to skirt securities laws that otherwise prohibit the unregulated sale of restricted and control securities.  See Sharp, 626 F. Supp. 3d at 366 (detailing the scheme based on allegations in SEC's complaint).  In essence, the Defendants "engaged in a decade-long scheme to profit at the expense of unwitting investors by concealing their, or their clients', ownership and control of many microcap companies."  Mem. Supp. 1.

Each of the Defendants played a different role in the interconnected pump-and-dump schemes.  Sexton, Veldhuis, and Friesen acted as a group that teamed with Sharp to "sell stock surreptitiously in the public market."  Am. Compl. ¶ 7.  They acquired, held, and then disposed of shares.  Id. ¶ 153.  Kelln, Sharp's employee, helped conceal common control of shares by distributing them accordingly to Sharp's directions.  Id. ¶¶ 52-53.  "Much of Kelln's work was grouping stocks for transmission to transfer agents such that the totals appeared five percent to avoid disclosure and registration requirements."  Sharp, 626 F. Supp. 3d at 366 (footnote omitted).  Gasarch, another Sharp employee, "organized wire transfers of the proceeds from the illegal stock sales while concealing the beneficiaries, maintained records in the encrypted accounting system, and

routinely created false invoices to support the payments." <u>Id.</u>
at 366-67; <u>see also</u> Am. Compl. ¶¶ 57-59.

Importantly, Kelln, Veldhuis, and Sexton have admitted
their liability, and this Court has entered partial judgments
against them in which they were instructed not to contest
liability but were given the opportunity to challenge any and
all remedies the SEC now seeks against them. <u>See</u> Kelln J. 5;
Veldhuis J. 5; Sexton J. 1-2. As for the remaining defendants,
Friesen and Gasarch, a ten-day trial ensued in which a unanimous
jury found both liable for the various securities laws
violations alleged in the SEC's complaint. <u>See</u> Jury Verdict;
<u>see also generally</u> Tr. Jury Trial Day Ten 7-9, ECF No. 445.

## III. ANALYSIS

The SEC seeks three remedies: (1) injunctive relief against
Sexton, Friesen, and Gasarch; (2) civil penalties against the
Defendants, in varying amounts; and (3) disgorgement and
prejudgment interest against the Defendants, in varying amounts.
<u>See generally</u> Mem. Supp. 1.

### A. Injunctive Relief Against Sexton, Friesen, and Gasarch

Section 21(d) of the Exchange Act permits the SEC to seek
temporary or permanent injunctions against persons "engaged or
[] about to engage" in Exchange Act violations. 15 U.S.C. §
78(u)(d)(1); <u>see also</u> <u>Securities and Exchange Commission</u> v.

7

Sargent, 329 F.3d 34, 39 (1st Cir. 2003).  "Such an injunction is appropriate where there is, 'at a minimum, proof that a person is engaged in or is about to engage in a substantive violation of either one of the Acts or of the regulations promulgated thereunder.'"  Sargent, 329 F.3d at 39 (quoting Aaron v. SEC, 446 U.S. 680, 700-01 (1980)).  "The legal standard for issuing an injunction is 'reasonable likelihood of recidivism, not an imminent threat of it.'"  Securities and Exchange Commission v. Lemelson, 596 F. Supp. 3d 227, 231 (D. Mass. 2022) (Saris, J.) (quoting Sargent, 329 F.3d at 39).  In assessing the likelihood of recidivism, courts look at several, non-dispositive factors, including "the nature of the violation, including its egregiousness and its isolated or repeated nature"; "whether the defendants will, owing to their occupation, be in a position to violate again"; and "whether the defendants have recognized the wrongfulness of their conduct." Id.  In analyzing whether injunctive relief is appropriate, courts consider the relevant factors to be established based on "a preponderance of the evidence." Steadman v. SEC, 450 U.S. 91, 95 (1981) (affirming a lower court "holding that in a disciplinary proceeding before the [SEC] violations of the antifraud provisions of the securities laws may be established by a preponderance of the evidence").

Here, the SEC seeks three types of injunctive relief: (1) permanent injunctions; (2) specific, conduct-based injunctions; and (3) penny stock bars.  See Mem. Supp. 2-11.

### 1. Permanent Injunctions

The SEC seeks permanent injunctions against Sexton, Friesen, and Gasarch that would prevent them from violating securities laws.  Id. at 2.

Specifically, the SEC makes three arguments.  First, it argues that the three Defendants' conduct was "egregious, recurrent, and sustained."  Id. at 3.  The SEC notes in support of this contention that the scheme in which these three Defendants were involved "resulted[ed] in the fraudulent sale of more than $144 million worth of penny stocks," id.; that Gasarch enabled the scheme by, among other things, concealing beneficial ownership and fabricating invoices and other documents, id. at 3-4; and that Sexton and Friesen exercised control over the stock of 14 issuers but concealed their control in their pump-and-dump schemes, id. at 4.  Second, the SEC argues that these three Defendants "have the opportunity to violate again."  Id. at 5.  The SEC notes that they engaged in illegal conduct spanning a decade; that they are located in "metropolitan Vancouver where they apparently have not found gainful employment"; and that they have refused to testify before the SEC to answer questions about their activity.  Id. at 5-6.

Third, the SEC argues that these three Defendants "have not yet recognized the wrongful nature of their conduct."  Id. at 6. The SEC also notes that this Court has issued similar injunctions against certain other defendants in this case.  Id. at 3; see, e.g., Final J. as to Sharp 2 ("Sharp J."), ECF No. 211 (ordering that Sharp "is permanently restrained and enjoined" from violating securities laws); Kelln J. 2-4 (same language); Veldhuis J. 2-4 (same language).

The three Defendants oppose.  Sexton argues that the SEC "has not established a reasonable likelihood of recurrence," Sexton's Opp'n 16, emphasizing that the last purported profit attributed to him is dated 2018, and that "nearly 93 percent of the alleged profits are from in or before 2015," id.  Friesen contends that the SEC has failed to provide the Court with "evidence of any conduct in the last six years" to establish a likelihood of recurrence.  Friesen's Opp'n 11 (emphasis in original).  Gasarch also opposes a permanent injunction, arguing that she was never involved in the actual issuance, purchase, offer or sale of security, which the permanent injunction seeks to enjoin.  Gasarch's Opp'n 15.  She also notes that the SEC has failed to establish the likelihood of recurrence.  Id. at 16.

While "an injunction is a drastic remedy," Aaron, 446 U.S. at 703 (Burger, C.J., concurring), for the following reasons,

10

this Court concludes that a permanent injunction against Sexton, Friesen, and Gasarch is an appropriate remedy.

First, the Court finds that these three Defendants' securities laws violations were egregious and of a repeated nature.  As the First Circuit has observed, a securities law "violation [may be considered] not an egregious one, particularly where [the defendant] neither traded on the information himself nor derived any direct personal profit." Sargent, 329 F.3d at 39.  Conversely, here, each of the three Defendants directly and personally profited from the scheme. Pursuant to the partial judgment as to Sexton, he "is liable under Counts I-IV of the Amended Complaint[.]"  Sexton J. 1. Those counts attribute liability to Sexton for engaging in fraud in connection with the offer and sale of unregistered securities, Am. Compl. ¶¶ 250-63, which has resulted in "the fraudulent sale of more than $144 million worth of penny stocks," Mem. Supp. 3, from which Sexton personally profited. See, e.g., Decl. of Ryan Murphy ("Decl. of Ryan Murphy I") ¶¶ 48-49, ECF No. 273; Mem. Supp. 4.  Friesen and Gasarch have similarly profited from the schemes.  See Decl. of Ryan Murphy I ¶¶ 48-49 (Friesen); Mem. Supp. 3-4 (Gasarch).

In addition to the egregiousness of the deceit undergirding it, the pump-and-dump schemes, far from being isolated or short in duration, lasted for a decade.  See Mem. Supp. 1.  Courts in

this district and others have not hesitated to impose permanent
injunctive relief against securities law violations much shorter
in duration.  See, e.g., Securities and Exchange Commission v.
Chan, 465 F. Supp. 3d 18, 38 (D. Mass. 2020) (Burroughs, J.)
(finding an "egregious" violation where "an [] insider trading
scheme [] lasted for nearly two years and involved multiple
trades"); Securities and Exchange Commission v. Wall, 2020 U.S.
Dist. LEXIS 56152, at *25 (D. Me. Mar. 31, 2020) (ordering
permanent injunction where "the defendants' violations were part
of a pattern lasting more than four years").

    Additionally, in view of the fact that the pump-and-dump
scheme involved fourteen separate issuers, thus rendering these
Defendants' securities violations repetitive and schematic in
nature, the Court does not hesitate to conclude that said
violations were egregious.  Cf. Securities and Exchange
Commission v. Cody, 2019 U.S. Dist. LEXIS 210452, at *11 (D.
Mass. Dec. 5, 2019) (Saylor, J.) (finding egregious conduct in
view of "the fact that [defendant] made multiple representations
over a prolonged period of time and created falsified documents
to hide his deceptions"); Securities and Exchange Commission v.
Weed, 315 F. Supp. 3d 667, 676 (D. Mass. 2018) (Gorton, J.)
(finding egregiousness where "[t]he violations [] were repeated
in nature"); Securities and Exchange Commission v. Spencer
Pharm. Inc., 2015 U.S. Dist. LEXIS 132909, at *17 (D. Mass.

Sept. 30, 2015) (Talwani, J.) (finding that "the scope and complexity of the scheme supports the need for a permanent injunction").

Second, the Court finds that these three Defendants have the opportunity to violate securities laws again. As the First Circuit has clarified, under this prong the analysis, courts must find a reasonable likelihood -- not mere possibility -- of recidivism. See Securities and Exchange Commission v. Lemelson, 57 F.4th 17, 31 (1st Cir. 2023). Here, the Court so finds. Although Sexton points out that his "proceeds have been frozen," Sexton's Opp'n 17, the SEC notes that "all three defendants recently sought a release of frozen funds," and none presented the Court with evidence that there are now gainfully employed outside of the microcap industry in which their fraudulent scheme operated. See Mem. Supp. 5. Remaining in the same sector or industry in which one's offensive conduct took place is a factor that courts have weighed in favor of finding a likelihood of recidivism. Cf. Lemelson, 57 F.4th at 31 ("Lemelson's continued position as a hedge fund manager and investment adviser would readily allow him to benefit from future material misstatements concerning investments."). Further, Sexton's argument that the "so-called Sharp network is no more," Sexton's Opp'n 16-17, is unavailing. The "Sharp network" is no more not because the Defendants ceased to operate

it on their own accord, which could have been an indication to
the Court that the Defendants do not intend to engage in future
violations.  That counterfactual is of no moment: the Sharp
network is no more simply because of law enforcement and the
present action brought by the SEC, not because the Defendants do
not intend to engage in future violations.

Moreover, that considerable time has elapsed since these
three Defendants last violated securities laws, see, e.g.,
Sexton's Opp'n 16; Friesen's Opp'n 11, does not persuade the
Court that they will not offend in the future.  Courts have
found a likelihood of recurrence where Defendants were seemingly
similarly, if not more, unlikely to offend again.  See, e.g.,
Cody, 2019 U.S. Dist. LEXIS 210452, at *10-11 (finding
likelihood of recurrence "[a]lthough it is true that he is
currently imprisoned, and thus not immediately in a position to
commit further violations"); Securities and Exchange Commission
v. Present, 2018 U.S. Dist. LEXIS 45056, at *5 n.1 (D. Mass.
Mar. 20, 2018) (Sorokin, J.) (finding likelihood of recidivism
in 2018 even though defendant "has not worked in the securities
industry since 2014").[3]

---

[3] The Court also observes that the duration of the schemes,
spanning nearly a decade, in addition to weighing in favor of
issuing a permanent injunction in and of itself, persuades the
Court, in combination with the reasons provided under this
paragraph, that the three defendants have significant experience
in the securities industry, rendering a future violation more

Third, the Court finds that these three Defendants have not acknowledged their wrongdoing.  Sexton still contends that the SEC, at most, can establish discrete securities laws violations but not that there was a fraudulent scheme where "all transactions involving 14 issuers were fraudulent," Sexton's Opp'n 8, thereby attempting to minimize his offensive conduct. Sexton also contends that "[t]here is nothing unlawful about stock promotion," id. at 9, denying the impropriety and illegality of his conduct.  Sexton further avers that the SEC has not been able to show that there "are any victims" of the scheme, id. at 10, a contention reiterated by Friesen, see Friesen's Opp'n 8, that, once again, endeavors to deny or at least minimize the large-scale harm perpetrated by their schemes.  In similar fashion, Gasarch, despite a unanimous jury verdict finding her liable of independent and aiding-and-abetting violations of securities laws, see Jury Verdict, continues to argue that her involvement in the scheme was legitimate.  See, e.g., Gasarch's Opp'n 10 ("Clearly, given the length of time and the number of accounts and activities, Mrs. Gasarch was compensated for supporting Mr. Sharp in his

---

likely than not.  Cf. Securities and Exchange Commission v. Baccam, 2017 U.S. Dist. LEXIS 88450, at *26 (C.D. Cal. June 8, 2017) (granting SEC's request for a permanent injunction in view of the fact, among others, that "[defendant] has more than a decade of experience in the securities industry").

legitimate business activities."); see also id. at 16
(contending that her conduct was not "grave" and her involvement
in the scheme not "prominent").  The Court accordingly finds
that these three Defendants have failed to show proper remorse
and acknowledge the wrongful nature of their conduct.

Finally, Gasarch unpersuasively argues that a permanent
injunction restraining and enjoining her from the issuance,
purchase, offer or sale of securities is inappropriate because
she did not independently and directly engage in any violations
involving such actions but, at most, aided and abetted others
who directly engaged in those actions.  See Gasarch's Opp'n 15.
Other sessions of this Court have not hesitated to permanently
restrain and enjoin defendants from engaging in violations whose
perpetration they aided and abetted.  See, e.g., Spencer Pharm.
Inc., 2015 U.S. Dist. LEXIS 132909, at *15, *18 (issuing
permanent injunction against aider and abettor of securities law
violation).[4]

---

[4] Accepting Gasarch's contention that the Court ought not
issue a permanent injunction against her because she merely
aided and abetted others in their fraudulent participation in
the securities market is unmeritorious for two additional
reasons.  First, the jury, in addition to finding her to have
aided and abetted others, found Gasarch independently liable of
violating Section 17(a)(3).  See Jury Verdict 2.  While that
independent violation does not directly pertain to the issuance
of securities, it supports this Court's finding - - made during
the trial - - that Gasarch was "at the hub" of the scheme.  Tr.
Jury Trial Day Eight 41, 164, ECF No. 442.  Her role at the hub
of the scheme supports this Court's finding that she was an

Accordingly, this Court finds that Sexton, Friesen, and Gasarch engaged in egregious and repeated violations of securities laws for many years; are in a position to violate again; and have failed to recognize the wrongfulness of their conduct.  In view of these findings, a permanent injunction against each of the three is appropriate.[5]

---

important part of the scheme even though she may not have been as culpable as the other defendants.  Second and more generally, permanent injunctions are equitable remedies over which courts enjoy a great degree of latitude.  See, e.g., Securities and Exchange Commission v. Tropikgadget FZE, 2017 U.S. Dist. LEXIS 25495, at *12 (D. Mass. Feb. 23, 2017) (Burroughs, J.) ("The Court has broad authority to grant such an injunction."). Gasarch's contention that she ought not be enjoined from activity she herself did not commit but only aided and abetted would run afoul of that latitude and also of the relevant statutory text that grants this Court broad equitable powers: "In any action or proceeding brought or instituted by the [SEC] under any provision of the securities laws, the [SEC] may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."  15 U.S.C. § 78(u)(d)(5) (emphasis added).

   [5] At least one of the three defendants has averred that permanent injunctions enjoining future securities laws violations, so-called "obey-the-law injunctions," do not make sense because everyone, regardless of an injunction, is bound to not violate laws, including the securities laws in question. See, e.g., Sexton's Opp'n 17; see also Securities and Exchange Commission v. Goble, 682 F.3d 934, 949 (11th Cir. 2012) ("As the name implies, an obey-the-law injunction does little more than order the defendant to obey the law.  We have repeatedly questioned the enforceability of obey-the-law injunctions not only in the context of securities cases but other cases as well.").
   While the First Circuit has struck general and vaguely worded "obey-the-law" injunctions in other contexts, see Equal Employment Opportunity Commission v. Aviation Port Servs., LLC, 2020 U.S. Dist. LEXIS 57073, at *34-35 (D. Mass. Apr. 1, 2020) (Saylor, C.J.) (collecting and analyzing cases), courts in this

## 2. Specific, Conduct-Based Injunctions

The SEC requests this Court specifically enjoin Sexton, Friesen, and Gasarch from "participating in the issuance, purchase, offer, or sale of any security; provided, however, that such an injunction shall not prevent [defendants] from purchasing or selling securities listed on a national securities exchange for [their] own personal account." See, e.g., Mot. Remedies, Text of Proposed Order Proposed Final J. as to Gasarch, ECF No. 425-2. In essence, the requested conduct-based injunction would prevent the three Defendants from professionally -- but not personally -- engaging in the national securities market.

This Court is authorized to issue the requested conduct-based injunction. See 15 U.S.C. § 78(u)(d)(1); 15 U.S.C. § 78(u)(d)(5). "The Court has wide discretion to impose a conduct-based injunction in SEC actions." Securities and Exchange Commission v. CKB168 Holdings, Ltd., 2022 U.S. Dist. LEXIS 144893, at *9 (E.D.N.Y. Aug. 12, 2022). The analysis for the SEC's request for permanent injunctions, see supra Section

---

Circuit as well as other sessions of this Court have issued injunctions in the securities context that are similar to the injunctions requested in the present case. See, e.g., Chan, 465 F. Supp. 3d at 38; Present, 2018 U.S. Dist. LEXIS 45056, at *2-3.

III.A.1 ("Permanent Injunctions"), is equally applicable here.
See CKB168 Holdings, Ltd., 2022 U.S. Dist. LEXIS 144893, at *9
(applying its permanent injunction analysis in its entirety --
"[f]or the same reasons laid out [above]" -- to its conduct-
based injunction analysis).

For the same reasons elucidated above, the Court issues the
specific, conduct-based injunctions requested by the SEC.  The
Court additionally notes three points in support of its
conclusion.  First, as the SEC correctly brings to this Court's
attention, "[t]his Court has issued this same requested
injunction against Sharp, Kelln, and Veldhuis already."  Mem.
Supp. 7.  Sexton, Friesen, and Gasarch have not raised any
convincing argument as to why their cases ought be treated any
differently.  Second, other courts, including those in this
Circuit, have issued similar specific, conduct-based
injunctions.  See, e.g., Wall, 2020 U.S. Dist. LEXIS 56152, at
*26-27.  Third, the injunction still allows the three Defendants
to "purchas[e] or sell[] securities listed on a national
securities exchange for [their] own personal account."  See,
e.g., Mot. Remedies, Text of Proposed Order Proposed Final J. as
to Sexton 5, ECF No. 425-3.  As such, this conduct-based
injunction "does not deprive [the three defendants] of [their]
living or the opportunity to purchase and sell securities for

[their] own personal account."  <u>Wall</u>, 2020 U.S. Dist. LEXIS 56152, at *27.

### 3. Penny Stock Bars

The SEC requests that Sexton, Friesen, and Gasarch be barred from participating in future offerings of penny stocks. <u>See</u> Mem. Supp. 8-11; <u>see also</u> Mot. Remedies, Text of Proposed Order Proposed Final J. as to Sexton 5 (requesting the Court decree the three Defendants "permanently barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock").

"The standard for imposing a penny stock bar essentially 'mirrors that for imposing an officer-or-director bar.'"  <u>Weed</u>, 315 F. Supp. 3d at 677 (quoting <u>Securities and Exchange Commission</u> v. <u>Universal Exp., Inc.</u>, 475 F. Supp. 2d 412, 429 (S.D.N.Y. 2007)).  The criteria to determine whether an officer-or-director bar is appropriate, in turn, are: "(1) the egregiousness of the underlying securities law violation, (2) whether defendant was a repeat offender, (3) defendant[']s[] role in the fraud[,] (4) defendant's degree of scienter, (5) defendant's economic stake in the fraud and (6) the likelihood that misconduct will recur."  <u>Id.</u> (citing <u>Securities and Exchange Commission</u> v. <u>Patel</u>, 61 F.3d 137, 142 (2d Cir. 1995)).

These criteria, also known as the Patel factors, are "neither mandatory nor exclusive."  Securities and Exchange Commission v. Bankosky, 716 F.3d 45, 46 (2d Cir. 2013); see also Securities and Exchange Commission v. Johnston, 368 F. Supp. 3d 247, 251 (D. Mass. Mar. 21, 2019) (Gorton, J.) ("While the Patel factors are instructive . . . they are not exhaustive and it is not necessary to apply all of the factors in every case.").

Here, the analysis in the foregoing sections has already established that Sexton, Friesen, and Gasarch meet many of the Patel factors,[6] which obviates the need for repetition. Accordingly, the Court grants the SEC's request for penny stock bars against each of the three Defendants.

The Court finds it appropriate to dispose of Gasarch's argument concerning her scienter -- or rather, in her formulation, the lack thereof -- here, as a "defendant's degree of scienter" is among the relevant Patel factors quoted above. Weed, 315 F. Supp. 3d at 677.

In her opposition, Gasarch correctly points to a misquotation by the SEC.  See Gasarch's Opp'n 1.  Indeed, in its motion for remedies, the SEC submitted that the jury found

---

[6] For example, Sexton, Friesen, and Gasarch's conduct was egregious, see supra pp. 11-12; repeated over the course of many years, see supra pp. 12-13; and resulted in economic benefit to the three defendants, see supra pp. 11-12.  Further, there is a likelihood that their misconduct, in the absence of an appropriate injunction, will recur.  See supra pp. 13-14.

"Gasarch liable for violating Section 17(a)(3) of the Securities Act and aiding and abetting violations of Sections 17(a)(1) <u>and</u> (3) of the Securities Act <u>and</u> Section 10(b) and Rule 10b-5(a) and (c) of the Exchange Act. . . ." Mot. Remedies (emphasis added).  Yet, as Gasarch points out and as the jury verdict form clearly indicates, the jury found Gasarch liable for independently violating Section 17(a)(3) of the Securities Act and aiding and abetting violations of Section 17(a)(1) <u>or</u> Section 17(a)(3) of the Securities Act <u>or</u> Section 10(b) and Rule 10b-5(a) and (c) of the Exchange Act.  <u>See</u> Jury Verdict 2; <u>see also</u> Gasarch's Opp'n 1.  While the jury may have found multiple aiding and abetting violations, the use of the disjunctive "or" indeed makes it also entirely possible, as Gasarch contends, that the jury may have found her liable for her independent violation of Section 17(a)(3) of the Securities Act and for aiding and abetting violations of, again, Section 17(a)(3).  <u>See</u> Gasarch's Opp'n 1.

Since a Section 17(a)(3) violation does not require scienter, as this Court previously held, <u>see</u> <u>Sharp</u>, 626 F. Supp. 3d at 382, Gasarch argues that it is possible that she is liable for her independent non-scienter-based conduct violating Section 17(a)(3) and for aiding and abetting others' non-scienter-based conduct violating the same.  <u>See</u> Gasarch's Opp'n 2.  Gasarch goes on to argue that, assuming those are her only two

22

securities law violations, "an aider and abettor may be liable
only to the same extent as the person to whom such assistance is
provided."  Gasarch's Sur-Reply 5 (quotation omitted).  Her
contention seems to be that her aiding and abetting violation
may be without scienter since the conduct she aided and abetted
itself is non-scienter-based if it is just the aiding and
abetting of others' non-scienter-based Section 17(a)(3)
violations.

   This Court rejects this contention for two reasons and
instead finds that Gasarch acted with a degree of scienter in
aiding and abetting securities violations by other defendants.
First, even assuming, arguendo, that they jury found Gasarch
liable only for her independent and non-scienter-based violation
of Section 17(a)(3) and for aiding and abetting other
defendants' violation of the same, this Court is still permitted
to make findings of fact as to the appropriate remedy that do
not conflict with the jury's findings as to liability.  Such
findings as to remedy may –– and here they do –– include the
finding that Gasarch acted with scienter.  Based on ample
evidence presented at trial, and as the Court made clear during
the hearing on remedies, the Court finds that there is
sufficient evidence to establish that Gasarch acted
intentionally.  Second, and relatedly, the Court rejects
Gasarch's contention as erroneous that an aiding and abetting

violation ought have, at most, the same degree of scienter as
the underlying violation.  That is because here, the very act of
aiding and abetting a securities violation, regardless of
whether the aided conduct itself requires scienter for its
commission, requires its own culpable mental state.  See, e.g.,
Malouf v. SEC, 933 F.3d 1248, 1268 (10th Cir. 2019) (holding
that "scienter is an essential element of aiding and abetting a
violation of the securities law"); Securities and Exchange
Commission v. Blackburn, 2015 U.S. Dist. LEXIS 120747, at *21
(E.D. La. Sept. 10, 2015) ("[A] prima facie claim for aiding and
abetting a violation of securities laws involves an underlying
requirement of scienter.").  In the case at bar, this Court
instructed the jury during Gasarch's trial that an aiding and
abetting violation requires knowing or reckless conduct.  See
Tr. Jury Trial Day Nine 34:24-25, 35:1, ECF No. 444 (instructing
the jury on the aiding and abetting allegation against Gasarch,
explaining that it must find, among other things, that "Gasarch
knowingly or recklessly provided substantial assistance to the
violation").  Thus, regardless of the conduct Gasarch aided and
abetted, that she aided and abetted others' conduct in violation
of the securities laws suffices for this Court to find that she
acted with scienter.[7]

---

[7] In any event, in view of the fact that scienter is but one

Accordingly, a permanent penny stock bar will issue against Sexton, Friesen, and Gasarch.

### B. Civil Penalties Against All of the Defendants

#### 1. Legal Standard

Section 20(d)(2) of the Securities Act and Section 21(d)(3) of the Exchange Act authorize the SEC to seek, and this Court to impose, civil penalties to be determined "in light of the facts and circumstances." See Lemelson, 596 F. Supp. 3d at 233.  In assessing civil penalties, courts may choose from three tiers, Tier I, Tier II, and Tier III, in increasing order of severity. Tier II requires "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement."  15 U.S.C. § 77(t)(d)(2)(B).  Tier III requires all of the elements of Tier II and the additional requirement that "such violation directly or indirectly result[] in substantial losses or create[] a significant risk of substantial losses to other persons."  15 U.S.C. § 77(t)(d)(2)(C).  Tier I is available for all other violations.  See also Mem. Supp. 12 (outlining the tier system). "The tier determines the maximum penalty, with the actual amount of the penalty left up to the discretion of the district court."

---

of the many Patel factors discussed above, the egregiousness of Gasarch's conduct, her economic stake in the fraud, and the likelihood that her misconduct will recur, still weigh in favor of issuing a penny stock bar against her.

Securities and Exchange Commission v. Kern, 425 F.3d 143, 153
(2d Cir. 2005) (citing 15 U.S.C. § 77(t)(d)).

In fashioning an appropriate civil penalty, courts look to
a variety of factors, including: "the egregiousness of the
violation, the defendant's willingness or failure to admit
wrongdoing, the isolated or repeated nature of the violations,
the degree of scienter involved, the defendant's cooperation
with authorities or lack thereof, and the defendant's current
financial condition." Securities and Exchange Commission v.
Esposito, No. 16-cv-10960-ADB, 2018 U.S. Dist. LEXIS 72728, at
*9 (D. Mass. Apr. 30, 2018) (Burroughs, J.).

Importantly, civil penalty claims may be time-barred. As
this Court previously held in disposing of a prior motion to
dismiss in this case, see Sharp, 626 F. Supp. 3d at 385-86, the
applicable statute subjects civil penalty claims like those
requested here to a five-year statute of limitations. Thus,
this Court may impose civil penalties only in relation to
securities law violations that may have occurred between August
5, 2016, and August 5, 2021, id. at 382. By contrast, as this
Court previously stated, it cannot impose a monetary penalty in
relation to violations prior to August 2016. See Tr. Motion and
Charge Conference 55:15-18, ECF No. 443 ("So let me be clear.
If we get to remedies, and I'm coming to think about remedies,
and I think that violation was pre-August 2016, then I cannot

impose a monetary penalty."); see also Sexton's Opp'n 14 (same); Gasarch's Opp'n 13 (same).

### 2. Parties' Arguments

With the foregoing legal standard in mind, the SEC requests this Court condemn the Defendants' conduct as repeated and egregious violations "evinc[ing] a high degree of scienter." Mem. Supp. 13.  The SEC also argues that none of the Defendants have acknowledged the wrongfulness of their conduct and that they are in possession of "substantial assets to satisfy a judgment."  Id. at 14; see also id. at 3-5 (describing how the Defendants' conduct caused substantial loss to investors).

As for each of Sexton, Veldhuis, and Friesen, the SEC requests the Court impose "individual civil penalties in the amount of $1,562,603."  Id. at 14.  The SEC's proposed methodology is as follows: multiply a one-time Tier III penalty amount of $223,229 by seven since each of these three Defendants traded in seven issuers' stock –- out of the 14 -- during the five-year statute of limitations period between August 2016 and August 2021, that is, $223,229 x 7 = $1,562,603.  See id.

Sexton opposes, arguing that the SEC's position that he was involved in issuing stock from seven companies between August 2016 and August 2021 is based on "a summary witness['] alleg[ations.]"  Sexton's Opp'n 14.  Sexton also argues that the evidence, at most, demonstrates that he profited from three

27

issuers, not seven, and even then, that the passive receipt of pay checks is not, in and of itself, sufficient to restart the five-year clock for what were payments relating to conduct predating August 2016. See id. at 15. Finally, Sexton argues that in alleging that he has sufficient funds to pay a civil penalty -- $13,808,338 in frozen assets according to the SEC, see Mem. Supp. 14 -- the SEC has failed to take into account the fact that it is also asking this Court to impose disgorgement and prejudgment interest against him in the amount of $17,367,474. Sexton's Opp'n 15. Veldhuis concurs with Sexton's objections. See Kelln & Veldhuis' Opp'n 2. Friesen similarly argues that the evidence proffered by the SEC shows that he "ceased his involvement with the other defendants in or about 2015," thus before the applicable five-year window beginning in August 2016. Friesen's Opp'n 10.

As for Kelln and Gasarch, the SEC requests this Court impose civil penalties in the amount of $904,078 and $558,072, respectively. Mem. Supp. 15. For Kelln, the SEC's proposed methodology is as follows: the sum of (1) one Tier III penalty for violating Section 17(a); (2) one Tier III penalty for violating Section 10(b); (3) one Tier III penalty for aiding and abetting violations of the Securities Act by the Sharp network clients; (4) one Tier III penalty for aiding and abetting violations of the Exchange Act by the Sharp network clients; and

28

(5) one Tier I penalty for her primary violation of Section 5 of the Securities Act.  See id.  In general, Kelln concurs with Sexton's objections to the civil penalties sought by the SEC. See Kelln & Veldhuis' Opp'n 2.

For Gasarch, the SEC's proposed methodology is as follows: the sum of (1) one Tier III penalty for aiding and abetting violations of the Securities Act by the Sharp network clients; (2) one Tier III penalty for aiding and abetting violations of the Exchange Act by the Sharp network clients; and (3) one Tier II penalty for her primary violation of Section 17(a)(3) of the Securities Act.  Mem. Supp. 15.  Gasarch opposes, arguing that the SEC has failed to proffer evidence that convincingly imputes any post-August 2016 liability to Gasarch.  See Gasarch's Opp'n 13.  She further objects to the amount as excessive, contending that the jury finding regarding her aiding and abetting "could have been based on one underlying violation," not two or three, id. at 14; that her distribution of proceeds happened after the purported fraud, id.; and that she does not have the requisite financial condition to pay the requested sum, id. at 15.

### 3. Analysis

The Court agrees with the SEC's proposed methodology for calculating civil penalties against Sexton, Veldhuis, and Friesen, determining that they each ought be liable for seven Tier III violations, as their fraudulent schemes concerned seven

out of the 14 issuers during the applicable five-year period.
Another session of this Court recently adopted a similar
methodology where a civil penalty was imposed against each of
the so-called entity defendants, that is, corporations who
engaged in penny stock fraud.  See Securities and Exchange
Commission v. Knox, 2022 U.S. Dist. LEXIS 99321, *9-10 (D. Mass.
June 3, 2022) (Stearns, J.).  Similarly, this Court finds it
appropriate to impose a civil penalty against each of Sexton,
Veldhuis, and Friesen per the number of entities they utilized
to defraud unwitting investors during the five years preceding
August 2021.  The SEC asserts, and this Court agrees, that that
number is seven.

Further, that the SEC is not seeking civil penalties in
relation to stock sold through all 14 of the issuers is
congruent with this Court's statement during trial that if it is
persuaded that a violation "was pre-August 2016, then [it]
cannot impose a monetary penalty."  Tr. Motion and Charge
Conference 55:17-18.

Indeed, evidence offered by the SEC supports its contention
that seven out of the 14 issuers were involved in the fraudulent
scheme between August 2016 and August 2021.  An affidavit by
Ryan Murphy, an enforcement accountant at the SEC, submits to
this Court "[his] determin[ation] that during that time period,
Veldhuis, Sexton and Friesen traded the securities of seven of

the Fourteen Issuers: Stevia First/Vitality, Arch Therapeutics, Liberty One Lithium, NewGen Biopharma, StartMonday Technology Corp., Lexington Biosciences, and BreathTec Biomedical." Decl. of Ryan Murphy ("Decl. of Ryan Murphy II") ¶ 30, ECF No. 427. While Sexton attempts to have the Court dismiss this as an unsupported allegation of "a summary witness," Sexton's Opp'n 14, the SEC responds by drawing the Court's attention to numerous pieces of evidence from trial exhibits as well as other witness statements that show that Sexton sold stock of the seven aforementioned issuers between August 5, 2016, and August 5, 2021. See Pl.'s Reply to Sexton 11 (collecting evidence). In his sur-reply, Sexton argues that certain pieces of evidence put forward by the SEC do not meaningfully identify that it was Sexton who traded the stock of these seven issuers. Sexton's Sur-Reply 5-6. Even assuming, arguendo, that Sexton's objections have any merit, he fails to respond to witness testimony as well as other evidence relating to his involvement in these issuers. See, e.g., Tr. Jury Trial Day Two 108:19-20, ECF No. 436 (Dhillon's testimony that Seton participated in the sale of Vitality stock "in 2017 and maybe even '18"); Tr. Jury Trial Day Five 91:9-18, ECF No. 439 (Knox's testimony regarding Sexton's involvement in Vitality and Arch throughout 2018); Tr. Jury Trial Day Six 34:24-25, 35:1-2, ECF No. 440 (Knox's testimony regarding NewGen trading in 2017).

31

Sexton's remaining objections that he, at most, profited from three out of the seven issuers during the five-year period and that the penalty amount is excessive, see Sexton's Opp'n 14-15, are unavailing.  As for profits, Sexton misconstrues the law: the relevant inquiry for purposes of determining the applicable period in relation to which civil penalties are to be imposed is not whether he profited from his misconduct during the relevant period but rather whether his misconduct, that is, the illegal stock trading, occurred during that same period. See, e.g., Securities and Exchange Commission v. Cohen, 332 F. Supp. 3d 575, 591 (E.D.N.Y. 2018) ("[T]he statute of limitations runs from when Defendants allegedly engaged in misconduct, not when they received compensation in connection with that misconduct.").  Regarding the alleged excessiveness of the penalty, the SEC convincingly raises two points: (1) that the Sexton, Veldhuis, and Friesen control group generated a total amount of $31,000,000 in profits during the five-year window; and (2) that Sexton "entirely ignores the value of his significant real estate holdings and other assets not held in frozen financial institutional accounts."  Pl.'s Reply to Sexton 12.  Sexton's frozen assets already total $13,808,338 as of December 2022, according to the SEC.  Mem. Supp. 14. Accordingly, this Court overrules Sexton's objection based on

his purported financial inability to pay the requested civil penalty.

Much of the above analysis applies with equal force to Veldhuis and Friesen against whom the SEC requests identical civil penalties.  Veldhuis and Friesen, too, illegally traded in the stock of seven out of the 14 issuers during the relevant five-year period.[8]  Friesen, like Sexton, argues that the SEC has failed to establish that he engaged in illegal conduct during the five-year window, averring instead that he simply profited from some deals that transpired prior to those five years.  See Friesen's Opp'n 10-11.  The voluminous evidence provided during trial contradicts that contention.  See Pl.'s Reply to Friesen 3 (referring to numerous trial exhibits).  Indeed, evidence was put before the jury during trial that indicated Friesen's -- and Veldhuis' -- involvement in the scheme post-dating August 5, 2016.  See Pl.'s Reply to Sexton 11; see also Decl. of Ryan Murphy II ¶ 30 (documenting Friesen and Veldhuis' engagement in the trade of stocks of seven out of the 14 issuers during the applicable window).  In view of the foregoing as well as voluminous evidence from trial demonstrating that Sexton, Veldhuis, and Friesen acted in concert, the Court is persuaded

---

[8] Since Veldhuis concurs with Sexton's objections to the civil penalty sought by the SEC, see Kelln & Veldhuis' Opp'n 2, and since those objections have been overruled above, the remainder of this paragraph deals with Friesen's objections.

that these three Defendants illegally traded in the stock of seven issuers between August 2016 and August 2021.  See, e.g., Tr. Jury Trial Day Five 78, 87-88, 90; Tr. Jury Trial Day Three 13-16, 24, 41, 96-97, ECF No. 437.

The Court also agrees with the SEC that the maximum Tier III penalty is warranted for each of the seven violations.  The scheme in which Sexton, Veldhuis, and Friesen were involved, this Court finds, operated through fraud and deceit, thereby fulfilling the statutory requirement that this Court impose Tier III penalties against violations involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement."  15 U.S.C. § 77(t)(d)(2)(B).  It is also clear that their violations "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons," 15 U.S.C. § 77(t)(d)(2)(C), as it is inconceivable for the scheme these three Defendants participated in during the five-year period to not have caused actual loss, let alone a significant risk thereof.[9]

---

[9] While courts have split over the issue of whether a demonstration of actual loss is required to impose a Tier III penalty, see Lemelson, 596 F. Supp. 3d at 235 (collecting cases), this Court need not adopt a position as to that split since here it is clear that investors were defrauded through the pump-and-dump schemes.

Accordingly, the SEC's request of one Tier III penalty multiplied by seven against each of the three Defendants Sexton, Veldhuis, and Friesen is appropriate and hereby granted.  The Court imposes a civil penalty of $223,229 x 7 = $1,562,603 against each of them.

The Court also grants the SEC's proposed civil penalty against Kelln.  Pursuant to the partial judgment as to her, Kelln was ordered to "not contest liability under the claims filed by the [SEC]."  J. as to Kelln 5.  Those claims allege five different violations: (1) an independent violation of Section 17(a) of the Securities Act; (2) an independent violation of Section 10(b) of the Exchange Act; (3) aiding and abetting others in their violation of the Securities Act; (4) aiding and abetting in their violation of the Exchange Act; and (5) an independent violation of Section 5 of the Securities Act. See Mem. Supp 15; see also Am. Compl. ¶¶ 259-58, 277-85. "Liability under Section 17(a)(1) [and] Section 10(b) . . . requires materiality and scienter."  Flannery v. SEC, 810 F.3d 1, 9 (1st Cir. 2015).  Aiding and abetting securities violations, as the above discussion regarding Gasarch's aiding and abetting violation reveals, see supra pp. 21-24, requires, at a minimum, knowledge or recklessness.  As such, the first four of the five violations by Kelln, this Court finds, qualify as Tier III violations.

As for Kelln's independent violation of Section 5 of the Securities Act, because liability under thereof need not require a showing of scienter, a less severe civil penalty is appropriate.  See Securities and Exchange Commission v. Esposito, 2017 U.S. Dist. LEXIS 192120, at *5-6 (D. Mass. Nov. 21, 2017) (Burroughs, J.) (collecting cases that have held that a Section 5 violation does not require scienter); Securities and Exchange Commission v. Smith, 2015 U.S. Dist. LEXIS 86625, at *25 (D.N.H. July 2, 2015) ("Section 5 imposes no scienter requirement."); see also Mem. Supp. 15 (contending that "liability under [Section 5] does not require a showing of scienter").  Accordingly, a Tier I civil penalty for Kelln's independent and non-scienter-based violation of Section 5 is appropriate.  In sum, a Tier III civil penalty of $223,229 for each of her first four violations and a Tier I civil penalty of $11,162 for her Section 5 violation is appropriate.  This Court therefore imposes a civil penalty against Kelln in the amount of ($223,229 x 4) + $11,162 = $904,078.

As for Gasarch, the Court agrees with the SEC's proposed methodology for calculating a monetary penalty but is persuaded that a downward variance from the SEC's requested amount is appropriate.  At the outset, the Court dismisses Gasarch's contention that she merely rendered legitimate secretarial services to Sharp and, at most, just arranged the distribution

of proceeds after the fraud by other occurred.  <u>See</u> Gasarch's
Opp'n 14.  That is precisely the unwitting secretary contention
and defense mounted by Gasarch during trial that the jury
necessarily rejected in finding her liable for various
securities law violations.  Relying on the disjunctive "or"
appearing on the jury verdict, <u>see</u> Jury Verdict 2, that found
her liable for alternative aiding and abetting violations,
Gasarch contends that she is liable for, at most, two
violations: (1) an independent violation of Section 17(a)(3) of
the Securities Act and (2) one aiding and abetting violation of
securities laws.  <u>See</u> Gasarch's Opp'n 14.

Gasarch is not wrong, <u>per se</u>, to argue that the jury, in
addition to finding her independently liable for a violation of
Section 17(a)(3) of the Securities Act, may have found that she
aided and abetted just one of the two violations separated by
the disjunctive "or" on the jury slip.  Conversely, the jury may
have found Gasarch liable for aiding and abetting both
Securities Act and Exchange Act violations in addition to her
independent violation of the Securities Act.

Moreover, and more importantly, for purposes of fashioning
appropriate remedies in the context of a securities enforcement
adjudication, "[a]t the remedies stage, trial judges may make
factual findings and rely on such findings in assessing the
amount of civil penalties so long as the court's findings do not

conflict with the jury's findings as to liability." Securities
and Exchange Commission v. Life Partners Holdings, Inc., 854
F.3d 765, 781-82 (5th Cir. 2017).  At trial, this Court found
that Gasarch worked "at the hub" of the fraudulent Sharp
enterprise.  See Tr. Jury Trial Day Eight 41:10, 164:21, ECF No.
442.  In her role as Sharp's aide working "at the hub," id., she
aided and abetted the Sharp scheme clients in their violation of
both the Securities Act and the Exchange Act.  This finding does
not conflict but rather comports with and honors the jury
verdict against Gasarch.

Accordingly, this Court agrees with the SEC that she is
liable for three violations: (1) her independent violation of
Section 17(a)(3) of the Securities Act; (2) aiding and abetting
others in their violation of the Securities Act; and (3) aiding
and abetting others in their violation of the Exchange Act.  See
Mem. Supp. 15.  Further, in view of the earlier discussion that
Gasarch's aiding and abetting required scienter, see supra pp.
21-24, a Tier III monetary penalty for her two aiding and
abetting violations is appropriate.  As for her independent
violation of Section 17(a)(3) of the Securities Act, a Tier II
penalty is appropriate, as an independent violation of Section
17(a)(3) does not require a showing of scienter.  See Sharp, 626
F. Supp. 3d at 382; see also supra p. 22.

While the Court agrees with the SEC's proposed methodology for imposing a monetary penalty against Gasarch, the Court will not impose the exact amount proposed by the SEC of ($223,229 x 2)[10] + $111,614[11] = $558,072.  At least three reasons persuade this Court that a downward variance is appropriate.  First, while this Court indeed found Gasarch to be an operative of the Sharp scheme and one at its hub, <u>see</u> Tr. Jury Trial Day Eight 41:10, 164:21, her role at the hub was necessarily under the command of Sharp and also meant that she did not operate at the spoke end of the hub-and-spoke scheme, where investors were directly harmed.  Second, evidence presented at trial points to the fact that Gasarch was involved in the fraudulent enterprise not at the outset but later in time.[12]  As such, the Court finds that, at least as an initial matter, prior to joining the scheme as co-conspirator, Gasarch performed legitimate secretarial

---

[10] A total of two Tier III penalties for Gasarch's two aiding and abetting violations: one for aiding and abetting Securities Act violations and the other for aiding and abetting Exchange Act violations.

[11] One Tier II penalty for Gasarch's independent and non scienter-based violation of Section 17(a)(3) of the Securities Act.

[12] At trial, the Court stated as much: "[Gasarch] joined the conspiracy later in time than her initial employment, which candidly I think is the fact, I'm not persuaded she was a co-conspirator at that time, whenever it was, that she became employed by Sharp.  I'm not clear when she joined the conspiracy."  Tr. Jury Trial Day Eight 165:8-13.

services to Sharp.  Third, the two Tier III civil penalties
against her are in relation to Gasarch's aiding and abetting,
not independent and primary, violations.  While her aiding and
abetting required its own mental culpability and scienter,
equitable considerations demand that a lesser civil penalty be
imposed against her than other Defendants whom she aided and
abetted in their primary and scienter-based violations of the
various securities laws.  Cf. Securities and Exchange Commission
v. Zwick, 2007 U.S. Dist. LEXIS 19045, at *83-84 (S.D.N.Y. Mar.
16, 2007) (imposing a Tier III penalty against an aider and
abettor but with a downward variance because of aider and
abettor status, as opposed to being the primary violator, among
other reasons).

　　　In view of the fact that the SEC submits to this Court that
as of December 2022 Gasarch has $296,651 in frozen assets, the
Court imposes a civil penalty of $296,651 against her.[13]

---

[13] The Court observes that the civil penalty amounts
requested by the SEC are all based on inflation-adjusted figures
from 2023.  See Mem. Supp. 12.  Since the SEC moved for remedies
in December 2023, the SEC has updated its civil penalty amounts,
announcing in January 2024 its inflation adjustment figures for
2024.  See Inflation Adjustments to the Civil Monetary Penalties
Administered by the Securities and Exchange Commission (as of
January 15, 2024), SEC.gov (Jan. 16, 2024),
https://www.sec.gov/enforce/civil-penalties-inflation-
adjustments.  The question arises whether the Court ought
consider the most recent inflation-adjusted figures for 2024 or
instead ought consider the inflation-adjusted figures for 2023
used by the SEC in its calculation.

### C. Disgorgement and Prejudgment Interest Against All of the Defendants

#### 1. Legal Standard

Disgorgement is an equitable remedy that is intended to deprive a wrongdoer of his ill-gotten gains at the expense of victims. See Liu v. SEC, 591 U.S. 71, 75 (2020) (clarifying "that a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under § 78(u)(d)(5)"). Liu provided three clarifications to disgorgement law.

First, it clarified that disgorgement is non-punitive and intended to make victims whole. See id. at 74 (defining courts' power to award equitable relief as "a power that historically excludes punitive sanctions"); id. at 75 (holding that a disgorgement award "is awarded for victims"); see also Sharp, 626 F. Supp. 3d at 380 ("The Supreme Court has entrenched disgorgement's non-punitive character in the context of securities violations, by requiring that it be used to make victims whole.").

---

The parties have not raised the issue of inflation adjustment in their briefs nor during oral argument. In the interest of fairness, the Court will not adjust figures to reflect inflation for 2024, although it is highly likely that the Court has the equitable power to do so sua sponte. Cf. Weed, 315 F. Supp. 3d at 677 (taking notice of the SEC's "increasing the maximum Tier-III penalty from the statutory limit of $100,000 to account for inflation adjustments").

Second and relatedly, a disgorgement award ought be limited to a wrongdoer's "net profits," Liu, 591 U.S. at 75, calculated by "deducting legitimate expenses" from a wrongdoer's gross ill-gotten gains, id. at 1946.  The Court noted one historical exception to the rule that legitimate expenses ought be diminished from the show of profits, defining that exception as "when the entire profit of a business or undertaking results from [a] wrongful activity."  Id. at 84 (quotation omitted).

Third, Liu clarified that the general rule in awarding disgorgement is to hold wrongdoers individually liable for their personal ill-gotten gains.  See id. at 82-83 ("Equity courts also generally awarded profits-based remedies against individuals or partners engaged in concerted wrongdoing, not against multiple wrongdoers under a joint-and-several liability theory.").  Reviewing a corpus of precedents, the Supreme Court observed that a "rule against joint-and-several liability for profits that have accrued to another appears throughout equity cases awarding profits."  Id.  Still, the Supreme Court also observed that "[t]he common law did . . . permit liability for partners engaged in concerted wrongdoing."  Id. at 90.

In sum, then, "[t]he [C]ourt's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing."  Securities and Exchange Commission v. MacDonald, 699 F.2d 47, 54 (1st Cir. 1983) (en

banc) (quoting Securities and Exchange Commission v. Blatt, 583
F.2d 1325, 1335 (5th Cir. 1987)).  "[C]ourts consistently
restrict[] awards to net profits from wrongdoing after deducting
legitimate expenses[,]" Liu, 591 U.S. at 84, though it is also
possible -- under exceptional circumstances -- to dispense with
that requirement, especially if the entire business,
undertaking, or enterprise involves wrongful activity, id. at
83.

In any case, "[t]he amount of disgorgement 'need only be a
reasonable approximation of profits causally connected to the
violation.'" Securities and Exchange Commission v. Happ, 392
F.3d 12, 31 (1st Cir. 2004) (quoting Securities and Exchange
Commission v. First City Fin. Corp., 890 F.2d 1215, 1231 (D.C.
Cir. 1981)).  "The risk of uncertainty in calculating
disgorgement should fall on the wrongdoer whose illegal conduct
created that uncertainty." Id.  "Once the SEC shows that the
disgorgement is a reasonable approximation, the burden shifts to
the defendant to demonstrate that the amount of disgorgement is
not a reasonable approximation." Id.

Finally, the Court takes notice of its previous holding
regarding the applicable statute of limitations in issuing
disgorgement awards: scienter-based claims for disgorgement
require a ten-year statute of limitations whereas non-scienter-

based claims for disgorgement "continue to require a five-year statute of limitations."  <u>Sharp</u>, 626 F. Supp. 3d at 381.

### 2. Parties' Arguments

The SEC requests this Court issue disgorgement awards in the following amounts: (1) $17,367,474 against Sexton; (2) $13,289,897 against Veldhuis; (3) $11,846,176 against Friesen; (4) $1,582,785 against Kelln; and (5) $2,522,367 against Gasarch.  Mem. Supp. 1.

The SEC bases its calculation "on the sums that each of them received into their personal Q accounts of the Fourteen Issuers whose illegal trading was at issue."[14]  <u>Id.</u> at 17-18. The SEC further asserts that the applicable statute of limitations is ten, not five, years, rendering the Defendants' profits from 2011 -- not from 2016 -- onward susceptible to disgorgement.  <u>Id.</u> at 17 ("[I]t is appropriate to award disgorgement for a ten-year time period, given that each of the

---

[14] As the following discussion on the Q data will make clear, in proposing respective amounts for its proposed disgorgement awards, the SEC focuses on a specific piece of evidence presented at trial: the so-called "Q records" or "Q data" that is a compilation of internal records kept by Sharp that the SEC contends shows stock proceeds allocated to each of the Defendants that they gained throughout the course of the pump-and-dump scheme, as well as commissions received by some of them.  <u>See, e.g.</u>, Mem. Supp. 17-18, 19, 21.

Separately, because some of the transfers reflected on the Q system were made in Canadian Dollars, the SEC informs the Court that its estimate "converts all of those transfers into US Dollars, using the applicable exchange rate on the date of the transfer in the Q system."  <u>Id.</u> at 18.

Defendants was found liable, or is being held liable, for violating a statute requiring the proof of scienter as an element.").  As such, the SEC requests the Court award disgorgement based on the time period from August 5, 2011, that is, ten years before the SEC filed this present action.  Id.

The Defendants object to the SEC's position as well as the specific award amounts proposed by the SEC on numerous grounds. After having carefully reviewed their briefs and the arguments made during the hearing held on the question of remedies, the Court distills these various objections to seven separate contentions.

First, the Defendants impeach the credibility of the Q data evidence by variously characterizing it as hearsay or as a document susceptible to manipulation.  See, e.g., Sexton's Opp'n 6 (arguing that "the Court has already ruled, the database is not a business record, because, among other issues, there are not sufficient indications that the records were entered contemporaneously"); Kelln & Veldhuis' Opp'n 2 (concurring with Sexton's objections); Friesen's Opp'n 5 (characterizing Q records as inadmissible hearsay); Gasarch's Opp'n 2, 7-8 (arguing that the Q data is unreliable and unverified).  As a corollary to the objection regarding its reliability, Gasarch also contends that there is no evidence that the designations

"PEAC" or "PERE" in the Q data indicate her Q account.
Gasarch's Opp'n 4.

Second, even assuming that the Q data is reliable, the
Defendants argue, it shows, at most, the proceeds generated over
the course of a decade but, crucially, not the actual
disbursements made from the generated proceeds to the individual
Defendants.  Sexton argues that the Q system may be considered
indicative of the stock transactions that transpired, but that
there is no evidence that this data is reflective of "the
division of proceeds stemming from those transactions."
Sexton's Opp'n 7.  In furtherance of his objection, Sexton also
points out that the SEC has not presented this Court with any
"documentary evidence to corroborate the purported gains" shown
on the Q system, specifically, bank records that would verify
that the Q system transfers actually happened and were received
by the Defendants.  See id. at 4-5; see also Kelln & Veldhuis'
Opp'n 2 (concurring with Sexton's objections).  Friesen, too,
argues that the Q records, at most, indicate stock entries but
not actual transfers to each of the Defendants.  See Friesen's
Opp'n 7.

Third, the Defendants argue that the SEC has not shown that
any transfers that they may have received from trading in all 14
of the issuers are ill-gotten, and not legitimate, gains.  See
Sexton's Opp'n 8 (arguing that the SEC "has not tied funds to

46

violations of the securities laws"); Kelln & Veldhuis' Opp'n 2 (same); Friesen's Opp'n 3 (same); Gasarch's Opp'n 12 (rejecting the SEC's position that she received ill-gotten funds).

Fourth, the Defendants argue that the SEC has failed to show that disgorgement would make victims whole, as the SEC has failed to specifically point to any victims who have suffered pecuniary harm as a result of the Defendants' alleged misconduct.  Sexton avers, for example, that the SEC "has not established that there are any victims to whom disgorgement should be allocated."  Sexton's Opp'n 10; see also Friesen's Opp'n 8-9 (same); Gasarch's Opp'n 10-11 (same).

Fifth, the Defendants argue that the SEC, in relying on the sums reflected in the Q system to calculate proposed disgorgement award amounts, failed to factor out legitimate expenses and payments received by the Defendants.  Friesen agues, for example, that the Q records also show repayments, debt payments, and offsets, which the SEC has not but should have considered in its calculation.  Friesen's Opp'n 6.  Gasarch similarly contends that the SEC does not attempt to factor out "legitimate" payments to her for her secretarial services. Gasarch's Opp'n 4-5, 10.

Sixth, the Defendants contend that disgorgement is time-barred as the SEC has failed to establish that disgorgement is

tied to scienter-based conduct.  Sexton's Opp'n 11; Gasarch's
Opp'n 12 (similar).

Seventh, the Defendants argue that the SEC should have but
has not avoided double counting in its calculations, failing to
offset funds frozen or funds collected from others –- such as
Sharp, Knox, or Dhillon –- involved in the Sharp enterprise.
See ECF No. 484.

### 3. Analysis

After reading the briefs and hearing the above-mentioned
objections from Defendants during a hearing held on the question
of remedies, the Court took the issue of disgorgement and
prejudgment interest under advisement.  See id.  The Court is
now prepared to rule on the issue and for the following reasons
**GRANTS** the SEC's motion for disgorgement in its entirety,
subject to certain caps as described below, see infra pp. 56-57,
and **DENIES** its motion for prejudgment interest in its entirety.

First, the Court has previously rejected, and once again
rejects, characterizations of the Q data that seek to describe
it as hearsay.  While the Court did not make a final finding
during the course of the trial, it intimated that it was
prepared to admit the Q system into evidence under the business
records exception to the rule against hearsay.  See generally
Tr. Jury Trial Day Four 69-72, ECF No. 438 (the Court, upon
hearing from witness testimony, holding that the Q data "would

48

seem to satisfy the business records exception"; noting that not "anyone could write in the book"; holding that the Q data "satisfies the requirements of a business record"); see also Tr. Hr'g Disgorgement 24:8-11, ECF No. 491 (the Court holding during the hearing on remedies that "[t]his Court is satisfied that the Q system records qualify as business records under the federal rules of evidence"). Thus, the Q system is admissible evidence and not hearsay.

Further, the Defendants' efforts to describe the Q data as easily manipulable are unavailing. See, e.g., Tr. Jury Trial Day Two 10:15-16 (Gasarch contending that Sharp "had the power as the administrator to change all the Q data"); id. at 21:11-12 (Friesen describing the Q system data as Sharp "sort of inputting data apparently in any way that he sees fit"); see also id. at 21:18-19 (Friesen arguing that the Q system data "is not a believable, authentic, reliable recitation of anything"); Tr. Jury Trial Day Nine 61:2 (Gasarch calling the Q data "garbage"). That Sharp may have been the main administrator of the Q system, see, e.g., Tr. Jury Trial Day Seven 129:3, ECF No. 441 (witness testimony characterizing the Q system as "[Sharp]'s own accounting system"), does not by itself demonstrate that the data has been unreliably manipulated.

The SEC has compared the Q data to independent brokerage records, Decl. of Ryan Murphy I ¶ 15, and the comparison has

returned a very high rate of accuracy.  As the affidavit of Ryan
Murphy indicates, the comparison between Q data for each of the
14 issuers and independent brokerage records has confirmed the
reliability of Q data with considerable accuracy: (1) 95% for
Stevia First/Vitality, id. ¶ 17; (2) 94% for Echo Automotive,
id. ¶ 20; (3) 97% for Arch Therapeutics, id. ¶ 23; (4) 100% for
Stevia Corp., id. ¶ 26; (5) 95% for Liberty One Lithium Corp.,
id. ¶ 29; (6) 96% for Oryon Technologies, id. ¶ 31; (7) 100% for
Makism 3D Corp., id. ¶ 33; (8) 98% for Graphite Corp., id. ¶ 35;
(9) 97% OncoSec Medical Inc., id. ¶ 37; (10) 97% for NewGen
Biopharma Corp., id. ¶ 39; (11) 91% for StartMonday Technology
Corp., id. ¶ 41; (12) 100% for Lexington Biosciences Holdings
Corp., id. ¶ 43; (13) 100% for BreathTec Biomedical Inc., id. ¶
45; and (14) 75% for RightsCorp., id. ¶ 47.  While the
Defendants are correct to argue that only a sample, and not all,
of the brokerage records and Q transactions were compared, they
do not meaningfully challenge, much less demonstrate, how the
sample is not representative.  Securities and Exchange
Commission v. Commonwealth Equity Servs., LLC, 2024 U.S. Dist.
LEXIS 59361, at *28 (D. Mass. Mar. 29, 2024) (Talwani, J.)
(rejecting the argument that the SEC's sample was "cherry-
picked").  Accordingly, the Q record, as a comparison with
independent brokerage records confirms, is a detailed and highly

accurate representation of the funds generated by the Sharp pump-and-dump schemes.

The Court is further persuaded that the Q data is highly accurate since evidence presented at trial demonstrated that Q system entries were made very close in time to the illegal trading that occurred.  See, e.g., Tr. Jury Trial Day Six 49:9 (witness testimony that Q entries were made within "less than 24 hours" following trade).  The Court therefore finds the Q data reliable and credible evidence of the proceeds generated through the illegal trading that occurred with respect to the 14 issuers.

Second, the Court rejects the Defendants' contention that there is no evidence that the proceeds recorded in the Q system were actually disbursed and distributed to and received by the Defendants.  To be sure, the Defendants are correct to point out that the SEC compared the Q data to independent brokerage records but did not "look at any bank records."  Tr. Jury Trial Day Eight 150:22 (SEC analyst testifying that he did not look at bank records to confirm receipt of the proceeds by the Defendants).  The Defendants repeatedly emphasized this point during the hearing on remedies.  See Tr. Hr'g Disgorgement 16:12, 17:1, 20:21-22, (mentioning the lack of evidence that the Defendants "actually received money"; that there are no "funds received were by us"; and asking the Court to focus on "what the

individual actually received"). Moreover, witness testimony at trial seemed to indicate that not all of the proceeds generated by the pump-and-dump scheme actually went to the Defendants. See, e.g., Tr. Jury Trial Day Seven 89.

The SEC notes that the Q system shows the transfers of illegal stock sale proceeds from the issuer accounts into each of the Defendants' personal accounts, and that the system shows, just like a bank account would, the Defendants paying their mortgages, paying the expenses of their family members, and making other transfers. See Tr. Hr'g Disgorgement 26:9-17. This, while true, does not change the fact that the SEC has not submitted any bank records to this Court that show actual receipt of funds by the Defendants.

Having carefully reviewed the record and considered the question of the lack of bank records showing actual receipt of funds by the Defendants, this Court is persuaded, for the following reasons, that the balance of equities favors the awarding of the disgorgement amounts requested by the SEC. First, the Q data's high degree of internal accuracy as to the proceeds generated counsels a similar finding of accuracy as to its figures regarding the money going into the Defendants' personal Q accounts, especially because the Defendants failed to argue, much less show, that there is money in their accounts in the Q system that still remains there. See Happ, 392 F.3d at 31

(burden of proof shifting to defendants once SEC makes a reasonable approximation).

Second, the production of bank records confirming actual receipt of funds, to this Court's knowledge, has never been declared a <u>sine qua non</u> before finding the SEC's disgorgement calculation reasonable.  Rather, courts in this district and in others have looked at bank records in combination with other evidence and sometimes have not looked at bank records at all. <u>See, e.g.</u>, <u>Securities and Exchange Commission</u> v. <u>Lazare Indus.</u>, 294 Fed. Appx. 711, 715 (3d Cir. 2008) (holding that the defendants' argument that the district court "abused its discretion in fixing the amount of disgorgement because the SEC did not offer bank records showing that defendants actually received the amounts memorialized on the subscription agreements" "lacks merit"); <u>Securities and Exchange Commission</u> v. <u>Eiten</u>, 2014 U.S. Dist. LEXIS 139428, at *3 (D. Mass. Sept. 30, 2014) (O'Toole, J.) (finding the SEC's disgorgement calculation based on "bank records, other financial information, and documents" reasonable).

Third and most importantly, in cases involving concerted wrongdoing, joint and several liability may be appropriate, in which case the ill-gotten gains subject to disgorgement need not

accrue to each defendant individually.[15]  Cf. Securities and
Exchange Commission v. San Francisco Reg'l Ctr. LLC, 2019 U.S.
Dist. LEXIS 4983, at *9-10 (N.D. Cal. Jan. 10, 2019) (rejecting
the SEC's contention that the court can disgorge profits
accruing to a defendant that "it never had" because SEC failed
to articulate a conspiracy claim and that the defendant was "a
participant in the wrongdoing").  Here, the Defendants were co-
conspirators within a hub-and-spoke model: Gasarch conspired
with Sharp; Kelln conspired with Sharp; and Sexton, Veldhuis,
and Friesen conspired with each other and with Sharp as part of

---

[15] Here, the Court notes that the antecedent question may
arise as to whether joint and several liability is permissible
in the context of disgorgement.  As noted above, Liu, while
articulating the default rule of individual liability in the
disgorgement context, still carved out an exception applicable
to instances of "concerted wrongdoing."  Liu, 591 U.S. at 90.
Further, the Liu Court eschewed "wad[ing] into all the
circumstances where an equitable profits remedy might be
punitive when applied to multiple individuals[,]" id. at 91,
remanding the case to the lower court instead so that it could
determine whether joint and several liability would be
appropriate, "[g]iven the wide spectrum of relationships between
participants and beneficiaries of unlawful schemes—from equally
culpable codefendants to more remote, unrelated tipper-tippee
arrangements."  Id.  As such, the Liu Court recognized the
permissibility of assigning joint and several liability to
defendants engaged in concerted wrongdoing.

Post-Liu, at least two sessions of this Court have held
securities law offenders jointly and severally liable for
disgorgement.  See Knox, 2022 U.S. Dist. LEXIS 99321, at *11
("The interchangeable role the Entity Defendants played within
the scheme makes joint and several liability appropriate."); see
also Securities and Exchange Commission v. Gomes, 2022 U.S.
Dist. LEXIS 191457, at *19-20 (D. Mass. Oct. 20, 2022) (Saylor,
C.J.).

specific pump-and-dump schemes.  As such, joint and several

liability is appropriate: Gasarch is jointly and severally

liable with Sharp; Kelln is jointly and severally liable with

Sharp; and Sexton, Veldhuis, and Friesen are jointly and

severally liable with Sharp.  Given that Sharp was a co-

conspirator in each of the conspiracies, the ill-gotten gains

need not have accrued personally to each of the Defendants --

that they may have partially or entirely accrued to Sharp

suffices to award disgorgement.  See Securities and Exchange

Commission v. Platforms Wireless Int'l Corp., 617 F.3d 1072,

1098 (9th Cir. 2010) ("We hold that the district court did not

abuse its discretion in holding Martin jointly and severally

liable with Platforms.  We have never held that a personal

financial benefit is a prerequisite for joint and several

liability."); see also Securities and Exchange Commission v.

Monterosso, 756 F.3d 1326, 1337-38 (11th Cir. 2014)

("[Defendant] argues it would be inequitable to hold him liable

for disgorgement when he did not receive proceeds.  The Ninth

Circuit, however, has stated, and we agree, a personal financial

benefit is not a prerequisite for joint and several liability."

(quotations omitted)).

The Court, in exercising its "broad discretion not only in

determining whether or not to order disgorgement but also in

calculating the amount to be disgorged[,]" Securities and

Exchange Commission v. Druffner, 802 F. Supp 2d 293, 297 (D.
Mass. 2011) (Gorton, J.) (quotation omitted), will, however, cap
the individual amount that may be disgorged from each of the
Defendants, notwithstanding their joint and several liability,
at the following amounts requested by the SEC based on the Q
system data: (1) $17,367,474 against Sexton; (2) $11,846,176
against Friesen; (3) $13,289,897 against Veldhuis; (4)
$1,582,785 against Kelln; and (5) $2,522,367 against Gasarch.

Third, the Court finds the remaining objections raised by
the Defendants unavailing.  As evidence submitted to this Court
as well as presented during trial indicates, the proceeds
reflected in the Q system are, absent any showing to the
contrary proffered by the Defendants, generated by illegal pump-
and-dump schemes that involved 14 different issuers.

Additionally, the argument the SEC has failed to show any
victims is premature: the SEC has agreed in writing, see, e.g.,
Mem. Supp. 22-24, and verbally represented to this Court during
the hearing on remedies, see ECF No. 482, that a plan can and
will be submitted to the Court, to its satisfaction, detailing
plans to return the disgorged funds to the harmed investors.

The objection that disgorgement is time-barred is also
without merit, as all of the Defendants acted with varying
degrees of scienter, rendering the applicable statute of
limitations ten, not five, years.  Finally, as to offsetting

legitimate expenses, the Defendants' objections are, again, unpersuasive for two reasons.  First, the Defendants do not meaningfully counter the SEC's calculation by any showing how certain payments were indeed legitimate, bearing in mind the SEC's obligation is to formulate a "reasonable approximation." Happ, 392 F.3d at 31.  Second, even though there may have been incidental expenses that could be offset, the exception articulated in Liu that offsetting or diminishing legitimate business expenses is not necessary where the enterprise itself is fraudulent, see Liu, 591 U.S. at 83-84, is applicable here.

For the foregoing reasons, the Court holds the Defendants jointly and severally liable as follows:

- Gasarch is jointly and severally liable with Sharp for disgorgement in the amount of $2,522,367;

- Kelln is jointly and severally liable with Sharp for disgorgement in the amount of $1,582,785; and

- Sexton, Veldhuis, and Friesen are jointly and severally liable with Sharp for disgorgement in the amount of $42,503,547; provided, however, that the amount to be disgorged from Sexton, Veldhuis, and Friesen will be capped at, and shall not exceed, $17,367,474, $13,289,897, and $11,846,176, respectively.

The disgorgement awards are, of course, subject to the SEC's submission, and this Court's approval, of a plan detailing

how the disgorged funds will be returned to the harmed
investors.

### 4. Prejudgment Interest

"Prejudgment interest, like disgorgement, prevents a
defendant from profiting from his securities violations."
Sargent, 329 F.3d at 40 (internal quotations omitted).  "An
award of prejudgment interest is based on consideration of a
variety of factors, including the remedial purpose of the
statute [involved], the goal of depriving culpable defendants of
their unlawful gains, and . . . unfairness to defendants."  Id.
(citing Securities and Exchange Commission v. First Jersey
Securities, 101 F.3d 1450, 1477 (2d Cir. 1996)).  The award of
prejudgment interest in securities violations prevents a
defendant from "receiving the benefit of what would otherwise be
an interest-free loan."  Druffner, 802 F. Supp. 2d at 298.

Here, the SEC seeks prejudgment interest against all five
Defendants.  See Mem. Supp. 24.  The SEC "computed prejudgment
interest using the IRS underpayment rate, compounded quarterly
on defendants' net proceeds for each calendar year separately,
assuming (favorably to the defendants) that each year's net
profit was received on the last day of the year in which it was
received into each defendant's personal Q account."  Id. at 25.
The end date for the SEC's calculation is August 5, 2021, when
the SEC obtained the asset freeze against the Defendants.  See

id.  The IRS methodology for calculating prejudgment interest is
one which other sessions of this Court have previously
determined to be appropriate.  See, e.g., Commonwealth Equity
Servs., LLC, 2024 U.S. Dist. LEXIS 59361, at *34; Securities and
Exchange Commission v. Esposito, 260 F. Supp. 3d 79, 83 (2017)
(Burroughs, J.).

Accordingly, the SEC asks that the Defendants pay the
following amounts in prejudgment interest: (1) $5,872,145
against Sexton; (2) $4,314,031 against Veldhuis; (3) $4,057,737
against Friesen; (4) $460,687 against Kelln; and (5) $646,366
against Gasarch.  Mem. Supp. 25.

The Defendants do not meaningfully oppose, having instead
focused their objections on the SEC's request for disgorgement.
Sexton argues, however, that the SEC "has not presented any
evidence that [he] invested any funds or even placed them in an
interest-bearing account."  Sexton's Opp'n 13.  Sexton
misconstrues the law here: a showing of the defendant gaining
interest on the ill-gotten funds is not necessary for the Court
to award prejudgment interest.  The very act of obtaining and
retaining ill-gotten funds is enough for defendants to benefit
from what resembles an interest-free loan: a showing that the
Defendants used ill-gotten funds to make more money out of it is
not necessary.  Cf. Druffner, 802 F. Supp. 2d at 298 ("The

defendants derived direct monetary benefit from their misrepresentations and retained those profits unjustly.").

Because this Court holds the Defendants jointly and severally liable as described above, see supra pp. 54, 56, however, the imposition of prejudgment interest is not equitable.  In holding the Defendants jointly and severally liable, the Court noted above that the ill-gotten gains need not have accrued to each of the individual offenders, see supra p. 54, and noted further that it suffices in the context of disgorgement for ill-gotten gains to have accrued to one or more of the co-conspirators.

The institution of prejudgment interest is premised, on the other hand, on the notion that a wrongdoer derives direct monetary benefit by unjustly "retain[ing]" profits.  Druffner, 802 F. Supp. 2d at 298.  While the Q data evidence, verified by external brokerage records, persuades this Court that ill-gotten gains have been generated by the pump-and-dump scheme perpetrated by the Defendants -- irrespective of to whom among the co-conspirators the proceeds accrued -- thereby necessitating disgorgement, the same data does not show that ill-gotten gains have been obtained and retained by the individual Defendants, much less in the amounts requested by the SEC.  Where actual accrual to each of the Defendants cannot be shown and where it is entirely possible that at least a portion

of the ill-gotten gains may never have reached the pockets of individual Defendants, it is not possible to speak with any reasonable degree of certainty that the Defendants benefited from what resembled an "interest-free loan." Sargent, 329 F.3d at 41.

Additionally, and equally importantly, as "[t]he decision whether to grant prejudgment interest [is] confided to the district court's broad discretion," Sargent, 329 F.3d at 40 (quotation omitted), this Court, in view of having issued injunctive relief, imposed monetary penalties, and awarded disgorgement, is satisfied that the foregoing relief will serve a significant remedial purpose.  Going any further and awarding prejudgment interest, in the absence of a precise determination as to the amount of ill-gotten gains actually obtained by the individual co-conspirators in the various conspiracies, may occasion unfairness to defendants.  Having weighed these factors, the Court will not award prejudgment interest.  Cf. id. at 40-41 (upholding a district court's finding of joint and several liability in the context of disgorgement, its disgorgement award, and its refusal to award prejudgment interest).

For the foregoing reasons, this Court **DENIES** the SEC's motion for prejudgment interest.

**IV.  CONCLUSION**

Pursuant to the proposed judgments by the SEC, see ECF No. 485, which this Court hereby incorporates into this memorandum and order, injunctive relief will issue forthwith.

Civil penalties imposed against the Defendants in these amounts:

- Sexton: $1,562,603

- Friesen: $1,562,603

- Veldhuis: $1,562,603

- Kelln: $904,078

- Gasarch: $296,651

Such sums will be payable to the SEC within 30 days after entry of this memorandum and order, and together with it, entry of the incorporated judgments as to the Defendants.

Disgorgement, is ordered as follows:

- Gasarch is jointly and severally liable with Frederick L. Sharp ("Sharp") for disgorgement in the amount of $2,522,367;

- Kelln is jointly and severally liable with Sharp for disgorgement in the amount of $1,582,785; and

- Sexton, Veldhuis, and Friesen are jointly and severally liable with Sharp for disgorgement in the amount of $42,503,547; provided, however, that the amount to be disgorged from Sexton, Veldhuis, and Friesen will be capped at, and shall not exceed, $17,367,474, $13,289,897, and $11,846,176, respectively.

The disgorgement awards shall be subject to the SEC's submission, and this Court's approval, of a plan detailing how the funds disgorged will be used to make victims whole.  The SEC shall submit said plan in due course and without any unreasonable delay.

No prejudgment interest will be awarded.

For the reasons elucidated above, the Court **GRANTS** the SEC's motion for remedies in part, ECF No. 425.


**SO ORDERED.**


                              /s/ William G. Young
                              WILLIAM G. YOUNG
                                    JUDGE
                                   of the
                              UNITED STATES[16]

---

[16] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 46 years.